October 18, 2010

Hon. Edward R. Korman
Senior United States District Judge
United States District Court
Eastern District of New York
225 Camden Plaza East
Brooklyn, NY 11201

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAR 04 2011 ★

BROOKLYN OFFICE

Dear Judge Korman:

I am the wife of Joseph Yannai. He appeared before you twice: Once when you discussed his eligibility to have a public defender and the second time, last Friday, in a bail hearing.

I don't know whether it is appropriate for a wife to address a judge in a letter, or even if you are interested in reading my letter. If the answer is no, then I ask that you stop reading, and please, don't hold it against my husband.

Joseph is in jail now for almost 3 months and you are about to decide on Thursday whether I will be able to take him home with me.

For almost two years he was free and never thought of running away from the law, although he knew he was going to be arrested and tried. For the first two months, before his arrest by the State of New York, he could have left the country to any destination in the world. He did not, even though the ADA in his case, Ms. Audrey Stone, had already informed Joseph's lawyers that he was going to be arrested one day. When she informed his lawyers that "his time has come", he went by himself to a State Police office, where he was arrested and brought before a Pound Ridge judge (the town of our residence).

He was released on $100,000 bail of which we had to pay the bondsman $45,000 (and would receive back only $35,000). For more than a year and a half he was free on bail and he did not run.

During this time we found out that a Federal Grand Jury was convened in Joseph's case. Ms. Stone admitted the fact that she alerted the Feds to my husband's case and provided them with all the material in her files, but she informed my husband's attorneys that there would be two trials simultaneously, one in State Court and one in Federal Court.

And still, knowing for months that there would now be two trials, Joseph did not run away.

As to my husband's attempted suicide, the obvious question that was asked of me since that awful day, when I saw my heart dying in front of my eyes and there was nothing I could do about it, was: "If he were afraid of jail why didn't he run when he could?" The answer is plain: He was not afraid of dying. My husband participated in four wars in his native country before he chose the US as his new home. Even after being here more than 20 years, when the recent war broke out in which Lebanon was bombarding the Northern part of his former country, my husband learned from the press that the streets of the "empty" towns and villages in the north were overrun with the pets left behind by their owners who had quickly evacuated. He went back to the country he left two decades earlier to manage and lead volunteers into the north to save these cats and dogs from hunger and dehydration, wounds inflicted from the bombs, by bringing them to safety. Night after night he did this in the midst of constant bombardment. I used to call him several times a day on his cell. I will never forget the night I called and heard the bombs very close to my ear. A person like that will not take his own life because he is afraid of jail.

So why did he try to kill himself. We spoke about it in the hospital where they took him, in visits in jail I have had with him since, and in our exchanges of letters and e-mails. The reason was his worries about me and my future. There are a lot of differences between my husband and me, between a 19 year old soldier, when I was born, from a well-off family in an affluent suburb of Tel Aviv, and a girl who grew up in a lower middle class Italian family in East Harlem, NY. We are from different cultures, different social backgrounds, different life experiences, different faiths, and different generations. Although my family was not supportive and most boycotted the wedding as I am Catholic and Joseph is Jewish, yet the depth of our love for each other, from the start, is what brought us together and it has grown with every day of our lives together for these 20 years of our marriage. It is an unshakeable, profound love.

When more than a year later it was obvious that the Feds were going to also prosecute Joseph, it became evident to him that we would not be able to finance this craziness. At that time we believed he would be facing two trials simultaneously. That was the information that was given to his lawyers by ADA Stone (the State only dropped its case weeks after the arrest by the Feds). He already knew that we would have to pay between $100,000 to $150,000 additional money to the lawyers handling the State case. The least expensive estimate for the Federal case was $300,000, plus daily trial expenses, once the trial started. We would also have to post bail for the Federal charges and he knew that the bail we already posted for the State case would not be returned to us for a long time. That would have amounted to nearly three quarters of a million dollars, which we did not have.

Win or lose, Joseph knew that we would have lost our home and still be in debt for many years. So why did he try to "escape" via suicide? He realized that a situation was created in which he faced a lose-lose proposition. He felt that even if he won, he would actually have lost and, by that, jeopardize my future, and to that he couldn't agree. He spent the last 25 years, in every possible effort, to make me happy and to secure my livelihood after he would be gone naturally. So, Joseph's attempt to die was for me. He wanted to save me from overwhelming debt, to be able to keep the house we both love so much, and for me to be as happy as I could be. In his eyes, he thought that anyhow he is at the end of his life (he is now 66) and that I, being 19 years younger, have my future ahead of me. He was, of course, wrong.

In my eyes, he has decades of good living to share with me, and I don't have a life without him. He is my existence and the source of my happiness.

I implore you, Judge, please let him out of jail on bail. Joseph understands now that I am not afraid of my future. He isn't afraid of his future, and never was. We are both determined to fight the charges with the help of his two very capable public defenders who have been assigned to his case. I am placing my house as a guarantee that he will not jump bail. I am also signing as being responsible for him not jumping bail as well as the signatures of my sister and brother-in-law.

There is no possibility that he will run, not only because it is not in his nature to run, but also because he loves me so much and he would not do anything to endanger me.

I thank you,

Elena Fusillo