UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X    Docket#
UNITED STATES OF AMERICA,      :    10-cr-594(ERK)
                               :
    - versus -                 :    U.S. Courthouse
                               :    Brooklyn, New York
JOSEPH YANNAI,                 :
              Defendant        :    May 23, 2011
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES SENIOR DISTRICT JUDGE

**A    P    P    E    A    R    A    N    C    E    S:**


**For the Government:**          **Loretta E. Lynch, Esq.**
                                 United States Attorney

                            BY:  **Daniel A. Spector, Esq.**
                                 **Hillary Jager, Esq.**
                                 Assistant U.S. Attorney
                                 271 Cadman Plaza East
                                 Brooklyn, New York  11201

                                 **Audrey Stone, Esq.**
                                 Westchester County
                                 District Attorney's Office
                                 111 MLK, Jr Blvd
                                 White Plains, NY 10601

**For the Defendant:**           **Michael Schneider, Esq.**
                                 **Heidi Cesare, Esq.**
                                 **Ben Silverman, Esq.**
                                 Federal Defenders Division
                                 16 Court Street
                                 3rd Floor
                                 Brooklyn, NY 11241

**Transcription Service:**       **Transcription Plus II, Inc.**
                                 3859 Tiana Street
                                 Seaford, N.Y. 11783
                                 Lafertype@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  <u>United States of America v. Joseph</u>

2  <u>Yannai</u>.

3          Your appearances, counsel.

4          MR. SPECTOR:  Good morning, your Honor.  Daniel

5  Spector for the government.

6          MS. STONE:  Audrey Stone for the government.

7          MS. JAGER:  And Hilary Jager for the United

8  States.

9          Good morning, your Honor.

10          THE COURT:  All right.  Has there been anything

11  in the newspaper since the jury was selected?

12          MR. SCHNEIDER:  Yes.

13          THE COURT:  It has.  All right.

14          MR. SCHNEIDER:  Federal Defenders by Michael

15  Schneider for Mr. Yannai.

16          MS. CESARE:  Heidi Cesare Federal Defenders.

17          MR. SILVERMAN:  Ben Silverman for Mr. Yannai.

18          MS. CESARE:  Good morning, Judge.

19          THE COURT:  All right.  Bring in the jury.

20          THE CLERK:  Judge, the record should reflect

21  that there was a request by alternate number 3 to be

22  excused.  I have a letter form her employer.  Counsel had

23  indicted that they have no problem excusing her and I did

24  so down in the jury room.

25

3

Proceedings

1          (Jury enters the courtroom.)

2          THE CLERK:  Please be seated.

3          THE COURT:  Ladies and gentlemen, during the

4    jury selection process, Judge Pollak who selected the

5    jury instructed you that you are not to view any media

6    regarding this case.  And this prohibition included

7    newspapers, radio, televison and the internet.  Has

8    anyone seen any news about this case since you were last

9    here on May 9, 2011?

10          (No response.)

11          THE COURT:  Any reason why the jury should not

12    be sworn?

13          MR. SCHNEIDER:  No.

14          MS. STONE:  No, your Honor.

15          THE COURT:  Okay.  Could you swear the jury?

16    (JURY SWORN)

17          THE COURT:  Ladies and gentlemen of the jury,

18    we're about to begin this trial of this criminal case of

19    which you have heard something during the process of jury

20    selection.  Before the trial begins, however, there are

21    certain things I wish to tell you which will help you

22    understand what will be presented before you and how you

23    should conduct yourselves during the trial.

24          To begin with, you are here to administer

25    justice in this case according to the law and the

4

Proceedings

1   evidence with complete fairness and impartiality and

2   without bias, prejudice or sympathy for or against the

3   government or the defendant.

4           This is important to the defendant who is

5   charged with a crime and has the constitutional right to

6   receive a fair trial.  The case is also important to the

7   government since the enforcement of the criminal laws is

8   important.

9           This case is based on an indictment which was

10  read to you by the magistrate and to which the lawyers

11  will refer during their opening statements and which you

12  will have in the jury room when you deliberate.

13          An indictment is simply the document by which a

14  criminal action is commenced.  It is merely an

15  accusation, a charge.  It is not evidence of the

16  defendant's guilt.  Since the defendant has pleaded not

17  guilty, the government has the burden of proving each of

18  the essential elements in the indictment beyond a

19  reasonable doubt.  And the purpose of this trial is to

20  determine whether the government can meet its burden of

21  proof.

22          A defendant does not have to prove his

23  innocence.  On the contrary, the defendant is presumed to

24  be innocent of the accusations contained in the

25  indictment.

5

Proceedings

1          The trial will proceed in the following order.

2    The parties will have an opportunity to make opening

3    statements.  The government will make such a statement.

4    Then the defendant, though he is not obliged to, may

5    through his attorney, make such a statement or may defer

6    it until the end of the government's case.  What is said

7    in these statements is not evidence but simply an

8    introduction to the evidence which the parties intend to

9    produce.

10          Second, the government will introduce evidence

11   in support of the charges and then the defendant may

12   present evidence but is not required to do so.  The

13   burden is always on the government to prove every element

14   of the offense charged beyond a reasonable doubt.  The

15   law never imposes on the defendant in a criminal case the

16   burden of calling any witnesses or of introducing any

17   evidence at all.

18          Fourth, after all of the evidence has been

19   presented, each party has the opportunity to present

20   argument in support of their case.  What is said in these

21   arguments is not evidence.  They simply present to you

22   the contentions of the parties as to what the evidence

23   has shown and the inferences that may be drawn from the

24   evidence.

25          The government will have the right to make the

6

Proceedings

1  open and closing argument.  The government gets to make

2  the closing argument because it has the burden of proof,

3  and is therefore entitled to the last word in the process

4  of summations.

5           Finally, I will instruct you on the applicable

6  law and you will then retire to consider your verdict.

7  Your verdict must be unanimous as to each count of the

8  indictment and regardless of whether the verdict is

9  guilty or not guilty.

10          You have a tremendously important task as

11  jurors.  It is to determine the facts.  Our Constitution

12  gives the defendant a right to have you, who are members

13  of the community, find those facts.  You, and not I, are

14  the sole judges of the facts.  I shall try to preside

15  impartially and not to express any opinion concerning the

16  facts.

17          However, if at any time I should make a comment

18  with respect to the facts, you may disregard it.  It is

19  your judgment as to the facts, not mine which controls.

20  As the sole judge of the facts, you must determine which

21  of the witnesses you believe, what portion of their

22  testimony you accept and what weight you attach to it.

23          Where an objection to a question is sustained,

24  you should disregard the question and draw no inference

25  from its wording about the answer that might have been

7

Proceedings

1  given.  Where the question was answered before the

2  objection was sustained, you should ignore the answer.

3  Where an objection is overruled, evidence then received

4  has no special weight just because it was unsuccessfully

5  objected to.

6          You must not consider anything you may have

7  heard or read about the case outside the courtroom

8  whether before or during trial.  And specifically, I also

9  instruct you that you are prohibited from discussing this

10 case with anyone until the case is over.  This means that

11 you cannot talk about it in person, over the phone or by

12 e-mail.  You cannot discuss the case in any way on

13 Facebook, My Space, Twitter or any other special social

14 media account until the case is over.  In other words,

15 please do not make any internet communications or posting

16 about this case or your role as jurors.  There can't be

17 any communications oral or over the internet about this

18 case while the trial is going on.

19         And please, finally, do not do any internet

20 research.  The case must be decided solely on the basis

21 of the evidence that you hear in this courtroom.

22         Now the instruction that I gave you that you

23 should not discuss the case with anyone until the case is

24 over, that that may sound counterintuitive.  Sitting on a

25 jury is an interesting experience.  It's a unique

8

Proceedings

1   experience and it's really something that you do want to

2   talk to people about.  And the reason we ask you not to

3   is that we're concerned about the influence that other

4   people will have over you who are not in the courtroom

5   and haven't heard all the evidence.  If you start talking

6   about the case, people start giving you their own

7   opinions and before you know it, you know, you have a

8   thirteenth, fourteenth, fifteenth or twentieth juror.

9   And we want you to decide the case based solely upon what

10  you hear in this courtroom.

11          You should also not discuss the case amongst

12  yourselves during the course of the trial and that's

13  counterintuitive, ladies and gentlemen because what

14  brings you here together is this case and that for the

15  moment is all that you may have in common.  And since

16  you're sitting here listening to evidence, during a

17  recess or while you're waiting for court to begin, it's

18  only natural that when you might want to talk about the

19  case and we ask you not to do that for the same reason I

20  asked you not to talk to anyone else about the case.  If

21  you start talking with each other before the case is

22  over, you may come to some conclusions which are

23  preliminary but which may affect your judgment before

24  you've heard all of the evidence, the lawyers' arguments

25  and my instructions on the law. So, I ask you not to

9

Proceedings

1   discuss the case among yourselves and that's the common
2   sense rule.  What I mean by that is don't talk about
3   whether you believe a witness or disbelieve a witness, or
4   whether you think the defendant is guilty or not guilty.
5   That doesn't mean you can't discuss what the courtroom
6   looks like, what the lawyers look like.  It's a common
7   sense rule which I have given you which is intended
8   really to prevent you from discussing the merits of the
9   case before you've heard all the evidence.
10  Now, no statement, ruling, remark or comment which I may
11  make during the course of the trial is intended to
12  indicate any opinion as to how you should decide the case
13  or influence you in any way in your determination of the
14  facts.
15          At times, I may ask questions of witnesses.  If
16  so, it is for the purpose of bringing out matters which I
17  feel should be brought out or clarified and not in any
18  way to indicate an opinion about the facts or to indicate
19  the weight that you should give to the testimony of the
20  particular witness.
21          Now, there are several rules which should
22  govern your conduct during any recesses.  You will not be
23  required to remain together while the court is in recess
24  but you are required to follow these instructions about
25  recesses about recesses.

Proceedings

1          First, do not discuss the case amongst

2  yourselves or with anyone else, as I told you. You should

3  keep an open mind reaching your conclusion, only during

4  your final deliberations and after all the evidence is in

5  and you have heard the attorney's summations and my

6  instructions on the law, and then only after an

7  interchange of views with other members of the jury.

8          Second, do not permit any other person to

9  discuss the case in your presence and if anyone does that

10  even though you tell them not to, you should also report

11  that fact to me.  You can tell my case manager, Paula

12  Susi or one of my law clerks.  You should not, however,

13  discuss with your fellow jurors either that fact or any

14  other fact that you feel necessary to bring to my

15  attention.

16          And third, though it is a normal human reaction

17  to talk with people with whom one is thrown into contact,

18  please do not do so whether in the courtroom, in the

19  hallways, in the elevator, outside or anywhere else with

20  any of the parties or their attorneys or any witness.

21  By this I mean not only do not talk about the case but do

22  not talk at all, even to pass the time of day.

23          Those of you who have been selected as

24  alternate jurors should listen just as carefully and as

25  conscientiously as the other jurors.  You may very well

11

Proceedings

1    be called upon prior to the conclusion of the case to

2    take the place of one of the jurors.  And then you will

3    have to render a verdict.  So, please pay strict

4    attention at all times.

5            Ladies and gentlemen, I understand the

6    magistrate told you that we would be sitting until 5:15.

7    That was not what I told her she should say.  I try to

8    move this case as quickly as possible. Sometimes if I can

9    finish a witness by staying a little bit later and not

10   have to bring the witness back, I do that partly out of

11   courtesy to the witness and partly out of desire to move

12   the trial along.

13           If I stay here a little later every day it

14   means we'll finish earlier.  And so, I use my judgment

15   about when we recess.  I don't have a strict time to

16   recess.  And I would also appreciate if that nobody --

17   there are at least two jurors who were not here by 10

18   o'clock when I wanted to start and that makes it also

19   difficult for me to -- I don't scream at jurors who are

20   late.  I urge you to try and be here on time but it also

21   accounts for the fact that sometimes you're going to have

22   to work later.  All right.

23           The opening statements -- we'll now begin the

24   opening statements.  The first statement will be made by

25   Audrey Stone, who is an Assistant United States Attorney

12

Ms. Stone - Opening Statement

1   and who will be one of the attorneys trying the case on

2   behalf of the government.

3           MS. STONE:  Good morning, your Honor.  Thank

4   you.  Ladies and gentlemen, from 2003 to 2009, the

5   defendant, Joseph Yannai, lured young women from across

6   the globe to his home in the small town of Pound Ridge,

7   New York.  His intent was clear; to use fear, force and

8   coercion to sexually exploit them for his own personal

9   gratification.  He lied in order to persuade them to

10  leave their friends and family.  He lied about the

11  conditions of employment and he lied about who he was.

12          One woman you're going to hear testify is a

13  woman named Bernadette Herczeg.  Bernadette comes from

14  Hungary.  She spends about three weeks working and living

15  in the defendant's home.  You will hear that over the

16  three weeks, the defendant's abusive conduct escalated.

17  You will hear how the defendant straddled Bernadette's

18  chest and ejaculated on her breasts.

19          Finally, you will learn from the testimony how

20  the defendant's criminal scheme unraveled when Bernadette

21  had the courage to file a report with the local police.

22          As the Judge already stated, my name is Audrey

23  Stone.  I'm an Assistant District Attorney and I'm also a

24  special Assistant United States Attorney.  Seated with me

25  at counsel table are Daniel Spector and Hillary Jager,

13

Ms. Stone - Opening Statement

1  two Assistant United States Attorneys.  And together, we

2  represent the United States government.

3          Ariel Warner, a legal assistant for the United

4  States Attorney's Office and Special Agent Donna Roethel

5  are also seated with us.

6          Now. Bernadette Herczeg lived and worked for

7  the defendant about three weeks.  When the defendant's

8  abuse became more serious, Bernadette knew she needed to

9  make a plan to escape.  But what you are going to hear

10 throughout this trial is that Bernadette was not the

11 defendant's first victim.  The victims were not there at

12 the same time.  You are going to hear from different

13 victims who at different times were recruited by the

14 defendant.

15          The defendant's scheme was a complicated,

16 sophisticated plan where he recruited women to work for

17 him as his personal assistant.  The women who were

18 selected by the defendant were often recent high school

19 graduates looking towards the future.  You will hear how

20 this defendant preyed on their hopefulness, how he preyed

21 on their naivete.

22          What these women did was they posted a profile

23 on an au pair website.  Au pairs work as nannies in host

24 countries.  They go abroad.  They join a family and for

25 modest pay, they get to see the world.  They learn new

14

Ms. Stone - Opening Statement

1  languages and they often go to school.  Each of the

2  victims that testify in this case, you will hear wanted

3  to be selected as au pairs when they posted their

4  profiles on these websites.  And they were selected.  And

5  they were hired to come to New York, not by a young

6  family but by the defendant, a man in his sixties.

7          One of the ways that the defendant lulled these

8  women into a false sense of security was that when he

9  contacted them, he pretended that he was also a young

10  woman.  Sometimes he used the name Sylvia, sometimes the

11  name Joanna and in the e-mails Sylvia and Joanna would

12  say that they were also young women who were the same age

13  as the victims, that they used to work as the defendant's

14  personal assistant.

15          She, Sylvia or Joanna, really the defendant,

16  was looking for a personal assistant for an older,

17  wealthy man who lived outside of New York City.  And this

18  personal assistant would work in the home with the

19  defendant and his wife.  He would train these women to

20  become successful businesswomen, just like he was a

21  successful businessman.  In fact, at times the defendant

22  even promised them a green card.

23          Sitting at his computer in Pound Ridge, the

24  defendant day after day perfected and concocted this

25  scheme.  As his assistant, you will hear testimony that

15

Ms. Stone - Opening Statement

1  the women learned that they would live expense-free at

2  the defendant's home and at the end of the year, if they

3  lasted a year, they would receive a bonus of $20,000 or

4  sometimes even more.  This was an enormous sum, more than

5  these women would have ever hoped to earn in the

6  situations they were currently in.

7           You will also hear how carefully this defendant

8  chose his victims.  None of the victims knew and many of

9  them who testified here still don't know, that this woman

10 named Joanna or Sylvia was actually the defendant.

11          So the women get contacted and they make plans

12 to come.  In some cases, they finish their school exams.

13 They pack their bags.  They left their parents, their

14 friends.  They made a leap of faith.  You will hear how

15 many of these women wondered, is this too good to be

16 true?  How the defendant seems so eager to bring them

17 into his home, to bring them into his family.  They had

18 concerns.  They had doubts.  But then they thought of

19 Joanna and Sylvia and you will also hear from these

20 witnesses that they knew the defendant was married.  So

21 they assumed the defendant's wife would be there.  And

22 what could possibly happen with her living in the home,

23 as well?

24          The evidence that you're going to hear in this

25 case will show that in arranging the victim's travel, the

16

Ms. Stone - Opening Statement

1  defendant carefully and explicitly instructed his victims

2  to lie to immigration.  He told them to say they were

3  coming to visit friends or family because he knew they

4  would not be allowed to work here.  And you will hear how

5  the women did lie and you will hear how the victims who

6  testify have received an immunity letter.  And so long as

7  they testify truthfully in court, the government has

8  agreed not to use their statements against them.

9        These women relied upon the defendant who posed

10  as a successful businessman, who promised them that he

11  had a team of lawyers who as soon as they started working

12  would get working on their green card.  And you will also

13  hear how the defendant never arranged a green card for a

14  single victim.

15        So, at the airport, you will hear from the

16  defendant's victims that they were met by the defendant.

17  And it is here within the very first hours of their entry

18  into the United States that they started to realize that

19  things were not as they appeared.

20        Many of these women, the defendant kisses and

21  then on the long drive from the airport to Pound Ridge,

22  New York, you will learn that the defendant in many

23  instances, grabbed the women's hand and the women started

24  to wonder why; such a level fo familiarity with someone

25  who would be their boss?

17

Ms. Stone - Opening Statement

1           After the drive, the women all arrived at the
2   defendant's home in Pound Ridge.  Now, Pound Ridge is a
3   place very different from Brooklyn and it was very far
4   away from these victims' homes.  You will hear testimony
5   during this trial describing Pound Ridge as a rural
6   place.  It's a place where the homes are separated by
7   fields and forests.  There are no trains in Pound Ridge.
8   No buses.  No public transportation.  And you're going to
9   hear how the defendant's house is located in the woods.
10  There's not even a sidewalk, no stores nearby, no public
11  phones.  And in most cases, there were no people around
12  who spoke these victims' native languages.
13          The defendant didn't lock his door.  No.  This
14  defendant used a host of tactics; some physical, some
15  psychological, to make these vulnerable victims feel
16  trapped.
17          So at his home, the women quickly learned the
18  rules.  They learned how to clean the house, to make his
19  coffee, fix his breakfast.  But they also learned other
20  rules, not the normal rules a personal assistant would
21  expect.  What they learned very quickly was their phone
22  and e-mail contacts were severely restricted.  That the
23  defendant frequently listened in on their calls.  They
24  could not wear what they wanted.  In fact, they were told
25  they could not wear bras.  They had to wear blouses,

18

Ms. Stone - Opening Statement

1   skirts and high heels to work, even though in many

2   instances you're going to hear how the defendant himself

3   wore a bathrobe all day.

4           So as the women hear these rules, it becomes

5   even clearer to them what the defendant's true intentions

6   were; that he knowingly had persuaded, induced, enticed,

7   and coerced them to travel from abroad in order to

8   sexually exploit them.

9           It also became apparent soon after these women

10  arrived because you will hear the defendant would begin

11  the groping.  He grabbed their breasts or buttocks making

12  it clear to them that he had brought them to the United

13  States and to his home to sexually exploit them.  This

14  defendant was going to have sexual contact with these

15  women, whether they wanted to or not.

16          Now the first two victims you're going to hear

17  from, Anne Simonsen of Denmark and Laura Ramirez from

18  Mexico, they had the wherewithal to leave very quickly,

19  after the defendant began his groping.  You will hear how

20  quickly they returned to their home.  They had the money

21  and the wits about them and the wherewithal to realize

22  the dangers posed by the defendant.  But you're also

23  going to hear during this trial about the women who

24  stayed.  You will hear from these victims for a variety

25  of reasons; their isolation, their fear of the defendant

Ms. Stone - Opening Statement

1   based on his threats, on his physical acts, how these

2   women worked long hours with little time off.  And there

3   were the activities that were expected of them when the

4   defendant's wife left every day for work, the demands for

5   sexual activity, bathing the defendant which involved

6   bring him his cigarettes, his coffee, washing him and

7   holding his penis.  And when he dried off, performing

8   oral sex.

9          Then there was the expectation to wake him from

10  his daily act.  And you will hear testimony of extremely

11  painful experiences as the defendant coerced, pressured

12  and in some cases, forced these women to perform sexual

13  acts in his bedroom following the nap.

14         Now throughout this trial, you might question

15  the choices  these young women made.  In some instances,

16  you might wonder were they willingly going along with

17  this bargain of the defendant.  But in all of these

18  cases, you are going to see how the defendant tricked

19  them, how he manipulated them, and I would ask that as

20  you hear these women testify, remember this trial is not

21  about whether they should have been smarter, whether they

22  should have been stronger.  This is about the defendant.

23  This is about the defendant's actions.  This is about the

24  defendant's intent.

25         Finally, I just want to review the law with you

20

Ms. Stone - Opening Statement

1   a little bit.  The defendant is charged with seven counts

2   in the indictment and the Judge is going to instruct you

3   on the law as to each and every one of those counts.  Let

4   me just go over them briefly.

5          The first count in this indictment is the Mann

6   Act, which charges the defendant that he induced the

7   victims to travel to the United States, so that he could

8   commit sex crimes against them.  These sex crimes include

9   sexual abuse, forcible touching and forced oral sex.

10         Now as the Judge is going to tell you at the

11  end of the trial, you're not going to be asked to decide

12  whether the defendant did, in fact, commit sexual

13  criminal offenses.  The question you are going to be

14  asked to deliberate is the defendant's intent.  What was

15  his intent in convincing these women to travel from

16  abroad, work and live in his home?  And the defendant's

17  conduct with every victim that you hear testify where he

18  groped each and every one of them within the first days

19  of their arrival where he continually sexually abused

20  those who stayed, is going to clearly demonstrate to you

21  his intent.

22         Now the defendant is also charged with bringing

23  women into the United States for immoral purposes.  And

24  here, the evidence throughout this trial will show that

25  there is no doubt that the defendant's scheme was devised

21

Ms. Stone - Opening Statement

1   to identify women who he could control and sexually

2   exploit.  His immoral purpose was to sexually exploit

3   these women.

4              There are other counts in this indictment

5   involving fraud and labor contracting.  And as to this

6   charge, the government will present evidence about how

7   the defendant lied about the job he offered his victims.

8   He lied about who he was when he solicited them.  And how

9   he convinced the women under totally false pretenses to

10  work for him.

11             There are also charges of attempted forced

12  labor and forced labor.  Now this is not a case, as you

13  just heard me describe, of chains and drugs.  There

14  weren't any locked doors in the defendant's house.  What

15  you're going to hear about as the proof that the

16  government will present is that this defendant used a

17  variety of tactics.  He used fear, psychological

18  coercion, to make his victims believe they had absolutely

19  no choice but to do whatever he demanded, whatever he

20  asked.

21             And finally, the government has charged the

22  defendant with two Immigration crimes.  Based on him

23  instructing the victims to lie to Immigration authorities

24  and employing them to work in the United States.

25             Now the government will prove this case using

22

Ms. Stone - Opening Statement

1   several different ways.  You are going to hear directly

2   from the defendant's victims and you are going to meet

3   women who have come literally from across the globe and

4   they are going to testify in painstaking detail to the

5   abuse they suffered from this defendant.

6           We will also have documents, e-mails the

7   defendant exchanged with his victims before they came to

8   the United States where the defendant pretended to be

9   Sylvia or pretended to be Joanna.  And how he told these

10  victims to lie to immigration.

11          And you're also going to hear from a state

12  police investigator who is specially trained in computer

13  forensic analysis and that evidence will provide you with

14  concrete evidence from the defendant's own computer that

15  corroborates these charges.

16          This is just some of the evidence you're going

17  to hear.  So at this time, I just want to thank you for

18  listening so intently during our opening statement and I

19  ask you to carefully consider the testimony and the

20  evidence you're going to hear.  At the end of the trial,

21  my colleagues will have the opportunity to once again

22  address you.  And we will ask you at that point to return

23  a verdict of guilty at each and every count.  Thank you.

24          THE COURT:  Who is going to open?  All right.

25  The opening statement on behalf of the defendant will be

23

Ms. Cesare - Opening Statement

1   made by Ms. Heidi Cesare who represents the defendant.

2           MS. CESARE:  Good morning, folks.  Thank you

3   for being here.  My name is Heidi Cesare.  I am sitting

4   at the defense table with the defense team.  We have Mike

5   Schneider, Mr. Joseph Yannai and Ben Silverman.

6           The government is going to spend a lot of time

7   telling you about what a bad man Joseph Yannai is.

8   They're going to tell you that they'll present evidence

9   that is going to sum up for sure telling you what a

10  terrible, terrible, bad man he is.

11          Well, maybe it is bad.  Maybe from your point

12  of view it is immoral or offensive to hear about a sixty-

13  seven year-old man who is interested in having sexual

14  relations with women who are twenty years-old or twenty-

15  one or twenty-two years old.  It's a matter of

16  perspective.  It's a matter of personal opinion but it's

17  not particularly unique.  It's not unique at all in our

18  society.

19          Most people may be offended by it but we've all

20  known or have got some examples of the May-December

21  relationship.  We all know about Bill and Monica

22  Lewinsky, Hugh Hefner, Donald Trump and his many young

23  wives.  It's not against the law to be immoral in your

24  sexual relationships.

25          And whatever your moral opinion may be of Mr.

24

Ms. Cesare - Opening Statement

1  Yannai's sexual behavior or sexual relations with other
2  people is not a matter for your decision-making in this
3  courtroom because this is a court of law.  It's not a
4  court of moral opinion.
5        There are two important legal issues in this
6  case which will remain important throughout the course of
7  the case and I would ask you to keep them in mind at all
8  times.  The first issue is a matter of intent.  What was
9  Mr. Yannai's intent when he invited each particular woman
10 to come to his home and be a personal assistant?  You
11 will see from the evidence in this case that his intent
12 when he invited each of the women who will testify in
13 this courtroom, was to hire a young woman who he could
14 persuade to have consensual sexual contact with, who he
15 could persuade to have consensual intimate relations with
16 him once they came to his home.
17       Once there, the other issue is what happened
18 once each woman was there in his home.  And the issue --
19 the second issue is whether or not each woman was
20 reasonably free to leave the home.  The question is
21 whether an ordinary person in her shoes would have had a
22 reasonable belief that they could leave his home whenever
23 they wished to.  And we are convinced that once you hear
24 all the evidence in this case, it will be abundantly
25 clear to you that Mr. Yannai's intent when he hired these

25

Ms. Cesare - Opening Statement

1  women was to hit on them when they got this home and that

2  once they're in his home, they were at all times free to

3  leave.  And, in fact, quite a few did leave.

4        So what will you learn about Joseph Yannai

5  during this trial?  One, you will learn that he's now

6  sixty-seven years old and you'll also hear names that

7  most people would call a dirty old man.

8        Number two, you will learn that he hit on every

9  young woman who came into his house.  He made a pass at

10  every single one.

11        Number three, you are going to find out that

12  some, surprisingly enough, actually (indiscernible).

13        Now what happened?  Mr. Yannai, Mr. Joseph

14  Yannai is a writer.  He's married.  He has a wife who is

15  in her forties.  They had no children.  They have a dog

16  named Sadie.  They live in a large, sprawling, beautiful

17  home in posh Pound Ridge.  Pound Ridge is a town in

18  Westchester County.  It's a beautiful town.  It's a

19  residential town.  The homes, some of the homes are

20  fabulous mansions.  All of the homes are lovely.

21        Their home was no mansion but by most

22  standards, most people would agree it's a very

23  attractive, comfortable home.  It had four bedrooms.  It

24  had wall to ceiling -- ceiling to floor windows on the

25  first floor and the second floor.  It had a big plot of

Ms. Cesare - Opening Statement

1   property.  There was a beautiful pond in the back behind

2   the house, a babbling brook, a bridge over the brook.

3   Inside the house, there's a beautiful home office, all

4   the desks facing out of these full, long windows with a

5   view of the pond and the brook, four big comfortable

6   bedrooms in the house.

7           There are certainly lots of trees.  There's

8   neighbors across the street and neighbors next door and

9   neighbors on the other side of the pond.  And neighbors

10  all along the road into town.  The town is exactly what

11  you'd expect of this rural residential fancy town.

12          And over many years, Joseph Yannai had

13  typically hired personal assistants to help him write his

14  books.  He hires assistants and they typically have lived

15  in his home.  They help him do research for the books he

16  writes.  And typically, they've lived in his house and

17  worked in exchange for room and board and expenses paid.

18          He only hired women.  He only hired young

19  women.  He only hired attractive, young women.  He never

20  hired a guy and he certainly never hired anybody who was

21  middle-aged.

22          He typically hired the women through internet

23  solicitation.  And he typically would reach out to young

24  women who had posted themselves on au pair networks

25  indicating that they were looking for work abroad, a

Ms. Cesare - Opening Statement

1   live-at-home type of work.

2           In the first -- in his first contact with them,

3   he would make it explicitly clear that he was not looking

4   for an au pair.  He had no children.  This is not an au

5   pair job.  He was looking for a personal

6   assistant/companion.  And he typically would -- and also

7   initially, all the initial contacts advised generally

8   what the exact nature of the job was.  He was looking for

9   someone who would be a personal assistant, companion, to

10  live in the home.  That he himself lived -- worked from

11  home, that he'd need them to do research, household

12  chores, and generally pamper him with food, getting him

13  cigarettes, run his daily bath, bring things when he was

14  in the bath.

15          He also in a -- typically in a first or second

16  e-mail would communicate the exact terms of his offer.

17  He gave each candidate two options; a live-in option or a

18  live-out option.  A live-in option was you can live in my

19  house.  You'll have your own bedroom.  It's a very

20  comfortable house.  You'll live for free room and board,

21  all expenses paid and that if the candidate works for a

22  full year, they'd get a bonus of $20,000.  But there was

23  no promise of any salary during the year, because they

24  must finish the whole year.  And this was very clear in

25  all -- to all candidates.

28

Ms. Cesare - Opening Statement

1          The live-out option was $2,000 a month salary

2     with no expenses paid.  Everyone took the live-in option.

3          Typically though, the e-mail correspondence

4     began with Joseph Yannai pretending to be a young woman

5     that worked with him and he adopted an online persona

6     either using the name of Joanna or Sylvia and he would

7     pretend that this person was someone who had previously

8     worked with him as a personal assistant and would pitch

9     the job and once the candidate responded with interest,

10    the pretend persona would introduce the candidate to

11    Joseph Yannai and Joseph would interact the candidate as

12    himself.

13         And then with each candidate, you'd have --

14    typically have a month or two or three of e-mail

15    correspondence.  The e-mail correspondence between Joseph

16    Yannai and the candidate, and even his pretend persona,

17    is not typical of what you would expect between an

18    employer and a candidate.  The e-mail correspondence all

19    in all is all about relationships, having relationships

20    with the defendant.  There is no discussion of office

21    skills.  It's about boyfriends and (indiscernible) and

22    then a discussion of how they would be close to one

23    another.  And this is -- it's clear from the e-mail

24    correspondence that he is plainly hitting on these

25    candidates through his e-mail conversation.  He was

29

Ms. Cesare - Opening Statement

1  hitting on them.  He makes it clear that he was

2  interested in being intimate with each one of them.

3         And with most candidates, typically he would

4  send a picture of himself.  And do you know what he sent

5  almost every single one?  He sent a picture of himself

6  kissing a beautiful, young, blonde woman.  It's a picture

7  of the two of them sitting across from one another at a

8  table for two in a restaurant, reaching across the table,

9  holding hands, and kissing one another on the lips.

10        And he would send this picture to the personal

11 assistant candidates and say "This is a picture of me

12 with my last assistant and I want to have the same

13 relationship with you."

14        And then in the e-mails he'd say he would --

15 you know, he would invite them to send him pictures.  He

16 would always say, "Oh, you look so beautiful.  You have

17 beautiful legs."  They talked about love and how they

18 were loving, intimate relationships.  There's one

19 question about writing a love letter.  He would finish

20 his e-mails saying "I can't wait to see you.  The days

21 are too long.  I can't wait until you come into my life

22 and be part of my family."

23        He talked about having intimacy and he talked

24 about how intimacy was important because that was the

25 only way he could really get to know her.  I mean the e-

Ms. Cesare - Opening Statement

1   mail correspondence and some of it is explicit but it's

2   always there and it's plain, plain, plain to anybody who

3   read these e-mails that he was hitting on them.  I mean

4   some of the e-mails are positively steamy.

5           And the candidates all wrote to him in English.

6   All the correspondence was always back and forth in

7   English, every single witness who testifies here has

8   English-speaking and English-writing abilities.  They may

9   have interpreters when they testify.  Some, I imagine

10  will speak in English.  Some will ask for the assistance

11  of an interpreter but they all corresponded with him in

12  English and lived in his home and spoke in English.

13          And what did the candidates -- how did the

14  candidates reply when they got these suggestive, steamy

15  e-mails talking about intimacy and really becoming close?

16  They say things like "I want the job.  I've always wanted

17  to live in America.  I understand everything.  What kind

18  of dresses should I bring?"

19          Joseph Yannai gave his real name, his real

20  address, his real telephone number.  He talked to

21  everyone on the phone.  And everyone who came to him --

22  you know, he wasn't bringing them to some -- to sneak off

23  somewhere or you know, take them to strange place.  You

24  know, he invited them to his home and he was always

25  honest about where he lived, what kind of work he asked

31

Ms. Cesare - Opening Statement

1   them to do and he really was honest about the fact that

2   he was hitting on them.  At any given time, Joseph would

3   have typically two personal assistants living in his

4   home.  None of them knew each other.  They didn't come to

5   his house at the same time.  Everyone stayed a different

6   period of time and it overlapped with one another but

7   generally at any given time there were two young women

8   living in his home.

9          Joseph Yannai's wife works.  She has an office

10   job.  She leaves the house Monday through Friday, leaving

11   him -- having breakfast, leave in the morning and come

12   back at dinner time.

13          But the women who stayed, who accepted the job

14   and decided to stay after he made the pass -- made passes

15   at them, the typical day -- well, let me back up.

16   Typically when people are arrive, they'd be shown around

17   the house and given a room.  Everyone had their own, you

18   know, travel documents, passports, money, whatever they

19   brought with them.  He didn't take any of their stuff.

20   He didn't take anybody's passport or anything like that.

21          He did make a copy of some of people's

22   passports though,  And typically with each young woman,

23   very soon afer they got into the house, Joseph Yannai

24   would have a conversation and he'd say, "Well, we can

25   have two types of relationships.  We can have the

32

Ms. Cesare - Opening Statement

1   intimate, loving relationship or we can have a

2   straightforward office relationship."

3          And he would say, "You know, the first option

4   was much better because if they had an intimate, loving

5   relationship and had real intimacy, the candidate would

6   learn more from him and she would enjoy her time better."

7   And sometimes if the candidate said "Oh, I'm not really

8   interested in that," he might even say, "Well you are

9   going to regret it.  You're going to change your mind.

10  You're going to come around.  You're really going to want

11  me."

12         He definitely wanted everybody to take the

13  first option.  He definitely was interested specifically

14  in having an intimate relationship where he could control

15  it.  After he had the conversation about the two options,

16  you know, each person made her own decision and some of

17  them to be blunt, the woman who declined are the ones who

18  left his house pretty quickly.  He didn't try to stop

19  them from leaving.  They left.

20         The others who accepted, stayed.  And they

21  stayed and they worked in his home.  They did help him to

22  do research for the books he was investigating at the

23  time.  They used the computers.  They e-mailed. They were

24  online, you know e-mailing people all over the world.

25  They were faxing all over the world.  They worked in a

33

Ms. Cesare - Opening Statement

1   beautiful, sunny home office.  They lived in a well-kept

2   beautiful home in a beautiful setting.  Their work

3   involved no heavy lifting.  It was not heavy work in any

4   respect.  And they spent their day, their weekdays or

5   when they worked, they spent the day in the house mostly

6   (indiscernible) in a highly (indiscernible).

7           The doors were never locked.  The four or more

8   computers, were all fully wired with internet ability.

9   Telephones in the house.  There were neighbors on the

10  block.  They all went for walks.  No secret room.  Nobody

11  was tied up, (indiscernible) a beautiful, nice home.

12          On a typical day for the woman who accepted the

13  offer and stayed in his home, in the morning the wife

14  would leave and go to the office.  And then whoever the

15  assistants were in the house made breakfast, had

16  breakfast with Joseph.  Coffee -- they'd make -- their

17  job was to make the coffee, take care of the dog.  And

18  then after breakfast it was bath time. And bath time, it

19  was the job of one of the assistants to run the bath,

20  prepare Joseph's bath, (indiscernible).  When the

21  assistants would run the bath, he'd get in and she would

22  bring him whatever he needed in the bathroom.  He liked

23  to have a cigarette.  He liked to have a cup of coffee

24  and have his newspaper and a phone handy.  And he liked

25  to have company.  And whoever it was, they would sit with

34

Ms. Cesare - Opening Statement

1  him.  Sometimes she'd bathe him.  She'd wash his body,

2  let him dry.  And often there was a -- there would be a

3  sexual encounter, usually oral sex performed on Joseph

4  Yannai.

5          Whoever wasn't in the bath with Joseph was --

6  had to clean up the kitchen after breakfast.  After that,

7  it was more -- after the bath, there were a couple of

8  hours of working in the office.  They'd get things done.

9  The young women would, you know, get online, start doing

10  their e-mail research or their faxing work, collating

11  documents.  They'd have lunch together.  On a typical

12  day, they often went out to lunch or they'd have lunch at

13  the house.  The girls would make lunch.  The women would

14  make lunch.

15          After lunch typically, Joseph who was a real

16  night owl, would have a nap.  He would -- yes, that was

17  in the day, midday.  About two hours he would nap.

18  During naptime nobody was in the house except him and his

19  assistant and things would have to be arranged and, they

20  would do whatever they wanted.  Nobody was looking over

21  their shoulder.  They could come and go, call whoever

22  they wanted, e-mail whoever they wanted.

23          And at wake-up time, typically one of the women

24  would go into his room, wake him up.  That was part of

25  the relationship.  He napped in the nude.  Sometimes both

Ms. Cesare - Opening Statement

1  of the women in the house would go in and wake him up

2  together.  They walked into his room.  They'd get in his

3  bed.  They'd get under the blankets with him and they'd

4  engage in sexual activity, touching one another.  there

5  was heavy petting, kissing, oral sexual contact,

6  (indiscernible).  No actual intercourse.  Often in

7  general it was -- generally, whoever was in bed would

8  stay in bed and (indiscernible).

9          After nap time, there would be a couple of more

10  hours of office work.  No more research.  Go back to the

11  home office.  They would all work.  Joseph was working at

12  his computer station.   Each one of them had her own work

13  station.  For supper, they would often go out to dinner

14  or they'd eat at home.  They'd wait until Joseph's wife

15  came home and they'd eat their supper together.  They

16  always ate together at dinner.

17          After dinner, the women would clean up and then

18  it was time to relax.  There was absolutely no hanky

19  panky while the wife was home.  No one ever told her.  No

20  one ever complained to her about it.  No one ever said

21  anything to her about it.  No one ever acted intimately

22  while the wife was around and on the weekends, there was

23  no hanky panky either.

24          So, folks, coming back to what the issues are

25  in this case, the first question is what was Mr. Yannai's

36

Ms. Cesare - Opening Statement

1   intent?  There's a lot of stuff going on in this case, a

2   lot of, you know, kind of shocking crazy facts but with

3   the charges that have been filed in the courtroom, it

4   boils down to two very clear issues.  Number one issues

5   is what was his intent when he invited them to travel

6   from their home country to the United States?  His

7   intent, we submit, was to invite them in order to

8   persuade them to have consensual intimate relations.  His

9   intent was not to rape them.  His intent was to seduce

10  them, maybe possibly convince them -- to convince them.

11          The second issue is what was each woman free to

12  leave when she was in his home?  And once you observe the

13  evidence in this case, and analyze with a reasonable

14  thought of an adult person, you'll agree that a person in

15  the same shoes as each one of these women would

16  understand or reasonably understood that she could have

17  left.  The ones who stayed, the choice was theirs.  They

18  were free to leave.  No one kept them there against their

19  will.

20          Now the government has -- I expect the

21  government is going to talk -- you know, they talk about

22  luring women to his home.  This was an opening they used

23  this morning and they're going to use it again in

24  summation and they'll probably use it when they ask

25  questions.  Did he lure you to his house?  Well, he

37

Ms. Cesare - Opening Statement

1  invited them to his house.  He made no false promises

2  about how much money they would make.  He told them

3  exactly who he was, where he lived.  He told them about

4  the books he wrote.  He told them exactly who else was in

5  the house; he, his wife and his dog.  He made no false

6  promises about the nature of employment.  He was inviting

7  people.

8       Of course they're going to talk -- the girls

9  are going to talk about the fact that he used a fake

10  personal to introduce himself to each of them.  And that

11  is, you know -- that is not an acceptable way to engage

12  in a normal, you know, employer-employee relationship,

13  we'll agree.  However, once you see the evidence, you'll

14  see that the fake persona was a device he used to really

15  honestly communicate his intention to women that he was

16  looking for an intimate relationship because he used the

17  device and the fake persona to say "I had an intimate

18  relationship with this young woman.  She really love me.

19  Here's a picture of us kissing and I want to hire you to

20  replace her.  I'm looking for her replacement."

21       So that was how he communicated to them his

22  intent to find somebody who was going to come to work and

23  (indiscernible).

24       The government's going to describe the

25  departure of each witness from his home as an escape.

Ms. Cesare - Opening Statement

1  Well, you know, they walked out of his house.  Sometimes

2  he drove them to the airport himself.  Nobody had, you

3  know -- when the woman -- when each women decided she

4  wanted to leave, Joseph did nothing to stop her.  She

5  left the house of her own free will.

6          You will hear testimony following some evidence

7  that Joseph Yannai, in addition to being, you know, funny

8  and was hard -- he was often very mean to the women in

9  his house.  He would say mean things to them.  He would

10  say they were fat or they were under dressed.  They

11  weren't being successful.  They didn't agree to being in

12  house intimately.

13          But he's not charged with being a mean guy.

14  Being mean is one thing.  There are issues here, can the

15  government prove the charges they filed in this

16  particular case?  The government is going to suggest that

17  he forced them to do whatever he wanted them to do

18  because of an atmosphere of coercion.  Well, he made

19  passes at every single woman.  He really did.  He hit on

20  all of them.

21          And sometimes he insulted them.  They refused

22  his passes.  He said, "You know, you're going to like me.

23  You know, you're going to change your mind.  You don't

24  know what you're missing.  You're not going to have much

25  fun it you don't accept my interests."

Ms. Cesare - Opening Statement

1        But he never forced anyone to be intimate.  And

2    he never said "I am going to force.  He never said I'm

3    going to hurt someone in your family if you don't do

4    this."  He just said, "You're going to like it better if

5    you stay and have intimate relations with me.  You're

6    going to more out of this experience.  It will be much

7    better for you if you agree to be intimate with me."

8        And finally, I talked about this a little bit

9    in the beginning.  There is really a real aspect of

10    immoral conduct here.  Many of you, many people, I can

11    understand will view what was going on in the Yannai

12    house, all of this daytime hanky panky as highly immoral.

13    You know, it's adulteress.  It's -- there's a big age

14    differential.  It involves, you know, oral sex.  It

15    involves three-way sexual encounters.

16        This type of -- these sexual relationship will

17    be challenging for some of you, maybe all of you but this

18    is not a court of moral opinion.  And whether or not you

19    morally approve or disapprove of this behavior is not a

20    basis to make an intellectual rational decision whether

21    or not (indiscernible).

22        The witnesses who come in here I am sure will

23    all be very embarrassed.  It will be embarrassing for

24    them to talk about what happened and what they did and

25    their relationship with Joseph Yannai.  It will be

40

Ms. Cesare - Opening Statement

1  embarrassing for them to answer questions that the

2  prosecutor, or from my myself, from Mike Schneider.  And

3  it will be embarrassing in a way for all of us, too.

4  It's embarrassing to poke into other people's private

5  lives.

6          And one of the reasons it will be particularly

7  embarrassing is because there's clearly a lot of moral

8  disapproval for the behaviors that are involved.  And

9  it's going to be hard for them to take responsibility for

10 the decisions they have made and take responsibility for

11 their own behavior.  It will be hard for them,

12 embarrassing for them, the ones who stayed, to admit that

13 they moved into his house and got into his bed while his

14 wife was at work.  And it will be hard for them to admit

15 it.  They're not going to want to do it.

16          Folks, once you've heard all the evidence and

17 had an opportunity to see the witnesses and see the

18 (indiscernible) evidence in this case, we're convinced

19 that no matter what your moral opinion of what was going

20 on in the Yannai household, you will agree that his

21 intent when asking these women to come to his house was

22 to have a consensual intimate relationship with them, not

23 forced.  He was intending and looking for consensual,

24 intimate relationships.

25          And you will be convinced my client's -- that

41

Ms. Simonsen - Direct - Mr. Spector

1   at all times, these women came to his home, was free to

2   leave when they wanted to leave.  And you then will find

3   that each one -- every one of you will come to unanimous

4   agreement and find that Joseph Yannai is not guilty of

5   these charges.  Thank you very much.

6          THE COURT:  All right.  Call your first

7   witness.

8          MR. SPECTOR:  The government calls Anne

9   Simonsen.

10          MS. CESARE:  May we have a bathroom break,

11   your Honor?

12          THE COURT:  Go ahead.  If any of the jurors

13   need to use the bathroom, you can go ahead too.

14          (Court recessed.)

15          THE COURT:  All right.  The record should

16   reflect that all of the jurors have returned to the

17   courtroom.

18   A N N E   S I M O N S E N ,

19       called as a witness, having been first duly sworn,

20       was examined and testified as follows:

21          THE CLERK:  Please state your name for the

22   record, ma'am.

23          THE WITNESS:  Anne Rosa Simonsen.

24          MR. SPECTOR:  May I proceed, your Honor?

25   DIRECT EXAMINATION

42

Ms. Simonsen - Direct - Mr. Spector

1  BY MR. SPECTOR:

2  Q.    Good morning, Ms. Simonsen.

3  A.    Good morning.

4  Q.    What country are you from?

5  A.    I'm from Denmark.

6  Q.    And what country do you live in now?

7  A.    Denmark.

8  Q.    Who paid for your travel expenses to come to the

9  United States to testify today?

10  A.    The United States did.

11  Q.    And did you meet with the government to prepare for

12  your testimony?

13  A.    Yes.

14  Q.    Before coming here for the trial, did you previously

15  travel to the United States to meet with the government?

16  A.    Yes, in March.

17  Q.    And who paid for your expenses for that trip?

18  A.    The United States did.

19  Q.    Do you know someone named Joseph Yannai?

20  A.    Yes.

21  Q.    How do you know him?

22  A.    I went to work with him in 2006.

23  Q.    Do you see Mr. Yannai in the courtroom today?

24  A.    Yes.

25  Q.    Can you please identify him by an article of clothing

43

Ms. Simonsen - Direct - Mr. Spector

1   he's wearing?

2   A.   He's sitting right over there in a suit.

3   Q.   And how close to the front or the back of the table?

4   A.   He's the second gentleman on that side.

5   Q.   Second from the back or the front?

6   A.   From the back.

7            MR. SPECTOR:  Let the record reflect the

8   witness has identified the defendant.

9            THE WITNESS:  Excuse me?

10           MR. SPECTOR:  Let the record reflect,

11  your Honor, the witness has identified the defendant.

12           THE COURT:  Yes.

13  Q.   Ms. Simonsen, are you currently in school?

14  A.   Yes.

15  Q.   What are you studying?

16  A.   I study cognition and communication, master of arts.

17  Q.   When did you finish high school?

18  A.   In 2005.

19  Q.   And was that in Denmark?

20  A.   Yes.

21  Q.   What did yo do after you finished high school?

22  A.   I worked half a year at a hotel in Denmark.

23  Q.   And while you were working at the hotel, did you have

24  plans to do anything else?

25  A.   Yes, I had plans to go abroad for six months after

44

Ms. Simonsen - Direct - Mr. Spector

1  that.

2  Q.   And what did you want to do abroad?

3  A.   Well, my plan was to work as au pair.

4  Q.   What's an au pair?

5  A.   Well, it's somebody who lives with a family and works

6  with household tasks and babysitting maybe.

7  Q.   Why did you want to work as an au pair?

8  A.   Well, because I was interested in getting to know

9  foreign culture for half a year and I thought that living

10  with a family would be a nice way of doing so.

11  Q.   Was there anywhere in particular you wanted to go?

12  A.   I think just as far as way I could get, the United

13  States or Asia or something like that.

14  Q.   At that point in time, had you ever been to the

15  United States before?

16  A.   No.

17  Q.   How did you go about looking for work as an au pair?

18  A.   Well, I found some internet sites where you could

19  make a profile and then you could get a connection with a

20  family there.

21          MR. SPECTOR:  Your Honor, if I may show the

22  witness through the computer, a document that's been

23  marked as Government Exhibit 3-I, just for the witness

24  for now if we can.

25          THE COURT:  Go ahead.

45

Ms. Simonsen - Direct - Mr. Spector

1   Q.   I'm sorry, I just need one moment.

2   A.   It was better before.

3        (Pause.)

4   A.   Yes.

5   Q.   What is it?

6   A.   It is my au pair profile.

7   Q.   The government --

8   A.   -- from Aupairconnect.com

9            MR. SPECTOR:  The government offers Government

10  Exhibit 3-I.

11           MR. SCHNEIDER:  No objection.

12           THE COURT:  It's admitted.

13  (Government Exhibit 3-I marked in evidence.)

14           MR. SPECTOR:  May I publish to the jury,

15  your Honor?

16           THE COURT:  Yes.

17  Q.   And Ms. Simonsen, what sort of information would be o

18  the au pair profile?

19  A.   Well, my contact information and for how long I

20  wanted to go abroad and --

21  Q.   If I can direct your attention to the second page.

22  Just generally speaking, what sort of information would

23  be there?

24  A.   Well it's information which languages I speak and

25  what I wanted to work with really and just an

46

Ms. Simonsen - Direct - Mr. Spector

1  introduction to myself.

2  Q.  Can you explain how the au pair website worked?

3  A.  Well, if you're seeking a job as au pair, you can

4  make profiles like an au pair profile and then you could

5  search for a family who also had profiles and then there

6  was just a general message system, you could send

7  messages.

8          THE COURT:  Ladies and gentlemen, you each have

9  in between, you can pull up your own screen if it's

10 easier for you, in between your seats.

11 Q.  Ms. Simonsen, did there come a time you received a --

12         THE COURT:  Are you offering this document into

13 evidence?

14         MR. SPECTOR:  I believe you already admitted

15 it, your Honor.

16         THE COURT:  I did?  Okay.  Go ahead.

17 Q.  Ms. Simonsen, did there come a time you received a

18 message on the au pair website from someone named Sylvia?

19 A.  Yes.

20 Q.  Did there also come a point in time when you

21 exchanged e-mails with Sylvia?

22 A.  Yes.

23 Q.  Did you also exchange e-mails with the defendant?

24 A.  Yes.

25         MR. SPECTOR:  May I approach, your Honor?

47

Ms. Simonsen - Direct - Mr. Spector

1           THE COURT:  Yes.

2  Q.   I'm showing the witness what's been previously marked

3  for identification as Government Exhibit 600.

4       Ms. Simonsen, did you review those documents in

5  preparation for your testimony today?

6  A.   Yes.

7  Q.   And did you sign the bottom of each page?

8  A.   I did.

9  Q.   Is Government Exhibit 600 e-mails between you and

10 Sylvia, as well as you and Joseph Yannai?

11 A.   Yes.

12          MR. SPECTOR:  The government offers Government

13 Exhibit 600.

14          MR. SCHNEIDER:  No objection.

15          THE COURT:  It's admitted.

16 (Government's Exhibit 600 marked in evidence.)

17 Q.   Ms. Simonsen, did you save these e-mails onto your e-

18 mail account?

19 A.   Yes.

20 Q.   Did you save every e-mail you exchanged with the

21 defendant and with Sylvia?

22 A.   No, but most of them.

23 Q.   Okay.  Do you remember if there was any particular

24 reason you deleted certain e-mails?

25 A.   No.

48

Ms. Simonsen - Direct - Mr. Spector

1  Q.   What did you do with the e-mails?

2  A.   Well, I saved them later as a Word document on my

3  computer and this is a Word document.

4  Q.   And did you give that Word document to the United

5  States government?

6  A.   Yes, I did.

7          MR. SPECTOR:  Your Honor, at this time we'd

8  like to hand out jury binders for the jury to follow

9  along as we go through some of those e-mails.

10          THE COURT:  Go ahead.

11          (Handing binders to jurors.)

12  Q.   Now the Word document you just described,

13  approximately how many pages is that?

14  A.   24.

15  Q.   And what order is it in chronologically?

16  A.   It's reverse chronological order.

17  Q.   So is the oldest e-mail the last one?

18  A.   Exactly.

19          MR. SPECTOR:  If we can turn to 24, Yes,

20  your Honor?  If I could ask the jurors to turn to the

21  last page, 24.

22  Q.   And Ms. Simonsen, focusing on the bottom half of that

23  page, what is that document?

24  A.   It's an e-mail sent from my e-mail account on the 8th

25  of November 2005.

49

Ms. Simonsen - Direct - Mr. Spector

1  Q.   And who did you believe you were sending this to?

2  A.   To Sylvia.

3  Q.   And was this in response to something previously?

4  A.   Yes, it was a response to an internal messages from

5  the au pair site.

6  Q.   If you can just read out loud the highlighted

7  portion, please.

8  A.   "Dear Sylvia, Thank you so much for considering me as

9  the future assistant for a boss.  I'm really excited

10  about the offer mostly because you've chosen me for my

11  skills and qualifications.  And I'm absolutely thrilled

12  about working for a publishing house and at the same

13  time, being part of a family."

14  Q.   You mentioned skills and qualifications; why did you

15  write that?

16  A.   Well, because this wasn't just babysitting.  It was

17  helping a publisher.

18  Q.   And why did you think you had been chosen for skills

19  and qualifications?

20  A.   Because I had written about my skills and

21  qualifications on the profile.

22  Q.   And if you can read the next highlighted portion,

23  please.

24  A.   "So could you tell me some more about the work as

25  publisher's assistant?"

50

Ms. Simonsen - Direct - Mr. Spector

1  Q.   How long did you want to work as a publisher's

2  assistant?

3

4  A.   For six months.

5  Q.   Do you remember when you wanted to end, what month?

6  A.   Yeah, I wanted to end in August.

7  Q.   And why was that?

8  A.   Because I planned to start university in September in

9  Denmark.

10  Q.   We can turn to the next page, to page 23 please.  And

11  focusing on the lower half of that page.  What is that

12  document?

13  A.   It's an e-mail from November 9, 2005 from the e-mail

14  address PublishersPlus@aol.com.

15  Q.   And who did you believe was sending that?

16  A.   Sylvia.

17  Q.   And if you can read aloud the highlighted portion,

18  please.

19  A.   "Their home is about 50 minutes drive from the city

20  and although you will visit New York and join them when

21  they go out to the city, you will not be staying in New

22  York City.  Their home is in New York State but not in

23  the City.  Actually, it cannot be more opposite than New

24  York City.  It is a small town, the kind of towns in

25  Westchester County in which the rich people move to."

51

Ms. Simonsen - Direct - Mr. Spector

1   Q.   Was the location something that mattered to you?

2   A.   Yeah, it seemed appealing because it was well

3   situated in the country but still close to the big City.

4   Q.   And if you can continue with the next highlighted

5   portion please.

6   A.   "You are his assistant, not a publisher assistant.

7   You will do the regular office work plus all the

8   correspondence and research in the languages you know,

9   mainly French and German."

10  Q.   What did you think about that job description?

11  A.   Well it sounded really interesting, a unique

12  possibility to use my language skills.

13  Q.   Now at the time you were e-mailing with Sylvia at

14  this point, were you considering any other options to

15  work as an au pair?

16  A.   Yes, among others, a Turkish family.

17  Q.   If we can turn to page 22, focusing on the bottom

18  portion there.  What is that document?

19  A.   It's an e-mail sent from me, 17th of November 2005.

20  Q.   And if you can read the highlighted portion please.

21  A.   "Today chatting with whom I thought was my future "au

22  pair father" I found out that he actually wanted to hire

23  me, not only as his daughter's teacher but also as his

24  new lover.  Thereby, my Turkish plans were canceled

25  immediately as you might have guessed."

52

Ms. Simonsen - Direct - Mr. Spector

1   Q.   And what was that a reference to?

2   A.   Well I was referring to an instant message chat that

3   I had with this au pair father and he was starting to ask

4   me if I wanted to be his lover and stuff like that.

5   Q.   And how did you respond to that?

6   A.   Well I said I wasn't interested.

7   Q.   And if we can turn to the second page, the top of 23,

8   the continuation there, if you can read the highlighted

9   portion.

10  A.   "I'm rather embarrassed that I turned you down at

11  first but I couldn't possibly have guessed that the

12  Istanbul job wasn't what it seemed."

13  Q.   And did you include a phone number there, as well?

14  A.   Yes.

15  Q.   Do you remember if you received a phone call after

16  you sent this e-mail?

17  A.   Yes, I did.

18  Q.   Who did you speak with?

19  A.   Joseph Yannai.

20  Q.   Do you remember anything about the conversation?

21  A.   Well, I remembered it was sort of a bad connection.

22  I remember he was a bit difficult to understand because

23  he has this accent and we just discussed some

24  practicalities.

25  Q.   If you can now turn ahead to page 20, please,

Ms. Simonsen - Direct - Mr. Spector

1  focusing on the bottom portion of the page.  What is that

2  document?

3  A.   It's an e-mail sent November 18, 2005 from

4  PublishersPlus@aol.com.

5  Q.   And who did you believe was sending this e-mail?

6  A.   Sylvia.

7  Q.   If you can read the first two highlighted portions,

8  please?

9  A.   "Joseph told me of your phone conversation this

10  morning and asked me to write to you.  Joseph is a

11  businessman who tried to work from home with minimum

12  office visits.  He lives with his wife, Elena, in a very

13  small town, much smaller than yours.  They have no

14  children."

15  Q.   Now at this point in time was the job you were

16  discussing to work for Joseph more appealing or less

17  appealing to you than a regular au pair job?

18  A.   I thought it was more appealing.

19  Q.   Why is that?

20  A.   Because it was challenging and it was something else

21  than just babysitting.  This was actually working with

22  something that was interesting.

23  Q.   And if you can -- if we can turn the page to 21.  If

24  you can read the top highlighted portion there?

25  A.   "Part of the lower floor of the house was converted

54

Ms. Simonsen - Direct - Mr. Spector

1    into an office space from which they work.  By they I
2    mean Joseph, his personal assistant and sometimes Elena
3    (she's a stockbroker but he asked her to quit her job for
4    a while to help him with his current project."
5    Q.   And then if you continue with the next highlighted
6    portion, please?
7    A.   "You will work mainly on the computer (how boring)
8    and mainly on the internet research in the languages you
9    know.  But the main job is to make his life more
10   comfortable, more pleasant and easier.  I learned the
11   hard way never to tell him no.  If he tells you to do
12   something that you don't like, do it, then discuss it
13   with him."
14   Q.   Now when you receive that e-mail, what did you think
15   that was a reference to?
16   A.   Well I thought it was a reference to working long
17   hours and working really intensively.
18   Q.   Did you believe at that point that that was a
19   reference to anything sexual?
20   A.   No.
21   Q.   If you can read the rest of the page that's
22   highlighted please.
23   Q.   "Pay.  There are two ways in which you can get pays
24   and they are dependent of the structure and the terms of
25   your coming here.  You will have to choose and choose

55

Ms. Simonsen - Direct - Mr. Spector

1  before you come.  The first way is living out. That means

2  that you will not live with them, get your own apartment,

3  a room and work six hours a week for eight hours and the

4  rest of the time will be yours.  You will then be paid a

5  monthly salary of $1,700 and will have to pay for all of

6  your expenses but for food when you're at work and eat

7  with them.  The other option is that you will live with

8  them.  You will have your own room and become part of the

9  family and I might say, an equal part.  You then will not

10  be paid a monthly salary but all your expenses will be

11  paid by him.  When I say all the expenses, you'll be

12  surprised how many things you'll not even have to ask.

13  He or she will think it before you will want it, from

14  clothing to tampons, from doctors to presents for your

15  family, from going out to dinner or to a concert to a

16  hairdresser; everything.  He is very large which

17  sometimes is even embarrassing.  At the end of the year,

18  and in your case, August, if you will not change your

19  mind and stay longer, you will receive a one-time pay

20  equivalent to $25,000 a year.  In your case if you leave

21  in August, it will be less the relevant sum of seven or

22  eight months.  That will be a net money that you can take

23  home with you as your stay here would not cost you but

24  you will get that only if you stay until August with

25  them.  If you leave before you do not get anything.  As

Ms. Simonsen - Direct - Mr. Spector

1  to the airline ticket, I spoke to him and he agreed to

2  repay you for the ticket, only if you will stay until

3  August."

4  Q.   Now of the two options described there, did one of

5  them seem more appealing to you?

6  A.   Yes, the live-in seemed more appealing.

7  Q.   Why was that?

8  A.   Because I thought of this as a cultural exchange, so

9  living with a family would be the easiest way to get to

10 know the culture.

11 Q.   If I could ask you to turn ahead to page 19, please.

12 I'm focusing on the bottom portion.  What is that

13 document that begins on the bottom portion of the page?

14 A.   It's an e-mail sent from me, the 22nd of November

15 2005.

16 Q.   And who did you believe you were sending it to?

17 A.   Sylvia.

18 Q.   If you can read the highlighted portion on the page

19 please?

20 A.   "My regards to your boss.  It was nice talking to him

21 on the phone, despite the bad connection.  Firstly, visa,

22 Joseph told me on the phone that I can stay in the United

23 States for three months without visa and that he can have

24 his lawyers extend my stay once I am there.  However,

25 according to the American Embassy in Copenhagen, I can

57

Ms. Simonsen - Direct - Mr. Spector

1  only go there without a visa if I have a valid return

2  ticket within those ninety days.  And I will stay from

3  primo January to primo August, seven months.  So, I've

4  booked an appointment at the U.S. Embassy 5th of December

5  where I can apply for a so-called business and tourist

6  visa, type B, which I think is the right one."

7  Q.   Why were you planning to go to the Embassy?

8  A.   Because I am used to traveling and I know that if you

9  want to go abroad, you need to apply for a visa in good

10  time.

11  Q.   Now during the e-mails that you were exchanging with

12  Sylvia, did you discuss what happened with the Turkish

13  man?

14  A.   Yes.

15  Q.   And generally speaking, what kinds of things would

16  Sylvia write about that?

17  A.   Well, she would sort of indicate that I might have

18  misinterpreted the Turkish compliments towards me.

19  Q.   And how did you respond?

20  A.   Well I told her there was no doubt that he was

21  definitely hitting on me.

22  Q.   If we can turn to page 17, at the very bottom -- it

23  starts on the very bottom.  What's the document there

24  beginning on the very bottom?

25  A.   It's an e-mail sent November 23, 2005 from

                    Ms. Simonsen - Direct - Mr. Spector

1  PublishersPlus@aol.com.

2  Q.   And who did you understand sent that?

3  A.   Sylvia.

4  Q.   If we can turn to page 18?  If you can read aloud the

5  top highlighted portions, please?

6  A.   "I wish you would have talked to me before doing your

7  own investigations and consulate.  We pay good money for

8  professionals to do the work, in this case, an attorney.

9  You will never receive a working permit for office work.

10 Only people with professions that the U.S. needs like

11 nurses and agriculture workers, have the chance to

12 receive a working permit.  Moreover, if you will be

13 denied a working permit, there is a chance they will not

14 let you into the U.S. on a tourist visa.  So, from now on

15 it does not cost money to send an e-mail, just as Joseph

16 or myself.  You will come on a tourist visa for three

17 months or so and after being here, you will stop working

18 on the extension.  Usually you can get between six to

19 twelve months extension.  Yes, you might be asked at the

20 border to show a return ticket for the appropriate time

21 and that is the kind of ticket you should purchase.  So I

22 suggest you will cancel your appointment and the

23 consulate or better yet, to avoid questions why you're

24 not coming, just don't come."

25 Q.   What did you do after you received that e-mail?

59

Ms. Simonsen - Direct - Mr. Spector

1    A.   I canceled my appointment at the embassy.

2    Q.   Were you concerned at that point about coming to the

3    United States on a tourist visa?

4    A.   Well, not really because when she's talking about

5    attorneys here, I believe that you know, they -- they

6    knew the law, so it would be legal to get this extension.

7    Q.   If you can continue with the bottom portion of page

8    18, please.

9    A.   "I started to work here when I was almost nineteen

10   years old high school graduate.  I'm not working with him

11   now.  I am back home in Poland for the last four months

12   because of family reasons.  But as you see, I am still

13   working for him and we are in an almost daily basis

14   contact either via e-mails, I have an access to one of

15   the company's e-mail addresses or on the phone.  He's

16   still a very good and dear friend of mine, probably the

17   most important part of my life and I know I can still

18   depend on him."

19   Q.   And if we can continue, can you turn to page 19 and

20   just read that last highlighted portion please.

21   A.    "There is a lot of intimacy and I do not mean sex.

22   You will realize, especially when traveling with him that

23   there will be many occasions that will invite a sexual

24   relationship but that will be the last thing on his mind.

25   It is difficult to understand it in the beginning.  He

Ms. Simonsen - Direct - Mr. Spector

1    might tell you how beautiful you are or even repeat the

2    mistake of the Turk telling you how sexy you are if you

3    will think that you are sexy.  Might hug you, kiss you.

4    I used to kiss him every morning when I came down to work

5    and said good morning and before I went to sleep.  And in

6    most cases, Elena was there.  And he never even tried to

7    have sex with me.  You will be at the end of the term a

8    very happy, experienced young woman."

9    Q.    How did you feel after reading that?

10   A.    Well, firstly I felt that when -- she's my own age

11   and she was happy to be there, well that's a sign that

12   it's a good place to work.  And then in this last passage

13   I read, she's actually saying three times that there's no

14   sexual interest. So I just took her on face value.

15   Q.    And what about the fact when she says that she kissed

16   him every morning, what did you think about that?

17   A.    Well I thought well if that's her way of expressing

18   her love or warm feelings to him, that's okay.

19   Q.    Is that something you thought you would do?

20   A.    Well, maybe not, no, but you know, you can kiss

21   somebody on the cheek or on the forehead without it

22   meaning something other than warm feelings.

23   Q.    If I can ask you to turn to page 16, please, focusing

24   on the bottom portion there, what is that document?

25   A.    It's an e-mail sent November 24, 2005 from

61

Ms. Simonsen - Direct - Mr. Spector

1  PublishersPlus@aol.com.

2  Q.   And who did you understand was sending that?

3  A.   Sylvia.

4  Q.   If you can read the highlighted portion, please?

5  A.   "I was very happy to read your e-mail.  I guess my

6  work is done now.  From now on, I think you should write

7  directly to Joseph (InStyleCompanies@aol.com.)

8  Q.   And after you received that, what did you do?

9  A.   I started writing to that e-mail address.

10 Q.   If we can turn ahead to page 14, please.  What is

11 that document beginning on page 14?

12 A.   It's an e-mail sent November 27, 2005 from

13 InStyleCompanies@aol.com.

14 Q.   And who did you understand was sending that e-mail?

15 A.   I understood it to be Joseph.

16 Q.   This is the first e-mail you received from him?

17 A.   Yes.

18 Q.   If you can just read the highlighted portions of the

19 first page, please.

20 A.   "Let me tell you a little of the project we're very

21 busy with now and the one which occupies us and will

22 occupy you.  We're about to publish a series of travel

23 guide which will cover hotels and restaurants throughout

24 the world."

25 Q.   You can continue, please.

Ms. Simonsen - Direct - Mr. Spector

1  A.   Yes.  "Last year, we published the best selling book

2  we ever had.  It was the International Who's Who of

3  Chefs, which included biographical sketches of 3,000 of

4  the best chefs in the world in which every one of them

5  gave us a signature recipe.  It became the most

6  comprehensive cookbook ever published and we sold almost

7  one million copies."

8  Q.   Now how did this make you feel about the job?

9  A.   Well, I thought it was very interesting because it

10  had different tasks that I wanted to work with; research

11  and traveling and publishing.

12  Q.   Did you do any research on what the defendant had

13  described in the e-mail?

14  A.   Well I Googled the title of the book and I found it

15  on Amazon.  So I just expected that it was what he said.

16  Q.   Were you ever able to determine whether it had, in

17  fact, sold a million copies?

18  A.   No, because I never imagined one would lie about

19  that.

20  Q.   If we can turn to page 15, please.  If you can read

21  the highlighted portion?

22  A.   "What is the most beautiful part of your body?  What

23  does other people say and which is the ugliest?  What do

24  you think?"

25  Q.   What did you think when you read that?

                    Ms. Simonsen - Direct - Mr. Spector

1   A.   Well, I thought he was sort of testing me because he
2   maybe wanted to see how confident I was.  It seemed that
3   Sylvia was sort of insecure when she came.  She told me
4   that in the previous e-mail.  So maybe he just wanted
5   somebody who was more confident of herself.
6   Q.   Were you concerned when you read that that he would
7   want a sexual relationship?
8   A.   No.
9   Q.   If we can turn to page 11, please.  Turn ahead to
10  page 11.  What is that document?
11  A.   It's an e-mail sent December 10, 2005 from
12  InStyleCompanies@aol.com .
13  Q.   And who did you understand was sending this?
14  A.   Joseph.
15  Q.   If you can read aloud the first highlighted portion,
16  please.
17  A.   "Thank you for your new pictures.  I feel as I know
18  who I am talking to a little better.  If the pictures are
19  right, I think you should place in the top of your list
20  of the beautiful parts of your body a long neck.  You
21  will find in the attachment four pictures.  I'm sorry,
22  Elena is not in them.  The first two are in a trip to
23  Israel I took with my friend Joanna, the same young lady
24  who is going to join us at the second part of January
25  from Poland.  The other two are from a trip I took to

64

                    Ms. Simonsen - Direct - Mr. Spector

1  Vietnam."

2  Q.   Now if we could just stop there.

3            MR. SPECTOR:  May I approach, your Honor?

4            THE COURT:  You could approach without asking

5  me.

6            MR. SPECTOR:  Thank you, Judge.  I'm showing

7  the witness what's been previously marked for

8  identification as Exhibits 601, 602, 603 and 604.

9  Q.   What are those documents?

10  A.   Thank you.  It's the pictures and that's an

11  attachment to this e-mail.

12            MR. SPECTOR:  The government offers 601, 602,

13  603 and 604.

14            THE COURT:  Any objection?

15            MR. SPECTOR:  No.

16            THE COURT:  They're admitted.

17  (Government's Exhibits 601, 602, 603 and 604 marked in

18  evidence.)

19  Q.   Showing you 602, what did you understand this to be?

20  A.   One of the photos from Vietnam.

21  Q.   And 603?

22  A.   The same.

23  Q.   And 601?

24  A.   The trip he took to Israel with Joanna.

25  Q.   And 604?

65

Ms. Simonsen - Direct - Mr. Spector

1  A.   The same.

2  Q.   Now how did you react when you saw this photo, 604?

3  A.   Well, I didn't want to save it on my computer because

4  I thought it was just well a little bit too much.

5  Q.   You said you didn't want to save it on your computer,

6  did you save the other three photos?

7  A.   Yes.

8  Q.   But not this one?

9  A.   No.

10  Q.   You said it's a little too much.  Were you concerned

11  when you saw that?

12  A.   Well, I thought it was a bit strange but maybe it was

13  -- you know, I couldn't know about it, maybe it was just

14  a cultural thing.  Maybe they were used to kissing on the

15  mouth that in a sort of a grandfatherly way.  And then at

16  the same time, this is not a business trip but a trip he

17  took with his friend at the time.  So --

18  Q.   If I can focus you back on the bottom of page 11, if

19  you can just read the highlighted portion there.

20  A.   Yup.  "I really suggest that you will consider me and

21  Elena, our home, as part of your new family without

22  taking anything from your family in Denmark.  It will

23  make all of our lives easy and more pleasant."

24  Q.   And having read that, did that, what you just read,

25  have any impact on how you reacted to Exhibit 604?

66

Ms. Simonsen - Direct - Mr. Spector

1   A.   Yes.  I definitely read it more in the warm family

2   relationship manner.

3   Q.   Did there come a time you made a decision about

4   whether to come to the United States for this job?

5   A.   Yes, I'd done that before reading this.

6   Q.   And who paid for your ticket?

7   A.   I did.

8   Q.   Who made the travel arrangements?

9   A.   Well, Joseph did.

10  Q.   During the e-mails you'd have directly with the

11  defendant, would he ever say or write, I should say,

12  provocative things?

13  A.   Yes.

14  Q.   Would he ever ask questions of you about sex?

15  A.   Yes.

16  Q.   And what did you think of that?

17  A.   I thought it was provocative but maybe he was just

18  testing me to see if I could -- if I would react to that.

19  Q.   And how did you react?

20  A.   Well I just answered him as cooly as I could and just

21  answered without getting into any details.

22  Q.   If we can turn to page 3?

23              MR. SPECTOR:  Your Honor, I believe a juror had

24  made a request to see the photo.

25              THE COURT:  Which one?  Which photo, not which

67

Ms. Simonsen - Direct - Mr. Spector

1  juror?  Which photo?

2           THE JUROR:  The photo that she did not save.

3           THE COURT:  Put it up.

4  Q.  Just to be clear, the defendant sent you four photos;

5  correct?

6  A.  Yes.

7  Q.  And there were two from Vietnam; is that correct?

8  A.  Yes.

9  Q.  This is 603?

10          THE COURT:  No, the juror wanted to see the one

11  that she didn't save.

12          MR. SPECTOR:  Sorry.

13  Q.  This, Exhibit 604, this is the photo that you did not

14  save on your computer?

15  A.  Yes.

16  Q.  Turning to page 3, if you can read aloud the

17  highlighted portions there?

18  A.  "For two days I did not receive an e-mail from you.

19  How could you do it to the man who loves you more than

20  anything else, okay, but the yoga freak."

21  Q.  What did you understand that to be a reference to?

22  A.  Well, the yoga freak would be the reference to my

23  boyfriend.

24  Q.  Your boyfriend at the time?

25  A.  Yes.

Transcription Plus II, Inc.

68

Ms. Simonsen - Direct - Mr. Spector

1   Q.   And what did you think when you read that?

2   A.   Well, I thought that he is saying this tongue-in-

3   cheek.  That is, just you know -- yeah, a funny way of

4   trying to provoke me again, I think.

5   Q.   And then turning to the next highlighted portion, if

6   you can read that aloud please.

7   A.   "Just to be honest with the current temporary love of

8   your life, try gently to prepare him for the possibility

9   that the tears that will flash your long nose on January

10  4 are the last image of yours he will see but when you

11  will come for home visits to Denmark after August 2007.

12  The best way of doing it is by making sure that one of

13  your girlfriends will comfort him."

14  Q.   The phrase, the current temporary love of your life,

15  what did you understand that to refer to?

16  A.   Well, that would be my boyfriend at the time.

17  Q.   And the last line there --

18  A.   Uh-huh.

19  Q.   -- about one of your girlfriends comforting, what did

20  you think of that?

21  A.   That it was also a sort of outright provocation but,

22  of course -- well, I just decided to ignore it.

23  Q.   Why was that?

24  A.   Well, I thought it was a stupid thing to write.

25  Q.   Were you concerned at this point that he wanted to

69

Ms. Simonsen - Direct - Mr. Spector

1   have a sexual relationship?

2   A.   No.

3   Q.   Why?

4   A.   Because I was confirmed all the time that he wasn't

5   interested in me in that way.  It was always said no, not

6   the Turk's way.  He never tried to have sex with Sylvia.

7   Q.   did you ever send the defendant a letter before you

8   came to the United States?

9   A.   Yes.

10  Q.   What was that?

11  A.   Well that was a Christmas card.

12       MR. SPECTOR:  If I can show the witness what's

13  been marked as Government Exhibit 3-H.

14  Q.   What is that document?

15  A.   It looks like the envelope from the Christmas card I

16  sent.

17       MR. SPECTOR:  The government offers 3-H.

18       MR. SCHNEIDER:  No objection.

19       THE COURT:  It's admitted.

20  (Government's Exhibit 3-H marked in evidence.)

21       MR. SPECTOR:  May I publish?

22  Q.   Why did you send him a Christmas card?

23  A.   Because it's tradition to do it in Denmark and you

24  send Christmas card to your family and friends.  I

25  thought it was a good way to create a good relation.

70

Ms. Simonsen - Direct - Mr. Spector

1   Q.   And if we can turn back to the -- I'm sorry, if we

2   can actually turn to page 4.

3   A.   Uh-huh.

4   Q.   The bottom of page 4, is that an e-mail you sent to

5   the defendant?

6   A.   Yes.

7   Q.   If you can read aloud the highlighted portion there?

8   A.   "By the way, before I forget, my boss' wife used to

9   work at a tourist bureau advising people in the

10  traveling.  She told me that it might be a good idea to

11  have an official letter from you saying that I am going

12  to live with you as a guest or something like that, as I

13  might be asked when arriving in the U.S. where I am going

14  and what for."

15  Q.   When you wrote that, were you concerned about what

16  might happen in immigration when you arrived in the

17  United States?

18  A.   Yes, a bit.

19  Q.   And if we can turn to page 1, the very first page,

20  just at the top, what is that document?

21  A.   Well, it's an e-mail sent from

22  InStyleCompanies@aol.com December 30, 2005.

23  Q.   And if you can read aloud the highlighted portion?

24  A.   "To whom it may concern:  Anne Rosa Simonsen is a

25  daughter of good friends of ours and we are happy to

71

Ms. Simonsen - Direct - Mr. Spector

1  invite her to be our guest on a trip she is taking to the

2  states.  She will be staying with us and, of course, we

3  will take care of all of her expenses.  We intend to show

4  her different parts of America by taking her with us on a

5  coast-to-coast trip."

6  Q.   Was the information in that letter true?

7  A.   No.

8  Q.   What did you understand the purpose of that was?

9  A.   I was supposed to show it to immigration if I were

10  asked any questions while I was there.

11          MR. SPECTOR:  We can put the binders aside now,

12  your Honor.

13          THE CLERK:  Place them under your seats,

14  please.

15  Q.   Ms. Simonsen, did there come a time or excuse me, did

16  you come to the United States in January 2006?

17  A.   Yes.

18  Q.   How old were you at the point?

19  A.   I was twenty years old.

20  Q.   And what airport did you arrive into?

21  A.   In John F. Kennedy.

22  Q.   Did you speak to immigration officials at J.F.K.

23  Airport?

24  A.   Yes.

25  Q.   And what did you tell them?

72

                    Ms. Simonsen - Direct - Mr. Spector

1   A.   I said I was here as a tourist.

2   Q.   Was that true?

3   A.   No.

4   Q.   No, why note?

5   A.   Because I was going to work for Yannai.

6   Q.   And why did you lie to the immigration authorities?

7   A.   Because I had been told to do so.

8   Q.   By whom?

9   A.   By Joseph Yannai.

10  Q.   Have you been granted immunity for your testimony

11  today?

12  A.   Yes.

13          MR. SPECTOR:  If I can show a document to the

14  witness?

15  Q.   I'm showing you what's been marked as 3500-ARS-20.

16  Do you recognize that document?

17  A.   Yes.

18  Q.   What is it?

19  A.   It's a letter from the United States Attorney to my

20  lawyers appointed in this case and saying that I cannot

21  be subject to prosecution.

22  Q.   Does that letter give you any protection if you lie

23  in court today?

24  A.   Not if I lie in court; no.

25  Q.   Do you have a lawyer for this case?

73

Ms. Simonsen - Direct - Mr. Spector

1   A.   Yes.

2   Q.   Who is your lawyer?

3   A.   Michael Beys.

4   Q.   And did you review this letter with your lawyer

5   before testifying?

6   A.   Yes.

7   Q.   Now in addition to the promise in the letter, do you

8   know if there's any other reason that you could not be

9   prosecuted for lying to immigration?

10  A.   Yes, my lawyer informed me of the statute of

11  limitations saying that after five years I cannot be

12  subject to prosecution.

13  Q.   And when you entered the United States in January of

14  2006, was that more than five years ago?

15  A.   Yes.

16  Q.   So after you passed through immigration, what

17  happened next?

18  A.   I went to pick up my luggage and Joseph Yannai came

19  and picked me up.

20  Q.   And what did the defendant do when he picked you up

21  at the airport?

22  A.   He hugged me and he kissed me on the cheek.

23  Q.   What did you think about that?

24  A.   Well, I was tired but it was maybe a little bit too

25  much.  But I wasn't concerned.

74

Ms. Simonsen - Direct - Mr. Spector

1   Q.   Was there anyone else in the car at that point?

2   A.   No.

3   Q.   Where did you go after he picked you up?

4   A.   Well, we went straight to his home in Pound Ridge.

5   Q.   Do you remember approximately how long the drive was?

6   A.   It was more than an hour.

7   Q.   How would you describe the area where the defendant

8   lived?

9   A.   Well, we arrived in the nighttime, so it was pretty

10  dark but it was very isolated.  The house is -- there was

11  a big distance between the houses and it was sort of

12  isolated.

13  Q.   What happened after you arrived at the defendant's

14  house?

15  A.   Well, we went into the kitchen and his wife Elena was

16  there.  And he would like hug me and Elena didn't really

17  react.

18  Q.   Did you have any further conversation with the

19  defendant that night in his home?

20  A.   Yes, I asked if I could use the phone, just to call

21  to my parents and my boyfriend and let them know that I

22  had arrived.  But Joseph said that it will be better I

23  use the phone the next morning.

24  Q.   And did he make any other comments about you?

25  A.   Yes, he commended on my figure.  I don't remember

Ms. Simonsen - Direct - Mr. Spector

1 quite exactly what he said but it made me feel

2 uncomfortable.

3 Q.   And after that, what happened next that night?

4 A.   Well I was shown to my room and well, I fell asleep

5 pretty quickly.

6 Q.   Did you make an attempt to use a phone?

7 A.   No.

8 Q.   Did you bring a phone with you?

9 A.   Oh, yes, I brought my cell phone and I also looked t

10 see if there was any connection but it doesn't work in

11 the states.

12 Q.   What happened the next morning?

13 A.   Well, I got up and got dressed and I asked to use the

14 shower.  And Elena showed me the shower downstairs.

15 Q.   And after Elena showed you around, did -- what did

16 you do next?

17 A.   Well, I was given the tour of the house by Elena.

18 She showed me where things were situated and stuff like

19 that.

20 Q.   And did you make a request after that?  Did you ask

21 to use the phone after that?

22 A.   Yes, but to Joseph when he later showed me the

23 downstairs room where the office were.

24 Q.   And how did the defendant react when you asked to use

25 the phone?

                Ms. Simonsen - Direct - Mr. Spector

1   A.   He was like, oh, okay, all right.  You -- accept it

2   but it was not -- it was really reluctant.

3   Q.   Who did you call?

4   A.   Well, first I called my parents.

5   Q.   And did you call anyone after that

6   A.   Yes, I called my boyfriend after that.

7   Q.   What language were these phone calls in?

8   A.   They were in Danish.

9   Q.   And what, if anything, happened while you were on the

10  phone with your boyfriend?

11  A.   Well, after some five or ten minutes, Joseph would

12  come over to me and hang up the phone mid-sentence.

13  Q.   And after the defendant hung up the phone, what, if

14  anything, did he say?

15  A.   He told me that I should not talk this extensively

16  with the people back home that from now on, I would have

17  to mature and that meant not talking with my family or my

18  boyfriend.  But if I really needed to contact them in any

19  way, I would have to send e-mails.

20  Q.   And what, if anything, did he say about how you were

21  to send these e-mails?

22  A.   Well it would have to be from his account and in

23  English, not in Danish because if I didn't do that, it

24  would pose a virus threat.

25  Q.   Is that what he said?

77

Ms. Simonsen - Direct - Mr. Spector

1  A.   Yes.

2  Q.   What happened next?

3  A.   Well, he approached me and he hugged me.  And then he

4  tried to kiss me but I turned my head away.

5  Q.   And what did he do when you turned your head away?

6  A.   He would then grab my head and forcefully kiss me on

7  the mouth.

8  Q.   Were you physically able to get away from him at that

9  point?

10 A.   No.

11 Q.   How did the defendant's actions make you feel?

12 A.   Well, I tried to back off and I said that this was

13 really too much and I didn't like it.  And then he would

14 -- he would just say that, "Oh, I shouldn't resist his

15 love."  He loved me and he had loved me all my life.

16 Q.   Did you make a decision about what you wanted to do

17 at that point?

18 A.   Well, I suddenly wanted to go home at that point.

19 Q.   Did you tell the defendant right away?

20 A.   No.

21 Q.   Why not?

22 A.   Because I would have to find a solution to do this.

23 Q.   What do you mean by that?

24 A.   Well, I just didn't really know how to say that

25 straight away.  I was in shock.  I had just been kissed

Ms. Simonsen - Direct - Mr. Spector

1   without my will.

2   Q.   And approximately how large was the defendant at that

3   point?  What was his sizes?

4   A.   Well he was much taller than me and he was very big.

5   Q.   And were you about the same size as you are now?

6   A.   Yes.

7   Q.   So, after that incident occurred, what happened next?

8   A.   Well, he was sort of mad at me for trying to push him

9   away.  So he asked, okay, maybe we should just get to

10  work now and he would turn on the computer and he asked

11  me to go fetch some coffee which I did.  And then when I

12  returned, he told me to research a French restaurant or a

13  hotel or something on the internet.

14  Q.   And did you do that?

15  A.   Yes.

16  Q.   What happened next?

17  A.   Well the telephone rang while I was doing the

18  research.  So Joseph went upstairs to get it and I did my

19  research as I was told.

20  Q.   Did there come a time you had lunch?

21  A.   Yes, Elena came down and told me to come have lunch

22  with them upstairs.

23  Q.   What happened during lunch?

24  A.   Well, the telephone rang again and the telephone is

25  in the same room.  So, Joseph got it.

Ms. Simonsen - Direct - Mr. Spector

1  Q.   And what happened?

2  A.   Well, it was for me he said.  It was an emergency.

3  So, I took the phone and it was my boyfriend.

4  Q.   And without telling us what your boyfriend said, can

5  you tell us if you observed any emotional reaction in his

6  voice?

7  A.   Yes, he was clearly very concerned for me.

8  Q.   Did anyone else come on the phone at that time?

9  A.   Yes, my sister came on the phone, too because she

10 lives in the same dormitory as he did.

11 Q.   And while you were speaking on the phone to your

12 boyfriend and sister, how did the defendant react?

13 A.   Well, he started gesturing to me to hang up because

14 he was impatient and you know, he didn't like this

15 apparently.

16 Q.   Approximately how long did you spend on the phone

17 with your boyfriend and sister?

18 A.   I think ten minutes.

19 Q.   And what language were you speaking?

20 A.   In Danish.

21 Q.   What happened after you finished the call?

22 A.   Well, Joseph came to me and he was furious.  He asked

23 me "What is going on?"  And I said, "Well, there's

24 somebody concerned for me, maybe want me to go home."

25 And then he said, "Well that's not an emergency.  I've

Ms. Simonsen - Direct - Mr. Spector

1  been lied to."  And he was furious.

2  Q.   And so what happened next?

3  A.   Well, he yell at me to come follow him into the

4  living room and we sat down.  And he told me that I would

5  have to chose now, either I stayed with him for the next

6  six months as we had agreed on but in that case, he would

7  have to decide what I was going to wear, who I was going

8  to talk to, how I was going to behave, everything or I

9  could go home in the morning.  And he told me that I had

10 an hour to decide.

11 Q.   Now in giving you these two choices, when he

12 described the choice about what would happen if you stay,

13 did he say that if you stayed, you'd be engaging in

14 sexual contact with him?

15 A.   No.

16 Q.   You said he had given you an hour to decide.  Did you

17 need any time to decide?

18 A.   I did not.

19 Q.   What did you do?

20 A.   Well, I went to my room because he had told me to

21 wait for an hour and I was in shock and I was shaken by

22 the events.  And I just sat down on the bed.

23 Q.   And what, if anything, happened while you were in

24 your room?

25 A.   Well I heard the telephone ringing again and I heard

Ms. Simonsen - Direct - Mr. Spector

1   him answering it and just shouting really, really loudly,

2   "Stop --"

3   Q.   When you say him, who are you referring to?

4   A.   Joseph Yannai.

5   Q.   And what did he shout?

6   A.   "Stop calling me, you fucking Danes.  Anne can't talk

7   right now. She's asleep."

8   Q.   After the hour was up, what did you do next?

9   A.   Well, I went to find him and I told him, of course,

10   that I wanted to go home the next day.

11   Q.   And how did he react?

12   A.   He just sighed and he looked really angry.

13   Q.   What happened next?

14   A.   He told me to find my credit card, so we could buy an

15   airline ticket for the next day.  So I went to find my

16   card and we went to the computer where he found the

17   airline ticket.

18   Q.   In addition to your credit card, did he ask you for

19   anything else?

20   A.   He also asked me for the e-mail address of my

21   parents.

22   Q.   Did you give that to him?

23   A.   Yes.

24   Q.   Why?

25   A.   Because he as threatening.

Ms. Simonsen - Direct - Mr. Spector

1   Q.   What happened next?

2   A.   Well, he sent an e-mail to my parents informing them

3   of when I was coming home but he also wrote a lot of

4   insulting things about me being immature and things like

5   that.

6   Q.   And you said you gave it to him because he was

7   threatening.  What do you mean by that?

8   A.   Well, he was shouting and really threatening towards

9   me.

10  Q.   Did you see him type this e-mail to your parents?

11  A.   Yes, I thought it was some kind of power

12  demonstration because I just wanted to talk to my parents

13  and he was showing that he could do it.  He was in

14  charge.

15  Q.   Did you try to stop him from writing the e-mail?

16  A.   No.

17  Q.   Why not?

18  A.   Because I didn't dare.

19  Q.   What did you do after that?

20  A.   I went to my room.  And yeah, I sat on the bed.

21  There was nothing much else to do.  And I remember I

22  wanted to try to calm myself.  So I started reading a

23  book and at some point, I fell asleep.

24  Q.   What happened when you woke up?

25  A.   Well, it was in the evening, I think around 8:00 or

Ms. Simonsen - Direct - Mr. Spector

1    9:00 in the evening.  I was really hungry because I got

2    very little to eat.  So I went to the kitchen and I was

3    all by myself there.  So I just cooked myself some

4    noodles from the cupboard.

5    Q.   And after you ate, what did you do?

6    A.   I went back to bed and yeah, I tried to fall asleep.

7    Q.   Were you able to sleep?

8    A.   No, I was just so worried.

9    Q.   And how were you feeling at that point physically?

10   A.   I started shaking.  I think that I was like almost in

11   -- having a panic attack or something.  I was shaking.  I

12   felt nauseous and I was sweating and just so afraid.

13   Q.   Did you think about leaving the house at that point?

14   A.   Yes, I did, but I figured I don't know this area and

15   it's dark out.  There's snow everywhere.  I didn't know

16   anything about infrastructure or anything, so I actually

17   didn't dare to go out myself.

18   Q.   What did you do?

19   A.   Well, at one point I just got so nervous that I

20   thought well maybe I can appeal to Elena.  And so --

21   Q.   What did you want to appeal to her for?

22   A.   Because I thought that if there was anything human to

23   find in this couple, it would be in Elena.

24   Q.   And was there anything in particular that you were

25   going to ask for?

84

Ms. Simonsen - Direct - Mr. Spector

1   A.   I was going to ask if I could just please call home.

2   And so, I went downstairs to their bedroom and I opened

3   the door and they were watching TV.  And I told them that

4   I was feeling sick.

5   Q.   And what happened next?

6   A.   Well, Elena turned to her husband and said, "Go tuck

7   her in."

8   Q.   And what happened after that?

9   A.   Well, Joseph would follow me to my room and I just

10  asked on the way, "Could I please use the phone to call

11  home, just once?"  But he said, "No, you're not sick."

12  And then he guided me to my room and well, I laid down

13  under the blanket.

14  Q.   And what did he do when you laid down on the blanket.

15  A.   He came over and he patted my shoulder.  I was laying

16  on the side.

17  Q.   And what happened next?

18  A.   Well, suddenly he crept down beside me in the bed

19  under the blanket.

20  Q.   How were you feeling at that point?

21  A.   I was paralyzed.  I was really, really afraid.

22  Q.   What happened next?

23  A.   Well he continued stroking my arm and my shoulder.

24  And then suddenly he would -- he grabbed my breasts.

25  Q.   Was that over your shirt or under your shirt?

Ms. Simonsen - Direct - Mr. Spector

1  A.   That was from outside the t-shirt and I said, "Oh,

2  don't do this."  And I tried to push his hand away and I

3  said, "Don't do this.  It's my boyfriend's privilege."

4

5  Q.   And what did he do when you did that?

6  A.   He continued and said "If you don't let me do this, I

7  will just put my hand under the t-shirt."

8  Q.   Did you feel anything physically at that point in the

9  bed?

10  A.   Yes, I also felt his erection pushing against my

11  thigh.

12  Q.   How did you feel at that point?

13  A.   I was afraid.  I didn't dare do anything.

14  Q.   What were you afraid of?

15  A.   I was afraid that he would rape me.

16  Q.   So what happened next?

17  A.   Well, I tried to, you know, to just sort of push him

18  a little bit away.  And I just kept saying, "Oh, I think

19  I need some sleep and I have a long trip tomorrow.  So,

20  please just leave me alone.  Please leave me alone."

21  Q.   And how did he respond?

22  A.   Well, after a while, he got up and left me.

23  Q.   How long had he continued to have his hand on your

24  breast?

25  A.   Five or ten minutes.

86

Ms. Simonsen - Direct - Mr. Spector

1   Q.   And after he left, were you able to sleep?

2   A.   No.

3   Q.   Uhm.

4   A.   Not really.  I think I might have dozed off a bit but

5   I was just afraid.

6   Q.   What happened the next morning?

7   A.   Well, I got up and I packed my things and then I went

8   to the kitchen and Elena was there and she just acting

9   like nothing had happened.  And Joseph got my suitcase

10  and put it in the trunk of the car and yeah.

11  Q.   Did anything happen on the ride to the airport?

12  A.   No, Joseph didn't say a word.  He was so angry and he

13  never spoke to me at all.  And then at one time, I

14  remember we took a side road from the highway and again,

15  I was just afraid that he would take me to some sort of

16  desolate place and yeah, maybe rape me but he didn't.  He

17  just went to buy something in a grocery shop and then we

18  went straight to the airport.

19  Q.   After you got back home, what if anything did you do

20  with respect to the au pair website?

21  A.   Well, I contacted them within a few days and told

22  them what had happened to me and that they should please

23  remove his profile because he was a fraud.

24  Q.   And what, if anything, did you notice about what

25  happened to his profile on the website after that?

87

Ms. Simonsen - Direct - Mr. Spector

1  A.   It was deleted.

2  Q.   Did you ever have any further contact with the

3  defendant after you came back home?

4  A.   No.

5  Q.   What did you do for work after you returned to

6  Denmark?

7  A.   Well, I went as au pair, three weeks after in France.

8  Q.   And did you have any problems with that experience?

9  A.   No, it was lovely.

10 Q.   Did you ever do any internet research about the

11 defendant?

12 A.   Yes.

13 Q.   Why was that?

14 A.   Because I suspected that there would be other girls

15 who had suffered the same destiny as I had and maybe even

16 worse.

17 Q.   How often would you search -- would you do that kind

18 of search?

19 A.   I think maybe once every half a year.

20 Q.   Now without telling us what you saw, did there come a

21 time that you saw something on the internet?

22 A.   I saw something on the internet in the summer of

23 2009.

24 Q.   And what did you do after seeing that?

25 A.   I contacted the authorities in the United States.

Ms. Simonsen - Direct - Mr. Spector

1   Q.   Before you contacted the authorities, did anyone from

2   law enforcement contact you about the case?

3   A.   No.

4   Q.   Are you hoping to get any kind of benefit from

5   testifying here today?

6   A.   No.

7   Q.   Were you required to come here?

8   A.   No, I am voluntarily here.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

89

Ms. Simonsen - Direct - Mr. Spector

1    Q.    Why did you decide to come testify?

2            MR. SCHNEIDER:  Objection.

3            THE COURT:  Sustained.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ms. Simonsen - Cross - Mr. Schneider

1   Q.   Do you know someone named Laura Ramirez?

2   A.   No.

3   Q.   Do you know someone named Natalie Yagoub?

4   A.   No.

5   Q.   Do you know someone named Vanessa Stenzel?

6   A.   No.

7   Q.   Do you know someone named Andrea Kramer?

8   A.   No.

9   Q.   Do you know someone named Isabel Krintz?

10  A.   No.

11  Q.   Do you know someone named Bernadette Herczeg?

12  A.   No.

13  Q.   Do you know someone named Giselle Lunkes?

14  A.   No.

15  Q.   Do you know who any of the other witnesses in this

16  case are?

17  A.   No.

18          MR. SPECTOR:  May I have a moment, your Honor?

19  No further questions, your Honor.

20  CROSS-EXAMINATION

21  BY MR. SCHNEIDER:

22  Q.   Good afternoon, Ms. Simonsen.

23  A.   Good afternoon.

24  Q.   My name's Mike Schneider.  I'm going to ask you some

25  questions.  All right?

91

Ms. Simonsen - Cross - Mr. Schneider

1   A.   Uh-huh.

2   Q.   First I'm going to ask you about when you arrived at

3   JFK Airport on January 4th.  It's 2006; is that right?

4   A.   Yes.

5   Q.   Your plane arrived late; is that correct?

6   A.   Yes.

7   Q.   Do you remember about what time?

8   A.   It was late in the evening.  It was dark.  I think

9   around 11 o'clock or something.

10  Q.   And you were coming from Denmark, correct?

11  A.   Yes.

12  Q.   And you had been living in Denmark your entire life

13  up until then?

14  A.   Yes.

15  Q.   Denmark is six hours behind --

16  A.   Yes.

17  Q.   -- New York?

18       So if you arrived at 11:00 it would be 5:00 a.m. in

19  Denmark, correct?

20  A.   Yes.

21  Q.   And Mr. Yannai was there to pick you up at the

22  airport?

23  A.   Yes.

24  Q.   And you said he hugged you and he kissed you on your

25  cheek, correct?

Ms. Simonsen - Cross - Mr. Schneider

1  A.   Yes.

2  Q.   Did that surprise you?

3  A.   Not much.

4  Q.   It seemed reasonable to you for him to do that; is

5  that right?

6  A.   Yeah, but maybe just a little too much.  We hadn't

7  met each other before remember.

8  Q.   I recall.  But you had had, you had exchanged e-mail

9  messages with Joseph, correct?

10 A.   Yes.

11 Q.   I'm going to -- you still have your binder in front

12 of you with the e-mails in them?

13 A.   Yes.

14 Q.   I'm going to show you what's been previously marked

15 as Defendant's Exhibit AS-1.  I think it's page 9 in your

16 binder.

17       MR. SCHNEIDER:  Can I put it on the -- you guys

18 don't need a binder.  I'm going to show it on the screen.

19 It'll be easier that way.

20 Q.   Okay.  So this is -- you looked at this e-mail before

21 when you were meeting with the prosecutors; is that

22 right?

23 A.   Yes.

24 Q.   And you confirmed that you received this e-mail and

25 you responded to it, correct?

Ms. Simonsen - Cross - Mr. Schneider

1   A.   Yes.

2   Q.   And if you could just -- maybe I could do it over

3   here.  See where I put that purple mark?

4   A.   Yes, I see that.

5   Q.   Can you read from that purple mark to the end of that

6   paragraph?

7   A.   "Can you try and consider me as a long-time friend, a

8   man who you love (no, not the Turk's way) for a long time

9   and feel confident with him.  I am facing a real conflict

10  with you that you will have to help me solving just

11  because you still play the cold fish in our exchange of

12  e-mails.  And I don't have the data to figure it out by

13  myself."

14  Q.   So in that e-mail with Mr. Yannai, you had never met

15  him before you got that e-mail, correct?

16  A.   No.

17  Q.   But he was telling you to consider him as a long-time

18  friend.

19  A.   Sorry.  Yeah.

20  Q.   Did that strike you as odd?

21  A.   Yeah, a little bit because it's sort of forced.  You

22  cannot really be friends with somebody you haven't met.

23  Q.   Could you turn to I think it's page 17 in your

24  binder?  I'm going to show you what's been previously

25  marked as Defendant's Exhibit AS-2. Put it on the screen.

Ms. Simonsen - Cross - Mr. Schneider

1   This is, again, a e-mail that you sent to Joseph, right?

2   A.   Yes.

3   Q.   You confirmed, again, that you actually wrote this e-

4   mail, right?

5   A.   Yes.

6   Q.   Can you read that paragraph next to the mark I just

7   put?

8   A.   "As to the way Joseph is, I will not be offended or

9   anything when hugging and kissing.  We do that a lot in

10  my family as well.  And since I am going to be part of

11  their home it comes rather naturally, the intimate

12  relationship that is."  Should I continue?

13  Q.   No, that's fine.  You wrote that, correct?

14  A.   Yes.

15  Q.   And well, how is your English at this time in 2006?

16  A.   Probably not quite as good as it is now, but --

17  Q.   Did you knew you were writing when you said it comes

18  rather naturally the intimate relationship?

19  A.   I don't think I thought too much about it.

20  Q.   All right.  Can you turn to page 19?

21  A.   Uh-huh.

22  Q.   This is a e-mail that you received from a person who

23  you thought was Sylvia, right?

24  A.   Right.

25  Q.   Can you start reading from "he will behave"?

95

Ms. Simonsen - Cross - Mr. Schneider

1   A.   Yeah.  "He will behave to you and that is how he

2   behaves from the very first minute, as if he knows you

3   and loves you for the last 10 years ignoring the fact

4   that you were then 9 years old and will not understand if

5   you will not behave the same."

6   Q.   And the next line as well.

7   A.   "There is a lot of intimacy, and I do not mean sex.

8   You will realize especially when traveling with him that

9   there will be many occasions that will invite a sexual

10  relationship, but that will be the last thing on his

11  mind."

12  Q.   Okay.  So you believed that Sylvia was a actual young

13  woman sort of like you, right?

14  A.   Yes.

15  Q.   And that she had written to you that he was going to

16  be intimate with you.

17  A.   Yes.

18  Q.   Now, you drove from the airport to Pound Ridge,

19  correct?

20  A.   Correct.

21  Q.   And how long did it take, do you recall?

22  A.   Well, as I said, a bit more than an hour.

23  Q.   Anything odd happen during the drive, anything that

24  worried you?

25  A.   No.

Ms. Simonsen - Cross - Mr. Schneider

1   Q.   Did you sleep?

2   A.   No.  I think I may have dozed off sometimes during

3   the way home.

4   Q.   Did you have a conversation with Mr. Yannai when you

5   were driving?

6   A.   Yes.

7   Q.   Was there anything about the conversation that made

8   you feel strange or odd or anything like that?

9   A.   No, I don't remember what we talked about.

10  Q.   And so you arrived at Pound Ridge it must have been

11  sometime after midnight; is that fair to say?

12  A.   Yes.

13  Q.   And so was Elena, Joseph's wife, there when you

14  arrived?

15  A.   Yes, she was there.

16  Q.   Was she awake?

17  A.   Yes, she was awake.

18  Q.   And you met her?

19  A.   I met her.

20  Q.   And did anything happen that night to make you worry,

21  anything make you afraid that night?

22  A.   Well, I wasn't worried but I just thought it was --

23  he was maybe a bit too physical.  But I wasn't worried

24  yet.

25  Q.   So he hugged you again when you got to the house?

                Ms. Simonsen - Cross - Mr. Schneider

1   A.   Yes.

2   Q.   And that was in front of his wife.

3   A.   Yeah.

4   Q.   And it was a little too intimate for you; would that

5   be accurate to say?

6   A.   Yes.

7   Q.   But you weren't worried.

8   A.   No.

9   Q.   And he also would tell you he loved you, right?

10  A.   Yeah.  I don't remember if he said that that night.

11  Q.   The next day did he say that?

12  A.   Yes.

13  Q.   What did you think about that?

14  A.   Well, when he said that he'd just been trying to kiss

15  me.  So I thought that was odd.

16  Q.   I'm going to show you what's been previously marked

17  Defendant's Exhibit P-1 and P-2 for identification at

18  this time.  It's hard to see on this screen because it's

19  glossy.  I --

20  A.   Well, I know the picture.

21  Q.   You recognize that picture, right?

22  A.   Yes.

23  Q.   That's the same one that the Government put into

24  evidence.  Does it appear to be the same one --

25  A.   Oh, yeah.  Yes, it's the same one.  I'm sorry.

Ms. Simonsen - Cross - Mr. Schneider

1  Q.   And Defendant's Exhibit P-1.

2  A.   Yes.

3  Q.   Does that appear to be the same one the Government

4  put into evidence?

5  A.   It's the same.

6           MR. SCHNEIDER:  I offer these into evidence,

7  Your Honor.

8           MR. SPECTOR:  No objection.

9           THE COURT:  But they were already in evidence.

10           MR. SCHNEIDER:  They are but I paid for

11  glossies.

12           THE COURT:  I'm sorry.

13           MR. SCHNEIDER:  I paid for glossies, Judge.  I

14  can't -- I've got to put these in.  They're better

15  images.

16           THE COURT:  Oh.  So what's the objection?

17           MR. SPECTOR:  There's no objection, Your Honor.

18           THE COURT:  Oh, I'm sorry.  Go ahead.  They're

19  admitted.

20  (Defendant's Exhibits P-1 and P-2 marked in evidence.)

21           MR. SCHNEIDER:  Could we publish this to the

22  jury?

23           THE COURT:  Go ahead.

24  Q.   So this is the -- this is one of the pictures that he

25  -- you received through e-mail, correct?

99

Ms. Simonsen - Cross - Mr. Schneider

1  A.   Yes.

2  Q.   And at some point you deleted this picture from your

3  computer; is that right?

4  A.   Yes.

5  Q.   When did you delete it?

6  A.   Well, just after seeing it the first time.

7  Q.   Just right when you got it back in --

8  A.   Yeah.

9  Q.   -- November of 2005, something like that.

10 A.   Yes.

11 Q.   And why did you delete it?

12 A.   Well, because I thought it was a little too much to

13 show me.  I couldn't see the relevance.

14 Q.   You didn't see it was relevant that he was showing

15 himself kissing a young woman on the lips.

16 A.   No.

17 Q.   Now, you attempt -- I'm sorry, you attempted to

18 contact the U.S. Embassy in Denmark --

19 A.   Yes.

20 Q.   -- to see about a visa to be able to work legally in

21 the United States, correct?

22 A.   Yes.

23 Q.   Because you knew you probably would have to get a

24 visa if you wanted to work; is that right?

25 A.   Yes.

100

Ms. Simonsen - Cross - Mr. Schneider

1  Q.   And at some point, you had a e-mail conversation with

2  I guess Sylvie (ph) and Joseph, and they said no, you

3  can't get a work visa for the work you're going to do; is

4  that right?

5  A.   Yes, that's true.

6  Q.   And they said it's better that you just come and say

7  that you're a tourist basically, you're going to come

8  visit friends, right?

9  A.   Yes.

10  Q.   And you did that.

11  A.   Yes.

12  Q.   And when you came to the airport did they ask you

13  what your purpose was?

14  A.   Yes.

15  Q.   And you said what?

16  A.   I think I said tourism.

17  Q.   That was a lie, right?

18  A.   Yes.  I was instructed to say that.

19  Q.   Well, you were instructed.  You never met this

20  person, right?

21  A.   Well, over e-mails.

22  Q.   You never met him face-to-face.

23  A.   Right.

24  Q.   He asked you to say that so you could get through

25  immigration, right?

101

Ms. Simonsen - Cross - Mr. Schneider

1   A.   Yes.

2   Q.   And you said it.  You lied, correct?

3   A.   Yes.

4   Q.   Now, when you traveled here, did you have a round-

5   trip ticket?

6   A.   Yes.

7   Q.   And you had purchased that yourself.  Or let me

8   withdraw that.

9            Mr. Yannai had purchased that for you but with

10  your credit card; is that right?

11  A.   Yes.

12  Q.   Was your return flight -- well, let me withdraw that.

13            When were -- you were expecting to leave in

14  August.

15  A.   Yes.

16  Q.   Because you expected to start school in September,

17  correct?

18  A.   True.

19  Q.   Was your return flight for August?

20  A.   No.

21  Q.   Do you remember when it was for?

22  A.   Not exactly but as it appears from the e-mail

23  correspondence it must have been two months or two months

24  and three weeks after.

25  Q.   Because you understood that your Danish passport only

allowed you to come to the country for three months, correct?
A. Yes.
Q. And so you would have to have a return ticket within that time; is that right?
A. Yes.
Q. So you intended I assume with Mr. Yannai to change the ticket at some time later to a later date in August; is that right?
A. Yes.
Q. So the purpose for you not getting a ticket to return in August was so you could show immigration that you intended to leave the United States in a timely manner.
A. Yes.
Q. And when you came you knew that your intent was to work for --
A. Yes.
Q. -- Mr. Yannai.
A. Uh-huh.
Q. And at some point you got an attorney to explain to you the immunity that the Government was giving you before your testimony here; is that right?
A. Yes.
Q. How did that happen?
A. How was it explained?

Ms. Simonsen - Cross - Mr. Schneider

1   Q.   How did you come to meet the lawyer?  Did you call a

2   lawyer and pay him money?  How did it happen that you got

3   a lawyer?

4   A.   Well, it was given to me by the Government.

5   Q.   Did you ask for a lawyer?

6   A.   No.

7   Q.   The lawyer -- the Government said we're going to get

8   a lawyer to talk to you to explain things to you?

9   A.   Yes.  I was appointed a lawyer.

10  Q.   I understand.  Did you go to court for that?

11  A.   No.

12  Q.   The Government arranged it.

13  A.   Yes.

14  Q.   And your lawyer is Michael Beys?

15  A.   Right.

16  Q.   He's sitting -- is he sitting back there?

17  A.   Yes, he is.

18  Q.   Did you speak to him about the case, about what you

19  told the officers at JFK when you arrived?

20           MR. SPECTOR:  Objection.  Objection.

21           THE COURT:  What grounds?

22           MR. SPECTOR:  Privileged.

23           MR. SCHNEIDER:  It's her privilege, Judge.

24           THE COURT:  You can answer the question yes or

25  no.

Ms. Simonsen - Cross - Mr. Schneider

1      THE WITNESS:  I need to hear the question

2  again.

3  Q.   Did you talk to him about the facts of your case,

4  about how you came to the country, you lied to

5  immigration?

6  A.   Yes.

7  Q.   And did he explain to you the Government's immunity

8  letter?

9  A.   Yes, the statute of limitations I believe.

10  Q.   Well, when did you first contact the police in New

11  York, do you remember?

12  A.   Summer 2009.

13  Q.   Right.  And that was within five years of January

14  2006, correct?

15  A.   Yes.

16  Q.   And your understanding of the statute of limitations

17  is that you could have been prosecuted for lying to

18  immigration anywhere up until January 2011; is that

19  right?

20  A.   Yes.

21  Q.   And you first contacted the police in summer 2009?

22  A.   Yes.

23  Q.   Do you remember when you met Mr. Beys?  Was that in

24  March?

25  A.   No.  That was now, in May.

Ms. Simonsen - Cross - Mr. Schneider

1  Q.  Well, so I'm going to talk now about the next day I

2  guess when you woke up --

3  A.  Okay.

4  Q.  -- January 5th, 2007, sorry, 2006.  What happened?

5  A.  When I woke up?

6  Q.  Yeah.

7  A.  Well, I got up and I showered.  And as I said before,

8  Elena showed me around the house.  And later Joseph

9  showed me the office.

10  Q.  Do you remember when you woke up?

11  A.  I think early in the morning around 8:00.

12  Q.  You were -- I assume you were still on Danish time.

13  A.  Well --

14        THE COURT:  You mean the body clocks were --

15  Q.  That's what I meant.

16  A.  Oh, body clocks.

17  Q.  Yes.

18  A.  Oh, yeah.  I guess I was.

19  Q.  Right.  Because 8 o'clock in New York is 2:00 in the

20  afternoon in Denmark, right?

21  A.  Yes.  Yeah.

22  Q.  And at some point I guess after you had breakfast,

23  you asked -- well, was it before or after breakfast you

24  were asked to make phone calls?

25  A.  It was after.

106

Ms. Simonsen - Cross - Mr. Schneider

1   Q.   And Mr. Yannai gave you the phone.  You were able to

2   make phone calls; is that right?

3   A.   That's true.

4   Q.   You called your parents first.

5   A.   Yes.

6   Q.   What language did you speak to them in?

7   A.   Danish.

8   Q.   As far as you know does Mr. Yannai speak any Danish?

9   A.   I don't think he does, no.

10  Q.   Do you remember how long you spoke to your parents?

11  A.   Well, five minutes.

12  Q.   And then you called your boyfriend?

13  A.   Yes.

14  Q.   Was it immediately after you called your parents?

15  A.   Yes, it was immediately after.

16  Q.   And you spoke to him, correct?

17  A.   Yes.

18  Q.   In what language?

19  A.   Danish.

20  Q.   And how long did you talk to him?

21  A.   I think 10 minutes -- until the phone was hung up.

22  Q.   Say that again?

23  A.   Until the phone was hung up.

24  Q.   You say that Mr. Yannai came and he hung up the

25  phone.

Ms. Simonsen - Cross - Mr. Schneider

A.   Yes.

Q.   And what did he say to you when he hung up the phone?

A.   He told me that I should not talk this extensively
with the folks back home.

Q.   You were calling -- you were making an international
call, right, from New York to Denmark; is that right?

A.   Yes.

Q.   And at some point after that or was it immediately
after that that he kissed you?

A.   It was immediately after that.

Q.   And that -- well, you said that was too far, right?

A.   Yes.

Q.   Even though the e-mails I went through with you, you
remember saying or writing to Sylvia I will not be
offended or anything when hugging and kissing.  You
remember writing that, right?

A.   Well, there's a difference between forcing a kiss on
somebody's lips and then kissing -- both people agreeing
and kissing on the cheek, for instance.

Q.   So that's what you were expecting when you arrived.

A.   Yes.

Q.   And you didn't -- you were surprised when he tried --
when he kissed you on the lips?

A.   Yes.  I was shocked.

Q.   You were shocked.  But you didn't want it, right?

108

Ms. Simonsen - Cross - Mr. Schneider

1   A.   I did not want it, no.

2   Q.   But you -- Sylvia had written to you, he will behave

3   to you and that is how he behaves from the very first

4   minute, as if he knows you and loves you for the last 10

5   years.

6   A.   But his manner was not loving.  It was forcing

7   something on me involuntarily.

8   Q.   And you said you didn't want it, right?

9   A.   Yes.

10  Q.   And he said okay, I guess we'd better go to work

11  then, right?

12  A.   Well, yes, after holding me for some small period of

13  time.  He didn't just, like, leave me instantly.

14  Q.   What do you mean holding you?

15  A.   Well, he hugged me.

16  Q.   He hugged you?

17  A.   Yes.

18  Q.   And then he let you go.

19  A.   Yes.

20  Q.   And said it's time to get to work.  Then he took you

21  to the computer and showed you how to do research,

22  correct?

23  A.   Yes.

24  Q.   And at that minute you knew you wanted to leave,

25  right?

Ms. Simonsen - Cross - Mr. Schneider

1    A.   Yes.

2    Q.   But you didn't know how to broach the subject.  You

3    didn't know how to bring it up.

4    A.   No.

5    Q.   Why not?  Couldn't you just say look, man, you kissed

6    me, I want to -- I'm leaving?

7    A.   Well, I was in shock.

8    Q.   Well, how long did you go back and work on the

9    computer?

10   A.   I don't know, maybe for an hour.

11   Q.   And you didn't mention anything about, you know, this

12   isn't for me.  You didn't go find Joseph and say this

13   isn't for me, I'm leaving?

14   A.   Well, I was sitting in front of the computer and

15   considering different ways of doing this.

16   Q.   But you never approached him and said that, right?

17   It never came up until he brought it up; is that fair to

18   say?

19   A.   That's true.

20   Q.   And that happened after lunch; is that accurate?

21   A.   Yeah.

22   Q.   You were having lunch, and your boyfriend called.

23   A.   Yes.

24   Q.   And you spoke to your boyfriend, correct?

25   A.   Yes.

110

Ms. Simonsen - Cross - Mr. Schneider

1   Q.   And your boyfriend was very upset.

2   A.   Yes.

3   Q.   And in turn, you became very upset.

4   A.   Yes.

5   Q.   Were you crying during that phone call?

6   A.   Yes.

7   Q.   And Joseph was there the whole time, and he heard you

8   speaking in Danish, correct?

9   A.   Yes.

10  Q.   He saw you crying.

11  A.   Yes.

12  Q.   And he was motioning you to get off the phone.

13  A.   Yes.

14  Q.   And eventually, you did hang up the phone.

15  A.   Yes.

16  Q.   And you had been speaking with your boyfriend and

17  your sister.

18  A.   Yes.

19  Q.   And Joseph, at that point he took you to the

20  livingroom and he sat down on the other end of the couch

21  from you, correct?

22  A.   Yes.

23  Q.   And he had a discussion with you; is that accurate?

24  A.   That's true.

25  Q.   And he said look, you can stay here for six months.

Ms. Simonsen - Cross - Mr. Schneider

1   You can do what I say about the phones, you know, about

2   how to dress and follow my instructions, or you can go

3   back.  You decide.

4   A.   Yes.

5   Q.   And in that moment, you decided I'm going back,

6   right?

7   A.   Yes.

8   Q.   But you decided to go to your room for an hour

9   because he had given you an hour to think it over and you

10  thought it would be rude to tell him right away?

11  A.   Yes.  You don't want to say -- you don't want to do

12  anything else than what he told -- tells you to.  He was

13  very threatening.

14  Q.   Well, when you say he was threatening, did he

15  threaten to hit you?

16  A.   He was shouting to me right in the face --

17  Q.   He was yelling.

18  A.   -- and leaning over me.  Yeah.

19  Q.   So it was his tone of voice that was threatening to

20  you.

21  A.   Yes, and the fact that he had been assaulting me

22  sexually in downstairs with kissing me and grabbing me.

23  Q.   So you view the kiss downstairs as a sexual assault.

24  A.   Yes.

25  Q.   Did you call the police?

Ms. Simonsen - Cross - Mr. Schneider

1  A.   No.

2  Q.   And you got to -- he drove you to JFK the next day,

3  right?

4  A.   Uh-huh.

5  Q.   Dropped you off.

6  A.   Yes.

7  Q.   You saw police there, right?

8  A.   I don't remember that.

9  Q.   Okay.  But you didn't talk to any police officers at

10 the airport and say there's this crazy sexual assaulter,

11 did you?

12 A.   No, I didn't.

13 Q.   Did you call the police from the airport to make a

14 report?

15 A.   No.

16 Q.   When you got back to Denmark did you call the police?

17 A.   No.

18 Q.   So after -- you went to your room for an hour, and

19 then after you -- well, did you come out and talk to Mr.

20 Yannai?

21 A.   Yes.

22 Q.   And you told him you made up your mind.

23 A.   Yes.

24 Q.   You want to leave.

25 A.   Yes.

Transcription Plus II, Inc.

113

Ms. Simonsen - Cross - Mr. Schneider

1  Q.   And he said -- he asked for your credit card?

2  A.   Yes.

3  Q.   And that was so he could change your ticket, right?

4  A.   Yes.

5  Q.   Because you had a return ticket.  He had to change

6  the date; is that right?

7  A.   I think we bought a new one.

8  Q.   He didn't just change your return ticket?

9  A.   No, because I paid for a full ticket.

10  Q.   Are you sure or are you just -- I'm saying do you

11  remember that now or are you just thinking that might

12  have been what happened?

13  A.   I'm pretty sure that was what happened because it was

14  really expensive.

15  Q.   And then after that you went back up to your room,

16  right?

17  A.   Yes.

18  Q.   And at this point it was what time, do you know?

19  A.   Well, in the afternoon sometime, late in the

20  afternoon.

21  Q.   Late in the afternoon?

22  A.   Yeah, I think so.

23  Q.   So if it was 4 o'clock it would be 10 o'clock in

24  Denmark, right?

25  A.   Yes.

114

Ms. Simonsen - Cross - Mr. Schneider

1   Q.   And when you're in your room at some point you fall

2   asleep, correct?

3   A.   Yeah.

4   Q.   And you wake up later in the evening.

5   A.   Uh-huh.

6   Q.   Do you remember what time you woke up?

7   A.   Well, I think I said before around 8 o'clock.

8   Q.   And when you woke up -- well, during the time you

9   slept in your room from afternoon to evening, from 4:00

10  to 8:00 or whatever time it was, did Mr. Yannai come to

11  bother you?

12  A.   No.

13  Q.   Did he knock on your door?

14  A.   No.

15  Q.   Did he sneak in your room?

16  A.   No.

17  Q.   Come sit on your bed?

18  A.   No.

19  Q.   What happened when you woke up at 8:00 or 9:00,

20  whatever time it was?

21  A.   I went to the kitchen to get some food.

22  Q.   Did you see Mr. Yannai?

23  A.   No.

24  Q.   Did you see Elena?

25  A.   No.

Ms. Simonsen - Cross - Mr. Schneider

1  Q.   Your bedroom was on the main floor, the top floor of

2  the house, right?

3  A.   Yes.

4  Q.   And their bedroom was downstairs.

5  A.   Yes.

6  Q.   Did you go downstairs at all right after you woke up?

7  A.   No.

8  Q.   Stayed upstairs, the kitchen is on that level.

9  A.   Yes.

10 Q.   And you went to the kitchen.  You made yourself

11 dinner.

12 A.   Yes.

13 Q.   You ate it.

14 A.   Yes.

15 Q.   And you went back to your bedroom.

16 A.   Yes.

17 Q.   You never saw Mr. or Mrs. -- Mr. Yannai or his wife.

18 A.   No.

19 Q.   And you tried to go to sleep.

20 A.   Yes.

21 Q.   And you had problems going to sleep; is that right?

22 A.   Yes.

23 Q.   And you -- well, describe what happened.  How were

24 you feeling?  Did you have a panic attack?

25 A.   Yes.  I felt something like I was physically feeling

Ms. Simonsen - Cross - Mr. Schneider

1  really sick and I was shaking.

2  Q.   Physically shaking.

3  A.   Yes.

4  Q.   Do you remember what time it was?

5  A.   No.  It was after I had dinner, so in the evening

6  like 9:00 or 10:00 -- 10:00.

7  Q.   And at some point you decide to go downstairs to

8  where Mr. Yannai and his wife are in bed to -- well, what

9  was your intention?

10 A.   Well, as I said, I hoped that I could evoke some

11 sympathy and be allowed to make a phone call.

12 Q.   And when you went down to the room, weren't they

13 sleeping?

14 A.   No.  No, they were watching TV.

15 Q.   And you told them that you were feeling sick?

16 A.   Yes.

17 Q.   And did you ask to use the phone?

18 A.   Not down there because Elena would say just

19 immediately after I said I was feeling sick she said that

20 well, Joseph, go tuck her in.

21 Q.   And so then you immediately went back upstairs with

22 Joseph?

23 A.   Yes.

24 Q.   And what was he wearing?

25 A.   A tee shirt and underpants.

117

Ms. Simonsen - Cross - Mr. Schneider

1  Q.   Did you tell him you know what, I can put myself to
2  bed?
3  A.   No, but I turned to him while we were walking towards
4  my room and asked if I could use the phone.
5  Q.   And he said no, you can't, you're not sick.
6  A.   Yes.
7  Q.   And did you say you know what, I can put myself to
8  bed?
9  A.   No, I didn't.
10  Q.   And you say Joseph went back to your bedroom, right?
11  A.   Yes.
12  Q.   Were you still shaking at this time, still physically
13  shaking?
14  A.   Yes, I think I was.
15  Q.   You -- I mean, you were still -- you were having, as
16  you said, a panic attack.
17  A.   Uh-huh.
18  Q.   Would you say you appeared very upset?
19  A.   Yes.
20  Q.   And you got into bed.
21  A.   Yes.
22  Q.   And Joseph sat by the bed and he was rubbing your
23  back.
24  A.   No.  At first he just stood up and he would, like,
25  pat my shoulder.

Ms. Simonsen - Cross - Mr. Schneider

1  Q.   Pat your shoulder.

2  A.   Uh-huh.

3  Q.   And was he trying to comfort you?

4  A.   I couldn't say.  I don't know what he thought.

5  Q.   What was he saying?

6  A.   I don't remember him saying anything.

7  Q.   You knew you were going back to Denmark in the

8  morning, correct?

9  A.   Yes.

10  Q.   And you say that he eventually laid down in bed next

11  to you?

12  A.   Yes.

13  Q.   And got under the covers.

14  A.   Yes.

15  Q.   Did you tell him get out of here?

16  A.   Well, I said no, don't do this.  I believe I said

17  maybe not get out of here but I gestured to him no, don't

18  do this.

19  Q.   That's right when he first laid down you gestured

20  don't do this, or did you say don't do this?

21  A.   I gestured.

22  Q.   Did you say no, I'm okay, go back to bed?

23  A.   I don't remember quite what I said.

24  Q.   And you said at some point he touched your breast

25  over your shirt, correct?

Ms. Simonsen - Cross - Mr. Schneider

1   A.   Yes.

2   Q.   You told him look, don't do that.  That's --

3   A.   Yes.

4   Q.   That's -- my boyfriend --

5   A.   Yes.

6   Q.   -- is the only one who does that.  And you said he

7   didn't stop for minutes; is that right?

8   A.   He didn't stop.

9   Q.   I'm saying you're saying Mr. Yannai didn't stop

10   touching your breast for minutes.

11   A.   For minutes?

12   Q.   For minutes, for several minutes.

13   A.   Oh.

14   Q.   For a period of time.  For how long?

15   A.   Well, he continued doing that for a while, and then,

16   you know, he said well, if you don't let me do it I'll

17   just put my hand under your tee shirt.

18   Q.   And did you tell him you know what, just get out of

19   here then?

20   A.   Well, he just said that, you know, if I said no he

21   could -- he was so big physically laying with his hand

22   over me, you know, I didn't really feel like I could say

23   get out of here.

24   Q.   Well, at some point you said you know what, I'm

25   feeling better.  I need to get some sleep.

Ms. Simonsen - Cross - Mr. Schneider

1   A.   Yes.

2   Q.   And he left after that.

3   A.   Yes, after some minutes.

4   Q.   The next morning he took you straight to the airport.

5   A.   Yes.  Oh, not straight, he had --

6   Q.   For --

7   A.   -- a sort of detour but --

8   Q.   Anything -- aside from your fear, did anything

9   strange happen during that trip?

10  A.   No.

11  Q.   You had no conversation, correct?

12  A.   No.

13  Q.   Now, you've -- we've never met before, correct?

14  A.   Correct.

15  Q.   You've met Mr. Spector, Ms. Stone and Ms. Jager

16  before, correct?

17  A.   Yes.

18  Q.   In fact, the Government paid for you to fly to the

19  United States in March of this year; is that right?

20  A.   Yes.

21  Q.   And you met with them over two days.

22  A.   Yes.

23  Q.   And about how long did you spend with them over those

24  two days?

25  A.   I don't know, maybe four or five hours.

121

Ms. Simonsen - Cross - Mr. Schneider

1  Q.  Each day?

2  A.  No, all.

3  Q.  And they paid for your ticket to come in March?

4  A.  Yes.

5  Q.  And they paid for your hotel.

6  A.  Yes.

7  Q.  And how many days did you stay?

8  A.  I think I stayed here four days.

9  Q.  Did you come alone or did you bring somebody with

10  you?

11  A.  I was alone.

12  Q.  And again, they paid for you to come back recently,

13  correct?

14  A.  Yes.

15  Q.  And you arrived, what, like a week ago?

16  A.  I arrived -- yeah, what date --

17  Q.  Was it May 17th?

18  A.  The 17th, yes, the 17th.

19  Q.  And they've paid for your hotel since then?

20  A.  Yes.

21  Q.  Did a family member come with you?

22  A.  Yes.

23  Q.  But they didn't pay for the family member.

24  A.  No.

25  Q.  Just for you.

122

Ms. Simonsen - Cross - Mr. Schneider

1   A.   Just for me.

2   Q.   And during -- and have you met with the Government

3   since May 17th?

4   A.   Yes.

5   Q.   How many times?

6   A.   Twice.

7   Q.   And for about how long?

8   A.   For about three or four hours -- three hours.

9   Q.   And did they discuss with you what your testimony was

10  going to be?

11  A.   Well, yeah, we prepared.

12  Q.   They prepared.  They told you what sort of questions

13  they were going to ask, and you told them what sort of

14  answers you were going to give, correct?

15  A.   Yes.

16          MR. SCHNEIDER:  Just one moment, Your Honor.

17      (Pause)

18  Q.   Ms. Simonsen, I just want to get clear the phone

19  calls that you had -- that you made to Denmark and that

20  you received from Denmark.  Is it your testimony that you

21  received one phone call -- let me withdraw that.

22      You called your parents one time on January 5th.

23  A.   Yes.

24  Q.   And how long did that last?

25  A.   Well, I don't know, five or ten minutes.  I don't

123

Ms. Simonsen - Cross - Mr. Schneider

1  really remember.

2  Q.   Was it -- would it have been longer than 10 minutes?

3  A.   I don't think so.  I think all in all I must have

4  been talking on the phone for 15 minutes, maximum 20

5  minutes that morning.

6  Q.   Okay.  And so -- and then you called your boyfriend

7  that morning as well.

8  A.   Yes.

9  Q.   And you don't think that lasted more than 10 minutes?

10  A.   No, maybe 15.

11  Q.   And then you spoke to your boyfriend again when he

12  called the home.

13  A.   And then what?

14  Q.   You spoke to your boyfriend again when he called the

15  -- he called New York.

16  A.   Yes.

17  Q.   And how long did that last?

18  A.   Ten minutes.

19  Q.   Did you have any other phone conversations while you

20  were in New York?

21  A.   No.  Well, in the same phone conversation I was

22  talking with my sister too.

23  Q.   Okay.  When -- you testified that Joseph grabbed your

24  -- forced you to kiss him.

25  A.   Yes.

124

Ms. Simonsen - Cross - Mr. Schneider

1   Q.   Where was his wife at that time, do you know?

2   A.   I think she was upstairs.  She was not in the same

3   room.

4          MR. SCHNEIDER:  Your Honor, I'm going to offer

5   Defendant's Exhibit AS-1 and AS-2 into evidence.  These

6   are subsets of Government's Exhibit 400 I think.

7          MR. SPECTOR:  They're already in evidence so no

8   objection.

9          MR. SCHNEIDER:  Well, I want the defense

10  exhibits --

11         THE COURT:  All right.  Your exhibits are in

12  admitted.

13  (Defendant's Exhibits AS-1 and AS-2 marked in evidence.)

14         MR. SCHNEIDER:  Thanks.  No further questions.

15         MR. SPECTOR:  No redirect, Your Honor.

16         THE COURT:  Ladies and gentlemen, we're going

17  to break for lunch for an hour.  There's a cafeteria in

18  the building.  There's sort of a concession stand

19  downstairs on the main floor.  You don't have to use

20  either of them.  I just want you to know that they're

21  there.

22         Okay.  You're excused.  Thank you.

23         THE CLERK:  All rise.

24         (Jury exits)

25

125

Ms. Simonsen - Cross - Mr. Schneider

1      THE COURT:  All right.  See you in an hour.

2      MS. CESARE:  When shall we be back?

3      THE COURT:  An hour.

4      (Court recessed.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

126

Ms. Ramirez - Direct - Ms. Jager

1          THE CLERK:  All rise.

2          THE CLERK:  Please be seated.

3          (Witness takes the stand.)

4          THE COURT:  Would you raise your right hand?

5    **L A U R A   M A R I E L L A   R A M I R E Z   E S C O B A R,**

6        **having been first duly sworn, was examined and**

7        **testified through an interpreter as follows:**

8          THE COURT:  Okay.

9          THE CLERK:  The record shall reflect that the

10   interpreter has previously been sworn by this Court.

11   Please state your name for the record.

12         THE INTERPRETER:  Libya Clancy, C-l-a-n-c-y).

13         MS. JAGER:  May I inquire, Your Honor?

14         THE COURT:  Yes.

15   DIRECT EXAMINATION

16   BY MS. JAGER:

17   Q.   Good afternoon.  Could you please state and spell

18   your name for the record?

19   A.   Laura Mariella Ramirez Escobar.

20   Q.   What country are you from, Ms. Ramirez?

21   A.   Mexico.

22   Q.   What country do you live in now?

23   A.   Mexico.

24   Q.   What is your first language?

25   A.   Spanish.

127

Ms. Ramirez - Direct - Ms. Jager

1   Q.   Are you able to read and speak English?

2   A.   Some things.

3   Q.   Are you more comfortable testifying in English or in

4   Spanish?

5   A.   In Spanish.

6   Q.   Who paid for your travel expenses to come to the

7   United States to testify at this trial?

8   A.   The Government of the United States.

9   Q.   And did the Government pay for anybody to travel with

10  you?

11  A.   My mother and my daughter.

12  Q.   And how old is your daughter?

13  A.   Two years old.

14  Q.   Why did the Government pay for them to travel with

15  you?

16  A.   Because my daughter is very little and she needs to

17  be with me, and I need somebody to look after her like my

18  mother.

19  Q.   Before today did you meet with the Government to

20  prepare for your testimony today?

21  A.   That is correct.

22  Q.   And did you previously travel to the United States to

23  meet with the Government about this case?

24  A.   In February of 2011.

25  Q.   And who paid for your travel expenses for that trip?

128

Ms. Ramirez - Direct - Ms. Jager

1  A.   The Government of the United States.

2  Q.   And did anybody travel with you at that time?

3  A.   No, nobody, only myself.

4  Q.   Do you know somebody named Joseph Yannai?

5  A.   Yes, I know him.

6  Q.   How do you know him?

7  A.   I met him through Internet and I worked at his home.

8  Q.   Do you see Mr. Yannai in the courtroom here today?

9  A.   Yes, I do see him.

10 Q.   Will you please identify him based on an article of

11 clothing that he's wearing?

12 A.   He has a black suit and a dark colored tie.  And he's

13 the man with a beard and bald.

14         MS. JAGER:  Let the record reflect that the

15 witness has identified the defendant.

16 Q.   How old are you, Ms. Ramirez?

17 A.   Thirty.

18 Q.   And how -- are you married?

19 A.   Yes, I am married.

20 Q.   Are you currently employed?

21 A.   No, sir.

22 Q.   And what is your educational background?

23 A.   University.

24 Q.   And what do you have your degree in?

25 A.   Business administration.

129

Ms. Ramirez - Direct - Ms. Jager

1  Q.   What if any employment did you have after you
2  graduated from University?
3  A.   I was, like, the manager at a casino.
4  Q.   And what did you do after working as the casino
5  manager?
6  A.   I looked for an au pair job through Internet.
7  Q.   What is an au pair?
8  A.   A person who looks after children and who helps out
9  with some household chores.
10 Q.   Did you know anyone -- strike that.
11      Why did you want to work as an au pair?
12 A.   I wanted to raise my -- the level of my English.
13 Q.   And did you know anyone who had worked an au pair?
14 A.   I have some acquaintances.
15 Q.   And did they generally have positive or negative
16 experiences?
17 A.   Positive.
18 Q.   And how did you go about looking for work as an au
19 pair?
20 A.   I put my profile, like my name, my age, my e-mail
21 address, my telephone number on some of the au pair pages
22 on Internet.
23 Q.   Do you remember the names of any of the websites that
24 you registered with?
25 A.   I just remember one, which is www.aupairoption.com.

Ms. Ramirez - Direct - Ms. Jager

1   Q.   And when did you register with them approximately?

2   A.   In May of 2006.

3   Q.   Now, you said you register -- excuse me, you said you

4   posted profiles with websites advertising au pair

5   positions and that you posted your profile.  Did that

6   profile also include your photograph?

7   A.   Yes, that is correct.

8   Q.   And why did it include your photograph?

9   A.   It was the suggestion of the page itself.

10  Q.   Now, what if any country did you want to work in when

11  you applied to be an au pair?

12  A.   In the United States.

13  Q.   And was there a particular place in the United States

14  where you wanted to work?

15  A.   New York.

16  Q.   Why New York?

17  A.   Because I always had wanted to come touring here.

18  Q.   And at that point in your life had you ever been to

19  the United States before?

20  A.   Several times at the border for shopping and in

21  Chicago and Dallas on a trip.

22  Q.   And approximately how far away from the border do you

23  live in Mexico?

24  A.   Three hours' drive.

25  Q.   Now, were you contacted about any au pair

Ms. Ramirez - Direct - Ms. Jager

1  opportunities in response to your posting on the au pair

2  website?

3  A.   I got answers from Spain, from Australia, and one

4  from New York.

5  Q.   And with respect to the e-mail about the job in New

6  York, who was that e-mail from?

7  A.   From Joanna Kulik.

8  Q.   Did there come a point in time when you also received

9  e-mails from the defendant, Joseph Yannai?

10 A.   Yes, that too.

11        MS. JAGER:  May I approach, Your Honor?

12        THE COURT:  Yes.

13 Q.   I'm showing you what's been marked Government's

14 Exhibits 501 to 513.  Can you take a look at those

15 documents?  What are they?

16 A.   They are the e-mails that I wrote between Joanna and

17 Yannai and I.

18 Q.   And did you review those e-mails prior to your

19 testimony here today?

20 A.   Yes, that is correct.

21 Q.   And did you sign at the bottom of each e-mail

22 verifying that you had reviewed it?

23 A.   Yes.  This is my signature.

24 Q.   And were these e-mails all saved to your e-mail

25 account?

132

Ms. Ramirez - Direct - Ms. Jager

1   A.   That is correct.

2        MS. JAGER:  Government offers Government's

3   Exhibits 501 to 513 into evidence.

4        MS. CESARE:  No objections.

5        THE COURT:  They're admitted.

6   (Government's Exhibits 501 to 513 marked in evidence.)

7   Q.   Did you forward these e-mails to the Government?

8   A.   That is correct.

9   Q.   I'm showing you what's in evidence as Government's

10  Exhibit 501.  What is it?

11  A.   This is the e-mail that I received from Joanna.

12  Q.   And what is -- e-mail address is it from?

13  A.   Jyasst@aol.com.

14       MS. JAGER:  Your Honor, could we please publish

15  to the jury?

16       THE COURT:  Yes.

17       MS. JAGER:  Thank you.

18  Q.   I'm sorry.  Just to go back, what e-mail address is

19  it from?

20  A.   Jyasst@aol.com.

21  Q.   And who signed this e-mail?

22  A.   Joanna.

23  Q.   Could you please read the highlighted portions of

24  this e-mail?

25  A.   "Dear Laura, we are not looking for an au pair as an

133

Ms. Ramirez - Direct - Ms. Jager

1  au pair is for children.  We are looking for an assistant

2  to my previous boss.  For more than two years I had the

3  same job I offering you now, who is far away from being a

4  child.  He's 63 years old.  The boss is a businessman

5  who's operate from home.  He's completely independent,

6  not disabled and takes very good care of himself.  He's

7  married.  His wife is 40 years old and very hardworking

8  person.

9      "You will not be a nurse or a caregiver as he doesn't

10  need one.  You will seem to be here to make his life

11  easier -- make coffee, prepare breakfast and lunch.

12  Dinner they usually goes out or the wife cooks.  Keep the

13  part of the house from which he's working neat and clean.

14  Accompany him in all his travels and he travel a lot.

15  Ensure a combination of companion, personal helper.  If

16  you were a man, it's kind of butler.

17      "You will have your own room, your own bedroom, and

18  will instantly become part of the family.  When they go

19  out, they will offer you to join them.  When they

20  entertain at home, you will be sitting with them and

21  their guest at the table.  You will be never treated as a

22  maid."

23  Q.   Ms. Ramirez, what did you think when you received

24  this e-mail?

25  A.   That it was a good job to become familiar with an

134

Ms. Ramirez - Direct - Ms. Jager

1  American family and to learn English and not have to look

2  after children.

3  Q.  Did you respond to that initial e-mail from Joanna?

4  A.  Yes, that is correct.

5  Q.  And can you summarize what you said in that response?

6  A.  Could I see the e-mail?

7  Q.  Showing you what's in evidence as Government's

8  Exhibit 502.

9  A.  Yes.  Now I remember.  I told her I was interested.

10  And I asked her to call me and tell me how long did they

11  want me to be up here and about the payment.

12  Q.  Did you receive another e-mail from Joanna in

13  response to your e-mail?

14  A.  Yes, that is correct.

15  Q.  I'm showing you what's in evidence as Government's

16  Exhibit 502.

17          MS. JAGER:  And could we publish to the jury

18  please?

19          THE COURT:  Yes.

20  Q.  Government's Exhibit 502.  What e-mail address is

21  this from?

22  A.  Jyasst@aol.com.

23  Q.  Could you please read the highlighted portion?

24  A.  Yes.  "As to the pay, you will have two options to

25  choose from and you will have to choose before you come.

Ms. Ramirez - Direct - Ms. Jager

1  One is live out option, in which case you will be paid
2  $2,000 a month.  His business pay monthly but all the
3  expenses will default to him when you're at their home,
4  and all the expenses when you travel with Joseph are on
5  you.  You will have to find and pay for your own room,
6  apartment, share combination with a roommate and each and
7  every one of your expenses outside the house where you
8  will be working.

9      "The other option is living in option.  Everything
10  from clothing to shoes, from Tampax to hair dressers,
11  from books or CDs will pay by him.  And you will be
12  surprised at how generous he is.  In most cases, you will
13  not even have to ask.  He will get what you need before
14  you even thought about it.  But you will not get paid a
15  salary.  At the end of your working year, and that is
16  only if you will be with him for the whole year, you will
17  receive a bonus of 20,000, which is -- which will be net
18  as you did not spend a penny during the year.

19      "Myself, I choose the live in option, and I am very
20  happy about it, not only because of the money but because
21  of the experience."
22  Q.   Did the e-mail tell you more about the position?
23  A.   Yes.  It said that I would have to be available to
24  prepare a cup of coffee for him, prepare something for
25  him to eat and like that, mostly chores like a companion.

Ms. Ramirez - Direct - Ms. Jager

1  Q.   And what if anything appealed to you about this

2  opportunity?

3  A.   The experience of learning from a businessman and the

4  money, which paid more than a regular au pair.

5  Q.   How much did you understand au pairs typically made

6  in terms of pay?

7  A.   Six hundred dollars a month.

8  Q.   And for what period of time did you want to come to

9  the United States?

10 A.   Initially from three to six months, but then after

11 this e-mail I thought I might be able to stay a whole

12 year in order to receive the bonus.

13 Q.   Did you respond to this second e-mail from Joanna?

14 A.   Yes, that is correct.

15 Q.   And I'm showing you what's in evidence as

16 Government's Exhibit 503.  Do you -- what did you say in

17 your response to Joanna?

18 A.   I said I would be interested.  I asked whether I

19 would be needing a work visa.  I asked for references,

20 and I asked whether there would be a contract.

21 Q.   Who did you ask for references for?

22 A.   References on the person that I would be working for.

23 Q.   And who did you understand that to be?

24 A.   Joseph Yannai.

25 Q.   And why did you ask for references for Joseph Yannai?

137

Ms. Ramirez - Direct - Ms. Jager

1   A.   Because since this was through Internet I could not

2   be certain with whom I may be dealing.

3   Q.   Did you receive a response from Joanna?

4   A.   Yes.

5   Q.   I'm showing you what's in evidence as Government's

6   Exhibit 503.

7           MS. JAGER:  Please publish this for the jury.

8           THE COURT:  Yes.

9   Q.   What is this?

10  A.   This is an e-mail that Joanna sent me.

11  Q.   Could you please read the highlighted portion?

12  A.   "You will probably never get a working visa while

13  being in Mexico.  You will come with your tourist visa,

14  and after a few weeks of being here the attorneys will

15  start working on your permanent working visa.  Joseph's

16  company currently have a little over of 30 employees and

17  probably had 100 during the more than 20 years he's in

18  business.  None of them asked for a contract.  I don't

19  know how is in Mexico, but over here it's not customary.

20  He will be ready to put into writing contract everything

21  you agreed open and everything that was in my letters to

22  you but only after you will receive your work permit.

23      "Now, to the reference, Joseph and Elena are ready to

24  bring a stranger from a different country, a different

25  person to their home, their house, their family.  These

Ms. Ramirez - Direct - Ms. Jager

1  persons can be crazy, dishonest or even worse, stupid.
2  These person can completely destroy the family life.  And
3  when you will get there, you will realize how wonderful
4  the relationship are can create damage to their houses or
5  their art collections worth many million of dollars or
6  set -- or even abuse the dog, which is as dear to them as
7  the dog you -- we are collecting in the streets.  And
8  still, they didn't ask you for reference.  So in your
9  reply, you offer it.  Why?  Because another of the job
10  and another of the relationship should be and will be
11  based on trust, and you cannot start a relationship like
12  that with these truths.
13      "That say, I understand if that for you Joseph and
14  his wife are not as obvious as they are to me.  I will
15  not ask Joseph for a reference because he will laugh at
16  me.  I don't think that anyone, even those who seek
17  silent have contract with him ever ask of him for
18  reference.  And with that opportunity which I support
19  with all my heart because from the other candidates I've
20  seen you will be the best for Joseph, will go away.
21      "There is one website which hopefully will help you
22  understand Joseph and his work, which we did sell
23  directly to the public.  And that is the website of a
24  book we published, which was (indiscernible), about one
25  million copies, which is called The International Who's

139

Ms. Ramirez - Direct - Ms. Jager

1  Who of the Chef and the website is

2  www.internationalchef.com.

3  Q.   What was your reaction -- excuse me -- Joanna's

4  response said that no one had ever asked for references

5  for the defendant before.  How did that make your feel?

6  A.   Ridiculous.

7  Q.   And what was your reaction to reading about the book

8  that is referenced in this e-mail?

9  A.   I went into the internet to search and I found the

10 page for it and I thought she was a very successful

11 person.

12 Q.   At the end of this e-mail did Joanna suggest that you

13 contact someone?

14 A.   May I see it?  Yes.

15 Q.   Who did she suggest that you contact?

16 A.   With Joseph, and she gives me his e-mail address and

17 asks for my telephone number.

18 Q.   And did you respond to Joanna and provide your

19 telephone number?

20 A.   That is correct.

21 Q.   Did there come a time when you received a phone call

22 from the defendant?

23 A.   Yes.

24 Q.   And what was your reaction after talking to him?

25 A.   I was happy that he had called that he was actually

Ms. Ramirez - Direct - Ms. Jager

1   real.

2   Q.   Now did you correspond with him after that call?

3   A.   That is correct.

4   Q.   And how did you correspond with him?

5   A.   Through e-mail.

6   Q.   I'm showing you what's in evidence as Government's

7   Exhibit 505.  Please publish to the jury.  What is this?

8   A.   The first e-mail I received.

9   Q.   From who?

10  A.   From Joseph.

11  Q.   And what e-mail address is it from?

12  A.   PublishersPlus@aol.com.

13  Q.   Would you please read the highlighted portion?

14  A.   "Dear Laura, I guess it's okay to call you that as

15  that is how your signing your e-mail.  I really enjoy

16  talking to you.  Joanna was right, I think you are the

17  girl for me.  Even so I guess we'll have to work hard on

18  the fact that even you are admitting somewhat that you're

19  a little childish and younger than other woman in your

20  age.  It's great that your mother is supportive of you

21  coming to me.  How about your father and your brother?

22  And let me now immediately when you will find out about

23  the tickets.

24  Q.   Did you respond to this e-mail?

25  A.   Yes, that is correct.

141

Ms. Ramirez - Direct - Ms. Jager

1  Q.   And what did you say to the defendant in your

2  response?

3  A.   May I see the e-mail?

4  Q.   Showing you what's in evidence as Government's

5  Exhibit 506.

6  A.   I told him that he was a mature person, that I could

7  do the job, and I told him that my father wanted my

8  brother or my boyfriend to bring me to New York.

9  Q.   And I'm sorry, did he say that you were a mature

10 person or the defendant was a mature person?

11 A.   I said that I was.

12 Q.   And why did your father want somebody to come with

13 you?

14 A.   To make sure that I would be all right.

15 Q.   Did you receive a response from the defendant?

16 A.   Yes, that is correct.

17 Q.   I'm showing you what's in evidence, Government's

18 Exhibit 506.  Please publish to the jury.  What is this?

19 A.   It is an e-mail that Joseph send me.

20 Q.   In response to the e-mail you just described?

21 A.   That is correct.

22 Q.   And could you please read the highlighted portion?

23 A.   "As to the delegation your brother or your boyfriend

24 are about, it will not be convenient for us or them to

25 come with you on the 8th because it will be only three

Ms. Ramirez - Direct - Ms. Jager

1    days after we come back from England.  With you it's a

2    different story, because as I told you before you will

3    never be a guest.  From the minute you step at the

4    airport you are a member of the family.  Maybe you think

5    you are a mature woman, but it seems that your father

6    doesn't, so if you insist on the delegation we will have

7    to postpone your arrival for a later date.

8        "This is the first time I hear about a boyfriend, and

9    I would really like to know the way you think.  If you

10   have a boyfriend, and I understand that this is a serious

11   relationship because he is ready to make a trip just to

12   check your new home, why do you leave him?  Why don't you

13   stay with the man you love?  You are going to be apart

14   from him for at least a year, and if everything will go

15   my way you will be here for more than a year.  What kind

16   of love is it?  I'm really not built for listening every

17   night to a young girl crying how much she's missing her

18   boyfriend, and I think we should talk again on the phone.

19   I have the feeling that you probably because I did not

20   explain it to you enough, think about coming here

21   (indiscernible).

22       "In order to be successful you should come only if

23   you're ready for a change in your life to have a new home

24   not instead of your own one, but in addition to it, have

25   a new family not even of your own one but in relation to

Ms. Ramirez - Direct - Ms. Jager

1  it, and most importantly become a career and professional

2  woman who will never think again on wasting her life on

3  being something like an au pair.  If you're ready to talk

4  let me know when to call you.  Joseph."

5  Q.   What was your reaction to this e-mail, Ms. Ramirez?

6  A.   I was worried that he would not give me the job.

7  Q.   But did you contact him -- did you have a

8  conversation with him on the phone like he suggested?

9  A.   That is correct.

10 Q.   And what did you tell him on the phone?

11 A.   I tried to persuade him that I was able to do the job

12 and that my boyfriend would not be a problem.

13 Q.   And what did the defendant tell you after that about

14 traveling -- about the job?  Did he say you could have

15 it?

16 A.   Could you repeat the question?

17 Q.   I'll rephrase the question.  You said that you tried

18 to persuade him to give you the job.  Were you successful

19 in that?

20 A.   Yes.

21 Q.   And what, if anything, did the defendant tell you

22 about coming through immigration or the need for a visa

23 on that phone conversation?

24 A.   He said that what I should say was that I was coming

25 to visit some of my parent's friend, that he had met them

144

Ms. Ramirez - Direct - Ms. Jager

1  during a trip, and that because of the relationship

2  between them they had invited me.

3  Q.  And did your parents in fact know the defendant?

4  A.  No, not at all.

5  Q.  Did you receive another e-mail from the defendant

6  after this conversation?

7  A.  Yes.

8  Q.  Did you receive it the same day?

9  A.  I don't remember.

10  Q.  Showing you the previous e-mail.  What date is it

11  dated?

12  A.  June 19, 2006.

13  Q.  At what time?

14  A.  11:13.

15  Q.  And is this the e-mail where he suggests you have a

16  conversation?

17  A.  No, we were going to.

18  Q.  Yes, and did you have the conversation after this

19  e-mail?

20  A.  That is correct.

21  Q.  Is the next e-mail you receive from him also from

22  June 19th?

23  A.  That is correct at 2:27.

24  Q.  And what did this e-mail -- could you please read the

25  -- it's not highlighted -- but the first line of the

Ms. Ramirez - Direct - Ms. Jager

1  e-mail?  Starting here.

2  A.  "Every time we talk I'm happier and I have the

3  feeling that it will work between us.  Thank you for

4  that.  Here's my address."

5  Q.  Okay, that's enough.  Thank you.

6     Showing you what's in evidence, Government's Exhibit

7  508.  Publish to the jury, please.  What is this?

8  A.  It's an e-mail that I received from

9  PublishersPlus@aol.com.

10  Q.  Is this e-mail signed by the defendant?

11  A.  Can I see?  Yes.

12  Q.  Would you please read the highlighted portion?

13  A.  "My dear Laura, isn't it a nicer opening than hi

14  Joseph?  Whenever I read one of your letters and after

15  every phone conversation with you I feel like sending

16  flowers to Joanna thanking her for getting good choice of

17  deciding to bring you and me together.  You will not have

18  any problems with immigrations, not at customs.  You just

19  tell them that you were invited by us.  If they will ask

20  give them our phone number and they can call us.  And

21  remember, Elena and I are friends of your parents, closer

22  age wise and because of our friendship with them we're

23  inviting their daughter.

24     "If your brother is coming with you try to separate

25  from him in the line so they will not make the connection

Ms. Ramirez - Direct - Ms. Jager

1   and will not think that half of the family is trying to

2   immigrate to the USA.

3       "During the daytime when we are in the house you will

4   work in the beginning of the matter that has to do with

5   the Spanish, you will help me understand, and yes, even

6   translate, and I know your limitation in English, from

7   your language to English and I will teach you what to

8   look for in internet.  I hope you will enjoy it."

9   Q.   Did the defendant say anything else in the e-mail

10  about bringing your brother with you?

11  A.   May I look at it?  Yes.

12  Q.   And what did he say?

13  A.   He said yes, he could come and stay at the house

14  overnight, and that the following day he would take him

15  to New York and put him up in a hotel.

16  Q.   And did the defendant say anything about what you

17  were supposed to wear while you were working?

18  A.   He said I should wear only skirts.

19  Q.   Did you have other e-mail correspondence with the

20  defendant?

21  A.   Yes.

22  Q.   And did the defendant ask you to send photographs of

23  yourself?

24  A.   That is correct.

25  Q.   Did you send him photographs?

Ms. Ramirez - Direct - Ms. Jager

1   A.   Yes.

2   Q.   And did you ask him for anything in return?

3   A.   I asked for pictures of himself and his family.

4   Q.   And did he -- I'm showing you what's in evidence as

5   Government's Exhibit 510.  Please publish to the jury.

6   What is this?

7   A.   It's an e-mail from PublishersPlus@aol.com signed by

8   Joseph.

9   Q.   And can you please read the highlighted portion?

10  A.   "Thank you for the pictures, you are more beautiful

11  than I previously thought."

12  Q.   Could you also read the paragraph that starts I hope?

13  A.   "I hope that upon my return I will have more pictures

14  of you and your family.  As to mine I promise to send you

15  when I return so you will be able to recognize me at the

16  airport."

17  Q.   That's fine, you can stop there.

18       What was your reaction to this e-mail where he said

19  you're more beautiful than I first thought?

20  A.   I didn't think of anything in particular.

21  Q.   I'm showing you what's in evidence as Government's

22  Exhibit 512.  Please publish to the jury.  And is this

23  another e-mail from the defendant to you?

24  A.   That is correct.

25  Q.   Could you please read the highlighted portion?

148

Ms. Ramirez - Direct - Ms. Jager

1  A.   "This was a real welcome present for me, the

2  pictures.  I knew that you were an attractive woman, but

3  your portrait picture was of a real beautiful woman.  I

4  admit that is important to me, not so much the beauty as

5  (indiscernible) and the aesthetics.  I love being

6  surrounded by beautiful scenes, that's why I am an art

7  collector and by beautiful people.

8      "And the other pictures show me that you have a

9  beautiful legs.  I love beautiful legs and beautiful

10  hands in a woman.  But above all I was impressed with

11  your parents picture.  I can tell where your beautiful

12  comes, your mother, and what your parents have such kind

13  face.  I even love the fact that your father is big, that

14  is how we generally call fat people.  As you know from my

15  picture I am not so small, slim myself.

16      Only three days and we are together.  With all my

17  love, Joseph."

18  Q.   By the time you received this e-mail had you received

19  a picture of the defendant?

20  A.   It was not attached, they weren't there.

21  Q.   Now in this e-mail he writes to you that you're

22  beautiful and that you have beautiful legs.  What was

23  your reaction to that?

24  A.   I was somewhat surprised with the thing about the

25  legs since he was an older man I didn't think about it.

Ms. Ramirez - Direct - Ms. Jager

1  Q.   And what about the statement where he says only three

2  days and we are together.  With all my love, Joseph?

3  A.   I thought he meant that in three days we would see

4  him.  And with the all my love was just a loving,

5  educated way of saying good-bye.

6  Q.   Showing you what's in evidence as Government's

7  Exhibit 513.  Please publish to the jury.  What is this?

8  A.   It's an e-mail from Joseph to me.

9  Q.   Could you please read the highlighted portion?

10 A.   "My dear Laura, please don't be nervous.  Both of us

11 Elena and me realize how difficult it is for a young girl

12 to start a new life in a new home."

13 Q.   Had you indicated to the defendant that you were

14 nervous?

15 A.   Yes, I said that I was nervous.

16 Q.   Why were you nervous, Ms. Ramirez?

17 A.   Because I had not been able to see his picture.  I

18 had not received it and because of the experience of

19 growing up.

20 Q.   So could you please read the last sentence of this

21 e-mail that's highlighted?

22 A.   "Just make the same effort to become quickly part of

23 my family as I will make the effort to make you part of

24 the family and everything will be okay."

25 Q.   Now were there photographs attached to this e-mail?

Ms. Ramirez - Direct - Ms. Jager

1    A.   Yes, that is correct.

2    Q.   And were you able to read this e-mail and see these

3    attachments before you arrived in New York?

4    A.   No, I was not able to see them because I was already

5    on the way for the trip.

6    Q.   What is the date of this e-mail, Ms. Ramirez?

7    A.   July 7.

8    Q.   And had you already begun your journey from Mexico to

9    New York on July 7th?

10   A.   Yes, I had left my city, driven out to go to Laredo,

11   Texas where I would board my plane on Saturday morning.

12   Q.   So did you ever see this e-mail or the photographs

13   prior to getting to the United States?

14   A.   No.

15   Q.   Now you communicated with the defendant in English;

16   is that correct?

17   A.   True.

18   Q.   And how was your English at that point?

19   A.   Like understand for the most part, and what I didn't

20   understand I just skipped.

21   Q.   Were there parts that you did not understand?

22   A.   Yes.

23   Q.   And were you fluent in English?

24   A.   No.

25   Q.   When did you arrive in New York?

151

Ms. Ramirez - Direct - Ms. Jager

1   A.   July 8th.

2   Q.   Of what year?

3   A.   2006.

4   Q.   And how old were you at that point?

5   A.   Twenty-five years old.

6   Q.   Now you mentioned that you drove to Laredo with your

7   mother and boyfriend; is that correct?

8   A.   That is correct.

9   Q.   And then at what point did you leave Laredo?

10  A.   On Saturday morning.

11  Q.   The 8th of July?

12  A.   Yes, July 8th in the morning.

13  Q.   And who paid for your ticket?

14  A.   My mother and I.

15  Q.   And was it a round trip ticket or one way?

16  A.   Round trip.

17  Q.   And when was the return for?

18  A.   One month later.

19  Q.   And why was it one month if you were planning on just

20  staying for a year?

21  A.   Because I wanted to check it out to see if I liked

22  it, and I thought that one month would be sufficient.

23  Q.   Did you go through an immigration checkpoint when you

24  came tor the United States?

25  A.   Yes, at the border.

152

Ms. Ramirez - Direct - Ms. Jager

1   Q.   And did they ask you questions?

2   A.   Yes.

3   Q.   And do you remember the specific questions they asked

4   you?

5   A.   Not specifically.

6   Q.   What did you plan to tell the immigration authorities

7   about why you were coming to the United States?

8   A.   I planned to lie and say that I was coming to visit

9   my friends -- to visit my parent's friends.

10  Q.   And was that the truth?

11  A.   No.

12  Q.   And as you sit here today do you know whether lying

13  to immigration authorities is a crime?

14  A.   Yes, I know.

15  Q.   And have you been granted immunity for your testimony

16  here today?

17  A.   That is correct.

18  Q.   I'm showing you what has been marked at Government's

19  Exhibit 3500LR11.  Do you recognize this document?

20  A.   Yes.

21  Q.   And what is it?

22  A.   This is the letter that I was given stating that my

23  own statements will not be used against me.

24  Q.   And what is your understanding of this immunity?

25  A.   That my words will not affect me.

153

Ms. Ramirez - Direct - Ms. Jager

1   Q.   Does that immunity give you protection if you lie on

2   the stand?

3   A.   No, not at all.

4   Q.   And who is your lawyer?

5   A.   Paul Madden (ph).

6   Q.   And did your lawyer explain this letter to you?

7   A.   That is correct.

8   Q.   And did you request a lawyer?  Did you request from

9   the Government that you have a lawyer to review this

10  letter with?

11  A.   That is correct.

12  Q.   And did your lawyer explain this letter to you?

13  A.   Yes.

14  Q.   And was a Spanish interpreter present?

15  A.   Yes.

16  Q.   What airport did you arrive at in New York?

17  A.   LaGuardia.

18  Q.   And what happened when you got here?

19  A.   Before I picked up my suitcases and before getting

20  down the stairs and even before I went to the bathroom I

21  made the call, and I found -- bumped into a tall, fat man

22  who asked me my name, and he asked are you Laura?  I

23  said, yes, I was.  And he said, I am Joseph.  He hugged

24  me and he kissed me on the cheek.

25  Q.   And what happened next?

Case 1:10-cr-00594-ERK-JO   Document 149   Filed 06/06/11   Page 154 of 258 PageID #: 1109

Ms. Ramirez - Direct - Ms. Jager

A.   We picked up my suitcases, went to the car, and we

started driving to his house.

Q.   Had you ever -- where was his house?

A.   Pound Ridge.

Q.   Had you ever been to New York before?

A.   Never.

Q.   Now what, if anything, happened in the car ride?

A.   He grabs me by the hand and asks me to get closer.  I

released my hand and he again grabbed my hand and asked

me to get closer.  So I moved closer a little bit and he

starts telling me about when we go on a trip, he says

that within the month we will be going to Israel and he

tells me that we will be staying in the same room on the

same bed, and that sometimes he will have to see me

naked, because we're going to be in the same room, which

would be very pleasant, and when I have to see him it

will not be as pleasant because he's fat.  And so I tell

him I don't want to go, it doesn't seem right to me or

that I would prefer to stay in a different room.  And he

said that only if you pay for the room.  And that the

hotels he stayed at were very expensive, like $5,000 a

night.

Q.   And what, if anything, did he say to you about how

you would change while working for him?

A.   He said that I would become a different person and he

Ms. Ramirez - Direct - Ms. Jager

1  called his Nietzsche, the philosopher, and he said that

2  pigs like to be in the mud because they don't know

3  anything else, but once they go to the water they never

4  want to go back to the mud, and that that was the same

5  thing that was going to happen to me with my family, with

6  my country, with my friends, with my boyfriend.

7  Q.  What was your reaction to this conversation and how

8  he was treating you in the car?

9  A.  I was afraid, and I thought to myself what am I doing

10 here?  And it upset me when he said the thing about the

11 mud, but for the most part I was nervous about what he

12 was telling me, what would be happening during the trips.

13 I was trying to talk to myself and say that perhaps I was

14 misunderstanding.

15 Q.  How long did it take to drive to the defendant's home

16 from the airport?

17 A.  About 40 minutes.

18 Q.  And how would you describe the area where the

19 defendant's house was?

20 A.  Full of trees.  It seemed to me that there was

21 nothing nearby, it was just woods.

22 Q.  Did you see any public transportation nearby?

23 A.  I did not see public transportation.

24 Q.  Was anybody else at the house when you arrived there?

25 A.  His wife, Elena was there.

Ms. Ramirez - Direct - Ms. Jager

1  Q.   And what did you do when you got there?

2  A.   I had supper by myself.  She had bought me some

3  Indian food and I ate at the table with Elena.

4  Q.   And did you have an opportunity to call home that

5  night?

6  A.   I asked him for the phone and he said that I couldn't

7  take more than three minutes.

8  Q.   And did you call somebody?

9  A.   I called home where my mother was and my boyfriend.

10 Q.   And what's your boyfriend's -- what was your

11 boyfriend's name?

12 A.   Hector Rodriquez (ph).

13 Q.   And he is -- what relationship do you have with

14 Hector now?

15 A.   He's my husband.

16 Q.   Now what did you tell them on the phone when you

17 called that night?

18 A.   I told him that I was not liking it, that he had told

19 me that we would be traveling and that I should not get

20 scared when we stay at the same room because he did not

21 want to have a relation with me.

22 Q.   You said the defendant told you in the car ride that

23 he didn't want to have relations with you?

24 A.   Yes.  He just said that he would have to see me naked

25 and that we would have to sleep on the same bed, but that

Ms. Ramirez - Direct - Ms. Jager

1  I shouldn't be scared because he didn't want to have

2  relations with me.

3  Q.   And by relations what do you believe?  What did you

4  understand it to mean?

5  A.   Sexual relation.

6  Q.   After you got off the phone with your family what, if

7  anything, did the defendant tell you about using the

8  phone while you were living in his house?

9  A.   He told me that I would not be able to speak to my

10  boyfriend again, only my family could call me, and only

11  during an emergency.

12  Q.   Did he explain why?

13  A.   No.

14  Q.   What happened that night?

15  A.   He showed me some of the chores at the house that I

16  would have to take care of like prepare his juice for

17  him, how he liked his tea, how to keep his refrigerator

18  full of food, keep the glove compartment in the car full

19  of cigarettes, and things like that.  He also told me

20  that I could not close any one of the doors, not even the

21  bathroom door because he had a dog that went crazy

22  whenever he closed the door, and so I couldn't close any

23  door.

24  Q.   Not even the bathroom door?

25  A.   Not even the bathroom door.

Ms. Ramirez - Direct - Ms. Jager

Q.   How did that make your feel?

A.   Uncomfortable, sad, unsafe.

Q.   What, if anything, happened that night before you went to bed?

A.   He asked me that every night I should say good night to him with a kiss on the cheek.

Q.   And did you do that the first night?

A.   Yes, I thought that it was a family thing, and I wanted to belong to the family.

Q.   And what happened the next day?

A.   The following day was a Sunday and I got dressed and put on trousers because it was my day off, and he invited me to go to a polo game with his wife.

Q.   And did you go?

A.   Yes.

Q.   And what happened while you were there?

A.   We attached the polo game and Elena explained to me the rules of the game and some girls approached to say hello to the dog.  And he asked them what age did they think I was, and they said 19, and he said isn't it grand.

159

Ms. Ramirez - Direct - Ms. Jager

1  Q.   Now what happened after the polo match?

2  A.   We went back to the house.  And I'm not certain

3  whether it was that day that we went to the supermarket

4  to buy some appetizers, and at the supermarket there were

5  some people who spoke Spanish, the people who worked

6  there, and I overheard them say, he has another one.

7          MS. CESARE:  Object.  Move to strike.

8          THE COURT:  Sustained.

9          MS. CESARE:  Move to strike.

10          THE COURT:  Strike it.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ms. Ramirez - Direct - Ms. Jager

Q.   What did you do after the supermarket?

A.   We went to his house.

Q.   And what happened when you got back to his house?

A.   I believe we had dinner with friends of his that were
with us at the polo game.

Q.   And did anything else happen while the friends were
still there?

A.   We sat in the living room after the dinner and he
grabbed me by the hand, I released by hand and he picked
it up again, Elena was there, his friends were there, and
nobody seemed to be surprised, and I felt uncomfortable.

Q.   What, if anything, else happened before you went to
bed that night?

A.   I went to say good night with a kiss and when I
approached to kiss him on the cheek he kissed me on the
mouth.

Q.   What did you do when he did this?

A.   I tell him don't.

Q.   And what did he say or do when you said don't?

A.   He just smiled and I went to my room.

Q.   And how did it make you feel when he kissed you on
the mouth?

A.   Unsafe, uncomfortable, I was repulsed.

Q.   What happened the first day of work?

A.   I got up and I had breakfast with him.  His wife had

Ms. Ramirez - Direct - Ms. Jager

1    prepared it and it was ready, and she had left for her

2    job.  And we were at his house, he explained to me how he

3    wanted me to clean the desk.  He gave me a rag and some

4    liquid and I was cleaning the desk and he went by and

5    spanked me one or two, a spank, and he said I was a bad

6    girl.

7    Q.   How did that make your feel?

8    A.   Again, unsafe, bad, sad.  I asked him not to do that

9    and he would say, that it was normal, not to make such a

10   big deal.

11   Q.   What was your work schedule, Ms. Ramirez?

12   A.   From 8:00 to 6:00 Monday through Friday.

13   Q.   And where did you work for the defendant?

14   A.   Downstairs in the house across from his room he had a

15   little office there with a computer and a couple of

16   desks.

17   Q.   Did he have rules about what you were allowed to wear

18   on workdays?

19   A.   Only skirts.

20   Q.   And did you ever see the defendant have any business

21   meetings at the house?

22   A.   Never.

23   Q.   Where was Elena on workdays?

24   A.   Working.

25   Q.   In the house or outside of the house?

Ms. Ramirez - Direct - Ms. Jager

1  A.   I believe she worked at a bank.

2  Q.   Now in addition to cleaning and some of the

3  assignments the defendant asked you to do around the

4  house what projects did he want you to work on in the

5  office?

6  A.   One day he turned on the computer for me and said

7  that I could not use the e-mail because what he had in

8  there was very important and he asked me to do a job

9  looking up some sites for Spain in order to work on a

10  tourist guide.

11      And another day -- no, that same day he asked me to

12  look up au pair pages and ordered me to find all the au

13  pairs that I could find according to country in order to

14  work out in this for him with the name, the age, the

15  e-mail, the country, the telephone number.  He said that

16  he wanted to work on a guide book for au pairs.

17  Q.   And what did you do with that information?

18  A.   I believe I worked on an Excel chart with everything

19  I find during the time that I was working.

20  Q.   And about how many entries do you think you put into

21  it?

22  A.   Perhaps 100, because I was only copying.

23  Q.   Now what, if any, comments did the defendant make

24  about your appearance while you were working for him?

25  A.   He said that he wanted to always see me with my hair

163

Ms. Ramirez - Direct - Ms. Jager

1   pulled back because he didn't like how I looked with the
2   loose hair.
3       And that another time as I was going up the stairs he
4   touched my buttock and he said, you are thin, but
5   everything you eat goes down to your ass.
6   Q.   What did you do when the defendant touched your
7   behind?
8   A.   I turned around and told him not to do that.  And he
9   would just always laugh.
10  Q.   And did there come a time when the defendant called
11  you into his bathroom?
12  A.   Yes.  One day he went into the bathtub and he called
13  me and asked him to bring him some tea.  The door was
14  ajar, not totally open, and I went in and put the tea
15  down without turning, and he asked me to bring it closer,
16  to put it in his hand, and he said, you shouldn't be shy,
17  you will be doing this very often, you better get used to
18  it.  And so he asked me to bring him his cigarettes,
19  while he laughed, and then he asked me to bring him his
20  phone, and I had to see him naked since he was in the
21  bathtub.  He said I shouldn't be so moralistic, like
22  Latin women were all very moralistic.  And that's it.
23  Q.   Was anyone else home when he asked you to come into
24  his bathroom?
25  A.   No, there was nobody else, we were alone.

Ms. Ramirez - Direct - Ms. Jager

1   Q.   Was there ever a night when the defendant came into

2   your bedroom?

3           MS. CESARE:  Objection, leading.

4           THE COURT:  Overruled.

5           THE WITNESS:  There was one time when I went to

6   lay down to go to sleep and shortly after, a few minutes

7   later he came inside my room, and I was not sleeping, but

8   I pretended to be sleeping because I was afraid, and I

9   didn't want to continue talking to him.  All day he was

10  bothering me.  And the only thing I wanted was for him to

11  let me sleep.  And he stood there for about ten minutes

12  without saying anything, just watching.

13  Q.   Now did the defendant ever call you into his bedroom?

14  A.   One day he called me and asked me to bring him some

15  juice.  I went inside, gave him his juice, he was in bed

16  without a shirt.  I don't know whether he was naked or

17  not.  He asked me to sit on the bed.  I sat on the edge

18  and he got up and started talking to me, why do you want

19  to leave?  And I told him I wanted to leave because I was

20  not comfortable.  And he would say, that that way I would

21  never be a successful person, that I was a spoiled child,

22  which he told me all the time every day.  He came close

23  to me, put his arms around me, I told him to let me go,

24  and I started crying.  I told him that I didn't like it,

25  not to touch me.  I didn't like it when he kissed me.

Ms. Ramirez - Direct - Ms. Jager

1    I was crying, he came close and put his arms around

2    me and at that point he was kissing me on the neck and he

3    was rubbing my back, and kept saying that I should think

4    about my family.  How would they feel if I went back a

5    failure?  And he kept telling me all the time that I

6    should think of all the things I would have if I were to

7    remain with him.  Whenever he did this to me, he said,

8    what he wanted to do was destroy me so that he could

9    rebuild me into a stronger person.  In business there are

10   things you can choose, but there are things you can be

11   choose, and this is one of them.  If I were to remain

12   there at the end of the year I would be ready to sign

13   contracts for millions of dollars, and I would shove him

14   back, and I always kept my hands up so that he would not

15   come close to me, but it seemed to me that it went on for

16   20 minutes until he said, fine, leave, you are too

17   spoiled and a lie.

18   Q.   Now how did this make your feel?

19   A.   Bad, very bad.  I started really doubting, I was

20   thinking maybe I'm too spoiled.  And the thing is I did

21   not miss my family that much, but what was happening was

22   that I really did not like for him to be touching me.

23   Q.   And what, if anything, did you tell him in response

24   to this?

25   A.   I kept telling him no, that I did want to develop,

Ms. Ramirez - Direct - Ms. Jager

1  that I did want to learn about business, but that I did
2  not want to do it in that way.
3  Q.   Now did you ever tell the defendant that you wanted
4  to go back to Mexico?
5  A.   Yes.
6  Q.   And what did he say when you told him that?
7  A.   Yes, he said he would drive me, but it was never --
8  right after he would say to me, but you will regret it,
9  you'll always be mediocre, you will never be able to do
10  anything in life on your own.  You're always going to be
11  hiding behind your family, your boyfriend, your mother,
12  and that's it.  After minutes of telling me these things
13  he would leave everything there.
14  Q.   Now did the defendant permit you to e-mail friends
15  and family in Mexico?
16  A.   No.
17  Q.   And why did he say that you could not?
18  A.   He first said that it was because his computer had
19  important things and if my e-mails brought any virus it
20  could get contaminated, I could ruin his things.  And
21  also because he wanted to cut -- he wanted me to cut all
22  ties with my boyfriend and my family.  He said that after
23  living with him I was not going to want to go back, that
24  I could stay with him for years.
25  Q.   Did you communicate with anyone in Mexico via e-mail?

Ms. Ramirez - Direct - Ms. Jager

1   A.   Yes, that is correct.

2   Q.   With who?

3   A.   With my boyfriend.

4   Q.   Hector?

5   A.   With my boyfriend, Hector Rodriquez.

6   Q.   And what did you tell Hector?

7   A.   Could I see the e-mail?

8            MS. JAGER:  May I approach, your Honor?

9            THE WITNESS:  Basically I told him --

10           THE COURT:  Yes.

11           THE WITNESS:  -- that I was uncomfortable, that

12  I wanted to go back, to take me out of there, to help me

13  get out, that I didn't like to be there, that he was

14  always touching me.

15  Q.   Would you still like to see the e-mails, Ms. Ramirez?

16  A.   No, I'm fine.

17  Q.   Now did you ever leave the defendant's house without

18  him?

19  A.   Yes.  One day I asked him permission to go for a walk

20  to exercise a little, an hour before my workday started.

21  Q.   What day is that?

22  A.   I believe it was Tuesday.

23  Q.   The Tuesday after your arrived?

24  A.   That is correct.

25  Q.   And was this before or after the day that you just

168

Ms. Ramirez - Direct - Ms. Jager

1  described when you were in his bedroom?

2  A.   After.

3  Q.   Would you please describe for the jury what happened

4  after you left?

5  A.   I wanted to look for the supermarket, I thought it

6  was nearby, but four blocks or so, but I didn't know.

7  And so I started walking, and after a while when I

8  realized I wasn't getting there I started running until I

9  arrived at a delicatessen, that's what I found.

10  Q.   How long did you run for?

11  A.   I don't know, maybe half on hour.

12  Q.   What happened when you got to the deli?

13  A.   I went inside but the phone was out of order.  I came

14  out, there was a woman there, I asked her to borrow her

15  phone, but she said something like it had no credit or

16  something, but that she had a boyfriend who was Mexican

17  and they lived nearby, and she said the boyfriend could

18  lend me his phone.  We arrived and the boyfriend did lend

19  me his phone but I wasn't able to call.  So I had to ask

20  them to please give me a ride and take me back nearby.

21  And I arrived walking as though I had been running.

22  Q.   What do you mean you arrived walking?

23  A.   That I got out a little bit ahead of time so that he

24  wouldn't see that I had been given a ride.

25  Q.   And who were you trying to call by going to the pay

Ms. Ramirez - Direct - Ms. Jager

1 phone and asking the woman for her cell phone and the

2 boyfriend?

3 A.   I was trying to call my boyfriend who was the only

4 one in my family who spoke English.  Well, my brother

5 does too, but I wanted him to do something to get me out

6 of there.

7 Q.   Now, did there -- were you able to reach him that

8 day?

9 A.   No, not on the phone that they lent me.

10 Q.   Did you -- did there come a time when you moved rooms

11 in the defendant's house?

12 A.   He told me he was going to hire another young woman

13 because I was not cooperating the way he wanted, and so

14 one day he called the airline and he asked for a ticket

15 for a woman, he showed it to me on the computer, and she

16 was coming from Poland.  And then he called her and told

17 her that he already had her ticket, and the date.  And

18 told her to go bring her tourist visa and fly over.

19      And then he told me that when this girl arrived, she

20 was going to be his new assistant, and she would be

21 making the trips with him, and I would only clean the

22 house and then he said he would move me to a smaller room

23 because the other room was for the new girl.  And this

24 room, the new room was across the hallway from his.

25 Q.   Where was your original bedroom, upstairs or

Ms. Ramirez - Direct - Ms. Jager

1   downstairs?

2   A.   Upstairs.

3   Q.   And your new room was downstairs?

4   A.   Downstairs exactly across the hallway from his, and

5   we were going to share a bath.

6   Q.   Now, you testified earlier that the defendant wanted

7   you to kiss him every night -- excuse me, kiss him

8   goodnight; is that correct?

9   A.   That is correct.

10   Q.   And what, if anything, ever happened to you when you

11   went to say goodnight to him Tuesday night?

12   A.   When I approached to kiss him goodnight, he grabbed

13   me by the waist with one arm, and he kissed me on the

14   mouth, and with the other hand, he touched me.   He

15   tightened his arm around me, and touched me on the

16   breast, as he was kissing.   And I moved back and went to

17   my room.   I did not unpack, because I decided that I was

18   leaving the next day.

19   Q.   When this happened to you, when he touched your

20   breasts, can you describe how he touched your breasts?

21   A.   He was grabbing me one, with one hand and with the

22   other, he had my arm and then all of a sudden, he brought

23   his hand down and tightened his hand on my breast.   And I

24   didn't know what to do.

25   Q.   Where did this happen?

Ms. Ramirez - Direct - Ms. Jager

1   A.   It happened right in front of the computer.

2   Q.   And was anyone else around when this happened?

3   A.   No.  His wife was already in the bedroom.

4   Q.   And what was your reaction to him grabbing your

5   breast and kissing you, after you had told him no the

6   time?

7   A.   I was speechless, and I realized that everyday was

8   going to get worse.  I had only been there for a very few

9   days, and he already touched me several times, kissed me

10  on the neck.  And I said tried to get out.

11  Q.   What did you do?

12  A.   So I moved back, I told him don't, and he just

13  laughed.  And I went to my room.

14  Q.   What happened next, Ms. Ramirez?

15  A.   Continued preparing my bags, they were practically

16  ready, because since I had taken them down, I had not

17  planned to unpack them.  I went to sleep and very early

18  the next morning, I changed my clothes, I put trousers on

19  and sneakers, and I went out instead of coming out at my

20  beginning time, 8 o'clock in the morning, I came out

21  later.  I came out later, and I told him I was leaving.

22  Q.   What did he say?

23  A.   He said why.  And I said because he has been touching

24  me on the breast, which was not by chance, but he had

25  really grabbed me, and he said, you're crazy.

172

Ms. Ramirez - Direct - Ms. Jager

Q.   What did you do?

A.   I had my passport and my money with me, and I left.

I left my bags behind.

Q.   But what did he say?  Did he say anything else to you

when he said you were leaving?

A.   Not at that point.  I left.  I started walking.  I

was very nervous, and at a corner, I found a woman who

was in a car, and I asked her for a ride to the

supermarket, when she realized I did not speak English, I

told her more or less what had happened to me, and she

said --

          MS. CESARE:  Objection.

          MR. SCHNEIDER:  Objection.

          THE COURT:  Wait, wait, wait.  Come up and tell

me what the answer to that question is.

173

Ms. Ramirez - Direct - Ms. Jager

1          (Conference held at side-bar.)

2          MS. JAGER:  The answer is that the woman told

3    her that she was a babysitter, and that she had children

4    back in the car, and that she would drive her to the

5    supermarket.

6          MS. CESARE:  Okay.  Withdraw the objection.

7          THE COURT:  Okay.

8          (Conference concludes at sidebar.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

174

Ms. Ramirez - Direct - Ms. Jager

1          THE COURT:  Okay.  You can answer the question.

2          THE WITNESS:  She told me that she could not

3    drive me, because I -- she didn't know me, but since she

4    saw me crying and so worried, she asked permission of the

5    child she had with her, a five-year old, to drive me to

6    the supermarket.  And at the supermarket, there was a

7    Peruvian working there, and he loaned me his telephone

8    card, and I was able to talk to my boyfriend.  And he

9    said forget about the suitcases, and he said that if you

10   want to go back for them, ask somebody to come with you;

11   otherwise, if you don't call me within three hours, I'm

12   going to call the Embassy.

13          But the Peruvian did offer to drive me when he

14   quit his job.  He drove me.  He said that he could come

15   inside with me, and I failed to say that somebody might

16   be coming with me.  I went inside, I told him I was

17   leaving.

18   Q.   Who did you tell you were leaving?

19   A.   Joseph Yannai.  And he said what money, and I said,

20   what do you think, I have my own money and my credit

21   card.  And he said transportation from here to New York

22   will cost you like $200.  And I said I didn't care, and I

23   walked out.  He said, I liked you so much, that if you

24   want to come back, I will give you a chance.

25          So I grabbed my suitcases and left.  And the Peruvian

175

Ms. Ramirez - Direct - Ms. Jager

1  drove me to a train station about a half an hour from

2  there it seemed to me, and the ticket only cost me $20.

3  I arrived in New York in the afternoon, it was raining, I

4  had my suitcases, they're very large.  I did have -- I

5  didn't have anywhere to go.

6  Q.   Ms. Ramirez, have you ever been to New York City

7  before?

8  A.   Never.

9  Q.   And where did you arrive?

10 A.   The train station.

11 Q.   What did you do?

12 A.   I walked for about an hour with my suitcases, and

13 because I couldn't find a hotel, they were all very

14 expensive, and some of them were full, and then all of a

15 sudden I saw a travel agency that was just about to

16 close.  They were closing the door, and I approached, and

17 a man who was there opened up for me.

18

19

20

21

22

23

24

25

176

Ms. Ramirez - Direct - Ms. Jager

1  A.   And because he saw me crying, and he saw that I was

2  desperate --

3            MS. JAGER:  Objection.

4            THE COURT:  Sustained.  She can testify that he

5  opened the door.

6            THE WITNESS:  He opened up --

177

Ms. Ramirez - Direct - Ms. Jager

1  Q.   What was your demeanor when he opened the door?

2            MS. JAGER:  Objection.

3            THE COURT:  Overruled.

4            THE WITNESS:  She was worried.

5  Q.   No.  I'm sorry, what was your demeanor?

6  A.   I was crying, and I told him what had happened to me.

7  I told him that I had come up to work and that this man

8  had tried to abuse me.

9            THE COURT:  Okay.  That's not necessary to

10  repeat it.  What happened after you told them?

11            THE WITNESS:  He made a reservation for me,

12  even though he had already closed down.  He asked -- he

13  called me a taxi, and told the taxi to drive me to the

14  hotel, and I arrived at the hotel, and I felt safe.

15  Q.   How did -- what happened next?

16            MS. CESARE:  Objection.

17            THE COURT:  On what ground?

18            MS. CESARE:  Its relevance.

19            THE COURT:  On what happened next?  Overruled.

20            MS. CESARE:  She's no longer in his home.

21            THE COURT:  Overruled.

22            THE WITNESS:  I was able to call my family.  I

23  told them I was all right.  I asked them to help me

24  change my flight, and I was there in New York for two or

25  three days.  I don't remember how long.  And I went back

Transcription Plus II, Inc.

178

                    Ms. Ramirez - Direct - Ms. Jager

1    to my country.

2    Q.   Why did you stay in New York for two or three days

3    instead of going back right away?

4    A.   Because there was no vacancy, there was no place for

5    me to change my ticket.  And the following day, I checked

6    with airplanes.  And then when I changed it, it was two

7    or three days later.  I don't remember how long.

8    Q.   Now, did you go to the police to report what happened

9    after you got to New York?

10             MS. CESARE:  Objection.

11             THE COURT:  She can answer it yes or no.

12             THE WITNESS:  No.

13   Q.   No?

14   A.   No.

15   Q.   Why not?

16   A.   Because I was afraid.  Because I knew I had lied at

17   immigration.  I thought he could accuse me of whatever

18   that I had robbed him, I had left my suitcases in his

19   house for many hours, he had works of art, I was afraid

20   he had -- could have put something in my suitcase, or

21   that he would claim something, and I was the one who was

22   illegally here.  And he is American.  So I was afraid of

23   the police.

24   Q.   What happened?  Did you fly back to Mexico?

25   A.   Yes, I went back to Laredo, Texas.

179
                    Ms. Ramirez - Direct - Ms. Jager

1   Q.   You went back to Laredo, Texas?

2   A.   Yes.  And when I got off the plane, there was an

3   officer there.  He recognized me, and he said, how come

4   you came back so quickly.  And I told him what had

5   happened to me.  I gave this man's address to him, and

6   his telephone number, and everything, and he said that he

7   would file a report.

8   Q.   Did you contact anyone else about what happened after

9   you got back home?

10  A.   When I arrived at my home in my country, my home, I

11  looked up on the internet for pages of assistance to

12  women, because I was afraid the same thing would happen

13  to somebody else, including the girl who was supposed to

14  be was going to arrive.

15            MS. CESARE:  Objection.

16            THE COURT:  What was the word that you said

17  including?

18            THE INTERPRETER:  Including the girl who was

19  just going to arrive.

20            THE COURT:  I don't see what's objectionable

21  about that.  Overruled.

22            THE WITNESS:  Then I found two or three --

23            THE COURT:  What's the next question?

24  Q.   Is whether or not she contacted any of these

25  organizations in the United States.


                    Transcription Plus II, Inc.

Ms. Ramirez - Direct - Ms. Jager

1   A.   Yes, I called two of them, and one of them spoke

2   Spanish, and I was able to explain clearly what had

3   happened to me.  And they said they would send somebody

4   to check it out.

5   Q.   Did they take your contact information down?

6   A.   No, not that I recall.

7   Q.   Now, how did you feel while you were at the

8   defendant's house?

9   A.   I -- all the time I felt unsafe, because generally he

10  kept telling me things, and he touched me at different

11  times, but mostly it was what he said to me.  All the

12  time, he kept telling me that I'm an ogre, that I would

13  never accomplish anything in my life if I didn't stay

14  with him.  He was constantly brainwashing me.

15  Q.   Did you ever talk to family members about what

16  happened to you while you were in the United States?

17          MS. CESARE:  Objection.

18          THE COURT:  Sustained.  I think we've been

19  through this.  I think we're going over stuff that she's

20  already responded to.

21          MS. JAGER:  I don't think she's answered the

22  question, Your Honor, about whether or not she told any

23  family members or personal people who were close to her

24  about what had happened?

25          THE COURT:  I thought she said she told her

181

Ms. Ramirez - Direct - Ms. Jager

1    boyfriend.

2         MS. JAGER:  Yes, but once she returned, did she

3    tell -- I could rephrase the question, did she tell

4    anybody else besides her boyfriend about what had

5    happened.

6         THE COURT:  You can answer it yes or no.

7         THE WITNESS:  I did tell my boyfriend.

8    Q.   Did you tell anyone else?

9    A.   Only my best girlfriend.

10   Q.   Why didn't you tell anyone else?

11   A.   Because it embarrasses me very much.

12   Q.   Did you ever have any further contact with the

13   defendant after you went back home?

14   A.   Never.

15   Q.   Did you -- did you do any internet search about him?

16   A.   Yes, some time.

17   Q.   And without telling what you saw, did you find

18   anything about him?

19   A.   Yes.

20   Q.   And what did you do as a result of that?

21   A.   I called the police in New York, and I told them that

22   I had some things that might be useful for them.

23   Q.   And what did you have?

24   A.   E-mails and pictures.

25   Q.   And why have you saved those e-mails?

182

Ms. Ramirez - Direct - Ms. Jager

1   A.   To remind myself of how stupid I had been.

2   Q.   And what did you do with those e-mails?

3   A.   I kept them for years in my e-mail account.

4   Q.   And then what did you do with them?

5   A.   I sent them to the Government of the United States.

6   Q.   And did you have any concerns about coming forward

7   with information that you had?

8   A.   Yes, because I felt that might perhaps affect my

9   visa.

10  Q.   Because you had lied about your purpose in coming

11  here before?

12  A.   Yes, that is correct.

13  Q.   But you came forward, nonetheless?

14  A.   That is correct.

15  Q.   Were you later contacted by law enforcement officials

16  regarding the defendant?

17            MS. CESARE:  Objection.

18            THE COURT:  Answer it yes or no.

19            THE WITNESS:  Yes.

20  Q.   Did you then come to the United States to be

21  interviewed?

22  A.   Yes.

23  Q.   Did you agree to come to the United States to testify

24  voluntarily?

25  A.   That is correct.

183

Ms. Ramirez - Direct - Ms. Jager

1   Q.   Were you required to come here to testify?

2   A.   No.

3   Q.   How long were you in the defendant's home?

4   A.   Perhaps five days.

5   Q.   Did you ever get paid for any of your work you did

6   for the defendant?

7   A.   No.

8   Q.   Did he ever help you get a green card or assist you

9   with a worker's permit?

10  A.   No.

11  Q.   Do you know someone named Anne Simonsen?

12  A.   No.

13  Q.   Do you know somebody named Vanessa Stenzel?

14  A.   Vanessa Stenzel, no.

15  Q.   Andrea Kramer?

16  A.   No.

17  Q.   Isabelle Krintz?

18  A.   No.

19  Q.   Bernadette Herczeg?

20  A.   No.

21  Q.   Gisele Lunkes?

22  A.   No.

23  Q.   Natalie Yagoub?

24  A.   No.

25  Q.   Do you know any of the other witnesses in this case,

184

Ms. Ramirez - Cross - Ms. Cesare

1  Ms. Ramirez?

2  A.   No.

3          MS. JAGER:  May I have just one moment, Your

4  Honor?

5          THE COURT:  Uh-huh.

6          (Pause.)

7          MS. JAGER:  Nothing further.

8          THE COURT:  Okay.  Eleven needs to use the

9  toilet.  There's the toilet, ma'am.

10         (Court recessed.)

11 CROSS-EXAMINATION

12 BY MS. CESARE:

13 Q.   Good afternoon, Ms. Ramirez.

14 A.   Good afternoon.

15 Q.   My name is Heidi Cesare.  I'm going to ask you some

16 questions.

17 A.   Fine.

18 Q.   How old are you now?

19 A.   Thirty.

20 Q.   And you came -- you spent time in Mr. Yannai's home

21 in July of 2006, correct?

22 A.   True.

23 Q.   How old were you then?

24 A.   Twenty-five.

25 Q.   And were you close to turning 26?

Ms. Ramirez - Cross - Ms. Cesare

1   A.   I had six months to go.

2   Q.   All right.  Before you came to Mr. Yannai's house,

3   you had finished your education, correct?

4   A.   True.

5   Q.   And you said you had gone to the University, correct?

6   A.   True.

7   Q.   Where did you go to the University?

8   A.   The University -- the State University in Mexico

9   City.

10  Q.   Did you ever study in London?

11  A.   Yes, I was in London.

12  Q.   How many years did you study in London?

13  A.   Ten months.

14  Q.   And was that during -- was that part of your

15  University experience?

16  A.   No.

17  Q.   Was that -- did you study in London after you

18  finished University in Mexico?

19  A.   No.  When I was 17 years old.

20  Q.   Was it part of a high school program?

21  A.   No.

22  Q.   How was it that you ended up staying in London when

23  you were 17 years old?

24  A.   My parents take me a trip learning.

25  Q.   Oh, so your parents sent you to London to study

Ms. Ramirez - Cross - Ms. Cesare

1   English for ten months when you were 17 years old?

2   A.   That is correct.

3   Q.   And did you go to a private school in Mexico for high

4   school?

5   A.   Yes.

6   Q.   And how many years did you spend at the University in

7   Mexico?

8   A.   Four-and-a-half, five.

9   Q.   Did you study English in school?

10  A.   Yes.

11  Q.   Did you study English in high school?

12  A.   Yes.

13  Q.   And you learned English when you spent twelve months

14  in London, correct?

15  A.   Very little.

16  Q.   But when you were in London, did you speak English

17  exclusively?

18  A.   No.

19  Q.   Did you live with a British family?

20  A.   I lived for a few months with a British family.

21  Q.   And then where did you live, in a dormitory?

22  A.   That is correct.

23  Q.   And the other students in the dormitory, were English

24  speakers, correct?

25  A.   No.

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   What languages did they speak?

2  A.   Spanish, Chinese, ESL.

3  Q.   Was it an English as a second language program?

4  A.   What is the question?

5  Q.   When you were in London studying, wasn't the school

6  designed to teach English as a second language?

7  A.   Yes.

8  Q.   Did you study English at the University in Mexico?

9  A.   No.

10  Q.   Now, you've traveled -- prior to going to Mr.

11  Yannai's house, you had traveled the United States on

12  numerous occasions; isn't that right?

13  A.   That is correct.

14  Q.   Didn't you say you've been to Chicago, right?

15  A.   Yes.

16  Q.   Dallas?

17  A.   No, not in Dallas.

18  Q.   What other cities did you go to in the United States?

19  A.   McAllen, Milwaukee, and San Antonio, Texas.

20  Q.   Did you travel by yourself when you went to those

21  cities?

22  A.   No, I go with my family.

23  Q.   Now, do you have any relatives that -- at the time in

24  2006 when you came to Mr. Yannai's home, did you have any

25  relatives that lived in the United States?

188

Ms. Ramirez - Cross - Ms. Cesare

1  A.   No.

2  Q.   Did you have a cousin in Boston?

3  A.   He was not a cousin.

4  Q.   What was that person's relationship to you?

5  A.   He was an acquaintance.

6  Q.   A friend?

7  A.   No.  I had only seen him a couple of times in my

8  entire life.

9  Q.   Did you have any friends who are in the United

10  States, when you came to Mr. Yannai's house?

11  A.   No.

12  Q.   Now, in some time around June 3rd, 2006, you received

13  an e-mail from a person named Joanna, correct?

14  A.   Yes.

15  Q.   And that first e-mail was about working as a personal

16  assistant for Joseph Yannai, correct?

17  A.   Yes.

18  Q.   And when you e-mailed this person, Joanna, you always

19  e-mailed her in English, correct?

20  A.   True.

21  Q.   And all other e-mails you received were written in

22  English, correct?

23  A.   Correct.

24  Q.   What -- did you do any research into this job offer

25  that you got through the e-mail?  What did you do to

189

Ms. Ramirez - Cross - Ms. Cesare

1  check out who Joseph Yannai was?

2  A.   What do you mean did I do --

3  Q.   Well, for instance, when you corresponded with Joseph

4  Yannai, he gave you his address, right?

5  A.   Yes.

6  Q.   He gave you the number, and a street, and a town he

7  lived in, right?

8  A.   True.

9  Q.   Did you look it up on a map to see where it was?

10  A.   Yes.

11  Q.   And did you -- when you looked it up on a map, did

12  you find out how close it was to the trains or the -- for

13  airports?

14  A.   No.

15  Q.   Did you look for any pictures of Pound Ridge?

16  A.   No.

17  Q.   Did you do any research to find out who else lived in

18  that town?

19  A.   No.

20  Q.   Now, when you corresponded with Joseph Yannai, one of

21  the things that he suggested was that maybe you should

22  come visit and have an in-person interview before you

23  accept the job; isn't that right?

24  A.   Yes.

25  Q.   And you decided not to do that?

Ms. Ramirez - Cross - Ms. Cesare

1  A.   I did decide to do it.

2  Q.   Did you visit his home before you went to work for

3  him?

4  A.   When I came, I went to check out the job.

5  Q.   Oh, I see.   When you -- the -- well, you arrived at

6  Joseph Yannai's house on Friday, July 8th, 2006, correct?

7  A.   No, that is not correct.

8  Q.   What date did you arrive?

9  A.   It was Saturday, June 8.

10  Q.   Saturday, July 8th?

11  A.   July.   July.

12  Q.   Is that right, Saturday, July 8th?

13  A.   Yes, that is correct.

14  Q.   Okay.   When you arrived there, wasn't the agreement

15  that that was the day you were arriving to begin the job?

16  A.   No.

17  Q.   No?   You were just arriving for an interview?

18  A.   No.   I came to meet him.

19  Q.   I see.   Now, in just -- in the second e-mail

20  correspondence you received from this person named

21  Joanna, you were advised of the terms of the job, right?

22  A.   Yes.

23  Q.   She told you that there was a live-in option and

24  live-out option, right?

25  A.   True.

Ms. Ramirez - Cross - Ms. Cesare

Q.   And the live-in option offered you the chance to live
in the Yannai home with room and board, all expenses
paid; is that right?

A.   Yes.

Q.   And that if you had completed a full year of
employment, a bonus came in of $20,000?

A.   True.

Q.   And you understood that the offer of the bonus was
contingent on finishing a whole year of work in the home,
right?

A.   Yes.

Q.   You understood that if you left before the year was
over, you should not expect any payment at all?

A.   Yes.

Q.   And that was right up front in the second e-mail you
got?

A.   Yes.

Q.   Now, you -- as you said, you started corresponding
with a person named Joanna in the e-mails, right?

A.   Yes.

Q.   And then after a few e-mails with her, you started
corresponding directly with Joseph Yannai.

A.   Correct.

Q.   And in that e-mail correspondence you had with Joseph
Yannai, it would be fair to say he used loving language

Ms. Ramirez - Cross - Ms. Cesare

1  with you?

2  A.   Correct.

3  Q.   He called you -- he referred to you as my dear Laura.

4  A.   True.

5  Q.   And he signed off as he wrote, used the expression,

6  with all my love?

7  A.   True.

8  Q.   He also told you that one of your jobs would be to

9  prepare his bath everyday.

10  A.   True.

11  Q.   And he told you he expected you to only wear dresses

12  and skirts in the house?

13  A.   True.

14  Q.   And you knew that this was a job in his home.

15  A.   True.

16  Q.   And you knew his wife wasn't around during the day

17  because she went off to her job.

18  A.   I don't remember that.

19  Q.   Now, from your position as a graduate of the

20  University, did it seem reasonable for you to wear skirts

21  and dresses only at a job in a man's home?

22  A.   Yes.

23  Q.   You thought that was reasonable?

24  A.   Yes.

25  Q.   Didn't you think to yourself, why do I have to wear

Ms. Ramirez - Cross - Ms. Cesare

1  skirts when I'm just working in the house?

2  A.   Yes, it seemed to me at one.

3  Q.   Now in this modern day and age, it's pretty common

4  for adult women to wear slacks when they work, right?

5  A.   Yes.

6  Q.   That's true in Mexico, right?

7  A.   But this was a job.

8  Q.   And here in the United States, you've been to the

9  United States, you know there's nothing unusual about

10  adult women wearing slacks while they're working.

11  A.   But he is Jewish, and I looked up and I saw that it

12  was a custom, a Jewish custom to wear skirts, and I

13  thought that this was his family's custom.

14  Q.   When Mr. Yannai told you he wanted you to wear skirts

15  and dresses when you work with him in his home and

16  office, you knew that was a -- that was a clue that he

17  was going to hit on you when you worked there, wasn't it?

18  A.   No, it's not true.

19  Q.   Now, on direct you went through a series of e-mails

20  that you sent and received before you took the job at Mr.

21  Yannai's house, correct?

22  A.   What do you mean?

23  Q.   I'm talking about Government Exhibits 501 through

24  513.  Do you remember looking at those exhibits?

25  A.   Yes.

194

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   And those were copies of e-mails you had saved on

2  your computer.

3  A.   Yes.

4  Q.   Did you delete any e-mails?

5  A.   Don't remember, I don't believe so.

6  Q.   Do you believe that was the complete correspondence

7  concerning the job at Mr. Yannai's house?

8  A.   Yes.

9  Q.   All right.  I'm going to show you what has been

10  marked as Defense Exhibit LR-3.

11         MS. CESARE:  I'd like to move it into evidence

12  at this time.

13         THE COURT:  Any objection?

14         MS. JAGER:  No objection.  It's already in

15  evidence.

16         MS. CESARE:  Can we publish it to the jury?

17  Q.   All right.  This Defense Exhibit LR-3 is -- yeah, let

18  me see if I can focus this a little.

19         MR. UNIDENTIFIED:  It's fine on this one.

20         MS. CESARE:  Oh, it's just -- okay.

21  Q.   All right.  This exhibit is -- at the top, it's a

22  message from Joseph Yannai to you, correct?

23  A.   Uh-huh.

24  Q.   And it's dated June 26th, 2006, right?

25  A.   Yes.

Transcription Plus II, Inc.

Ms. Ramirez - Cross - Ms. Cesare

1  Q.    Okay.  I'm going to circle a sentence in this e-mail

2  communication.  Can you read what I just circled?

3  A.    "Thank you for the pictures.  You are more beautiful

4  than I first thought."

5  Q.    Mr. Yannai was complimenting your beauty, right?

6  A.    Yes.

7  Q.    You knew at that time, as a 25-year old woman, a

8  University graduate in business administration, that this

9  was a comment that had nothing to do with your qualities

10 as an employee?

11 A.    Yes.

12 Q.    When you read that, you knew he was hitting on you?

13 A.    I did not know that he was hitting on me.

14 Q.    Well, you -- this sentence tells you that he was

15 interested in your physical appearance, right?

16 A.    I just thought it was a way of showing he was

17 educated.

18 Q.    A way of showing he was educated?

19 A.    Yes.

20 Q.    What exactly about you are more beautiful than I

21 first thought indicates education?

22        THE INTERPRETER:  I'm sorry.

23 Q.    What exactly about the phrase, "you are more

24 beautiful than I first thought" indicates education?

25 A.    Yes, I thought it was a compliment.  But not a hit

Ms. Ramirez - Cross - Ms. Cesare

1  on.

2  Q.  Why did you think he was interested in your physical

3  appearance?

4  A.  I didn't believe he was interested in my physical

5  appearance.

6  Q.  At the end of this same short message, there's a

7  single sentence, can you read that last sentence?

8  A.  "Remind you of coming back from England, will be

9  there five -- four days later.  I will see you."

10  Q.  When Mr. Yannai was talking about the joy he would

11  have seeing you, you understood he was talking about

12  seeing you, the beautiful woman.

13  A.  I did not understand that part.  All I understood was

14  that he was coming back from England.

15  Q.  And did you understand the word "joy"?

16  A.  Joy?  I believe that means enjoy.  I did not look at

17  it -- take it into account, but I didn't understand, I

18  just skipped it.

19  Q.  You skipped it?

20  A.  Yes.

21  Q.  When he spoke of the joy of coming back to see you,

22  you understood then when you wrote that letter that this

23  man is going to be interested in you, you were an

24  attractive young woman.

25  A.  No, I will repeat, I did not understand that he was

Ms. Ramirez - Cross - Ms. Cesare

1  interested in me, and my physical appearance.

2  Q.   Why was he talking about how beautiful you are then?

3  A.   I thought it was a compliment.

4  Q.   Have you had other jobs?  Have you ever had a job

5  anywhere else?

6  A.   I always have employment, which I mentioned already.

7  Q.   All right.  When you got your other jobs, it wasn't

8  because you weren't beautiful, was it?

9  A.   Appearance does have something to do with it.

10 Q.   And that was the case with your job with Mr. Yannai,

11 your appearance had something to do with the job?

12 A.   I realized it later on, and he -- that he was not

13 solely interested in the physical appearance, that he was

14 more interested in the character.

15 Q.   All right.  Let me show you what's been marked as

16 Defense Exhibit LR-4.

17           MS. CESARE:  And I'm going to move it into

18 evidence at this time.

19           MS. JAGER:  Sorry, no objection, it's already

20 in evidence.

21           THE COURT:  Is it already in evidence?

22           MS. CESARE:  It's a portion of -- it's a

23 duplicate of one of the Government's exhibits.

24           THE COURT:  What --

25           MS. CESARE:  It's not marked.

198

Ms. Ramirez - Cross - Ms. Cesare

1        THE COURT:  What Government exhibit is it?

2        MS. CESARE:  It's Government Exhibit 12, 512.

3        THE COURT:  All right.  So that's admitted as a

4   duplicate of Government's Exhibit what?

5        MS. CESARE:  512.

6        THE COURT:  512.

7   (Defendant's Exhibit LR-4 was received in evidence.)

8   Q.   This is another e-mail that Joseph Yannai sent to you

9   and it's dated Wednesday, July 5th, 2006; is that right?

10  A.   That is correct.

11  Q.   And in this letter, Joseph writes to you, "This was a

12  real welcome present for me, the pictures."  Right?

13  That's how he starts off the message?

14  A.   Yes.

15  Q.   And this e-mail was a response -- he was writing to

16  you in response to some photographs that you e-mailed to

17  him.

18  A.   That is correct.

19  Q.   And the next thing he writes is, "I knew that you

20  were an attractive woman, but your portrait picture was

21  of a real beautiful woman."

22  A.   Yes.

23  Q.   When you read this e-mail message from Joseph Yannai,

24  you knew that he thought of you primarily as a beautiful

25  attractive woman?

Ms. Ramirez - Cross - Ms. Cesare

A.   Yes.

Q.   And you knew that your beauty was very important to

him.

A.   I didn't know that my beauty was so important to him.

Q.   When you read this e-mail you understood that the

reason -- the fact that you were so attractive was one of

the main reasons he was offering you a job?

A.   No, of course not.  Just because I'm beautiful, no.

Q.   Then he wrote, "And the other picture showed me that

you have beautiful legs."

A.   Yes.

Q.   When you read that, you understood -- you knew that

Joseph Yannai was interested in having a relationship

with you, you knew that when you read this e-mail, didn't

you?

A.   No.

Q.   You knew that you were going to be working in his

home just -- in his home without his wife around during

the day, right?

A.   I didn't know that his wife was not there.

Q.   You knew he wanted you to wear only skirts and

dresses when you worked for him?

A.   Yes.

Q.   And you knew that he loved women with beautiful legs?

A.   Yes.

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   What does having beautiful legs have anything to do

2  with research for books?

3  A.   And actually, he didn't know of her making books,

4  told me prepare coffee and be a personal assistant, not

5  make books, that had nothing to do with my course of

6  study.

7  Q.   Oh, but you had e-mail discussion with him about the

8  possibility of assisting him with writing his books,

9  right?

10  A.   That is correct.

11  Q.   You don't need beautiful legs to make coffee or clean

12  up the office?

13  A.   No, I don't need that.

14  Q.   And then he finishes this e-mail with the phrase,

15  "Only three days and we are together."

16  A.   Yes.

17  Q.   Is that an expression of a man who's interested in a

18  woman?

19  A.   When I read that, what I thought was that it's still

20  three days before we see each other, but not to be like

21  together.

22  Q.   Now, before you got this e-mail, you had talked to

23  Joseph Yannai on the telephone, right?

24  A.   Yes.

25  Q.   You'd had many other e-mail communication with him,

201

Ms. Ramirez - Cross - Ms. Cesare

1   right?

2   A.   That is correct.

3   Q.   He told you he lived in a big, beautiful house.

4   A.   Yes.

5   Q.   He told you he wrote books.

6   A.   He published books.

7   Q.   He made lots of money selling books.

8   A.   That is correct.

9   Q.   He told you there was a pond behind his house?

10  A.   That is correct.

11  Q.   It's a beautiful place to live.

12  A.   Yes.

13  Q.   You had the impression at this time that Mr. Yannai

14  was a man of apparent affluence, right?

15  A.   Yes.

16

17

18

19

20

21

22

23

24

25

202

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   And you thought it was -- you didn't think it was

2  anything unusual about him talking to you about how

3  pretty your legs were?

4            MS. JAGER:  Objection.

5            THE COURT:  It's sustained.  This is going over

6  the same ground, and a lot of these questions are also

7  argumentative.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   The last e-mail you got Mr. Yannai had pictures

2  attached to it, correct?

3  A.   True.

4  Q.   Now, you didn't see these -- you didn't receive this

5  e-mail until after you got to his house, right?

6  A.   Yes.

7  Q.   When was the first time you looked at his last e-mail

8  to you?

9  A.   A few days before I met him.  Oh, you mean the last

10 e-mail, this last e-mail?

11 Q.   I'm talking to you about the e-mail which has been

12 identified as Government Exhibit 513, the e-mail that had

13 pictures attached to it.

14 A.   After I had arrived in New York.

15 Q.   And did you check your e-mail from New York?

16 A.   Yes, I checked my e-mail one day.

17 Q.   When you were in Joseph Yannai's house?

18 A.   Yes, I did.

19 Q.   You arrived at his house on a Saturday, and you left

20 his house on a Wednesday, right?

21 A.   I believe so.

22 Q.   Okay.  And when was the first time you were able to

23 check your e-mail from Joseph Yannai's home?

24 A.   I believe it was on Tuesday.

25 Q.   On Tuesday.  And that's when you saw the pictures he

Ms. Ramirez - Cross - Ms. Cesare

1  had attached to his e-mail, right?

2  A.   I don't remember whether I saw them or not.  I had

3  the chance to open the mail, but I -- the old ones I had.

4  Q.   I'm going to show you what's been marked as Defense

5  Exhibit P-1.

6      This is a photograph of Mr. Yannai kissing a young

7  woman, right?

8  A.   Yes.

9  Q.   The Defendant's Exhibit P-1 is a copy of one of the

10  pictures Joseph Yannai sent you, right?

11  A.   Yes.

12  Q.   And from looking at that picture -- let me rephrase

13  the question.

14      When he sent you this picture, he told you this is a

15  picture of him and a young woman who used to be his

16  personal assistant, right?

17  A.   Yes.

18  Q.   And when you saw this picture, you understood that he

19  had had an intimate relationship with his prior personal

20  assistant?

21  A.   Yes.

22  Q.   And when you looked at it, you understood that he

23  wanted the same relationship with you?

24  A.   No.

25  Q.   You didn't think so?

Ms. Ramirez - Cross - Ms. Cesare

1   A.   I was in Mexico when I saw the pictures, so I was

2   never able to see them while I was in New York or before

3   I arrived.

4   Q.   Wherever you were in this world when you saw this

5   picture, would it be fair to say that you understood that

6   Joseph Yannai was looking for the same relationship with

7   you?

8   A.   I don't know what he might have been looking for or

9   what he thought.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ms. Ramirez - Cross - Ms. Cesare

Q.   Looking at this picture, what does this picture tell

you?

            MS. JAGER:  Objection.

            THE COURT:  Sustained.

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   He sent you this picture the day before you got to

2  New York, right?

3  A.   Yes.

4  Q.   Now -- so you landed at JFK on Saturday, July 7th

5  late in the evening, right?

6  A.   No, LaGuardia.

7  Q.   Oh, LaGuardia.  And Mr. Yannai picked you up at the

8  airport?

9  A.   Yes.

10 Q.   And when you were in the car with him, he tried to

11 hold hands with you.

12 A.   Yes.

13 Q.   And he was --

14 A.   He did grab me.

15 Q.   You were sitting next to him in the car and he

16 reached over to hold your hand.

17 A.   Yes, he pulled my hand.

18 Q.   And did you take your hand back and say, I don't want

19 to hold hands?

20 A.   I just released my hand and pulled my hand back.

21 Q.   You put it back in your lap?

22 A.   I don't remember.

23 Q.   Did you tell him -- did you say Joseph, I don't want

24 to hold hands with you?

25 A.   No.

208

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   And then he tried to hold hands with you again,

2  right?

3  A.   That is correct.

4  Q.   Did you hold hands the whole way up to Pound Ridge?

5  A.   I don't believe so.

6  Q.   In that car ride, he told you that you would be

7  traveling together?

8  A.   Yes.

9  Q.   And that you would have to share a hotel room?

10 A.   Yes.

11 Q.   Expected to share a room with you?

12 A.   Yes.

13 Q.   And sleep in the same bed?

14 A.   That is correct.

15 Q.   See one another naked?

16 A.   Yes, sometimes.

17 Q.   And when you got to Pound Ridge after this car ride,

18 you called your mother?

19 A.   That is correct.

20 Q.   And you spoke to your mother and your boyfriend on

21 the telephone?

22 A.   Yes.

23 Q.   You didn't tell your mother about that hotel

24 business, did you?

25 A.   No, of course not.

                    Ms. Ramirez - Cross - Ms. Cesare

1    Q.   And you didn't tell your boyfriend about that hotel
2    business either, did you?
3    A.   I don't remember whether I told him about the hotel.
4    Q.   Now, you said of course you wouldn't tell your mother
5    about it.
6    A.   That is correct.
7    Q.   Why didn't you say to her, Mom, this guy's crazy and
8    I'm going to come back as soon as I can?
9    A.   There was nothing she could do for me, she was just
10   going to be worried.
11   Q.   The next day you went to a polo match, right?
12   A.   True.
13   Q.   And had you ever been to a polo match before?
14   A.   No.
15   Q.   And you enjoyed it, right?
16   A.   Yes.
17   Q.   It was a beautiful place to go?
18   A.   Yes.
19   Q.   The horses were beautiful?
20   A.   Yes.
21   Q.   Lots of people were watching the game?
22   A.   Yes.
23   Q.   You were there with a couple who were friends with
24   Yannai's?
25   A.   That is correct.

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   And, you know, when they took a break during the polo

2  match, you'd go out into the field and walk along the

3  grass of the polo field?

4  A.   Yes.

5  Q.   It was a very nice day, right?

6  A.   Not the day, just the game.

7  Q.   And you enjoyed it, right?

8  A.   Yes.

9  Q.   And that night, friend of Yannai's had dinner at the

10  Yannai home?

11  A.   I don't remember whether it was, in fact, that night.

12  Q.   So one of the nights you were there, the Yannai's had

13  house guests, right?

14  A.   That is correct.

15  Q.   And so the second time you called home was on Monday,

16  July 10th, right?

17  A.   I don't remember.

18  Q.   But without giving me your home phone number, does

19  your telephone number end in digits 227?

20  A.   I don't remember my telephone number.  I haven't

21  lived there for many years now.

22  Q.   Did it begin with digits 528?

23  A.   Yes.

24  Q.   Is it -- now I'm going to show you something to see

25  if it refreshes your recollection.

Ms. Ramirez - Cross - Ms. Cesare

A.   Yes, this is my telephone number.  Yes.

Q.   So you called your home number on Monday, July 10th, right?

A.   Yes, I called my mother.

Q.   And you told her everything was okay.

A.   No.

Q.   What did you tell her?

A.   That the old man was heavy, he was like annoying or that he was getting too far with --

Q.   Right.  Now, on that Monday after you talked to your mom, you went to the office, you went to the home office with Joseph Yannai, right?

A.   Which office?

Q.   The work station, the downstairs at the Yannai home?

A.   Yes.  I don't remember what day.  I remember the office, but I don't remember whether I went there.

Q.   But you recall that Ms. Yannai's wife went to work on a Monday, right?

A.   Yes.

Q.   All right.  And that was the day that Joseph Yannai showed you around the office?

A.   Yes.

Q.   Because you arrived Saturday night and Sunday you went to the polo match, on Monday, Mr. Yannai's wife went to work; is that right?

212
Ms. Ramirez - Cross - Ms. Cesare

1  A.   Yes.

2  Q.   And on Monday, Mr. Yannai showed you around the

3  office?

4  A.   I don't remember whether he showed it to me on Monday

5  or actually on Sunday afternoon, anyway, it was there in

6  plain sight.

7  Q.   Right.  But the day his wife went to work is the day

8  you started doing some research for him?

9  A.   I believe.

10  Q.   Okay.  And he had you using the internet to look up

11  things about -- look up information on the internet,

12  right?

13  A.   Yes.

14  Q.   And Mr. Yannai was working at his own work station at

15  a separate computer, right?  I'm going to show you --

16  A.   I don't remember that.

17  Q.   I'm going to show you what's been marked as

18  Defendant's P-6, P-7 and P-8.  Do you recognize who's in

19  that photograph?

20  A.   That's the terrace, the outside is the terrace.  And

21  this is one of the desks.

22  (Defendant's Exhibit P-6 through 8 marked for

23  identification.)

24  Q.   Okay.  And I'm going to show you what's been marked

25  as Defendant's P-8.  Do you recognize that photograph?

Ms. Ramirez - Cross - Ms. Cesare

1  A.   I remember the place, but I don't remember all those
2  computers.
3  Q.   All right.  How many computers were there when you
4  were there?
5  A.   I don't remember.
6  Q.   But is this a photograph of the inside of the Yannai
7  home?
8  A.   Yes.
9  Q.   Now, I'm going to show you what's been marked as
10  Defendant's Exhibit P-7.  Do you recognize that?
11  A.   Yeah, it's like a cubicle he had.
12  Q.   Okay.
13          MS. CESARE:  I move Defendant's P-6, P-7 and P-
14  8 into evidence.
15          THE COURT:  Is there any objection?  Are they
16  already in evidence?
17          MS. JAGER:  They're not in evidence, Your
18  Honor, they're government would just note that the
19  witness said the space appeared different in the
20  photographs than it did when she was there, but she
21  recognizes it to be the defendant's home.
22          THE COURT:  Is there an objection?
23          MS. JAGER:  No.
24          THE COURT:  They may --
25          MS. CESARE:  May I publish?

Ms. Ramirez - Cross - Ms. Cesare

1          THE COURT:  Yes.  It's admitted.

2          MS. CESARE:  All right.  Thank you.

3  (Defendant's P-6 through 8 received in evidence.)

4  Q.   All right.  So looking at Defendant's Exhibit P-8,

5  this is not exactly the way the home office looked when

6  you were there because there weren't as many desks as

7  when you were there, correct?

8  A.   No, I don't remember where the -- what the office

9  looked like.  I cannot tell you whether it looked like

10  that, or it didn't look like.

11  Q.   But is this space you worked in when you worked

12  there?

13  A.   I remember the computer that was here.

14  Q.   And -- can you touch your screen?

15  A.   Here?

16  Q.   Is this the station you worked at?

17  A.   No, I think I used this one, but I'm not sure.  There

18  was a computer.

19  Q.   You're not sure there was a computer?

20  A.   Not sure period.  There was a computer.

21  Q.   Okay.  And you used the computer?

22  A.   Yes, he asked me to do a few things.

23  Q.   And I'll show you Defendant's P-7.  That's another

24  shot of the work space.

25  A.   He said that that was the work space but we never

Ms. Ramirez - Cross - Ms. Cesare

1   actually used it.

2   Q.   But is -- when you did the research on the guide he's

3   making, did you work in that space?

4   A.   No, it was outside in the other one.

5   Q.   Are you talking about what's circled in Defendant's

6   P-8?

7   A.   Yes.

8   Q.   That's where you were?

9   A.   Yes.

10   Q.   So I'm going to show you Defendant's P-6, and this is

11   another -- this P-6 shows the station you used when you

12   did research, right?

13   A.   Yes.

14   Q.   Yes, okay.  Now, all the windows in the work station

15   looked out onto a pond, right?

16   A.   Yes.

17   Q.   I'm going to show you what's been marked as

18   Defendant's Exhibit P-4.  It's not been admitted yet.  Do

19   you recognize Exhibits -- Defendant's Exhibit P-4?

20   A.   No.

21   (Defendant's Exhibit P-4 marked for identification.)

22   Q.   I'd like to show you Defendant's P-5.

23   A.   That I do.

24   (Defendant's Exhibit P-5 marked for identification.)

25           MS. CESARE:  I move Exhibit P-5 into evidence.

216

Ms. Ramirez - Cross - Ms. Cesare

1          MS. JAGER:  No objection.

2          THE COURT:  Admitted.

3  (Defendant's Exhibit P-5 received into evidence.)

4  Q.   Now, this is the pond behind the Yannai's house,

5  right?

6  A.   Yes.

7  Q.   This was the view from the work station in the home

8  office?

9  A.   Yes.

10  Q.   You were there in the summertime, and it was greener

11  while you were there, right?

12  A.   Perhaps.

13          MS. CESARE:  May we publish this?

14  Q.   So in the summertime, it was a much greener view,

15  right?

16          THE COURT:  What difference does it make

17  whether it was much greener in the summertime?

18  Q.   I'm going to show you what's been marked as

19  Defendant's Exhibit P-9 for identification purposes.  Do

20  you recognize this?

21  A.   No.

22  (Defendant's Exhibit P-9 marked for identification.)

23  Q.   Now, you described an incident when you were in

24  Mr. Yannai's house, when he asked you to come into his

25  bedroom while he was napping, right?

217

Ms. Ramirez - Cross - Ms. Cesare

1   A.   Yes.

2   Q.   Okay.  And that would've been Monday or Tuesday?

3   A.   Yes.

4   Q.   Because his wife wasn't there at the time?

5   A.   Yes.

6   Q.   He asked you -- he called you and asked you to come

7   into his room.

8   A.   Yes.

9   Q.   And you went in there.

10  A.   Yes.

11  Q.   You observed he was undressed from the waist up.

12  A.   Yes, that is correct.

13  Q.   Now, this is after he had tried to kiss you, right?

14  A.   He did not try, he did kiss me.

15  Q.   I'm talking about you described the time where you

16  kissed him goodnight, and he kissed you on the lips.

17  A.   I believe that that had happened already once.

18  Q.   So this day when he asked you to come into his

19  bedroom, was after that incident when he tried to kiss

20  you on the lips?

21  A.   I am not certain.

22  Q.   Okay.  So you went into his room, and you sat down on

23  the side of the bed.

24  A.   Yes.

25  Q.   Then he sat up.

218

Ms. Ramirez - Cross - Ms. Cesare

1   A.   Yes.

2   Q.   And he tried to kiss you.

3   A.   He hugged me and kissed me.

4   Q.   And he kissed your neck.

5   A.   Yes.

6   Q.   And you pulled away?

7   A.   It's not that I got away, I just put up my hands to

8   shove him a little.

9   Q.   Okay.  And he stopped, right?

10  A.   No.

11  Q.   You told him I don't want to kiss you?  And you told

12  him I don't want to do this, right?

13  A.   Yes.

14  Q.   And then he let go?

15  A.   No.

16  Q.   Never let go?

17  A.   After several times.

18  Q.   After several kisses?

19  A.   Several, yes.

20  Q.   And he kissed you on your neck, right?

21  A.   One other time.

22  Q.   Where else did he kiss you?

23  A.   The cheek.

24  Q.   And you made clear that you didn't want that to

25  happen and he did let you go, right?

Ms. Ramirez - Cross - Ms. Cesare

1  A.   I made him see that I did not want that to be

2  happening, and after that, he let me go.

3  Q.   And then he said to you that I'm an old man, but I

4  can have sex.

5  A.   That happened when I came into the room.

6  Q.   Oh, he said that to you before he kissed you?

7  A.   I really don't remember whether it was before or

8  after, he just said don't be scared.  It seems to that

9  that happened when I sat on the bed.

10 Q.   Now, you've --

11 A.   I don't want to have sex with you.  I know that there

12 are people who are my age who are unable to, but I can.

13 Q.   Okay.  He was telling you that even though he was old

14 and fat, he still had the ability to have sex with you.

15 A.   He just said on account of his age.

16 Q.   Okay.  Now, you've talked about this incident with

17 the investigators in the case, right?

18 A.   Yes.

19 Q.   You were flown here in February of 2011 to talk about

20 what happened, right?

21 A.   Yes.

22 Q.   And you made your best -- when you spoke to the

23 investigators in February 2011, you were as accurate as

24 you were able to be when you talked about what happened?

25 A.   Yes, I tried to remember everything.

Ms. Ramirez - Cross - Ms. Cesare

1   Q.   Okay.  And when you spoke again, you were asked about

2   the same incident.  And you -- is that right?

3   A.   Yes.

4   Q.   And you said, when you pulled away, Joseph Yannai

5   said to you, I can have sex, some men my age can't, but I

6   can.

7   A.   I remember having said that to Frank.

8   Q.   So you -- your best recollection is that he said that

9   to you after you pulled away from him?

10  A.   What I remember now is that he said that to me

11  before, but that's happened so long ago.

12  Q.   But he also said to you, after he told you that some

13  men my age have sex -- can't have sex but I can, he also

14  said to you I won't have sex with you, you're not my

15  type.

16  A.   That is correct.

17  Q.   And he said that to you after you refused his

18  advances, right?

19  A.   I don't remember whether it was before or after, but

20  he did say that.

21  Q.   Okay.  And you had this conversation with him in his

22  bedroom.

23  A.   I believe so.

24  Q.   Okay.  And after the conversation, you walked out of

25  the room.

221

Ms. Ramirez - Cross - Ms. Cesare

1   A.   I don't remember what I may have done after the

2   conversation.

3   Q.   You didn't remain in Mr. Yannai's bedroom?

4   A.   Probably not, but I don't remember.

5   Q.   He certainly didn't try and keep you in his bedroom.

6   A.   No.

7   Q.   You were free to leave.

8   A.   Yes.

9   Q.   And that was in the middle of the day, and do you

10  recall how you spent the afternoon after that?

11  A.   No.

12  Q.   Now, you talked about the goodnight kissing, right,

13  do you remember?

14  A.   Yes.

15  Q.   Joseph Yannai told you that he would like to kiss you

16  goodnight, each night you were there.

17  A.   That he liked me to give him a kiss.

18  Q.   And you did, right?

19  A.   Yes.

20  Q.   So before you went to bed at night, would you go to

21  wherever he was sitting and give him a kiss?

22  A.   Yes.

23  Q.   And, you know, you walked -- you kissed him of your

24  own free will?

25  A.   He would say, come say goodnight.

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   Okay.  Did you ever say I don't want to do that?

2  A.   The first time, but since it was a goodnight kiss,

3  supposedly he was a part of my family, and I gave him a

4  goodnight kiss on the cheek.

5  Q.   Okay.  And the next night you went to kiss him again?

6  A.   Which night?

7  Q.   Well, you kissed him every night you were there,

8  right?

9  A.   I think so.

10 Q.   Kissed him goodnight even after the day he

11 propositioned you in his bedroom.

12 A.   He did not make any promises, he was just hugging me

13 and kissing.  And, yes, that night, I also planted a kiss

14 on him.

15 Q.   Well, when he hugged you and kissed you in his

16 bedroom, you understood that was an invitation to join

17 him in bed, right?

18        MS. JAGER:  Objection.

19        THE COURT:  Overruled.

20        THE WITNESS:  No.

21 Q.   So you're -- when you -- when you're in his bedroom

22 and he reached and tried to kiss you, you didn't think he

23 was inviting you to get in bed with him?

24 A.   He was kissing me and hugging me and consoling me

25 because I was sad without my mom, and he was making game

Ms. Ramirez - Cross - Ms. Cesare

1    plays in my head.

2    Q.   You really knew, I mean, you knew, as a grown woman,

3    that he was kissing you because he wanted you to get in

4    bed with him, right?

5              MS. JAGER:  Objection.

6              THE COURT:  Overruled.

7              THE INTERPRETER:  I'm sorry, Judge, I didn't

8    hear.

9              THE COURT:  She can answer the question.

10             THE INTERPRETER:  Okay.

11             THE WITNESS:  No, I did not -- he wanted me to

12   go into his bed.  I thought that he might grab me by

13   force, but I never thought that he wanted me on my own to

14   be in his bed.  Those are mind games he played with me

15   all the time.

16   Q.   He -- did -- he didn't force you to sit on his bed,

17   did he?

18   A.   No.

19   Q.   He didn't say he was going to hurt you if you didn't

20   come and sit on his bed?

21   A.   No.

22   Q.   And when you said I don't want this and you pushed

23   away, he let go?

24   A.   No.

25   Q.   He did let go after he kissed you, right?

224

Ms. Ramirez - Cross - Ms. Cesare

1    A.    After 20 minutes.

2    Q.    20 minutes of kissing?

3    A.    Yes.

4    Q.    He kissed your neck for 20 minutes?

5    A.    No.  He had -- he was hugging me for 20 minutes.

6    Q.    And are you saying he hugged you for 20 minutes

7    before or after he told you he would not have sex with

8    you?

9              THE COURT:  She'll answer it again.

10             THE WITNESS:  Could you repeat the question,

11   please?

12   Q.    Was this 20 minutes of hugging and kissing before or

13   after he said I'm not going to have sex with you?

14   A.    I don't remember.

15   Q.    Now, when you arrived at Joseph Yannai's house, you

16   had your own passport, right?

17   A.    Yes.

18   Q.    Had a credit card?

19   A.    Yes.

20   Q.    You had money?

21   A.    Yes.

22   Q.    And you -- what was your plan -- did you have a plan

23   before you arrived at his house for how you would leave

24   if you didn't like the job?

25   A.    No.

Ms. Ramirez - Cross - Ms. Cesare

1   Q.   You had no back-up plan?

2   A.   No.

3   Q.   But didn't you say at the beginning of your -- of

4   this testimony, that you were just going there to

5   interview for the job?

6   A.   I did not  say interview, I said approve.

7   Q.   I beg your pardon?

8   A.   I did not say that I came for an interview.  I said I

9   came to check whether I liked it, approve it.

10  Q.   Okay.  And what were you going to do if you did not

11  like the job?

12  A.   Go back to my country.

13  Q.   Okay.  And that's what you did, right?

14  A.   Yes.

15  Q.   Now, you spoke on Tuesday of July 11th, you had

16  numerous e-mail communications with your boyfriend,

17  right?

18  A.   Yes.

19  Q.   You said you probably sent five or six e-mails to him

20  that day.

21  A.   I don't remember how many.

22  Q.   About how many?

23  A.   Perhaps six.

24  Q.   Okay.  And you told your boyfriend that Joseph told

25  you that whenever you wanted to leave, he wouldn't ask

                    Ms. Ramirez - Cross - Ms. Cesare

1   any questions, he'd just take you to the airport.

2   A.   Among other things.

3   Q.   Okay.  And he told you -- and you sent this e-mail to

4   your boyfriend on Tuesday, the day before you left the

5   Yannai house, right?

6   A.   Yes.

7   Q.   So on Tuesday, you knew that if you wanted to leave,

8   Joseph would take you to the airport.

9   A.   He had mentioned it several times.

10  Q.   Okay.  And you told your boyfriend that actually Joe

11  is a pleasant person.

12  A.   Yes.

13  Q.   You know, he wasn't awful the whole time, right?

14  A.   When I said pleasant, I meant that he didn't ask me

15  for things screaming at me.

16  Q.   Okay.  And you went out to dinner every single day

17  you were there.

18  A.   I remembered twice.

19  Q.   Okay.  Well, you told your boyfriend that you went

20  out to dinner every day.

21  A.   I was only there for three days.

22  Q.   Well, you were there from Saturday until Wednesday.

23  Sunday night you went out to dinner, right?

24  A.   No.

25  Q.   Monday night you went out to dinner?

227

Ms. Ramirez - Cross - Ms. Cesare

1  A.   Yes.

2  Q.   Tuesday you went out to dinner?

3  A.   Yes.  Yes, two days.

4  Q.   And you also said -- you told your boyfriend that

5  everything Joseph had told you about the house was true.

6  A.   True.

7  Q.   It's a very nice house.

8  A.   Yes.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

228

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   And there was a pond or a lake in the back.

2            MS. JAGER:  Objection.

3            THE COURT:  On what ground?

4            MS. JAGER:  Relevance.

5            THE COURT:  Yeah.  All right.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ms. Ramirez - Cross - Ms. Cesare

1   Q.   And that it was all very nice.

2          THE COURT:  Is that a direct quote?

3          MS. CESARE:  No.

4          THE WITNESS:  I don't remember if I said that.

5   Q.   I beg your pardon?

6   A.   I don't remember whether I said that.

7          THE CLERK:  Can you pull the mic closer to you?

8          THE INTERPRETER:  Sorry.

9   Q.   Now, you never told Joseph Yannai's wife about what

10  happened in the bedroom, did you?

11  A.   No.

12  Q.   You never told her that he was hitting on you?  You

13  never told Joseph's wife that he was hitting on you?

14  A.   No.

15  Q.   He said things to you that made you feel better.

16  A.   Yes.

17  Q.   And he spanked you on the bum once.

18  A.   True.

19  Q.   And he grabbed your bum one time while you were

20  walking up the stairs.

21  A.   Yes.

22  Q.   And he made a pass at you while you were in his

23  bedroom.

24  A.   Yes.

25  Q.   But he never forced you to go anywhere.

Ms. Ramirez - Cross - Ms. Cesare

1   A.   No.

2   Q.   He never forced himself on you sexually?

3   A.   No.

4   Q.   Never assaulted you sexually?

5   A.   Yes.

6   Q.   You mean the kissing?

7   A.   Yes, and the touching and the kissing, just the

8   kissing and the touching.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

231

Ms. Ramirez - Cross - Ms. Cesare

1  Q.   Well, the touching included the spank on the bum,

2  when he touched your bum walking up the stairs.

3            MS. JAGER:  Objection.

4            THE COURT:  On what grounds?

5            MS. JAGER:  Asked and answered.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ms. Ramirez - Cross - Ms. Cesare

Q.   And it also included the last night when you kissed

him goodnight, and he gave you a tight hug then touched

your breast.

A.   What, you mean the last time?

Q.   Yeah, the last night when he gave you that kiss.

A.   And he grabbed my breast.

Q.   All right.  That was the bedtime kiss, right?

A.   Yes.

Q.   He never threatened -- he never told you that he

would hurt you.

A.   No.

Q.   He told you that he would hurt your family.

A.   No.

Q.   Or go find them in Mexico?

A.   No.

Q.   When his wife wasn't there, he took a nap every day.

A.   I don't remember.

Q.   When he was napping, you were alone in the house,

right?

A.   Yes.

Q.   And you had access to the computers while you were

alone in the house?

A.   He left me working at the computer.  It was outside

his bedroom.

Q.   And you could use the computers.

Ms. Ramirez - Cross - Ms. Cesare

1   A.   Only when he allowed it, and to do his own work.

2   Q.   That's not really true because you used the computers

3   to e-mail your boyfriend numerous times.  Did you e-mail

4   your boyfriend?

5   A.   Yes, behind his back.

6   Q.   But you could do it.

7   A.   Yes, I was able to do it.

8   Q.   And while he was napping, you could've easily walked

9   right out of the house.

10  A.   It didn't occur to me.

11  Q.   The door wasn't locked.

12  A.   But I didn't think of it, I had no place to go.  I

13  had my suitcases there.

14  Q.   You could go home, couldn't you?

15  A.   How?

16  Q.   You had a return plane ticket.

17  A.   And how was I to get to an airport.

18  Q.   And you -- well, Joseph told you he would take you to

19  an airport if you wanted to leave, right?

20  A.   Yes, he did tell me that.

21  Q.   And you met a Mexican at the store, who told you he

22  would help you give you a ride if you needed it.

23  A.   Yes.

24  Q.   And you told your boyfriend that a cousin in Boston

25  that you could contact.

Ms. Ramirez - Cross - Ms. Cesare

1   A.   That I had the telephone number.

2   Q.   And you know -- you knew how to get to the store in

3   town.

4   A.   No, I did not know how.

5   Q.   You got there.  You went to the store, right?

6   A.   I got there one day to a delicatessen.

7   Q.   Right.  So you knew how to get to the deli.

8   A.   Yes, but the telephone didn't work.

9   Q.   Joseph Yannai never did anything physically to stop

10  you from leaving the house.

11  A.   That is correct.

12  Q.   And he never threatened to you hurt you if you left

13  the house.

14  A.   No.

15  Q.   And he said, he said, any time you want to leave,

16  I'll take you to the airport, right?

17  A.   Yes.

18  Q.   Now, when you entered the United States, you were

19  prepared to lie and say you were coming here for tourism,

20  right?

21  A.   Yes.

22  Q.   And the reason you brought a round trip ticket that

23  had a return flight a month later, was so you could

24  convince the immigration authorities that you were coming

25  here for tourism.

Ms. Ramirez - Cross - Ms. Cesare

1   A.   No.

2   Q.   But you told Joseph -- you were interested in

3   spending a year at Joseph's house, right?

4   A.   Yes.

5   Q.   And you didn't buy a flight, a round trip ticket that

6   had a return flight a year away.

7   A.   No.

8   Q.   And a return ticket that would have you coming back a

9   month later.

10  A.   Yes.

11  Q.   And you did that because you knew that if you had a

12  one year ticket, the immigration wouldn't let you in the

13  country.

14  A.   I did not buy my ticket that way for that reason.

15  Q.   Why did you buy it that way?

16  A.   Because I wanted to come and try out first, and I

17  thought that one month would be enough.

18  Q.   All right.  So you knew that -- you were prepared to

19  leave if you didn't like it.

20  A.   Yes.

21  Q.   Okay.  The prosecutors also got you a lawyer, right?

22  A.   Yes.

23  Q.   They found a lawyer and got you in touch with that

24  lawyer, right?

25  A.   I asked for one.

236

Ms. Ramirez - Cross - Ms. Cesare

1   Q.   Uh-huh.  And did you go get your own lawyer?

2   A.   No.  I asked them for --

3   Q.   And the prosecutors picked a lawyer and gave you a

4   lawyer.

5   A.   I don't know what the procedure is.

6   Q.   You didn't select your own lawyer though.

7   A.   No.

8   Q.   And that lawyer worked out an immunity agreement for

9   you.  Right?

10  A.   Yes.

11  Q.   So you don't have to worry about being prosecuted for

12  lying to immigration.

13  A.   That is correct.

14  Q.   Now, you talked in your direct testimony about the

15  doors and how you said Joseph didn't want you closing the

16  doors while you were in the house.

17  A.   Yes.

18  Q.   Isn't it more accurate to say he didn't want you to

19  lock the doors?

20  A.   No.  He did not want the doors to be closed.

21  Q.   Well, you wrote in one of your e-mails to your

22  boyfriend on Tuesday, July 11th, you told him that Joseph

23  didn't want you to lock the doors.

24  A.   Yes.

25  Q.   GX-3500 LR-15A.  Did Joseph go to the doctor's office

237

                    Ms. Ramirez - Redirect - Ms. Jager

1   while you were at his house?

2   A.   No.  I don't know.

3   Q.   Did he ever leave you alone in the house?

4   A.   Yes.  What -- yes.

5   Q.   On one of the days he left and left you home alone.

6   A.   Yes.

7              MS. CESARE:  I have no further questions.

8              MS. JAGER:  A few questions, Your Honor.

9   REDIRECT EXAMINATION

10  BY MS. JAGER:

11  Q.   Just a few more questions, Ms. Ramirez.  Ms. Cesare

12  asked you on cross-examination questions about your

13  knowledge of English.  Was there a reason why you didn't

14  become fluent in English after 10 months in England?

15  A.   Yes.  Because I spent all the time speaking in

16  Spanish with my boyfriend who is now my husband.

17  Q.   Is that where you met Hector?

18  A.   That is correct.

19  Q.   Now, are you able to read and speak English but in a

20  limited fashion?

21  A.   That is correct.

22  Q.   And the defendant knew that, right?

23  A.   True.

24  Q.   Because you had spoken to him briefly on the phone.

25  A.   Yes.

                        Transcription Plus II, Inc.

238

Ms. Ramirez - Redirect - Ms. Jager

1  Q.   And he also referenced it in an e-mail to you; isn't

2  that right?

3  A.   True.

4  Q.   I'm showing you what's been marked, oh excuse me,

5  what's in evidence as Government's Exhibit 508.  Can I

6  publish to the jury please?  Here, can you read the

7  highlighted portion here?

8  A.   "You will help me understand and yes, even translate.

9  And I know your limitation in English."

10  Q.   Thank you.

11       The defense attorney also asked you questions about

12  Defendant's Exhibit D-1 we published to the jury.

13  A.   True.

14  Q.   And when did you first see this photograph, after you

15  left the defendant's house or before you arrived there?

16  A.   After I got out of the house.

17  Q.   And what country were you in when you first saw this

18  picture?

19  A.   In my own.

20  Q.   After you left his house.

21  A.   Yes.

22  Q.   You were also asked about how you had e-mailed Hector

23  and told him that Joseph said he would take you to the

24  airport.  When the defendant told you that he would take

25  you to the airport, did you believe him?

239

Ms. Ramirez - Redirect - Ms. Jager

1   A.   No, not ever.

2   Q.   Did you try to -- there was also reference to an

3   acquaintance friend of yours in Boston.

4   A.   True.

5   Q.   Did you ever try to contact that person?

6   A.   The day I was leaving.

7   Q.   And what happened when you tried to contact him?

8   A.   He said he was busy.  We were not very close.

9   Q.   Was he able to help you?

10  A.   No.

11  Q.   You were also asked questions about when you were in

12  the defendant's bedroom and he held you for what you

13  described as about 20 minutes.  Were you able to push him

14  away?

15  A.   No.

16  Q.   Did you try to push him away while he was kissing you

17  and holding you?

18  A.   Yes.

19  Q.   And how did you feel after he held you and kissed you

20  on the neck for those 20 minutes and wouldn't let you go

21  with you pushing against him?  What were you thinking?

22  A.   I felt alone.  I was very afraid that perhaps he

23  might rape me.  We were alone.  It did not seem to me

24  that anybody would be able to hear me if I were to shout.

25  I thought that I would have to leave on my own and I had

240

Ms. Ramirez - Recross - Ms. Cesare

1   to do it intelligently.

2   Q.   Now after you pushed him away in the bedroom and you

3   told him you didn't want to be touched, the defendant --

4   eventually that 20 minutes ended, but the defendant

5   touched you again, right?

6   A.   Can you repeat that please?

7   Q.   After the incident in the bedroom when he was holding

8   you and kissing you and you said you didn't want to be

9   touched and you tried to push him away, he didn't stop

10  touching you, right?  In fact, Tuesday night, the night

11  before you left, he touched you again.

12  A.   That is correct.

13  Q.   And what did he do that night?

14  A.   He touched me on the breast.

15  Q.   And did he just touch you on the breast?

16  A.   No.  He embraced me.  He was grabbing me with one

17  hand and with the other one he was touching my breast and

18  squeezing and kissing me on the lips.

19          MS. JAGER:  One moment, Your Honor.

20          No further questions.

21  RECROSS-EXAMINATION

22  BY MS. CESARE:

23  Q.   Did you ever ask Joseph to take you to the airport?

24  A.   No.

25  Q.   When you e-mailed your boyfriend, you told your

Ms. Ramirez - Recross - Ms. Cesare

1    boyfriend you were not afraid that Joseph was going to
2    rape you.  Didn't you tell him that?
3    A.    Yes.  I told him that once because I wanted to
4    persuade myself that that was not about to happen.
5    Q.    So you wrote in an e-mail to your boyfriend on
6    Tuesday, July 11th that no fear that Joseph was going to
7    rape you.
8    A.    True.
9    Q.    And you also told your boyfriend that Joseph told you
10   he would take you to the airport whenever you wanted to
11   leave, he wouldn't ask you any questions and that -- and
12   then right after that, you also said they've taken me to
13   dinner every day and actually, he is a pleasant person.
14   A.    Yes, I did say that.
15   Q.    And you said that to your boyfriend in an e-mail that
16   you wrote on Tuesday, July 11th, the day before you left.
17   A.    Yes.  Excuse me.  The last part was --
18   Q.    That was the day before you left.
19   A.    True.
20   Q.    You wrote an e-mail to Hector where you talked about
21   whether or not you worried that he might rape you or
22   something like that.
23            MS. JAGER:  Reference please.
24   Q.    This is Government's Exhibit 3500 LR-15 and 15-A.
25   And you asked and you -- do you remember saying to him --

242

Ms. Ramirez - Recross - Ms. Cesare

1  talking to him about whether or not you felt safe?

2  A.   Yes, I remember.

3  Q.   And you asked him in a rhetorical -- you answered in

4  a rhetorical fashion to him, "How would you feel if you

5  couldn't lock the doors, if you couldn't write whenever

6  you wanted to the people you love?"  Do you remember

7  writing that?

8  A.   Yes.

9  Q.   Okay.

10 A.   I remember that perfectly.

11 Q.   "And if there was a fat, hairy, repulsive old man

12 calling you to bring him coffee who takes advantage and

13 hugs you at the same time he kisses you on the neck and

14 grabs your ass."  Do you remember writing that?

15 A.   Yes, perfectly well.

16 Q.   And you said now, "I don't feel that he might rape me

17 or something like that.  He does like to grope me and

18 things like that, which is not up for discussion.  I

19 don't like to be groped by him."

20 A.   Yes, I remember.

21 Q.   And when you told Hector that you weren't afraid that

22 the defendant might rape you, why did you write that?

23 A.   Because he couldn't be out of it.  There was no

24 reason for me to worry him any further.  And it was a way

25 of calming myself, which is what I really wanted to

243

Ms. Ramirez - Recross - Ms. Cesare

1  think.

2  Q.    Were you in fact afraid that the defendant might rape

3  you?

4  A.    Yes.  There were times when I was afraid.

5              MS. CESARE:  No further questions.

6              MS. JAGER:  Nothing further.

7              THE COURT:  You can step down.  Thank you.

8              (Witness excused.)

9              THE COURT:  All right.  Ladies and gentlemen,

10  we're going to recess until tomorrow at 10 o'clock.

11              (Jury excused.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings

1          THE COURT:  Okay.

2          MS. STONE:  Your Honor, may we just be heard

3    about one thing briefly concerning testimony tomorrow?

4    Your Honor, there was some discussion concerning one of

5    the Government's witnesses, Vanessa Stenzel, who took a

6    trip to Michigan with the defendant.  And the Government

7    agreed that we would not elicit any testimony from

8    Ms. Stenzel concerning a sexual encounter with a 16-year-

9    old minor while they were on this trip.

10          And I just wanted to be very clear that what

11   our intention is, is that we will be eliciting an act

12   concerning a sexual encounter between the defendant and

13   Ms. Stenzel.  No one else was present.  The minor was not

14   present.  We will not be mentioning the minor.  We will

15   not be eliciting any testimony.  I think there was a

16   little bit of confusion as to whether this minor was

17   present during the act that we intend to elicit.  She was

18   not and we will not be doing so.

19          We also, though, did want to move to preclude

20   various defense exhibits that have been proposed

21   concerning Ms. Stenzel.  They gave us a list that

22   included several homemade videos that Ms. Stenzel took

23   during her time that she was working and living in the

24   home.  These are videos that show her on the trip to

25   Michigan.  They show her showing the house, videos that

245

Proceedings

1   she would agree she's happy.  She's taking them.  They

2   describe her state of mind at the time.

3            There's nothing about these videos that are at

4   all inconsistent with anything she's going to testify to.

5   And we would request from the defense what evidentiary

6   basis there possibly could be.  It seems to be an attempt

7   to convince the jury or prejudice them rather into

8   believing that these few minutes of planned videos that

9   Ms. Stenzel took were demonstrative of her state of mind

10  during the three months that she lived in the defendant's

11  house.

12           THE COURT:  What is the planned video?

13           MS. STONE:  Well, she -- I mean, these are ones

14  that she took that were orchestrated.  They weren't at

15  all just like a running camera of her life in the house.

16  These were several-minute little videos, happy little

17  movies that she took.

18           THE COURT:  I don't understand, happy little

19  movies of what?

20           MS. STONE:  They're -- that's what we're

21  saying.  We're asking what the relevance is of these

22  defense exhibits.  They are videos of her when she's

23  walking around Michigan, walking around New York City,

24  showing the defendant's home.

25           MS. STONE:  We haven't offered any New York

246

Proceedings

1   City videos.  We've offered three videos of Vanessa

2   Stenzel that Vanessa Stenzel took inside of Mr. Yannai's

3   home, the front of his house, inside his house and in the

4   backyard of his house.  She gives a tour of the house

5   through all the rooms in the house.  Mr. Yannai is on it.

6   Some -- one of the other witnesses is on the videos.

7   It's a present sense impression of what was going on in

8   the house.

9           MS. STONE:  I don't understand what that means,

10  a present sense impression.  It's not a video --

11          THE COURT:  Well, I assume that makes it an

12  exception to the hearsay rule other than that I don't

13  know what that means either.

14          MS. STONE:  I just -- I would ask that there be

15  an actual evidentiary basis for these videos.

16          THE COURT:  I don't know.  What are they being

17  offered for?

18          MS. CESARE:  It's relevant to show there was no

19  climate of fear inside that house.

20          THE COURT:  And at what point were they taken?

21          MS. CESARE:  One was taken at the beginning of

22  her stay within the first -- Vanessa Stenzel spent

23  approximately three months at Mr. Yannai's home.  One of

24  the videos was taken within the first few weeks of her

25  arrival there.  We don't have an exact date.  And the

247

Proceedings

1  second two home videos were taken at the end of her stay

2  after her trip to Michigan after other significant

3  events.

4          There's -- so those are -- I'm talking video

5  one, video three and video four.  And video two is a

6  video Vanessa took outside of the hotel in Michigan.

7  She's all by herself showing how beautiful it is.

8          THE COURT:  What's the relevance of that?

9          MS. CESARE:  To show that there was -- that she

10 -- there was no atmosphere of fear or coercion.  She was

11 happy to be there, happy to be with Mr. Yannai.

12         THE COURT:  I don't know that is shows that.

13 You can -- I'm inclined to admit it, but I don't want to

14 make any decision until I hear the direct testimony.  I

15 -- you know, I can't -- I need a picture of what this

16 witness is going to testify to and what happened before I

17 know precisely what I would do with this.

18         MS. CESARE:  With respect to the 404(b) issue

19 on the trip to Michigan, our understanding is that Mr.

20 Yannai was in Michigan for two nights.  And I just want

21 -- request that the Government proffer a little more

22 clearly what they expect to bring into evidence.  Is

23 there -- are you -- is the Government going to bring into

24 evidence that there was a sexual assault on the first

25 night of the stay in Michigan and then bring in no

248

Proceedings

1  testimony about the second night in Michigan?

2         MS. STONE:  Your Honor, just to be clear, this

3  goes to the actual crimes that have been charged.  It's

4  not being offered as a separate bad act.  What we intend

5  to elicit is that there was a forced sexual encounter, or

6  rather I should I say a non-consensual sexual encounter

7  between Ms. Stenzel and Mr. Yannai the first day of the

8  Michigan trip.  We will not elicit any testimony after

9  the first day, which is when the minor would be a witness

10 and involved.

11        MR. SCHNEIDER:  A couple of issues, we

12 requested Giglio material.  The Government says they're

13 going to get to us.  They're the CHI visa applications

14 for two of the witnesses.  But we're certainly going to

15 need those before those witnesses testify.

16        And also, I asked before if the Government

17 knows of any witnesses they're not going to call if

18 they'd tell us, and it's going to become relevant because

19 I don't want to be asking witnesses questions relevant to

20 some woman who's not going to testify whether she saw

21 that person, whether she saw that person being forced to

22 do something.  So I'd like to know if one of -- any of

23 the eight witnesses the Government has decided not to

24 call as a witness.

25        THE COURT:  Well, they went through the names

Transcription Plus II, Inc.

249

Proceedings

1   of eight people by my count --

2            MR. SCHNEIDER:  I --

3            MR. SPECTOR:  Judge --

4            THE COURT:  -- when they asked -- I forget

5   which one.  I think it was the last witness.

6            MR. SCHNEIDER:  Judge, I don't care --

7            THE COURT:  They asked whether the -- one of

8   the witnesses heard, and I was counting just because I

9   was curious as to how many witnesses I would have to

10  listen to.  And it got to eight.

11           MR. SCHNEIDER:  But that would make nine if

12  they asked for that.  But it --

13           MR. SPECTOR:  Judge, just to be clear as we

14  said before, we're -- I think it's unlikely we're going

15  to call Andrea Kramer.  It's also at this point unlikely

16  we're going to call Isabelle Krintz.  But we say that

17  with the caveat that we may change our minds about one or

18  both of those.

19           THE COURT:  That's fine.

20           MS. CESARE:  Who's on deck for tomorrow?

21           MR. SPECTOR:  Stenzel.

22           THE COURT:  One witness the whole day?

23           MR. SPECTOR:  We'll see how it goes.  This

24  witness will probably be somewhat longer.

25           MS. CESARE:  Especially --

Proceedings

1          MR. SPECTOR:  We'll have another one available

2    if we need to obviously, yes.

3          THE COURT:  This last witness took a little

4    under four hours by my count, well, three and a half --

5          MR. SPECTOR:  She was only there for five days.

6    This one was there for three months.

7          THE COURT:  Hmm?

8          MR. SCHNEIDER:  She was only there for five

9    days.  The next one was there for three months.

10          MR. SPECTOR:  We'll be ready to fill the day if

11    we need to, Judge.

12          Oh, I'm sorry, just on Giglio just for the

13    record, we had filed an under seal Giglio letter as to

14    witness Yagoub.  Just want to confirm the defense and the

15    Court received that.

16          THE COURT:  I assume you're getting to them.

17          MR. SCHNEIDER:  Yes, we are.

18          MR. SPECTOR:  Yes.  Thank you.

19          MS. JAGER:  What about that other stuff, the --

20          MR. SPECTOR:  Oh, right.  On the T visa -- I'm

21    sorry.  We'll put it on the record when the Judge is

22    ready.

23          (Pause)

24          THE CLERK:  Judge, as the jurors were being

25    excused for the day, Juror No. 4 asked to speak to me

Proceedings

1  outside the presence of the other jurors.  She related

2  that she has a problem with leaving at this hour when

3  this morning she told me if she left at 6 o'clock it

4  would be acceptable.  But that much more seriously for

5  her after hearing today's evidence she has a very strong

6  bias against the defendant, and she stated to me that she

7  could not possibly be fair and impartial.

8            I inquired as to whether or not she said

9  anything to the other jurors.  She said she had not.  I

10  told her to keep it to herself, I would inform the Court,

11  and that she should be here tomorrow morning as

12  scheduled.

13            THE COURT:  Well, what do you want to do about

14  her?

15            MR. SCHNEIDER:  We'd like to excuse her.

16            MR. SPECTOR:  Judge, let us think about that

17  overnight.

18            THE COURT:  Well, that's why she's coming back.

19  Okay.

20            MR. SPECTOR:  Well, just to clarify on the T

21  visa issue, we'll provide that to the defense before

22  those witnesses testify.

23            THE COURT:  Okay.  Anything --

24            MR. SPECTOR:  There's a little bit of

25  procedural hurdles involved in getting that material, and

Proceedings

1   we're actually going to be submitting a motion to the

2   Court.

3           THE COURT:  What, the T visa?

4           MR. SPECTOR:  Right.  There's various rules

5   about privacy concerns with respect to certain portions

6   of it, and there's certain waivers that have to be

7   executed by both the witnesses and their attorneys.

8   We're in the process of getting that done.  We'll be

9   coming actually to the Court with --

10          THE COURT:  Well, what's in there that's --

11  other than that they said they were coming as tourists?

12          MR. SPECTOR:  There's a number of different

13  portions of it, some of which is --

14          MR. SCHNEIDER:  Oh, this is -- I'm sorry,

15  Judge.  This is a visa two of the witnesses have been

16  provided because they're victims of sex trafficking.  So

17  since the investigation started they have obtained visas

18  to remain in the country, and those visas can lead to

19  permanent residency.

20          MS. JAGER:  Those applications contain a

21  significant amount of personal information about the

22  applicants.  They're extensive immigration papers.

23          THE COURT:  Well, that could be --

24          MS. JAGER:  But as part of the --

25          THE COURT:  I can't follow your argument.

253

Proceedings

1          MR. SCHNEIDER:  I'm sorry.  Well, it's not so
2 much an argument.  The witnesses --
3          THE COURT:  I know.  But I just want to
4 understand what the, you know, follow the elements --
5          MR. SCHNEIDER:  These witnesses who arrived in
6 the country --
7          THE COURT:  These are the victim -- two victim
8 witnesses.
9          MR. SCHNEIDER:  Yes, who remained in this
10 country.
11          THE COURT:  After they came to work for
12 Mr. Yannai and they stayed in the country after this.
13          MR. SCHNEIDER:  That's right.
14          THE COURT:  And then what?
15          MR. SCHNEIDER:  And then when the case was
16 investigated they applied for and were granted something
17 called a T visa, which is a visa reserved for victims of
18 sex trafficking.  And the T visa allows them to work in
19 the country, allows them to remain in the country and
20 allows them to convert it to a green card after a certain
21 amount of time.
22          THE COURT:  So if they stipulated all this
23 happened, why isn't that enough?
24          MR. SPECTOR:  Well, Judge, the issue is that
25 that application does contain 3500 material because the

254

Proceedings

1    witness described the abuse.  And we're prepared to turn

2    that over as part of 3500.  There's just some procedural

3    hurdles in getting the applications.  So we're in the

4    process of taking care of that.

5              THE COURT:  But you must have them.

6              MR. SPECTOR:  Well, no.

7              THE COURT:  How do you know what's in them?

8              MR. SPECTOR:  We know what the applications

9    look like generally.  They ask for that information.

10             THE COURT:  Okay.

11             MR. SPECTOR:  Thank you.

12             THE CLERK:  Be here at 9:45 counsel please.

13             THE COURT:  Who did she say was not going to

14   testify?

15                   (Matter adjourned)

16                        -o0o-

17

18

19

20

21

22

23

24

25

255

1                        **I  N  D  E  X**

2

3  **Opening Statement**:

4  By Ms. Stone.. . . . . . . . . . . . . . . . . . 12

5  By Ms. Cesare. . . . . . . . . . . . . . . . . . 23

6

7

8  **Anne Simonsen:**

9  Direct Examination by Mr. Spector. . . . . . . . . . . 41

10  Cross-Examination by Mr. Schneider. . . . . . . . . . 90

11

12  **Laura Mariella Ramirez Escobar**:

13  Direct Examination by Ms. Jager. . . . . . . . . . . 126

14  Cross-Examination by MS. Cesare . . . . . . . . . . 184

15  Redirect Examination by Ms. Jager. . . . . . . . . . 237

16  Recross Examination by Ms. Cesare. . . . . . . . . . 240

17

18

19

20

21

22

23

24

25

256

1                           **I N D E X**

2                        (Continued)

3                     **E X H I B I T S**

4    <u>**Government's Exhibit Marked in Evidence:**</u>

5    Government's Exhibit 3-I. . . . . . . . . . . . . 45

6    Government's Exhibit 600. . . . . . . . . . . . . 47

7    Government's Exhibit 601. . . . . . . . . . . . . 64

8    Government's Exhibit 602. . . . . . . . . . . . . 64

9    Government's Exhibit 603. . . . . . . . . . . . . 64

10   Government's Exhibit 604. . . . . . . . . . . . . 64

11   Government's Exhibit 3-H. . . . . . . . . . . . . 69

12   Government's Exhibit 501. . . . . . . . . . . . . 132

13   Government's Exhibit 502. . . . . . . . . . . . . 132

14   Government's Exhibit 503. . . . . . . . . . . . . 132

15   Government's Exhibit 504. . . . . . . . . . . . . 132

16   Government's Exhibit 505. . . . . . . . . . . . . 132

17   Government's Exhibit 506. . . . . . . . . . . . . 132

18   Government's Exhibit 507. . . . . . . . . . . . . 132

19   Government's Exhibit 508. . . . . . . . . . . . . 132

20   Government's Exhibit 509. . . . . . . . . . . . . 132

21   Government's Exhibit 510. . . . . . . . . . . . . 132

22   Government's Exhibit 511. . . . . . . . . . . . . 132

23   Government's Exhibit 512. . . . . . . . . . . . . 132

24   Government's Exhibit 513. . . . . . . . . . . . . 132

25

257

**I N D E X**

**(Continued)**

**E X H I B I T S**

**Defendant's Exhibit Marked for Identification**:

Defendant's Exhibit P-6. . . . . . . . . . . . . . . 212

Defendant's Exhibit P-7. . . . . . . . . . . . . . . 212

Defendant's Exhibit P-8. . . . . . . . . . . . . . . 212

Defendant's Exhibit P-4. . . . . . . . . . . . . . . 215

Defendant's Exhibit P-5. . . . . . . . . . . . . . . 215

Defendant's Exhibit P-9. . . . . . . . . . . . . . . 216


**Defendant's Exhibit Marked In Evidence**:

Defendant's Exhibit P-1. . . . . . . . . . . . . . . . 98

Defendant's Exhibit P-2                              98

Defendant's Exhibit AS-1. . . . . . . . . . . . . . . 124

Defendant's Exhibit AS-2. . . . . . . . . . . . . . . 124

Defendant's Exhibit LR-4. . . . . . . . . . . . . . . 198

Defendant's Exhibit P-6. . . . . . . . . . . . . . . 214

Defendant's Exhibit P-7. . . . . . . . . . . . . . . 214

Defendant's Exhibit P-8. . . . . . . . . . . . . . . 214

Defendant's Exhibit P-5. . . . . . . . . . . . . . . 216

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **23rd** day of **May**, 2011.

*Linda Ferrara*
Linda Ferrara
Transcription Plus II, Inc.