UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X      **Docket#**
UNITED STATES OF AMERICA,        :   10-cr-594(ERK)
                                 :
     - versus -                  :   U.S. Courthouse
                                 :   Brooklyn, New York
JOSEPH YANNAI,                   :
              Defendant          :   May 26, 2011
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES SENIOR DISTRICT JUDGE

**A    P    P    E    A    R    A    N    C    E    S:**


**For the Government**:          **Loretta E. Lynch, Esq.**
                                 United States Attorney

                            BY:  **Daniel A. Spector, Esq.**
                                 **Hilary Jager, Esq.**
                                 Assistant U.S. Attorney
                                 271 Cadman Plaza East
                                 Brooklyn, New York  11201

                                 **Audrey Stone, Esq.**
                                 Westchester County
                                 District Attorney's Office
                                 111 MLK, Jr Blvd
                                 White Plains, NY 10601

**For the Defendant**:           **Michael Schneider, Esq.**
                                 **Heidi Cesare, Esq.**
                                 **Ben Silverman, Esq.**
                                 Federal Defenders Division
                                 16 Court Street
                                 3rd Floor
                                 Brooklyn, NY 11241

**Transcription Service**:       **Transcription Plus II, Inc.**
                                 3859 Tiana Street
                                 Seaford, N.Y. 11783
                                 Lafertype@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

712

## Proceedings

1          THE CLERK: Be seated, counsel.

2          THE COURT:  Bring in the jury.

3          THE CLERK:  Bring your witness up.

4          (Witness takes the stand.)

5          THE CLERK:  All rise.

6          (Jury enters the courtroom.)

7          THE CLERK:  Please be seated.

8          MS. CESARE:  Thank you.

9  CONTINUED CROSS-EXAMINATION

10  BY MS. CESARE:

11  Q.   Good morning, Ms. Herzceg.

12  A.   Good morning.

13          THE COURT:  You're still under oath.

14  Q.   Ms. Herzceg, when you flew to J.F.K. Airport on

15  February 18, 2009, did you have a backup plan?

16  A.   No.

17  Q.   What were you going to do if no one showed up to pick

18  up you up at the airport?

19  A.   I believed in Mr. Yannai that he will pick me up.

20  Q.   All right.  But you had never met him in person;

21  correct?

22  A.   No.

23  Q.   You'd only -- and you had never been to his house

24  before; right?

25  A.   No.

713

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   You didn't have any kind of, you know, interview

2  before you flew to New York.

3  A.   That's correct.

4  Q.   So, you didn't know for sure that he was actually

5  going to show up and pick you up at the airport.

6  A.   I was not sure.

7  Q.   And what would you have done if no one showed up to

8  pick you up?

9  A.   That's a good question.

10  Q.   You had no plan.

11  A.   I had no plan.

12       THE COURT:  She's asked and answered it twice

13  already.

14  Q.   Now you said that on the way to Joseph Yannai's

15  house, he held your hand in the car.

16  A.   No.  I put my hand on top of his hand.

17  Q.   He asked you to do that?

18  A.   Yes.

19  Q.   And you agreed to do that?

20  A.   Yes.

21  Q.   And you left your hand on top of his hand for the

22  whole ride up to Pound Ridge?

23  A.   No, I don't think so.  I can't remember.

24  Q.   Okay.  Now when you got to Mr. Yannai's home on the

25  second day you were there, you started doing the research

Transcription Plus II, Inc.

714

Ms. Herczeg - Cross - Ms. Cesare

1    work; right?

2    A.   No, the second day I didn't have to work.

3    Q.   When did you start doing the computer research work?

4    A.   On the 20th.

5    Q.   So about, maybe your second or third day there?

6    A.   The second.

7    Q.   All right.  And your job was to research churches;

8    right?

9    A.   That's correct.

10   Q.   And can you be more specific about the research work

11   you were doing?

12   A.   There was a website called churchangel.com and it was

13   a list of thousands of churches.  And it was contact

14   informations, website, for churches.

15   Q.   So were you using that website to get contact

16   information for churches?

17   A.   Yes.

18   Q.   And were you then contacting personnel at the

19   churches?

20   A.   No.

21   Q.   Were you just recording the contact information for

22   the churches?

23   A.   That's correct.

24   Q.   And you did that every day for about three weeks;

25   right?

Transcription Plus II, Inc.

715

Ms. Herczeg - Cross - Ms. Cesare

1  A.   Yes.

2  Q.   And in a given day, about how many churches would you

3  research?

4  A.   A day?  Maybe a hundred.

5  Q.   All right.  So in the course of the week, you were

6  getting -- you got information about thousands of

7  churches; right?

8  A.   Probably.

9  Q.   And the information you got about each church, you

10 recorded in an Excel spreadsheet; is that right?

11 A.   That's correct.

12 Q.   And did you -- aside from that website you mentioned,

13 the church website, did you also go to the website for

14 each individual church?

15 A.   If the website was listed, yes.

16 Q.   Okay.  And were you researching all type -- were you

17 researching specific denominations?

18 A.   No, all kind of.

19 Q.   So, Catholic churches; right?

20 A.   Yeah.

21 Q.   Protestant churches?

22 A.   Uh-huh.

23 Q.   Were you researching other religious institutions or

24 just Christian institutions?

25 A.   I believe just Christianist (sic).

716

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   Okay.  Now what was -- now Gisele was also working at

2  the same time that you were working; right?

3  A.   Yes.

4  Q.   And you guys worked in the same work area; correct?

5  A.   Yes.

6  Q.   Did you each have your own work station?

7  A.   Yes.

8  Q.   So you each had your own desk and computer to work

9  with; right?

10  A.   Yes.

11  Q.   And each of your computers was internet connected;

12  right?

13  A.   Yes.

14  Q.   And Joseph had his own desk.

15  A.   Yes.

16  Q.   Was Gisele also doing the church research?

17  A.   Yes.

18  Q.   And was she -- as far as you observed, was she doing

19  the exact same kind of research that you were doing?

20  A.   Yes, as far as I know; yes.

21  Q.   In the course of your research, did you do any

22  faxing?

23  A.   No.

24  Q.   Did you do any telephone work?

25  A.   No.

717

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   It was all internet work; right?

2  A.   Yes.

3  Q.   And was -- from what you witnessed, was Gisele also

4  contacting hundreds of churches a day or researching

5  hundreds of churches a day?

6  A.   Yes.

7  Q.   And did the two of you collaborate on -- did you both

8  put your research work into the same Excel spreadsheet?

9  A.   No.

10  Q.   So you had your own spreadsheet and she had her own

11  spreadsheet.

12  A.   Yes.

13  Q.   And by the end of three weeks, how many pages were in

14  this spreadsheet?

15  A.   I have no idea.

16  Q.   It must have been massive; right?

17  A.   Yeah.

18  Q.   And did you learn how to use Excel in Joseph Yannai's

19  home or was that a skill you had before you came to his

20  house?

21  A.   I had the skill before.

22  Q.   I am going to show you what's in evidence -- please

23  publish Defendant's Exhibit  P-7.

24       Can you see that on your screen?

25  A.   Yes.

718

Ms. Herczeg - Cross - Ms. Cesare

1    Q.    All right.   This is the glossy picture, so that
2    there's some hot spots but do you recognize what's in
3    this picture?
4    A.    Yes, this is Mr. Yannai's office.
5    Q.    This is the home office at Mr. Yannai's house?
6    A.    Yes.
7    Q.    And would the picture that -- would the chair that's
8    at the furthest end of this work space be Joseph Yannai's
9    work station?
10   A.    Yes.
11   Q.    And where was your work station; is it in this
12   picture?
13   A.    Yes, this was mine, the nearest.
14   Q.    The closer --
15   A.    I mean the closer; yes.
16   Q.    Okay.   Did you always work at that same work station?
17   A.    Yes.
18   Q.    Now after about a week -- after about a week's time
19   in Mr. Yannai's house, he asked you to stop wearing your
20   bra; is that right?
21   A.    Yes.
22   Q.    And that first week, did you observe whether or not
23   Gisele wore her bra?
24   A.    I don't remember.
25   Q.    Did you talk to her about it?

719

Ms. Herczeg - Cross - Ms. Cesare

1   A.   No.

2   Q.   And when he asked you to stop wearing your bra, you

3   did stop wearing your bra; right?

4   A.   Yeah.

5   Q.   Okay.  You certainly packed brassieres when you went

6   to his house; right?  You had them.

7   A.   Yes.

8   Q.   He didn't take them away from you.

9   A.   No.

10  Q.   And when you got dressed in the morning, you were

11  alone in your private bedroom getting dressed; right?

12  A.   Yes.

13  Q.   So each morning when you decided not to wear a bra,

14  that was a decision you made yourself.

15  A.   Not really.

16  Q.   Well, you were all by yourself when you got dressed;

17  right?

18  A.   I was -- I felt like I was under pressure.

19  Q.   Would it be fair to say you were afraid you would

20  lose your job if you didn't wear the bra?  I mean -- let

21  me rephrase that.

22       Would it be fair to say that you were afraid you

23  would lose your job if you chose to wear your bra; right?

24  A.   That was his requirement.

25  Q.   Well what did you think would happen if you didn't

720

Ms. Herczeg - Cross - Ms. Cesare

1  wear a bra?

2  A.   I don't know what could have happened.

3  Q.   Well, you were asked about this on direct yesterday;

4  weren't you?

5  A.   Yes, I believe so.

6  Q.   And when you talked about this yesterday, didn't you

7  agree that you were afraid that you would lose your job

8  if you did not follow Joseph's instructions?

9  A.   I was afraid that I would have to leave.

10 Q.   Which means -- that means the same thing as losing

11 your job; right?

12 A.   No, it means that I would be on the street.

13 Q.   Right.

14 A.   Not lose my job.

15 Q.   When you came to New York, you had no backup plan.

16 You didn't make plans to have any other place to go if

17 the job didn't work out; right?

18 A.   Yes, that's correct.

19 Q.   And you did have a round trip ticket to fly back to

20 Hungary; right?

21 A.   Yes.

22 Q.   And it was a one-month ticket; right?

23 A.   Yes.

24 Q.   And it would have been possible to advance the return

25 date; correct?

721

Ms. Herczeg - Cross - Ms. Cesare

1   A.   I am not sure.

2   Q.   Did you ever try to advance the return date?

3   A.   No.

4   Q.   Did you ever investigate advancing the return date?

5   A.   No.

6   Q.   You had when you -- when you were in Joseph Yannai's

7   home, you had your passport with your private belongings;

8   right?

9   A.   Yes.

10  Q.   He didn't take any of your travel documents from you.

11  A.   No.

12  Q.   And you had your ticket in your private belongings;

13  right?

14  A.   Yes.

15  Q.   Now you said also that around the second week that

16  you were in Joseph Yannai's house, he would regularly

17  stand behind you and touched your -- touch your breasts

18  while you were at your work station; right?

19  A.   That's correct.

20  Q.   And he would do that when he was passing behind you;

21  correct?

22  A.   Yes.

23  Q.   And you never said anything -- you never said to him,

24  "Stop, don't do that."

25  A.   No, because I was afraid of the consequences.

722

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   Right.  So you -- you just -- you let it happen;

2  right?

3  A.   Yes.

4  Q.   And you were afraid that you would have to leave his

5  house --

6  A.   No.

7  Q.   -- if you protested?

8  A.   I was afraid to leave his house or he would hurt me

9  if I would refuse it.

10  Q.   He never said to you that he would hurt you if you

11  refused the fondling; right?

12  A.   No.

13  Q.   And you never said to him, "Joseph, don't touch me

14  that way."  Right?

15  A.   I told him that I didn't want to be the part of this.

16  Q.   You told him that after the incident when he

17  ejaculated on your breasts; right?

18  A.   Yes.

19  Q.   And the fondling began before that; correct?

20  A.   Yes.

21  Q.   Now the second week you were there, you started --

22  was when you started to on a regular basis prepare

23  Joseph's bath; is that right?

24  A.   Yes.

25  Q.   And that would involve running the bath, filling up

723

Ms. Herczeg - Cross - Ms. Cesare

1  -- and filling the tub up with water; right?

2  A.   Yes.

3  Q.   And you always made a bubble bath for him.

4  A.   Yes.

5  Q.   And you would bring his coffee, cigarettes, newspaper

6  and a telephone to him in the bathroom; right?

7  A.   Yes.

8  Q.   And while he was in the bathroom, you would sit

9  beside him?

10  A.   He wanted me; yes.

11  Q.   And you agreed to do that; right?

12  A.   Yes.

13  Q.   You walked into the bathroom of your own free will;

14  right?

15  A.   I never did anything on my own will in his house.

16  Q.   The only other person in the house was the other

17  woman named Gisele; right?

18  A.   That's correct.

19  Q.   And Gisele was also preparing his bath on a regular

20  basis; right?

21  A.   Yes.

22  Q.   And sometimes she'd sit -- the two of you would sit

23  in the bathroom with Joseph; right?

24  A.   Yes.

25  Q.   And during bath time, sometimes you'd wash his hair?

724

Ms. Herczeg - Cross - Ms. Cesare

1   A.   No.

2   Q.   Did you ever wash his hair?

3   A.   No.

4   Q.   Did you wash his body?

5   A.   No.  Uhm, well once he -- he grabbed my hand and he

6   wanted me to soap him.

7   Q.   His private parts?

8   A.   Yes.

9   Q.   And you said you didn't want to do that; right?

10  A.   Yes.

11  Q.   And let go; correct?

12  A.   (No verbal response.)

13          THE COURT:  You have to speak.  You can't shake

14  your head.

15  A.   Yes.

16  Q.   Okay.  And Joseph never forced you to touch him when

17  he was in the bathroom; correct?

18  A.   If someone would grab my hand, I would consider it.

19  Q.   Okay.  But when you pulled it back, he let go; right?

20  A.   Yes, because he said that I was in the beginning of

21  my learning process.

22  Q.   Uh-huh.  He said eventually you'd change.

23  A.   So later on --

24  Q.   Did he say that eventually you'd change your mind and

25  be willing to do that for him?

Ms. Herczeg - Cross - Ms. Cesare

1   A.   Yes.

2   Q.   And he'd -- and there was a reason why he wasn't --

3   there was a reason you believed he wasn't giving you

4   pressure at that moment to touch him; right?

5   A.   Yes.

6   Q.   Is that right?

7   A.   Yes.

8   Q.   And what was the reason?

9   A.   Only thing what was going on in my mind, that it was

10  the part of my job and if I would -- if I wouldn't do it,

11  then he would kick me out.

12  Q.   But you didn't do it; right?  You didn't touch his

13  penis when he wanted you to; right?

14  A.   Because he said that it's okay for now.

15  Q.   All right.

16  A.   And then later on --

17  Q.   And he -- you know, it was -- he clearly indicated to

18  you that he wanted you to perform oral sex occasionally

19  in that bathroom; right?

20  A.   Yes.

21  Q.   And you never did it; right?

22  A.   No.

23  Q.   And he never forced you to do it; right?

24  A.   Yes, he did.

25  Q.   Well, you never -- you never actually performed oral

726

                    Ms. Herczeg - Cross - Ms. Cesare

1  sex on him; isn't that correct?

2  A.   That's correct.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

727

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   And there was a reason you believe that he didn't

2  force you to do it; right?

3  A.   I didn't believe --

4            MS. STONE:  Your Honor, I'm going to object.

5  Q.   Isn't the reason --

6            THE COURT:  On what ground?

7            MS. STONE:  Asked and answered.

8            THE COURT:  Yes, sustained.

9  Q.   Isn't the reason that Joseph didn't force you to have

10  oral sex because Gisele was regularly performing oral sex

11  for him in the bathroom.

12            MS. STONE:  Objection, your Honor.

13            THE COURT:  Sustained.

14

15

16

17

18

19

20

21

22

23

24

25

728

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   Were you ever in the bathroom with Gisele and Joseph

2  when Gisele performed oral sex on Joseph?

3  A.   Yes.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

729

                    Ms. Herczeg - Cross - Ms. Cesare

1   Q.   And when she performed oral sex on Joseph, did she do

2   so willingly, as far as you could tell?

3              MS. STONE:  Objection.

4              THE COURT:  Sustained.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

730

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   Did you observe Joseph force her to perform oral sex?

2              MS. STONE:  Objection.

3              THE COURT:  Overruled.

4  A.   No.

5  Q.   Did you ever see Gisele initiate sexual contact with

6  Joseph in the bathroom?

7  A.   (No verbal response.)

8  Q.   Did you ever see Gisele start --

9              THE COURT:  You have to answer -- you have to

10  speak into the microphone.  You can't just --

11             THE WITNESS:  Sure.

12  Q.   Do you understand the word initiate?

13  A.   No.

14  Q.   Did you ever see Gisele make the first gesture

15  towards sexual contact with Joseph?

16  A.   I didn't observe this.

17  Q.   You did ever see her put her hand into the tub with

18  him?

19  A.   Yes.

20  Q.   Did you ever see her touching his penis?

21  A.   Yes.

22  Q.   Did you ever see her move towards him, so that she

23  could perform oral sex on him?

24  A.   Yes.

25  Q.   And on those occasions when Gisele performed oral sex

731

Ms. Herczeg - Cross - Ms. Cesare

1  on Joseph, you remained sitting in the bathroom; isn't

2  that right?

3  A.   At this moment, we were not sitting.

4  Q.   You're standing in the bathroom?

5  A.   Joseph would stand.  Myself would stand.  And Gisele

6  would --

7  Q.   Be on her knees?

8  A.   Yes.

9  Q.   Okay.  And you remained in the bathroom while that

10 occurred; right?

11 A.   Yes.

12 Q.   Nobody else was in the house at the time; correct?

13 A.   No.

14 Q.   You could have walked out of that bathroom.

15 A.   I could have.

16 Q.   Nobody forced you to stay in there.

17 A.   No.

18 Q.   Okay.  Thank you.  And instead you stayed and

19 observed what was happening.

20 A.   Yes.

21 Q.   I'm going to show you for identification what we've

22 marked as Defendant's Exhibit P-3.  Do you recognize

23 that?

24 A.   This is the bathroom.

25 Q.   Is this the bathroom where Joseph usually had his

732

Ms. Herczeg - Cross - Ms. Cesare

1  morning bath?

2  A.   That's correct.

3           MS. CESARE:  I move into evidence P-3.

4           MS. STONE:  No objection.

5           MS. CESARE:  May we publish to the jury?

6           THE COURT:  Yes.

7  (Defendant's Exhibit P-3 marked in evidence.)

8  Q.   So is this what the bathroom looked like when you

9  were living in the Yannai residence?

10  A.   Yes.

11  Q.   Now on direct yesterday, you described an incident

12  where you said Joseph tried to push you down onto your

13  knees.

14  A.   Yes.

15  Q.   So -- because he wanted you to perform oral sex;

16  right?

17  A.   Yes.

18  Q.   Now, you've talked about what happened in Joseph

19  Yannai's house on many occasions to law enforcement

20  officers; correct?

21  A.   Yes.

22  Q.   And you said on direct that the first few times you

23  talked to the law enforcement officers you didn't tell

24  them the whole story; correct?

25  A.   That's correct.

733

Ms. Herczeg - Cross - Ms. Cesare

1   Q.   And you said that's because you were afraid of the

2   police.

3   A.   The first night; yes.

4   Q.   So the first -- the night you left Joseph's house,

5   you felt afraid of the police?

6   A.   No, I felt afraid of him.

7   Q.   Of Joseph; okay.  When you spoke to the police, were

8   you honest with them?

9   A.   I was --

10          MS. STONE:  Your Honor, I'm going to object to

11  the time frame.

12  Q.   I'm talking about March 11, 2009.  Were you honest

13  when you talked to the police?

14  A.   I didn't tell the whole truth.

15  Q.   You didn't tell them the whole truth.  You left out

16  details; right?

17  A.   Yes.  Yes.

18  Q.   Did you lie to them about anything?

19  A.   Yes.

20  Q.   On March 13, you met with Investigator Neil Merritt;

21  correct?

22  A.   I'm not sure about the date but, yes.

23  Q.   Just a few days after you left the Yannai residence;

24  right?

25  A.   Yes.

734

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   And when you met with him, you were not so

2  frightened; correct?

3  A.   Not really.

4  Q.   Because --

5  A.   I was --

6  Q.   -- you met with him at the police station.

7         MS. STONE:  Your Honor, I'd ask that the

8  witness be allowed to continue her answer.

9         THE COURT:  Did you finish your answer?

10  A.   I met her -- I met him at the -- at a police station,

11  I believe.

12  Q.   And when you went to the police station, you brought

13  a letter that you had written about your experiences in

14  the Yannai home; correct?

15  A.   Yes.

16  Q.   And you had signed and dated that letter; correct?

17  A.   Yes.

18  Q.   And were there any false statements in the letter you

19  gave to Investigator Merritt?

20  A.   I don't think so.

21  Q.   And then after you gave him the letter, you sat down

22  and you talked to him about what happened in the Yannai

23  residence; correct?

24  A.   Yes.

25  Q.   And he took notes while you talked to him?

735

Ms. Herczeg - Cross - Ms. Cesare

1   A.   Yes.

2   Q.   And isn't it a fact that in your letter dated March

3   13, 2009, you never mentioned Joseph forcing you down to

4   your knees; isn't that correct?

5   A.   There was a reason for that.

6   Q.   Well what's the answer?  Did you mention that Joseph

7   forced you to your knees in that letter?

8   A.   My friend was helping me with the letter since my

9   English wasn't good.  And I just felt ashamed, again, in

10  front of her.

11  Q.   But in the --

12  A.   But I didn't want to tell her.

13  Q.   You told her that he wanted you to have oral sex in

14  the bathroom; right?

15  A.   To who, I am sorry?

16  Q.   In your letter, you write -- in your letter, dated

17  March 13, 2009, you write about the fact that Joseph

18  wanted you to have oral sex in the bathroom; is that

19  correct?

20  A.   I don't remember.

21  Q.   I'm going to -- would looking at something refresh

22  your recollection of what you wrote about --

23  A.   I believe so.

24  Q.   -- oral sex in the bathroom?  For the witness, only,

25  I am going to show you something.  Just, you know, don't

736

Ms. Herczeg - Cross - Ms. Cesare

1  read it out loud and I want to direct your attention --

2  just take a look at it.  Does this document help you

3  refresh your recollection?

4  A.   Yes.

5  Q.   Okay.  And so now that your memory is refreshed,

6  isn't it correct that you wrote about the fact that

7  Joseph wanted you to have oral sex in the bathroom in

8  your letter dated March 13.

9  A.   Yes.

10 Q.   Yes.  So you talked to your friend about oral sex in

11 the bathroom; right?

12 A.   Yes.

13 Q.   So -- I understand you are ashamed about what

14 happened in the Yannai house; right?

15 A.   Yes.

16 Q.   But you were able to talk to your friend about it.

17 A.   Not everything.

18 Q.   Because you wrote that -- because you wrote about

19 that in the letter that she helped type for you; right?

20 A.   Yes.

21 Q.   And in that letter there's no mention of being forced

22 to your knees in the bathroom; isn't that correct?

23 A.   No.

24 Q.   Those details are not in the letter; is that right?

25 A.   That's correct.

737

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   All right.  What you wrote instead was "After he

2  wanted me to have oral sex, I refused that every time and

3  he didn't force me."  That's what you put in the letter;

4  right?

5  A.   Yes.

6  Q.   After you walked into Investigator Merritt's office,

7  you talked to him -- now I am talking about March 13,

8  2009, you walked into Investigator Merritt's office;

9  right?  Is that right?

10  A.   Yes.

11  Q.   And you talked to him about what happened in the

12  Yannai residence.

13  A.   Yes.

14  Q.   And you gave him this letter; right?

15  A.   Yes.

16  Q.   And it's also fair to say that you never told

17  Investigator Merritt about being forced to your knees in

18  the bathroom in Joseph Yannai's house; isn't that right?

19  A.   It was uncomfortable to talk about it with him.

20  Q.   So it's correct, you didn't tell him about that.

21  A.   That's correct.

22  Q.   You told him that -- you did discuss the issue of

23  oral sex in the bathroom though; right?

24  A.   Yes.

25  Q.   And you told him that Joseph wanted you to do it;

Ms. Herczeg - Cross - Ms. Cesare

1   right?

2   A.   Yes.

3   Q.   And you told Investigator Merritt that you refused it

4   every time; right?

5   A.   Yes.

6   Q.   And you told Investigator Merritt that Joseph Yannai

7   never forced you to have oral sex in the bathroom; right?

8   A.   I said it because --

9   Q.   Well, did you -- is that correct?  Is that an

10  accurate statement?

11  A.   Yes.

12  Q.   You never told him -- you told him that Joseph never

13  forced you; right?

14  A.   Yes.

15  Q.   And that is correct; right?

16  A.   Yes.

17  Q.   But you didn't tell him about being pushed down to

18  your knees.

19  A.   No.

20  Q.   And the second week, you were in Joseph's home,

21  Joseph started to ask you to wake him up after his daily

22  nap; is that right?

23  A.   It was Gisele.

24  Q.   Gisele asked you to wake him up?

25  A.   I was ready for the daily routine; yeah.

739

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   Okay.  And was Gisele inviting you to join her when

2  she woke up Joseph after his nap?

3  A.   Yes.

4  Q.   And you agreed to do that.

5  A.   Yes.

6  Q.   Okay.  And at first you would go into his bedroom and

7  sit on his bed; right?

8  A.   Yes.

9  Q.   And then you agreed to lie down in bed with them.

10  A.   Yes.

11  Q.   And then sometimes you got under the blankets with

12  the two of them.

13  A.   Yes.

14  Q.   And when all three of you were in bed, Joseph would

15  be in the middle; right?

16  A.   Yes.

17  Q.   There were times when Joseph took off your shirt or

18  unbuttoned your shirt?

19  A.   Yes.

20  Q.   Were there times when you unbuttoned it yourself?

21  A.   Yes.

22  Q.   And when Joseph unbuttoned your shirt, you didn't --

23  you agreed.

24  A.   Yes.

25  Q.   You didn't -- you never said no.  You let him do it.

Ms. Herczeg - Cross - Ms. Cesare

1    A.   In the beginning, I did not.

2    Q.   Okay.

3    A.   I didn't want to.

4    Q.   And in the beginning, you didn't take off your shirt;

5    right?

6    A.   No.

7    Q.   But eventually, you let it happen.

8    A.   Yes.

9    Q.   Okay.  And when you were in bed with Joseph and

10   Gisele, you observed the two of them engaged in sexual

11   contact; right?

12   A.   Yes.

13   Q.   And it was more than just hugging and kissing;

14   correct?

15   A.   Yes.

16   Q.   It involved oral sex.

17   A.   Yes.

18   Q.   Kissing intimate parts of their bodies.

19   A.   I believe so.

20   Q.   And you would lie in bed with them and observe what

21   they were doing.

22   A.   Yes.

23   Q.   And sometimes you'd lie in bed with your own shirt

24   off; right?

25   A.   Yes.

741

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   On direct you talked about one time how Joseph wanted

2  you to manually -- to touch his penis; right?

3  A.   Yes.

4  Q.   And you were uncomfortable with that; right?

5  A.   Yes.

6  Q.   You were uncomfortable about all of this; right?

7  A.   Yes.

8  Q.   It's uncomfortable to talk about it right now; right?

9  A.   Yes.

10 Q.   But on that one occasion when he asked you to touch

11 him, you did.  You agreed to do that; isn't that correct?

12 A.   He grabbed my hand.

13 Q.   Okay.  And you --

14 A.   And put it on his penis.

15 Q.   -- did --

16 A.   Yes.

17 Q.   He took your hand and put it on his penis; right?

18 A.   Yes.

19 Q.   And then you manipulated his penis in some way;

20 correct?

21 A.   Yes.

22 Q.   But you were uncomfortable doing it, so you didn't

23 continue touching him as long as he wanted you to touch

24 him; right?

25 A.   Yes.

742

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   And when you stopped touching him, he got upset;
2  correct?
3  A.   Yes.
4  Q.   And he said something like, "Why did you stop?"
5  A.   Yes.
6  Q.   Yesterday on direct you said that on one occasion, I
7  believe, Joseph kissed your breasts and bit your breasts
8  while he was kissing you; right?
9  A.   That's correct.
10 Q.   And it was painful.
11 A.   Yes.
12 Q.   And it made you uncomfortable; right?
13 A.   Yes.
14 Q.   Now this -- you didn't tell Investigator Merritt
15 about this biting when you spoke to him in his office on
16 March 13, 2009; did you?
17 A.   No.
18 Q.   And a few days later, you had another meeting with
19 Investigator Merritt and Prosecutor Audrey Stone in her
20 office; right?
21 A.   Yes.
22 Q.   You met Prosecutor Audrey Stone very shortly after
23 you left the Yannai residence; isn't that correct?
24 A.   Yes.
25 Q.   And isn't it a fact -- and when you met with Audrey

743

Ms. Herczeg - Cross - Ms. Cesare

1  Stone and Investigator Merritt, the investigator was

2  keeping notes of the conversation; correct ?

3  A.   Yes.

4  Q.   And isn't it a fact that when you met with Prosecutor

5  Audrey Stone in her office with Investigator Merritt, you

6  didn't tell her that you had been bitten on your breasts.

7  A.   No.

8  Q.   And you didn't put anything about biting in the

9  letter you wrote on March 13 either.

10 A.   I couldn't remember everything.

11 Q.   Okay.

12 A.   On direct you said that one time while you were in

13 bed with Joseph and Gisele he slapped you; is that right?

14 A.   Yes.

15 Q.   That's another detail you did not tell

16 Prosecutor Stone about when you met with her on March 16,

17 2009; right?

18 A.   As I said, I couldn't remember everything.

19 Q.   Okay.  And that meeting was a few days after you left

20 Joseph Yannai's residence; correct?

21 A.   I'm not sure.

22 Q.   It was soon after you left his house, a matter of

23 days or a week; right?

24 A.   Yes.

25 Q.   Now Joseph Yannai's wife is named Elena; right?

744

Ms. Herczeg - Cross - Ms. Cesare

1   A.   Yes.

2   Q.   And Elena was home on the weekends.

3   A.   Yes.

4   Q.   And Elena came home on weekdays after her job was

5   finished; right?

6   A.   I believe so.

7   Q.   And the four of you would have your dinner meal

8   together; right?

9   A.   Yes.

10  Q.   And after supper, you would help clean up the kitchen

11  together?

12  A.   Yes.

13  Q.   And then after that, sometimes you'd relax and watch

14  TV in the family room?

15  A.   Yes.

16  Q.   And would Elena join you and watch television with

17  you?

18  A.   No, I don't remember.

19  Q.   Okay.

20  A.   I -- no.

21  Q.   Okay.  Did you ever tell Elena what was going on when

22  she was at work?

23  A.   No.

24  Q.   The worst thing that happened to you in Joseph

25  Yannai's house was that day when he ejaculated on your

745

Ms. Herczeg - Cross - Ms. Cesare

1  breasts; right?

2  A.   Yeah.

3  Q.   And on that day, Gisele had asked you if you wanted

4  to go wake him up; right?

5  A.   I don't remember if she asked or not.

6  Q.   The two of you went into his room together; right?

7  A.   Yes.

8  Q.   And you stayed in bed with him for about an hour.

9  A.   Maybe.

10  Q.   Isn't that what you told the investigator --

11  A.   Usually; yes.

12  Q.   -- when you talked to him?

13  A.   Usually, that's how long it lasted.

14  Q.   You usually spent about an hour in the bedroom

15  together?

16  A.   Yes.

17  Q.   Okay.  And on this particular day, like the other

18  times you were in bed, Gisele and Joseph were engaged in

19  sexual relations; right?

20  A.   That's correct.

21  Q.   You were lying next to them observing this happening.

22  A.   Yes.

23  Q.   And Joseph had taken -- unbuttoned your shirt; right?

24  A.   Yes.

25         THE COURT:  Didn't we go over this already?

Ms. Herczeg - Cross - Ms. Cesare

1    MS. CESARE:  I'm talking about what
2  specifically happened on a specific date, all right.
3  Q.   And then Gisele gave Joseph a -- performed oral sex
4  on Joseph; right?
5  A.   I don't remember.
6  Q.   You talked about this when you spoke to Investigator
7  Merritt on March 13, 2009; didn't you?
8  A.   It was every day.  It wasn't on the particular date.
9  Q.   But do you have a clear recollection of what happened
10 on the day he ejaculated on you?
11 A.   No.
12 Q.   Okay.  But it would be fair to say on that particular
13 date, it was Gisele who performed the sexual act that
14 brought him to have an orgasm; right?
15 A.   No.
16 Q.   Isn't that what you told Investigator Merritt?
17 A.   No, I said she was helping in some way.  That's what
18 I told him.
19 Q.   And right before Joseph achieved orgasm, he climbed
20 on top of you and ejaculated on your breasts; right?
21 A.   Yes.
22 Q.   And you got upset after that happened; right?
23 A.   Yes.
24 Q.   And he said to you "It's okay, take it easy;" right?
25 A.   Yes.

747

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   And then you got up and left the room.

2  A.   Yes.

3  Q.   And after that happened, you said to Joseph, "I can't

4  take this anymore.  I don't want to do this at all;"

5  right?

6  A.   I believe so.

7  Q.   You said, "That's the end.  I'm not doing any of this

8  anymore;" right?

9  A.   Yes.

10 Q.   And he said, "Okay."  Right?  He accepted that

11 decision.

12 A.   Yes.

13 Q.   And he said to you something like "Well, I'm going to

14 treat you like an it instead of a she;" right?

15 A.   That's correct.

16 Q.   He would -- and he would treat you like a piece of

17 furniture instead of a person.

18 A.   Yes.

19 Q.   And he indicated to you that he would not be

20 affectionate towards you in any way.

21 A.   What do you mean?

22 Q.   He wouldn't treat you with any affection or attention

23 or kindness if you didn't want to have sex with him;

24 right?

25 A.   Yes.

748

Ms. Herczeg - Cross - Ms. Cesare

1   Q.   And after you made this decision, Joseph stops making

2   passes at you; right?

3   A.   He stopped treating me as a human being; yes.

4   Q.   Right.  So after that, he didn't grope your breasts

5   anymore.

6   A.   No.

7   Q.   He didn't ask you to stop wearing your bra.

8   A.   No.

9   Q.   Did you -- did you start wearing your bra again after

10  that?

11  A.   I believe so.

12  Q.   And he didn't call you to come wake him up in the

13  bedroom.

14  A.   That's correct.

15  Q.   So when you told him you didn't want to do it, he

16  accepted your decision; right?

17  A.   Yes.

18  Q.   Now after you made this decision, Joseph and Gisele

19  stopped being friendly with you; correct?

20  A.   Yes.

21  Q.   They just kind of stopped talking to you.

22  A.   Yes.

23  Q.   And you know, you just continued to do the church

24  research on the computer; right?

25  A.   Yes.

749

Ms. Herczeg - Cross - Ms. Cesare

Q.   You continued to have your meals with them; right?

A.   Yes.

Q.   But there was no more friendly conversation with them.

A.   No.

Q.   And that's when you decided to get in touch with your Hungarian friend who lived in Pound Ridge; right?

A.   That's correct.

Q.   So you e-mailed her and you made a plan to meet her.

A.   Yes.

Q.   And you asked her to bring you a converter, so you could charge up your cell phone; right?

A.   Yes.

Q.   And she did.

A.   I think she -- yeah, I think she did.

Q.   Right.  Because you were able to -- after you met your friend, Csilla --

A.   Yes.

Q.   -- you were able to charge up and use your cell phone; right?

A.   Yes.

Q.   Because after that, you were able to text her to communicate with her; correct?

A.   Yes.

Q.   So -- and then you texted her and made a plan to meet

750

Ms. Herczeg - Cross - Ms. Cesare

1  her another day; correct?

2  A.  Yes.

3  Q.  I am going to show you what's in evidence as Exhibit

4  P-38.  Do you recognize the people in this picture?

5  A.  Yes.

6  Q.  And is that -- are the people in this picture Gisele

7  and Joseph Yannai?

8  A.  Yes.

9         MS. STONE:  Your Honor, I'm going to object to

10  the relevance of this.  It's not even a time when this

11  witness was in the country.

12         THE COURT:  This picture has been shown a

13  hundred times or something similar to it.  Overruled.

14  Q.  Do you remember what Joseph's house looked like?

15  A.  Yes.

16  Q.  While you were there, did you ever walk down to the

17  pond and look around the property?

18  A.  Maybe once.

19  Q.  Okay.

20  A.  Or twice.

21  Q.  I am going to show you for identification purposes,

22  Defendant's Exhibit  P-4.  Do you recognize that?

23  A.  Yes.

24  Q.  And that's a picture of the back of the Yannai

25  residence?

751

Ms. Herczeg - Cross - Ms. Cesare

1  A.  Yes.

2          MS. CESARE:  And I move P-4 into evidence.

3          MS. STONE:  No objection.

4  (Defendant's Exhibit P-4 marked in evidence.)

5          MS. CESARE:  May we publish?

6          THE COURT:  I am tempted to object myself

7  because I don't see the relevance of this but go ahead.

8  It's admitted.  Go show it to the jury.

9          MS. CESARE:  Thank you.

10  Q.  Joseph never forced you to go into the bathroom with

11  him; right?

12  A.  No.

13  Q.  He never forced you to walk into his bedroom;

14  correct?

15  A.  No.

16  Q.  Is it correct that he never forced you to come into

17  his bedroom?

18          MS. STONE:  Your Honor, I believe this has been

19  asked and answered.

20          MS. CESARE:  Let me, I'm just trying to

21  rephrase the --

22          THE COURT:  Go ahead.  Rephrase it.

23  Q.  Did Joseph ever force you to have intercourse with

24  him?

25  A.  What does that mean?

752

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   That's penis-vagina penetration.  Did Joseph ever

2  force you to have sexual intercourse with him?

3  A.   Yes.

4  Q.   Yes?

5  A.   Yes.

6  Q.   Did you ever have an occasion where Joseph put his

7  penis inside of you?

8  A.   Oh, no, no.  I'm sorry.  No.

9  Q.   All right.  And he never forced you to do that;

10 right?

11 A.   No.

12 Q.   He never forcibly touched your vagina; right?

13 A.   Mine?

14 Q.   Right.

15 A.   I'm sorry, that -- I don't understand the question.

16 Q.   He never forcibly touched your vagina.

17 A.   Myself?

18 Q.   Yes.

19 A.   No.

20 Q.   Now you had a -- when you left Joseph Yannai's

21 residence on March 11, 2009, you still had a valid return

22 ticket back to Hungary; correct?

23 A.   That's correct.

24

25

753

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   And that ticket had a return flight of March 17,

2  2009; correct?

3  A.   Yes.

4           MS. STONE:  Your Honor, this is asked and

5  answered yesterday afternoon.

6           THE COURT:  Sustained, unless -- I mean I don't

7  remember exactly but I believe it was.  Was it asked and

8  answered yesterday?

9           MS. CESARE:  It was but I am moving on to a new

10 topic.  I'm setting up the topic.

11          THE COURT:  You don't have to go over old

12 topics.

13          MS. CESARE:  All right.

14 Q.   Before your ticket expired, you had a meeting with

15 Prosecutor Audrey Stone in her office; correct?

16          MS. STONE:  Your Honor, this was asked and

17 answered, this very same line of questioning.

18          THE COURT:  Was it asked and answered?

19          MS. CESARE:  I did ask that question yesterday.

20          THE COURT:  So why are we going over it?

21

22

23

24

25

754

Ms. Herczeg - Cross - Ms. Cesare

1   Q.   So while you were in Audrey Stone's office, she told

2   you that she could help you get housing.

3          MS. STONE:  Your Honor, objection.

4   A.   No.  No.

5   Q.   She told you she could help you get a visa to stay in

6   the United States; right?

7   A.   No.

8          MS. STONE:  Your Honor, objection.

9   Q.   In May of 2009, you had a meeting in Audrey Stone's

10  office with two officials from the United States

11  Immigration Service; didn't you?

12  A.   I can't remember.

13  Q.   Do you remember having a meeting in her office with

14  some other people where you talked about getting a visa

15  to stay in the United States?

16  A.   No.

17  Q.   Never?

18  A.   I don't remember it.

19  Q.   In June of 2009, you had a lawyer who helped you file

20  an application for a visa to remain in the United States.

21  A.   I don't remember the date but that's correct.

22  Q.   You had a lawyer; right?

23  A.   Yes.

24  Q.   How did you get that lawyer?

25  A.   I have no idea.

755

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   You didn't hire the lawyer yourself; did you?

2  A.   I did not.

3  Q.   Did somebody help you get that lawyer?

4  A.   I believe so.

5  Q.   Who?

6  A.   I don't know.

7  Q.   You have no idea who helped you get that lawyer?

8  A.   I believe that was the organization.

9  Q.   And who introduced you to the organization?

10  A.   I think that was Audrey Stone.

11  Q.   And then after that you had a meeting with a person

12  with Audrey Stone, a person from the organization, your

13  lawyer and some people from the immigration service;

14  right?

15        MS. STONE:  Your Honor, I'm going to object.

16        THE COURT:  On what ground?

17        MS. STONE:  There was -- I don't even know what

18  is being referred to.

19        THE COURT:  Well that is not a basis for an

20  objection.

21  Q.   Do you remember that meeting?

22        THE COURT:  Do you want to repeat the question?

23  Q.   You had a meeting with Audrey Stone, your attorney, a

24  person from the organization, and two members from the

25  United States Immigration Service; correct?

756

Ms. Herczeg - Cross - Ms. Cesare

1  A.   I can't remember if everyone was in the room at the

2  same time.

3  Q.   Okay.  But you do remember meeting with some people

4  from immigration; correct?

5  A.   I met hundreds of people during this -- since the

6  whole thing started.

7  Q.   Right.  And you had most of those meetings in Audrey

8  Stone's office or the office building where she works;

9  right?  Yes or no?

10 A.   Yes.

11 Q.   One June 5, 2009, you filled out an application for a

12 visa to stay in the United States; correct?

13 A.   That what it --

14 Q.   Does that date sound --

15 A.   Yes.

16 Q.   -- right?

17 A.   I'm not sure.

18 Q.   But was it a -- is it fair to say it was

19 approximately June of 2009?

20 A.   I can't remember.

21 Q.   All right.  Well, I am going to show you something,

22 let me see if it will refresh your recollection.  Just

23 for the witness, please.  Just take -- can you see what's

24 on the screen?

25 A.   Yes.

Ms. Herczeg - Cross - Ms. Cesare

1  Q.   Just take a look at it.  Don't read it out loud.

2  A.   Yes.

3  Q.   Does this help you remember when you applied for your

4  visa?

5  A.   Yes.

6  Q.   And that was approximately June 4, 2009?

7  A.   It was.

8  Q.   When you applied for your visa, you made the

9  statement that you'd been the victim of a severe form of

10  human trafficking; isn't that correct?

11  A.   Yes.

12  Q.   You also made the statement that once you began

13  working for Joseph Yannai, you became totally dependent

14  on him and he never paid you.  Did you make that

15  statement?

16  A.   Yes.

17  Q.   But you agreed to work for him in exchange of room,

18  board and expenses; correct?

19  A.   Yes.

20  Q.   You knew you weren't going to be paid a salary;

21  right?

22  A.   Yes.

23  Q.   That was the deal.  You understood it; right?

24  A.   Yes.

25  Q.   But when you filed your petition to get a visa with

758

Ms. Herczeg - Cross - Ms. Cesare

1  the United States Immigration Service, you complained

2  that he had never paid you.

3  A.   Yes.

4  Q.   And you didn't -- and you file dan affidavit to that

5  effect; correct?

6  A.   A what?  I'm sorry.

7  Q.   You swore out a written statement with that -- to

8  that effect; correct?

9  A.   Yes.

10 Q.   And you never anywhere in that statement said that

11 you had agreed to come in exchange for room, board and

12 expenses only.

13 A.   No.

14 Q.   So you didn't tell the whole truth when you filled

15 out that application; correct?

16 A.   I think it wasn't about the deal, the reason why I

17 came here or how I came here.

18 Q.   In your affidavit in support of your visa

19 application, you never clearly stated that you agreed to

20 come here in exchange for room, board and expenses; isn't

21 that correct?

22 A.   Yes.

23 Q.   You also made a statement in your application for a

24 visa application -- for a visa, that you had never

25 committed a crime for which you had not been arrested;

759

Ms. Herczeg - Cross - Ms. Cesare

1  isn't that correct?

2  A.   Yes.

3  Q.   But in fact, you had committed a crime for which you

4  had not been arrested; right?

5  A.   I don't think so.

6  Q.   Well on direct yesterday --

7  A.   Oh.

8  Q.   -- you agreed that you knew it was a crime to lie to

9  immigration --

10  A.   Yeah.

11  Q.   -- when you falsely claimed that you were a tourist

12  instead of coming for a job; right?

13  A.   Yes, that's correct.

14  Q.   And you filled out this visa application many months

15  after you left Joseph Yannai's residence; right?

16  A.   Yes.

17  Q.   And in this application, you falsely stated that you

18  had never committed a crime for which you had not been

19  arrested; correct?

20  A.   No, it wasn't on a statement.

21  Q.   I'm going to -- you made this -- did you or did you

22  not answer no to the following question on the visa

23  application:

24       "Have you ever committed a crime or offense for which

25  you have not been arrested?"

760

Ms. Herczeg - Cross - Ms. Cesare

1  A.   I can't remember.

2  Q.   All right.  Well, I am going to show you something

3  and see if this refreshes your recollection, please.

4  A.   Uhm.

5  Q.   Does that refresh your recollection?

6  A.   Yes.

7  Q.   Do you now have a memory of how you filled out the

8  visa application?

9          THE COURT:  Not how she filled it out what she

10  wrote on that particular question.

11  A.   The answer is no.

12  Q.   You have no recollection?  Well --

13  A.   The answer on the sheet is no.

14  Q.   Okay.  You said -- and that was a false statement;

15  right?

16  A.   The -- yes.

17  Q.   You were granted a T visa on January 22, 2010;

18  correct?

19  A.   Yes.

20  Q.   And you were granted this visa based upon what you

21  said happened in Joseph Yannai's house; right?

22  A.   I believe so.

23  Q.   And this visa gives you permission to live and work

24  in the United States for four years.

25  A.   I really don't know what's the visa for.

761

Ms. Herczeg - Cross - Ms. Cesare

1   Q.   Well when you got the visa, it advised you it was

2   valid from -- actually, the visa indicated -- you

3   received notice of the award of the visa on January 22,

4   2010; does that sound right?

5   A.   I can't remember.

6   Q.   I will show you something.  See if this refreshes

7   your recollection, please.  Was the notice date of the

8   visa January 22, 2010?

9   A.   Yes.

10  Q.   Right.  And the visa was valid from November 30, 2009

11  to November 29, 2013; correct?

12  A.   Yes.

13  Q.   So you got a four year visa; right?

14  A.   Yes.

15  Q.   And so now you are free to live in the United States

16  and work in the United States legally; correct?

17  A.   Yes.

18  Q.   And you also can apply with this visa, you now --

19  you're permitted to apply for legal permanent residency

20  status; correct?

21  A.   I'm not sure.

22  Q.   Did your immigration lawyer talk to you about that?

23  A.   I never asked.

24  Q.   The notice you got about the visa explained to you

25  that "Federal law provides that you may be eligible to

762

Ms. Herczeg - Redirect - Ms. Stone

1    become a legal permanent resident in the United States;"

2    right?

3    A.   Yes.

4    Q.   And that means that you could spend the rest of your

5    life living in the United States.

6    A.   Could be a possibility.

7    Q.   Right.  So this visa has given you the opportunity to

8    live here in this country for the rest of your life.

9                THE COURT:  She's asked and answered the

10   question.

11   Q.   The notice you got with the visa also informed you

12   that not only can you live here for the rest of your

13   life, you can bring your family here to live with you;

14   right?

15   A.   I didn't have any information about that.  I didn't

16   have any clue.

17   Q.   Now you've talked to the prosecutors about getting

18   money as a result of this trial; right?

19   A.   Yes.

20   Q.   And it's fair to say that you have an expectation

21   that you might win some money if Joseph Yannai is

22   convicted in this case?

23   A.   No.

24   Q.   You think that will have nothing -- do you have any

25   hope that you will receive a money award in this case;

763

Ms. Herczeg - Redirect - Ms. Stone

1  right?

2  A.   No.

3  Q.   In your June 4, 2009 affidavit in support of your

4  visa application, didn't you in fact say "I am interested

5  in asking for money damages from Joseph?"

6  A.   My lawyer helped me with the application.  He offered

7  me.

8  Q.   So you signed a statement saying you were interested

9  in getting money damages from Joseph; right?

10  A.   Yes.

11  Q.   And your lawyer told you that when you sign an

12  affidavit, you have to be -- it must be -- you have to

13  swear to the truthfulness of what's in the statement;

14  right?

15  A.   Yes.

16  Q.   So the affidavit was, in fact, your true statement?

17  A.   I agreed with him.

18          MS. CESARE:  May I have a minute, please?

19          (Pause.)

20          MS. CESARE:  No further questions.

21  REDIRECT EXAMINATION

22  BY MS. STONE:

23  Q.   Bernadett, why are you here testifying in this trial?

24          MS. CESARE:  Objection.  Scope.

25          THE COURT:  I'm sorry.  I was talking to my

764

Ms. Herczeg - Redirect - Ms. Stone

1   courtroom deputy.  Did anybody --

2   Q.  Why are you here testifying?

3            THE COURT:  You have an objection?  Did you

4   voice an objection?  I'm sorry.  I don't want to suggest

5   that you should but I didn't --

6            MS. CESARE:  I have an objection.

7            THE COURT:  You do?

8            MS. CESARE:  I do.  It's scope.

9            THE COURT:  Scope?

10           MR. SCHNEIDER:  Beyond the scope.

11           THE COURT:  Overruled.

12  Q.  Why are you here testifying, Bernadett?

13  A.  Because I wanted -- I want Mr. Yannai to stop doing

14  what he was doing with women.

15           MS. CESARE:  Objection.  Move to strike.

16           THE COURT:  Overruled.

17  Q.  Bernadett, at a certain point, did you meet with the

18  government and a lawyer and it was explained to you that

19  lying to immigration was a crime at the airport?  Do

20  you --

21  A.  No.

22  Q.  Do you remember when you learned that lying to

23  immigration was a crime?

24  A.  Like two weeks ago, three.

25  Q.  And when you filled out the application for a visa,

Ms. Herczeg - Redirect - Ms. Stone

1  that was in June 2009; right?  That was a year ago when

2  you filled out the affidavit for the visa?

3  A.   Yes.

4  Q.   And when you filled out the affidavit for the visa,

5  you were asked some questions about whether on the

6  affidavit you had explained that the payment would come

7  after a year.  Do you remember writing on that

8  application that "The offer was $20,000 after one year of

9  work and free housing and food at Joseph's house."  Do

10  you remember writing that on your affidavit?

11  A.   I can't remember.

12  Q.   Let me just show you something and ask if this

13  refreshes your recollection.  Just take a look at the

14  highlighted portion.  Does that refresh your recollection

15  if you put that in your affidavit?

16  A.   Yes.

17  Q.   Now Bernadett, at a certain point you lived in a

18  domestic violent shelter.

19  A.   That's correct.

20  Q.   And did you feel any safer when you went to live in

21  the domestic violent shelter than you had when you were

22  living in Pound Ridge?

23           MS. CESARE:  Objection.

24           THE COURT:  Overruled.

25  A.   Yes.

766

Ms. Herczeg - Redirect - Ms. Stone

1   Q.   And while you were living in the shelter, did you

2   meet with counselors?

3   A.   Yes.

767

Ms. Herczeg - Redirect - Ms. Stone

1   Q.   And after that, do you recall, you filled out a sworn

2   statement with Investigator Merritt about this case; do

3   you remember signing a statement?

4           MS. CESARE:  Objection.  May we approach?

5           (Conference held at side-bar.)

6           MS. CESARE:  I think the government's about to

7   try and bring in a prior consistent statement of this

8   witness that was subsequent to the statements I cross-

9   examined her on.  It's not admissible. It's hearsay.

10  There's no exception to the clause.

11          MS. STONE:  Will you --

12          THE COURT:  Do you mean if it was before, it

13  would be admissible but now --

14          MS. CESARE:  Right.

15          THE COURT:  -- because it's after --

16          MS. CESARE:  If they're going to argue -- they

17  can argue recent fabrication under this sequence of

18  events.

19          THE COURT:  I'm not sure I understand.  First

20  tell me what it is that you were going to --

21          MS. STONE:  It's a prior consistent statement.

22  There was a suggestion that --

23          THE COURT:  No, when was it given?

24          MS. STONE:  It was given in April 22, 2009. It

25  was her fist affidavit that she ever wrote to the police.

768

Ms. Herczeg - Redirect - Ms. Stone

1    It's the first sworn affidavit in this case.

2            THE COURT:  I mean what does it say?

3            MS. STONE:  It's consistent with her testimony

4    concerning the forced oral sex, the biting, the

5    ejaculation.

6            MS. CESARE:  But she -- my point when I was

7    confronting her was that she didn't give those details

8    when she talked to the police on March --

9            THE COURT:  Wait a minute.  Wait.  We're going

10   to take a little recess, ladies and gentlemen.

11           (Jury exits the courtroom.)

12           MR. SPECTOR:  Judge, should we have the witness

13   step down?

14           THE COURT:  Yes.

15           (Witness exits the courtroom.)

16           MS. CESARE:  Your Honor, my point when I was

17   confronting this witness and the point I want to make now

18   is that she changed her story after -- subsequent to

19   March 13 and March 16.  And the government is bringing in

20   -- my point was that she left out important details about

21   what happened when she talked to the police close in time

22   to the incident.

23           Subsequently, she changed her story and the

24   government wants to bring in a subsequent statement that

25   is simply an out of court statement.  It's a hearsay

769

Ms. Herczeg - Redirect - Ms. Stone

1   statement.  The only basis they could use to bring it in

2   would be to suggest that I've accused this witness of a

3   recent fabrication but that's not the case.

4        This witness did not in a timely manner

5   describe the details of what happened to her to the

6   police officers in the case.  And the fact that

7   subsequently she has changed her story does not give the

8   government a basis to introduce prior consistent

9   statements with her in court testimony.

10       THE COURT:  Well, what about the doctrine of

11  rehabilitation?  I mean it seems to me that you sort of

12  left the impression that she never said this in 2009 and

13  isn't it admissible essentially to rebut that suggestion?

14  I mean it was a month later.  There were -- there were

15  arguably different circumstances.

16       I think that -- I mean my initial feeling is

17  that to the extent that there is an impression left in

18  2009 before this particular charge anyway was brought,

19  before the federal government got involved in the case,

20  you left an impression that she never said this.  And I

21  don't know why the government is not entitled to rebut

22  that and just --

23

24       MS. CESARE:  Judge, I didn't --

25       THE COURT:  -- simply rehabilitate her.  Now,

770

Ms. Herczeg - Redirect - Ms. Stone

1  I --

2          MS. CESARE:  Judge, I --

3          THE COURT:  Go ahead.

4          MS. CESARE:  Frankly, I don't think that's a

5  fair interpretation of the questions and answers that I

6  elicited in the cross-examination.  Whenever I asked her,

7  I was very specific about the dates involved.  I

8  specifically identified statements she made on March 11,

9  2009, March 13, 2009 and March 16, 2009.

10          THE COURT:  I understand that.  So?

11          MS. CESARE:  And I never suggested that

12  subsequent to that she left out details.

13          THE COURT:  I understand that.

14          MS. CESARE:  You know, of course --

15          THE COURT:  But that's the point.  It's roughly

16  contemporaneously.  You know, you're talking about March

17  and she's talking about April.  I mean it's roughly

18  contemporaneous.  Of course you didn't suggest it.  You

19  don't want the jury to know it.  I'm not being critical

20  of you.  It's simply -- it's a perfectly proper what you

21  did.  I mean this is -- the question is whether or not an

22  erroneous impression has been left that she never said

23  this during this period when she was talking, I assume to

24  the --

25          MS. CESARE:  No, the impression she never --

771

Ms. Herczeg - Redirect - Ms. Stone

1          THE COURT:  -- to Ms. Stone in her capacity as

2    an assistant district attorney.

3          MS. CESARE:  No, the impression that only --

4    the only conclusion the jury can draw is that she never

5    said this on March 11, March 13 and March 16.  There is

6    no -- there was no cross-examination to suggest that she

7    never said that stuff on later dates.  All right?  I

8    don't think that's fair.

9          THE COURT:  I understand that.  That's the

10   whole point.  That's the whole point.  And that's what

11   you're going to argue to the jury and it's going to leave

12   that impression.  In March, whatever dates you just --

13   she never said anything and the impression is going to be

14   left that she never said anything.  And it seems to me

15   that the government is entitled to show that she did.  I

16   mean, I am not suggesting that the hearsay rule doesn't

17   apply here necessarily but --

18         MS. CESARE:  Judge?

19         THE COURT:  -- that's what I call technical --

20         MR. SCHNEIDER:  You can call it justice.

21         THE COURT:  -- hearsay objections because --

22         MS. CESARE:  Just as what -- Judge, I --

23         THE COURT:  -- essentially, the two purposes of

24   the hearsay rule are one that you haven't had a chance to

25   contemporaneously cross-examine and the other -- it's the

772

Ms. Herczeg - Redirect - Ms. Stone

1   same as the confrontation clause essentially, in which

2   the fact that the hearsay declarant is available for

3   cross-examination doesn't implicate the confrontation

4   clause.  And the other purpose underlying the hearsay

5   rule is, you know, there's some question as to whether

6   what the witness said has been accurately recorded.  And

7   this is a -- is this a written -- contemporaneously

8   written statement?  I forget now.

9           MS. STONE:  Your Honor, this is the first

10  complete affidavit that the witness provided to --

11          THE COURT:  Oh, so it's under oath, as well.

12  So we don't even have the question of it not being under

13  oath.

14          MS. CESARE:  Your Honor, I --

15          THE COURT:  So it's under oath.  There's no

16  question about whether -- what the hearsay declarant said

17  was made.  I don't -- that doesn't mean it would be --

18  that hearsay objection is necessarily technically not

19  correct.  I am just pointing out that it's essentially a

20  -- it comes more technical when, you know none of any of

21  the purposes of the hearsay rule are truly implicated.

22  But just give me a minute.

23          MS. CESARE:  Your Honor, may I?

24          THE COURT:  Yes.

25          MS. CESARE:  Though we persist in our

773

Ms. Herczeg - Redirect - Ms. Stone

1   objection, we certainly object to the -- we'd object to

2   the admission of her supporting deposition affidavit into

3   evidence.  If the Court is going to permit any

4   questioning on this issue, we feel that the questioning

5   should be limited to questions and answers and we oppose

6   the admission of the April 22, 2009 affidavit.

7              THE COURT:  Just give me a minute.

8              (Pause.)

9              THE COURT:  I'm just going to take a short

10  recess.

11             MS. CESARE:  I beg your pardon?

12             THE COURT:  I said I'm just going to take a

13  short recess.  Do you intend to offer this document?

14             MS. STONE:  Yes, your Honor.

15             MS. CESARE:  Yeah, I'd --

16             MR. SCHNEIDER:  We'd be asking for redaction if

17  it goes in at all.

18             MS. CESARE:  Does your Honor want to see a copy

19  of this affidavit they want to put in, that they're

20  talking about?

21             THE COURT:  Not right now.

22             (Court recessed.)

23             THE COURT:  Okay.  So where are we?  I mean, I

24  just want to be sure.  You're not -- you're saying you're

25  not making a claim of recent fabrication.

774

Ms. Herczeg - Redirect - Ms. Stone

1          MS. CESARE:  That's correct.

2          THE COURT:  And why is that not?  Why not?  I

3  mean, I'm not asking why you didn't, why do you say it's

4  not?

5          MS. CESARE:  Our point is that her story

6  changed after March 16th, 2009.  It's not a recent

7  fabrication.  There's --

8          THE COURT:  No, but her story -- the recent

9  fabrication generally is the one that she's given in the

10  court, and you show prior inconsistent statement to show

11  that the claim in court is a recent fabrication.

12          MS. CESARE:  It would only be admissible if the

13  Government had some evidence that she had made a

14  consistent statement prior to March 13th or March 16th,

15  but there was a prior consistent statement that existed

16  before the statement I impeached her with.  In that case

17  we would fall into a recent fabrication scenario.

18          THE COURT:  I don't quit understand the

19  significance of the distinction, but I'm not going to let

20  it -- I'm not going to let the affidavit in, but I am

21  going to allow -- I just -- well, first of all, the

22  doctrine of rehabilitation basically allows prior

23  consistent statement may be used to rehabilitation when

24  the statement has a probative force bearing on

25  credibility beyond showing repetition, and I think -- I

775

Ms. Herczeg - Redirect - Ms. Stone

1   was reading from United States versus Pierre,

2   P-i-e-r-r-e, 781 F2d 329, and my feeling is it does, it

3   just leave it is impression that during a -- roughly a

4   period of, I don't know, 30 days.  What was the

5   difference in time?

6           MS. CESARE:  Six weeks.

7           THE COURT:  Between the statement you used and

8   the statement she -- the government wants to rehabilitate

9   with.

10          MR. SPECTOR:  About a month, yeah.  Five weeks

11  maybe.

12          THE COURT:  Five weeks.  She actually did it --

13  did make a statement that was not so much -- that was in

14  effect -- that did in fact implicate him in the way that

15  we've been talking about, I don't want to go into the

16  exact testimony, exact substance, when the implication

17  that's left is that she hadn't said it, and this was the

18  first time she's essentially saying this.

19          MS. CESARE:  We're not going to make that

20  argument it's the first time she said it, we're going to

21  make the argument that she didn't describe what had

22  happened to her close in time to the incident.  She was

23  in -- she had two --

24          THE COURT:  It was close in time -- yours -- I

25  mean we're talking about statements that were made that

Ms. Herczeg - Redirect - Ms. Stone

1   were roughly 30 days apart.

2        MS. CESARE:  Well, the statements I confronted

3   her with were statements she made in the safety of the

4   police department with Investigator Merritt and then in

5   the safety of the prosecutor's office with prosecute, Ms.

6   Stone.  The statements I confronted her with were

7   statements that were made on March 13th, 2009 and March

8   16th, 2009.

9        THE COURT:  I understand that.

10       MS. CESARE:  A week or two after the events she

11  described in the Yannai residence.

12       THE COURT:  I didn't -- they're arguing about

13  whether you could have done that.  The question is the

14  implication is left that during that period roughly,

15  whether you know, before or after, she didn't also, you

16  know, say what the government now wants to elicit, and

17  you know, my feeling is that there's something unfair and

18  misleading about that, and I'm not even sure that you're

19  right, you're not arguing that it's a recent fabrication.

20  I don't see how in general it would not be.  I mean she's

21  testified that X occurred, you're saying that she's

22  testified -- she gave a statement that says Y.

23       MS. CESARE:  Your Honor, I think --

24       THE COURT:  I mean, I don't --

25       MS. CESARE:  In order for the government to get

777

Ms. Herczeg - Redirect - Ms. Stone

1  in a prior consistent statement --

2          THE COURT:  Well, we're not --

3          MS. CESARE:  -- through their witness --

4          THE COURT:  Well, that's offered in evidence.

5  For the moment I'm not -- I'm willing to be more cautious

6  --

7          MS. CESARE:  In order for the government –

8          THE COURT:  -- and give a statement that

9  basically this is not being offered for the -- it's not -

10 - they should not -- the jury should not consider it for

11 its truth, but merely to the extent that it bearing on

12 her credibility.

13         MS. CESARE:  Your Honor, in order for the

14 government to avail themselves of getting in a prior

15 consistent statement of their own witness they have to

16 convince you that the statement I elicited was a recent

17 fabrication.  The government has to --

18         THE COURT:  That's not my understanding.

19         MS. CESARE:  -- has to establish that --

20         THE COURT:  That's just the opposite of my

21 understanding.  My understanding is that the recent

22 fabrication is the fabrication in the courtroom and that

23 the reason that that's a recent fabrication was because

24 on a prior occasion she said something different.  That's

25 my understanding of that doctrine.  I don't understand, I

778

Ms. Herczeg - Redirect - Ms. Stone

1  mean you've got it -- unless I'm seriously mistaken

2  you've got it totally reversed.

3        MR. SCHNEIDER:  I think she may have misspoke.

4  Can I just understand what the ruling is going to be so

5  maybe we can -- I mean is the jury going to get this

6  piece of paper or is she just going to be about to ask

7  questions about --

8        THE COURT:  I'm willing to be a little bit more

9  cautious, but I don't, you know, I'm willing to let the

10  jury know that during this period of time in order to

11  avoid a misleading impression that she also said what the

12  government wants to elicit, but I don't understand why --

13  I don't understand your argument about why this isn't a

14  claim of recent fabrication.  That is the claim in the

15  courtroom, it's not whether the --

16        MR. SCHNEIDER:  I think our argument is just a

17  timing argument.  We believe that this witness fabricated

18  the testimony between March 16th and April 22nd, and we

19  never said anything different, because we don't -- we

20  acknowledge --

21        THE COURT:  That's what you're saying now, but

22  the jury doesn't know what was said on April 16th.

23  That's the point.

24        MR. SCHNEIDER:  I understand.

25        THE COURT:  But the point is that she's

779

                Ms. Herczeg - Redirect - Ms. Stone
1    fabricated -- this is the recent fabrication.
2            MR. SCHNEIDER:  It was more the timing of it,
3    is that we didn't -- it's obvious that she's changed her
4    story, that's obvious.
5            THE COURT:  Right.  Well, that's what normally
6    is a claim of recent fabrication.
7            MR. SCHNEIDER:  Correct.  But we --
8            THE COURT:  That's basically the definition of
9    it.
10           MR. SCHNEIDER:  And our position is that a
11   prior consistent statement would only be relevant if it
12   indicates that the fabrication occurred -- I'm sorry --
13   yes, that it indicates that she gave a consistent
14   statement at the same time period where we are saying
15   that she gave inconsistent statements.
16           THE COURT:  She did.  The same time period is
17   roughly 30 days.  I mean --
18           MR. SCHNEIDER:  Well, we're talking about a
19   week after her report and a month later.  We don't view
20   that --
21           THE COURT:  Oh, I think you're wrong.
22           MS. STONE:  Your Honor, if I might just add
23   that it's also our contention that there was a
24   misimpression that this witness fabricated the testimony
25   in order to procure a visa, and that affidavit was filled

780

Ms. Herczeg - Redirect - Ms. Stone

1    out long after -- in June of 2009, which was long after

2    this warrant affidavit that's completely consistent with

3    her trial testimony.

4              THE COURT:  Look, I'm going to let her -- I'm

5    not going to let the affidavit in.  I'm going to let her

6    ask the witness whether she said -- I'm going to overrule

7    the objection to the question.

8              MS. STONE:  Thank you, Judge.

9              MR. SCHNEIDER:  Judge, we have another issue

10   about the police testimony.  Should we address that now

11   or maybe since we're going to have lunch?

12             THE CLERK:  We can do that after lunch.

13             MR. SCHNEIDER:  Okay.

14             THE COURT:  I don't know how long you're going

15   to be with this witness, I don't.

16             MR. SCHNEIDER:  Well, it's almost -- it's 20 to

17   1:00.

18             THE COURT:  Let's go.

19             MR. SCHNEIDER:  Okay.

20             THE COURT:  Let's bring in the jury.

21             (Pause.)

22

23

24

25

781

Ms. Herczeg - Redirect - Ms. Stone

1          THE CLERK:  All rise.

2          (Jury enters the courtroom.)

3          THE CLERK:  Please be seated.

4   REDIRECT EXAMINATION

5   BY MS. STONE:

6   Q.   Bernadett, you recall that you were asked some

7   questions about your initial statements to the police in

8   the middle of March 2009?  Do you remember you were asked

9   some questions about your initial statements to the

10  police?

11  A.   No.

12  Q.   On cross-examination you were asked about meeting

13  with the police the night that you left the defendant's

14  house.

15  A.   Yes.

16  Q.   And then a couple of days later you had a meeting

17  with Investigator Merritt and you also discussed --

18  A.   Yes.

19  Q.   -- some of the things that had happened in the

20  defendant's house.  And then you gave Investigator

21  Merritt a sworn statement in April of that day.  Do you

22  remember typing out and swearing to a statement in April

23  of that year?

24  A.   Yes.

25  Q.   And in that statement, Bernadett, did you talk about

782

Ms. Herczeg - Redirect - Ms. Stone

1  the promise that you were going to be paid $20,000 after

2  a year of work?

3  A.   Can't remember.

4          MS. STONE:  If I could just show this to the

5  witness and see if it refreshes her recollection?

6          THE WITNESS:  Uh-huh.

7  Q.   Take a look at the highlighted section.

8  A.   Yes.

9  Q.   So does that refresh your recollection?

10  A.   Yes.

11  Q.   Okay.  Now -- and in this sworn affidavit from April

12  of 2009, did you also put in writing that at times the

13  defendant wanted to perform oral sex and you were

14  refused, that he tried to force you to perform oral sex

15  by pushing your head to his penis and you refused and

16  told him you didn't want to do it, that even after you

17  refused he still tried to force you.  Do you recall

18  telling the police that?

19  A.   Yes.

20  Q.   And do you also recall that in this sworn affidavit

21  you provided information about the many times that the

22  defendant touched your breasts?

23  A.   Uh-huh, yes.

24  Q.   And that also that he had forced you to hug and kiss

25  him and to make your touch his penis by moving your hand

783

Ms. Herczeg - Redirect - Ms. Stone

1   down to it?

2   A.   Yes.

3   Q.   And do you also recollect that you told the police in

4   this sworn affidavit that he would kiss your breasts very

5   hard causing lots of pain and that he would bite your

6   breasts, do you recall telling that to the police in this

7   sworn affidavit?

8   A.   Yes.

9   Q.   And Bernadett -- and when you gave that sworn

10  affidavit that was about five weeks after you left the

11  defendant's house?

12  A.   Yes.

13  Q.   And at that point you were staying in a shelter; is

14  that right?  Or were you staying with your friends?

15  A.   I can't remember the date that I moved to the

16  shelter.

17  Q.   Now Bernadett you had, at the shelter there was a --

18          THE COURT:  Ladies and gentlemen, before this

19  goes on I just want to tell you something about this --

20  the witness's statement about what he said in an

21  affidavit in April 2009.  You have to determine whether

22  the witness is testifying truthful here in court, and of

23  course the fact that somebody has repeated something on

24  prior occasions doesn't necessarily mean it's true.  You

25  have to decide based on all the evidence whether you

784

Ms. Herczeg - Redirect - Ms. Stone

1  credit the testimony of the witness.  I've let that

2  testimony come in to help you determine and make a

3  judgment about whether the testimony given in court is

4  true or not.

5  Q.   Bernadett, when you were staying at the shelter did

6  the shelter help provide you with an immigration lawyer?

7  A.   Yes.

8  Q.   And to resolve whether or not you could stay in the

9  United States?

10  A.   Yes.

11  Q.   Was this lawyer helping you with any legal

12  immigration issues you might have?

13  A.   I believe so.

14  Q.   And why were you staying in the United States in

15  2009, and why have you stayed?

16  A.   The reason why I stay is -- was because I wanted to

17  help out the case.

18  Q.   And when you filled out your application for the visa

19  did the lawyer type up the application and go through it

20  with you?

21  A.   Yes.

22  Q.   I'm just going to have you take a look.  And you

23  reviewed everything in the application with the lawyer?

24  A.   Yes.

25  Q.   Now, Bernadett, before you got on the plane and came

785

                    Ms. Herczeg - Redirect - Ms. Stone

1    from Hungary to the United States did you think you were

2    going to have a sexual, consensual, romantic relationship

3    with the defendant?

4    A.    No.

5    Q.    And I'm just going to ask you to take a look at

6    what's been entered into evidence, and I'm going to ask

7    that this be published for the jury.  Do you see the two

8    underlined --

9    A.    Yes.

10   Q.    -- parts of this e-mail?  Who is this e-mail from?

11   A.    It's from Joanna.

12   Q.    Do you know who Joanna is?  Do you know now who

13   Joanna is?

14   A.    Yes.

15   Q.    Who do you believe Joanna is?

16   A.    Joanna is Mr. Yannai.

17   Q.    Could you read those lines that have been underlined,

18   please.

19   A.    "I don't want ever to feel that a woman is having sex

20   with me just because even maybe there's a small part

21   there's a possibility that she's doing it because she's

22   afraid to lose her job or lose the roof above her head.

23   When Joseph needs a massage he calls a professional

24   masseuse."

25   Q.    Bernadett, have you ever wanted to have a consensual

786

Ms. Herczeg - Recross - Ms. Cesare

1  romantic relationship with the defendant?

2  A.   No.

3           MS. STONE:  Can I have just one moment?

4           THE COURT:  Uh-huh.

5           MS. STONE:  We have no further questions.

6  RECROSS-EXAMINATION

7  BY MS. CESARE:

8  Q.   Ms. Herczeg, you could Have flown back to Hungary as

9  scheduled and still helped out in this case.

10          MS. STONE:  Your Honor, that's beyond the scope

11  of the redirect.

12          THE COURT:  Overruled.

13          THE WITNESS:  I didn't know about that.

14  Q.   You could have flown back here to testify?

15  A.   I didn't know about that.

16  Q.   The prosecutor talked to you about an affidavit you

17  swore out on April 22nd, 2009; is that right?  Do you

18  remember the date of the affidavit she asked you about?

19  A.   I don't remember the date.

20  Q.   All right.  I'm going to show you something and see

21  if it helps you remember the date, all right?  Just for

22  the witness.  Do you see anything on this that helps you

23  remember the date?

24  A.   Yes.

25  Q.   You swore out that affidavit on April 22nd, 2009,

787

                    Ms. Herczeg - Recross - Ms. Cesare

1  correct?

2  A.   Yes.

3  Q.   And that was about five weeks after you left the

4  Yannai residence, correct?  You left the Yannai residence

5  on March 11th, 2009, right?

6  A.   Yes.

7  Q.   So five, six weeks later?

8  A.   Yeah, five, maybe.

9  Q.   During that five, six period of time the prosecutor

10 helped you get housing in a women's shelter, right?

11 A.   Yes.

12 Q.   So when you left the Yannai residence you stayed with

13 your friends Csilla and Andras for a short period of

14 time, correct?

15 A.   Yes.

16 Q.   And they lived on the estate of Clive Davis, right?

17 A.   Yes.

18 Q.   And then you left there and went to a shelter, right?

19 A.   Yes.

20 Q.   Ms. Stone helped you find that housing, right?  Or

21 people in her office helped you find it.

22 A.   I believe so.

23 Q.   And while you were at the shelter you had counseling,

24 right?

25 A.   Yes.  Yes.

788

Ms. Herczeg - Recross - Ms. Cesare

1  Q.   And you got a life skills class?

2  A.   Yes.

3  Q.   And you were living there with other women who had

4  been in domestically violent situations?

5  A.   Yes.

6  Q.   And you talked to them about your case?  Did you talk

7  to anybody about your case at all?

8  A.   No.

9  Q.   And while you were at the shelter did you get any

10  public assistance benefits?

11  A.   Which means?

12  Q.   Money?

13  A.   Money for personal use?

14  Q.   Yeah.

15  A.   No.

16  Q.   Did you get money for anything?

17  A.   We had money for transportation.  That was it.

18  Q.   And did you have any money for rent assistance or

19  anything?

20  A.   It was provided.

21  Q.   Okay.  And the shelter gave you -- helped you get

22  transportation to the prosecutor's office when you needed

23  to go there?

24  A.   Yes.

25  Q.   And it was after living in that shelter for several

789

Ms. Herczeg - Recross - Ms. Cesare

1  weeks that you made the April 22nd, 2009 statement in

2  your affidavit, right?

3  A.   I don't remember the date when I moved into the

4  shelter.

5  Q.   But you'd been living in that shelter several weeks

6  before you made your April 22nd, 2009 statement?

7  A.   I don't remember the date when I moved to the

8  shelter.

9  Q.   Well, how long did you stay with Csilla and Andras?

10 A.   I believe three weeks.

11 Q.   All right.  And so you probably stayed at the shelter

12 two or three weeks before you made the statement, right?

13 Before you made the April 22nd, 2009 statement.  Maybe

14 one week.

15 Q.   One week?

16 A.   One or two, I --

17 Q.   Okay.

18         MS. CESARE:  No further questions.

19         MS. STONE:  None, Your Honor.

20         (Witness excused.)

21         THE COURT:  Who's next?  Next witness.

22         MR. SCHNEIDER:  Your Honor, the next witness is

23 in the bathroom.

24         THE COURT:  I'm going to try and work a little

25 beyond what I normally do for lunch because we may be

Mr. Merritt - Direct - Mr. Stone

1  able to finish up and you could go home altogether.  So

2  if I can do that I may keep you a little longer.  If

3  you're really hungry and you want me to take a -- okay.

4          (Pause.)

5          THE COURT:  My case manager who always arguing

6  with me says that I'm wrong, we're not going to be able

7  to get them in before lunch, so we'll see.  Would you

8  raise your right hand.

9  **C O R N E L I U S   M E R R I T T ,**

10         **having been first duly sworn, was examined and**

11  **testified as follows:**

12  DIRECT EXAMINATION

13  BY MS. STONE:

14  Q.   Good afternoon.  Investigator Merritt, can you please

15  describe what your job is?

16  A.   I'm an investigator with the New York State's

17  division of State Police Bureau of Criminal

18  investigation.

19  Q.   And what is your experience, Investigator Merritt?

20  A.   I'm a 25 year member of the New York state Police, 20

21  years as a uniformed trooper, and the past 5 years or so

22  as an investigator.

23  Q.   And where are you assigned, Investigator Merritt?

24  A.   Somers, New York, Westchester county.

25  Q.   Are there other local police that work in the area of

791

Mr. Merritt - Direct - Mr. Stone

1   Somers?

2   A.   Yes.

3   Q.   And can you describe the role of the local police and

4   what departments there are?

5   A.   Okay.   The area we cover is a four town area, each

6   area -- each town is covered by both the State Police and

7   a part-time police department.   These towns are Somers,

8   North Salem, Lewisboro, and Pound Ridge.

9   Q.   And what is the role of the local police versus the

10  State Police?

11  A.   Okay.   All the local police, they are sworn police

12  officers, they are part-time though, they do not have

13  investigative personnel full-time.   So anything,

14  generally felony level would come to the State Police.

15  Q.   And in Pound Ridge do you have any idea how many

16  officers there are?

17  A.   I believe about 16 or so --

18  Q.   Are any --

19  A.   -- with a full-time chief.

20  Q.   Are the rest full-time or part-time?

21  A.   To my knowledge they are all part-time.

22  Q.   And can you describe the setting of Pound Ridge, New

23  York, please.

24  A.   Pound ridge is a -- it's a small town about 50 miles

25  north of New York City, it's rural in character, quite

Mr. Merritt - Direct - Mr. Stone

1   spread out, consisting of a lot of secondary homes,

2   people from places like New York City that have weekend

3   homes splitting between full-time residents and part-time

4   residents.

5   Q.   And is there any commerce in Pound Ridge, New York?

6   A.   Very little.  There is one business district referred

7   to as Scotts Corners, it's like a hamlet within the town

8   consisting of just small businesses.  Restaurants,

9   hardware store, antiques, galleries, and things of that

10  sort.

11  Q.   Do you know how far that is approximately from the

12  defendant's home?

13  A.   From the defendant's home it's probably four miles.

14  At least four miles.

15  Q.   And what type of transportation is there -- public

16  transportation in Pound Ridge?

17  A.   None.  None.

18  Q.   And --

19  A.   Aside from -- there are Taxi services in surrounding

20  towns that could be called, but as far as any buses or

21  trains your standard what we would refer to as public

22  transportation there is none.

23  Q.   Do you know the address of the defendant's home?

24  A.   Yes, it's 309 Salem Road, Pound Ridge, New York.

25  Q.   And would you be able to say approximately the

793

Mr. Merritt - Direct - Mr. Stone

1  closest commercial establishment would be from the

2  defendant's home?

3  A.   The closest commercial establishment to the

4  defendant's home would probably be about two and a half

5  miles north of that residence.  There's a mobile station,

6  gas station and a small liquor small or Route 35 in South

7  Salem, and about equal distance from the residence

8  there's also a small deli, the Salem Market located on

9  spring street in South Salem.

10 Q.   Any sidewalks leading to those establishments?

11 A.   No, no.  No sidewalks.

12 Q.   Now when did you become involved in the investigation

13 of the defendant, Joseph Yannai?

14 A.   March 13th, 2009.

15 Q.   And how did you become involved?

16 A.   I was advised by my supervisor, Senior Investigator

17 Patrick Bosley (ph), that the Pound Ridge police had been

18 referred a case of possible human trafficking.

19 Q.   And again, would the Pound Ridge police have

20 investigators who would normally investigator that type a

21 case?

22 A.   No, that's the kind of case that would be turned over

23 to the State Police.

24 Q.   So after it was referred to you what was your first

25 step in the investigation?

794

Mr. Merritt - Direct - Mr. Stone

1  A.   My first step, Sergeant Mark Miller of the Pound

2  Ridge Police Department arrived at my station in Somers

3  with Bernadett Herczeg.  I briefly spoke to Sergeant

4  Miller who basically gave me a timeline of how his

5  department had come across this case.

6  Q.   And did you also have a conversation with Ms.

7  Herczeg?

8  A.   I did.

9  Q.   And following your conversation with Ms. Herczeg did

10 you apply for a search warrant relating to the

11 defendant's residence?

12 A.   I did.

13 Q.   And do you recall when you executed that search

14 warrant?

15 A.   Search warrant was executed March 23rd, 2009.

16 Q.   And who was at the house when you executed the search

17 warrant?

18 A.   Residents at the house or --

19 Q.   Yes.

20 A.   -- people within the house on arrival?  A gentleman

21 subsequently identified to me as Joseph Yannai, a woman

22 from France named Isabelle Krintz, and a woman from

23 Brazil named Gisele Lunkes, L-u-n-k-e-s.

24 Q.   And do you see the defendant, Joseph Yannai, in court

25 today?

795

Mr. Merritt - Direct - Mr. Stone

1   A.   I do.

2   Q.   And could you just describe him, please.

3   A.   He's the gentleman sitting at the table to my right

4   with the beard and hand under his chin.

5        MS. STONE:   Let the record reflect that

6   Investigator Merritt identified the defendant.

7   Q.   Now while the search warrant was being executed were

8   there any interviews conducted?

9   A.   There were.

10  Q.   And who was interviewed?

11  A.   Mr. Yannai was interviewed by myself at the start of

12  the search warrant procedure.  Ms. Lunkes was interviewed

13  by Investigator Michael Davis, and Ms. Krintz was

14  interviewed by Investigator Jennifer Hahl, H-a-h-l.

15  Q.   And did the defendant interact with either of these

16  women before the interviews were conducted?

17  A.   He did.  As I was speaking to Mr. Yannai in the

18  upstairs living room area Investigator Davis was

19  attempting to have Gisele Lunkes accompany him to another

20  part of the house so that he could speak to her, at which

21  time Mr. Yannai became very agitated, ordered Ms. Lunkes

22  not to go with Investigator Davis, and she appeared very

23  conflicted as to what she could do.  Eventually going the

24  Investigator Davis.

25  Q.   Now what time of day was it when you executed the

796

Mr. Merritt - Direct - Mr. Stone

1  search warrant?

2  A.   We arrived at the residence at 3 p.m.

3  Q.   And how was the defendant dressed when you arrived at

4  3 p.m. to his residence?

5  A.   He was in a bathrobe.

6  Q.   And how were the other two women dressed?

7  A.   I would say business attire for a woman.  Blouse and

8  skirt and shoes.

9  Q.   Now before collecting evidence you mentioned that you

10  interviewed the defendant, and can you tell us where that

11  interview took place?

12  A.   The interview took place on the upper level of the

13  residence in the what I would refer to as a living room

14  area.

15  Q.   And where -- who was present for that interview?

16  A.   Well, it was myself, Mr. Yannai, I know my

17  supervisor, Senior Investigator Patrick Bosley was in the

18  area.

19  Q.   And did you explain the purpose for why you wanted to

20  speak to Mr. Yannai?

21  A.   I did.  He was advised that we were there pursuant to

22  the issuance of a search warrant by the town of Pound

23  Ridge Court.

24  Q.   And did you ask him any questions?

25  A.   I did.

797

Mr. Merritt - Direct - Mr. Stone

1  Q.   And can you tell us what the defendant told you?

2  A.   Well, I told Mr. Yannai the purpose of our visit, the

3  search warrant, and the allegations that were made that

4  led to the issuance of the search warrant.

5        I asked Mr. Yannai about his employment of

6  women in the residence.  He stated to me that they were

7  personal assistants.

8        I asked him how many girls he had had at the

9  residence and he stated there were three or four over the

10  years.

11        I asked him about any payment arrangements and

12  he mentioned that a $20,000 bonus after a years work.

13        I asked him if any of the girls had been paid,

14  he said yes.  I asked him in what manner, he said they

15  were paid by check.

16

17

18

19

20

21

22

23

24

25

798

Mr. Merritt - Direct - Mr. Stone

1  A.       I specifically asked about Ms. Lunkes, knowing

2  that she had been at the residence, information I had

3  gotten from Ms. Herczeg that she'd been at the residence

4  for about a year and a half.

5          *MR. SCHNEIDER:  Objection.  Relevance and

6  hearsay.

7          THE COURT:  I think he's explaining why he

8  asked the question, but we'll strike it.  Just say what

9  you did.

799

Mr. Merritt - Direct - Mr. Stone

1          THE WITNESS:  Okay.  I -- get my train of

2    thought here.

3    Q.   Investigator Merritt, did the defendant say anything

4    about Ms. Lunkes and who she was?

5    A.   Yes.  Yes, he did.  When I asked if Ms. Lunkes had

6    been paid he stated that she was a good friend and that

7    she had not been paid.

8    Q.   And did he say anything about what his personal

9    assistants did in terms of work in the house?

10   A.   I asked the duties of the personal assistants and he

11   stated that they were there for computer work as part of

12   his publishing business and to be neat and to be clean.

13   Q.   Did he say anything to you about how he found his

14   personal assistants?

15   A.   He stated that he had a friend, a woman that worked

16   for him at one point named Joanna, a Polish woman that

17   would find women over the internet to work for him.

18   Q.   And did he say anything about any sexual demands?

19   A.   I asked him if there were sexual demands placed on

20   any of the women in the house and he stated no.

21   Q.   So after speaking to Mr. Yannai did you continue with

22   your collection of evidence?

23   A.   I did.

24   Q.   What evidence were you permitted to seek pursuant to

25   this search warrant?

800

Mr. Merritt - Direct - Mr. Stone

1  A.    Search warrant permit the seizure of any and all

2  computers located within the residence, documentation

3  concerning the operation and ownership of computers found

4  within the residence, file, any files, income tax

5  records, financial records related to the hiring of

6  people to work in the residence.  Any other documentation

7  as to people having worked in the residence.

8  Q.    And Investigator Merritt, did you search the

9  residence for bank records concerning payment to the

10 personal assistants?

11 A.    Yes.

12 Q.    Did you find any canceled checks for payment of

13 bonuses?

14 A.    I did not.

15 Q.    Did you find any bank record at all concerning

16 payment or employment of a personal assistant?

17 A.    No.

18 Q.    Now during -- Investigator Merritt, after the search

19 warrant did you continue with your investigation?

20 A.    I did.

21

22

23

24

25

801

Mr. Merritt - Direct - Mr. Stone

1   Q.   And as a result of that investigation did you learn

2   how many women worked as personal assistants in the

3   house?

4               MR. SCHNEIDER:  Objection.

5               THE COURT:  Sustained.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

802

Mr. Merritt - Direct - Mr. Stone

1  Q.   Investigator Merritt, were there other types of files

2  that you found during the search?

3  A.   Yes.  In addition to seizure of the computers and

4  storage medium located within the residence in the

5  downstairs portion of the residence adjacent to the

6  office area there were boxes of files that were seized,

7  and also a hanging file folder labeled employees secured

8  from an area downstairs in the residence.

9  Q.   Did one of these -- excuse me -- did two of these

10  boxes involve particular au pair questionnaires?

11  A.   Yeah.  There were three large boxes of files that

12  were seized pursuant to the search warrant, two of the

13  them contained questionnaires of au pairs, very lengthy,

14  detailed questionnaires.  The third box contained

15  profiles of the au pairs with information on each.

16          MS. STONE:  Your Honor, I would just ask if we

17  could approach the witness with the evidence?

18          THE COURT:  You don't have to approach -- you

19  don't have to ask me to approach.

20          MS. STONE:  Okay.

21          THE COURT:  It wastes time.

22          MR. SCHNEIDER:  Your Honor, I have a previously

23  noted objection to this evidence.

24          THE COURT:  I understand.  My ruling is the

25  same, it's overruled.

803

Mr. Merritt - Direct - Mr. Stone

1   (    Pause.)

2   Q.    Investigator Merritt, the two boxes that were just

3   placed on the podium next to you, do you recognize those

4   boxes?

5   A.    I do.

6   Q.    And what do you recognize them to be?

7   A.    They were boxes -- or files seized from the

8   defendant's address pursuant to the search warrant.

9   Q.    Have they been changed or altered in any way?

10  A.    The only alteration was the covering.  We typically

11  seal up evidence, and the evidence tape is the State

12  Police evidence tape and the covers were placed on the

13  boxes by me.

14  Q.    And are the contents of the boxes the same as what

15  you collected during the search?

16  A.    Yes.

17  Q.    And did you ever release these boxes to anyone?

18  A.    They were released to representatives of the

19  department of Homeland Security, Immigrations and Customs

20  Enforcement for a review, and I believe photocopying in

21  connection with the prosecution of this case.

22          MS. STONE:  Your Honor, we now move what's been

23  marked as Government's Exhibit No. 1 into evidence.

24          *MR. SCHNEIDER:  Holding previous stated

25  objection.

804

Mr. Merritt - Direct - Mr. Stone

1          THE COURT:  It's admitted.

2  (Government's Exhibit No. 1 received in evidence.)

3  Q.    Now, Investigator Merritt, I would just ask that this

4  be published to the jury.  Is this an example of one of

5  the questionnaires in the box?

6  A.    Yes.

7  Q.    And could you just explain to the jury who the --

8  what the purpose of this questionnaire was according to

9  the survey, if you know what it's for?

10 A.    Well, it's -- like I said, it's a very lengthy

11 questionnaire, probably over 100 questions on the

12 questionnaire.

13 Q.    Who was the publisher of the questionnaire?

14 A.    Publisher was Y2 or Y Square Communications Corp.

15 Q.    And what was this for?  It was publisher for what

16 type of a transcript or book?

17 A.    It says publisher of the au pair world and the

18 address listed is the same address as that of the

19 defendant.

20 Q.    And when you conducted your search of the defendant's

21 residence did you ever see a manuscript or book entitled

22 the au pair world?

23 A.    I did not.

24 Q.    Now going through these questions, I'm just going to

25 show you the various different pages, what types of

Mr. Merritt - Direct - Mr. Stone

1  questions are asked on this questionnaire?

2  A.   The question are very far ranging from pedigree

3  information to family life to require au pair experiences

4  to expectations of, you know, their work in the au pair

5  field.  Relationships with the host families.  Different

6  -- you know, what they would do with the host families,

7  who was allowed with the host families, not allowed.  As

8  far as outside of the employment what they would be

9  doing.  Socializing, et cetera.

10 Q.   Were there particular questions about whether or not

11 the au pair felt comfortable about leaving a financé or a

12 boyfriend for a period of time?

13 A.   There were, yes.

14 Q.   I would just direct you to question number 50, if you

15 could just read that.

16 A.   "If you had a financé/boyfriend what was his reaction

17 to your going away to be an au pair."

18 Q.   And question 51 as well.

19 A.   "How did you feel about leaving your fiance/boyfriend

20 for a substantial period of time?"

21 Q.   I'm also going to direct you to -- I'm sorry --

22 question 64, and if you could just read that question.

23 A.   "Did you consult with family members/friends as to

24 which of the families who approached you you should

25 choose?  If yes, with whom?"

806

                Mr. Merritt - Direct - Mr. Stone

1    Q.   And do you have any idea approximately in those boxes
2    how many answers to these au pair questionnaires there
3    were?
4    A.   How many responses?
5    Q.   Yes, to those boxes?
6    A.   Hundreds.  I did not count them individually, but
7    they're a significant number.
8    Q.   Now did you also collect another box of evidence?
9    A.   Well, the third box of three contained profiles of au
10   pairs.  Not the questionnaires -- separate from the
11   questionnaires are profiles.
12   Q.   Investigator Merritt, I'd ask you to just take a look
13   at what's been previously marked as Government Exhibit
14   No. 2.
15   A.   Inside the box?
16   Q.   Do you recognize that?
17   A.   I do.
18   Q.   What is that, Investigator Merritt?
19   A.   This is a box of au pair profiles.  Hundreds and
20   hundreds of au pair profiles.
21   Q.   And besides for the tape that is -- that's been
22   removed --
23   A.   Uh-huh.
24   Q.   -- is this box in every other respect the same as
25   when you collected it at the defendant's residence?

807

Mr. Merritt - Direct - Mr. Stone

1   A.   Well, it is.  One addition to the box itself, this
2   was one -- listed as one evidence item for State Police
3   purposes, and I labeled the box -- I'm sorry -- I labeled
4   the boxes, boxes -- box one of three, two of three, and
5   three of three.  So that is State Police marking on the
6   box.  Other than that it is the box.
7              MS. STONE:  We would now move what's been
8   previously marked as Government's Exhibit No. 2 into
9   evidence.
10             MR. SCHNEIDER:  Holding my previous objection.
11             THE COURT:  It's admitted.
12  (Government's Exhibit No. 2 received in evidence.)
13  Q.   Now as to that box, Investigator Merritt, could you
14  just take a look at the au pair profiles.
15  A.   Any of them?
16  Q.   Are they organized in any particular way?
17  A.   There are stickers alphabetically, it appears to be
18  alphabetically, the white -- it looks like a
19  pharmaceutical company's note pad, sticky pad, then some
20  individual -- many actually individual profiles have
21  yellow stickies on them with no designation as to why
22  they're marked.
23  Q.   And can you tell us what au pair websites those
24  profiles have been selected from?
25  A.   Okay.  May I look at a sample profile?

808

Mr. Merritt - Direct - Mr. Stone

1  Q.   Yes.

2  A.   Going off memory the Aupairconnect.com, Au Pair

3  Profile, au Pair connect-worldwide Au Pair.  Well, that's

4  a description actually.  AupairConnect.com.

5  Q.   Can you take a look to see if there's any other au

6  pair websites?

7  A.   On any of these?

8  Q.   Yeah, just take a look at the profiles for a moment.

9  A.   Okay, I believe there -- maybe with a few exceptions,

10 most of them are this Au Pair Connect.  GreatAupair.com

11 is another one.  I'm sorry.

12 Q.   Thank you, you can put that back, Investigator

13 Merritt?

14 A.   GreatAupair.com.  They're all apparently au pair

15 websites.

16 Q.   And Investigator Merritt, did you also as part of

17 your search seize a file that was labeled an employee

18 file?

19 A.   I did.

20      (Pause.)

21 Q.   Investigator Merritt, I would just ask you could open

22 up that envelope that's be handed to you?

23 A.   Done.

24 Q.   Yes.  Can you remove what's inside?  Oh, there you

25 have it.

809

Mr. Merritt - Direct - Mr. Stone

1   A.   I have it.

2   Q.   What is that?

3   A.   This is a green Pendaflex hanging file, letter size,

4   and on the tab states employees.

5   Q.   And has that file been changed in any way since the

6   time that you collected it?

7   A.   No.

8        MS. STONE:  Your Honor, we would now move

9   what's been marked as Government's Exhibit No. 3 into

10  evidence.

11       MR. SCHNEIDER:  We need to review it.

12       (Pause.)

13       MR. SCHNEIDER:  I have an objection.  Its

14  relevance.

15       MS. STONE:  Your, the defendant has been

16  charged with --

17       THE COURT:  Please, I don't want to hear

18  argument in front of the jury.

19       MS. STONE:  Okay.

20       THE COURT:  How much longer do you have with

21  this witness?

22       MS. STONE:  This is really the last -- the last

23  area of questioning is about this file.

24       THE COURT:  All right, come up.

25

810

Mr. Merritt - Direct - Mr. Stone

1          (Conference held at sidebar.)

2          THE COURT:  All right, there are a lot of

3   papers in here.  Is there a general objection?

4          MR. SCHNEIDER:  I understood they were going to

5   put this in, which is one of the witness's passport

6   photos.  I don't object to that, but these other people

7   aren't witnesses in the case.  I don't see why it's

8   relevant.

9          THE COURT:  Her name has come up in the case.

10         MR. SCHNEIDER:  Her name has come up, they can

11  put that one in, but I don't understand why they want to

12  prove women who aren't -- this is already in evidence.

13         THE COURT:  I can't deal with this.  What do

14  you want to put in?

15         MS. STONE:  Well, we were --

16         THE COURT:  That's not already in evidence?  I

17  mean I don't --

18         MS. STONE:  Well, there were several specific

19  things from here that we were going to elicit, and if

20  you'd like to reserve it to those, certainly.

21         MR. SCHNEIDER:  We don't object to that.

22         THE COURT:  Call it by a number.

23         MS. STONE:  3A, 3B.

24         MR. SCHNEIDER:  3B we don't -- 3D we don't

25  object to.

811

Mr. Merritt - Direct - Mr. Stone

1          MS. STONE:  I'm sorry, this is already in

2   evidence, Your Honor.  This is regarding Anna Simonsen.

3          UNIDENTIFIED SPEAKER:  It's already in.

4          MS. STONE: I believe that's all, Your Honor.

5          MR. SCHNEIDER:  Well, just put both in, that's

6   fine.

7          THE COURT:  Then we're not arguing about

8   anything here.

9          (Conference concludes at sidebar.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

812

Mr. Merritt - Direct - Mr. Stone

1  Q.   Investigator Merritt, could you just describe in

2  general what the employee file was?

3  A.   The complete file contained numerous records

4  containing the names of numerous different women.  There

5  were travel itineraries within that file primarily

6  showing entry into the country into JFK airport from

7  different countries throughout the world.

8  Q.   Okay.  I'm now going to show you what's been

9  previously marked as Government's Exhibit 3A.  Do you

10 recognize that from the employee file?

11 A.   I do.

12 Q.   Can we publish --

13          MS. STONE:  Is there any objection to the

14 exhibits we discussed?

15          MR. SCHNEIDER:  No.

16          MS. STONE:  Admitted into evidence.

17          MR. SCHNEIDER:  No objection.

18          MS. STONE:  I would ask that 3-A be entered

19 into evidence and it be published to the jury.

20 Q.   What is this --

21          THE COURT:  It's admitted.

22 (Government's Exhibit No. 3-A, 3-B, 3-C, 3-D, 3-E, 3-F,

23 3-G, 3-H, 3-I and 3-J received in evidence.)

24 Q.   -- Investigator Merritt?

25 A.   This appears to be a photocopy of a passport of a

813

Mr. Merritt - Direct - Mr. Stone

1  Vanessa Jasmine Stenzel, a German passport.

2  Q.   And now I'm going to show you what's been attached to

3  that.   I don't know if you can read that.   Can you see

4  what that is, Investigator Merritt?

5  A.   I don't speak the language that's portrait, it

6  appears to be German, but it also appears from what I can

7  make out, you know, it references JFK and times and

8  dates.   It appears to be a travel itinerary.

9  Q.   And finally what's been marked Government's Exhibit

10  3B that has been admitted into evidence.

11  A.   That is a DHS customs and border protection visa

12  waiver in the name of Vanessa Stenzel.

13  Q.   I'm now also going to show you what's been marked as

14  3C, this to be published to the jury, and do you know who

15  that relates to?

16  A.   Well, the name once again is Vanessa Stenzel, and it

17  appears to be flight itinerary to JFK.

18  Q.   Is there also some other information on this?

19  A.   Well, there's a sticky note from that pharmaceutical

20  company apparently, it says social security, Vanessa, and

21  then has a number on it.

22  Q.   And now I would just show you -- are these other

23  pages that were attached to that?

24  A.   Yes.

25  Q.   Now I'm going to show you what's already been

814

Mr. Merritt - Direct - Mr. Stone

1  admitted into evidence and ask that it be published to

2  the jury.  Do you recognize this from the employee file?

3  A.   I do.

4  Q.   And I'm going to just turn it over, this is

5  Government's Exhibit 3H.  Who is this from?

6  A.   It's from Anne Rosa Simonsen of Denmark.

7  Q.   And in the employee file did you also see this,

8  what's been previously admitted into evidence as

9  Government's Exhibit 3I?

10 A.   I did.  That's a profile very similar to the ones

11 contained in one of the large file boxes that was seized,

12 profile of Anne Rosa Simonsen.

13 Q.   And where is that profile from?

14 A.   It's from the --

15      MS. STONE:  Oh, I'm sorry, can we publish this?

16 I thought it -- thank you.

17      THE WITNESS:  It appears to be the Au Pair

18 Connection website.

19 Q.   And I'm sorry, Investigator Merritt, attached to that

20 au pair profile is there also what's been marked as

21 Government's Exhibit 3J?

22 A.   Yes.

23 Q.   And it's also been previously entered into evidence.

24 And who is that addressed to, Government's Exhibit 3J?

25 A.   Anne -- I'm sorry -- Anne Rosa.

815

Mr. Merritt - Direct - Mr. Stone

1  Q.   Anna Rosa.  And who is it from?

2  A.   Sylvia is the name.

3  Q.   And finally, I must, I'm going to show you what's

4  been previously marked as Government's Exhibit 3D, I'd

5  ask that this be published to the jury, and that has been

6  agreeable be admitted into evidence.  What is this,

7  Investigator Merritt?

8  A.   That is a passport -- it appears to be a -- well,

9  visa with a photograph of Gisele Lunkes, also showing a

10  visa stamp of July 21st, 2007 entering the country, New

11  York City.

12  Q.   And I'm going to show you what's been marked as

13  Government's 3E.  And can you explain what that

14  particular document is?

15  A.   It appeared to me to be pedigree information on

16  Gisele Lunkes and her family.  Address, phone number,

17  parent's names, notation that the father is deceased.  I

18  assume it's father, Hugo Lunkes.

19  Q.   And finally 3G.  I'm, I shouldn't have said finally

20  there's one more.  Can you read that, Investigator

21  Merritt?

22  A.   Okay.  Once again it appears to be another document

23  generated upon Ms. Lunkes entry into the United States on

24  July 21st, 2007.  Departure from Brazil I believe.  I

25  don't know if the original is any clearer, and it does

816

Mr. Merritt - Cross - Mr. Schneider

1  have her information on it though, her name.

2  Q.   And finally, Investigator Merritt, if you could just

3  take a look at what's been previously marked as

4  Government's Exhibit 3F.

5  A.   Uh-huh.

6  Q.   And if you're able to tell us what you believe this

7  to be.

8  A.   Okay.  This appears to be another travel itinerary.

9  I don't speak the language, but I can make out enough,

10  the passenger would be Gisele Lunkes.

11  Q.   Investigator Merritt, these exhibits, 3F, 3G, 3E, 3D,

12  that all involve Gisele Lunkes, what file was that found

13  in?

14  A.   The employee file.

15       MS. STONE:  Thank you.  I have no further

16  questions, Your Honor.

17  CROSS-EXAMINATION.

18  BY MR. SCHNEIDER:

19  Q.   Now investigator you're -- I'm sorry -- you're

20  familiar with Pound Ridge, New York?

21  A.   I am, sir.

22  Q.   And you are familiar with 309 Salem Road?

23  A.   I am.

24  Q.   You conducted the search there, correct?

25  A.   I did.

817

Mr. Merritt - Cross - Mr. Schneider

1  Q.   And there's -- you described it as a rural area I

2  believe, correct?

3  A.   Yes, sir.

4  Q.   But there's a house right across the street from 309

5  Salem Road; is that correct?

6  A.   There is.  There are other houses in the area.  Lot

7  sizes are probably between two and four acres, standard.

8  Some bigger.

9  Q.   I'm going to --

10  A.   -- very few smaller.

11  Q.   I'm going to show you what's been admitted into

12  evidence as Defendant's Exhibit P-9.  It can be shown to

13  the jury, it's in evidence.  How many times have you been

14  to 309 Salem Road?

15  A.   I'm sorry, sir.

16  Q.   How many have you been to 309 Salem Road?

17  A.   Actually been to the residence?

18  Q.   Yes.

19  A.   To the door of the residence twice.  Once for the

20  search and once to return some property.

21  Q.   Can you recognize what's depicted in this photo?

22  A.   It appears to be a house.

23  Q.   Do you recognize that as being taken from the front

24  of the house at 309 Salem Road?

25  A.   It very well could be.  Without the sign that's

818

Mr. Merritt - Cross - Mr. Schneider

1  outside the residence or visibility of a car in the

2  driveway or the mailbox I couldn't say for certainty that

3  this was taken from 309.

4  Q.   I understand.  But where that house is situated --

5  A.   Uh-huh.

6  Q.   -- assuming this picture was taken from the front of

7  another house, is that about how far away houses are in

8  that part of Pound Ridge?

9  A.   In that part of Pound Ridge there could be houses

10 right across from each other.  Other situations there

11 might not be.  Once again it's a big assumption for me to

12 make that this was taken from 309.

13 Q.   I'm not asking you to assume that, I'm asking you

14 about your memory.  Do you recall there was a house right

15 across the street from 309 Salem Road?

16 A.   I don't recall offhand if the house directly --

17 direct across the street, there are other houses on that

18 road.

19 Q.   And it would take a matter of a few minutes at most

20 to reach those other houses if you were walking from 309

21 Salem Road; is that correct?

22 A.   Absolutely.  Yes, sir.

23 Q.   Now you first heard about this case on March 13th; is

24 that correct?

25 A.   That is correct.

Transcription Plus II, Inc.

819

Mr. Merritt - Cross - Mr. Schneider

1   Q.   And you spoke to officers from the Pound Ridge Police

2   Department about what they had learned from Bernadett

3   Herczeg?

4   A.   I did.

5   Q.   And you next went to the house about ten days later

6   on March 23rd; is that right?

7   A.   I did.

8   Q.   Do you know in any police officer had contact with

9   Mr. Yannai between March 13th and March 23rd?

10  A.   Not to my knowledge.  I can't attest to what the

11  Pound Ridge police may have -- if there was contact

12  between the Pound Ridge police.  I had no contact.

13  Q.   That's all I'm asking.

14  A.   Okay.

15  Q.   What you know.

16  A.   I'm telling you what I know.

17  Q.   I'm going to show you, I believe it's part of what's

18  in evidence as Government's Exhibit 1, which is the au

19  pair questionnaire, okay?

20  A.   Okay, sir.

21  Q.   And since it's in evidence I can put it on the

22  screen.  Let me ask you about some of the other questions

23  that are on that questionnaire.  Do you see question 68?

24  A.   I do.

25  Q.   What does that say?

820

Mr. Merritt - Cross - Mr. Schneider

1    A.    It says, "Were you satisfied with the way the agency

2    prepared you for your new job?"

3    Q.    And what about agency 72 -- I'm sorry -- question 72.

4    Do you see that one?

5    A.    Yes.

6    Q.    And what does that say?

7    A.    "How would you rate the agency as a whole?  From one

8    to ten, ten is the highest rating."

9    Q.    I'm going to show you the next page of that document.

10   Actually real question 104.

11   A.    "Was the family sensitive to your comfortable with

12   regard to the temperature in the house?  For example, if

13   you were too cold in the winter was the problem solved."

14   Q.    And how about question 109?

15   A.    "If you had disagreements or even fights with the

16   children did the parents back you or take the side of the

17   children?  Please give examples."

18   Q.    Now on March 23rd you interviewed Mr. Yannai in his

19   living room I think you said?

20   A.    It was -- it appeared to be a living room.

21   Q.    A large --

22   A.    A setting -- a large -- with couches, yes.  I would

23   refer to it as a living room if it was my house.

24   Q.    A large open area on the main floor of that house?

25   A.    The upper level.  It's a split level house.

821

Mr. Merritt - Cross - Mr. Schneider

1  Q.   The house where if you're coming from the street
2  that's the level you enter?
3  A.   It's up a few -- it's slightly -- the living room is
4  slightly raised.
5  Q.   It's the top floor of the house?
6  A.   Top floor of the house, yes, sir.
7  Q.   And you asked him about the young women who were in
8  the house, right?
9  A.   I did.
10  Q.   And he told you they were personal assistants,
11  correct?
12  A.   That's what he referred to them as, yes, sir.
13  Q.   And he told you they did computer work for his
14  publishing business?
15  A.   Yes.
16  Q.   And that they also had to clean up?
17  A.   Yes.
18  Q.   You asked him how he paid them and he said that if
19  they're there for a year they got a $20,000 bonus?
20  A.   Yes.
21  Q.   And you asked him if he demanded sexual favors from
22  them?
23  A.   Yes.
24  Q.   And he said no?
25  A.   Yes, he did.

822

Mr. Fearon - Direct - Mr. Spector

1        MR. SCHNEIDER:  Just one second, your Honor.

2        (Pause.)

3        MR. SCHNEIDER:  No further questions.

4        MS. STONE:  None, Your Honor.

5        THE COURT:  You can step down.

6        (Witness Excused.)

7        THE COURT:  How long is your next witness going

8   to be?

9        MR. SPECTOR:  The next witness will be somewhat

10   longer, probably half an hour.

11        THE COURT:  What do you want to do, ladies and

12   gentlemen?  Do you want to stay?  Okay, call the next

13   witness.

14        MR. SPECTOR:  Government calls Denzil Fearon.

15   **D E N Z I L   F E A R O N**

16        **having been first duly sworn, was examined and**

17   **testified as follows:**

18        THE COURT:  Please be seated.

19   DIRECT EXAMINATION

20   BY MR. SPECTOR:

21   Q.   Good afternoon, Inspector Fearon.

22   A.   Good afternoon.

23   Q.   What do you do for a living?

24   A.   I'm the supervisory investigator for the Southern

25   District office of the New York State Police Computer

823

Mr. Fearon - Direct - Mr. Spector

1    Crimes Unit.

2    Q.   And what geographic area does that office cover?

3    A.   It covers -- it covers the area south of Albany for

4    the troops.  Troops K, Troop F, and Troop L.

5    Q.   Explain what your job duties are, please.

6    A.   As the supervisory investigator for the southern

7    office I supervise investigators who deal with technology

8    and computer- related crimes.  We offer services to

9    state, local, and federal agencies in terms of securing

10   digital evidence and gathering evidence from digital

11   evidence.

12   Q.   And what is digital evidence?

13   A.   Digital evidence is evidence that has a digital

14   nature.  Things such as a computer, a digital camera, a

15   digital video recorder.  Any piece of equipment that has

16   the ability to store information digitally.

17   Q.   How long have you worked in the State Police Computer

18   Crimes Unit?

19   A.   I've work in the State Police Computer Crimes Unit

20   since 2002.

21   Q.   Who you think have you been a supervisor there?

22   A.   I've been a supervisor since 2006.

23   Q.   What did you do before you worked in the Computer

24   Crimes unit?

25   A.   Before I was a member of the Computer Crimes unit I

824

Mr. Fearon - Direct - Mr. Spector

1  worked for one year as an investigator doing general

2  investigations, and prior to that I was a patrol trooper,

3  a New York State trooper.

4  Q.   Can you tell us about just some of the computer

5  training you've received?

6  A.   Uh-huh.  I received training from the National White

7  Collar Crime Center.  I've received training in basic

8  data recovery and acquisition.  Received training in

9  advanced data recovery and acquisition.  I've received

10  training from SEARCH, which is the national consortium on

11  justice information statistics.  I've also received

12  training from the FBI academy in Quantico.

13  Q.   And just generally speaking what types of cases do

14  you work on?

15  A.   I deal with and I supervise primarily computer-based

16  and technology-based cases.  Essentially any type of case

17  that might have a technology component, but in today's

18  world that could be just about any type of case.  We're

19  -- or investigators are requested when any sort of

20  digital evidence is available in a case.

21  Q.   I want to turn your attention to 2009.  Did there

22  come time you were assigned to work on a case involving

23  the defendant, Joseph Yannai?

24  A.   Yes.

25  Q.   And how did that come about?

825

Mr. Fearon - Direct - Mr. Spector

1  A.   I was requested by the State police in Somers to

2  assist with the execution of a search warrant at a

3  location in Pound Ridge.

4  Q.   And generally speaking what did the search warrant

5  authorize you to do?

6  A.   The search warrant authorized us to secure any

7  digital evidence, any computers, any imagines of

8  individuals engaged in sexual activity, any paperwork

9  regarding the digital evidence or computers.

10  Q.   Did you participate in executing the search warrant?

11  A.   Yes, I did.

12  Q.   Do you remember what date that took place?  Remember

13  approximately what date that took place?

14  A.   It was approximately in March.

15  Q.   Of what year?

16  A.   March of 2009.

17  Q.   And do you remember the address you remember

18  searching?

19  A.   The address was 309 Salem Road.

20  Q.   What home did you understand that to be?

21  A.   The home of Joseph Yannai.

22  Q.   Had you ever had any contact with Mr. Yannai before

23  coming to his home for that search?

24  A.   No.

25  Q.   What town was that in?

826

Mr. Fearon - Direct - Mr. Spector

1   A.   In the town of Pound Ridge.

2   Q.   Are you familiar with Pound Ridge?

3   A.   Yes.

4   Q.   How are you familiar with it?

5   A.   For the year that I was doing general investigations

6   I worked out of the State Police in Somers and the State

7   Police in Somers has investigative jurisdiction over that

8   town.

9   Q.   Now when you conducted the search were there other

10  law enforcement -- other members of law enforcement there

11  as well?

12  A.   Yes.

13  Q.   What organization were they from?

14  A.   From the town of Pound Ridge Police Department and

15  the State Police as well.

16  Q.   And did different officers have different

17  responsibilities during the search?

18  A.   Yes, they did.

19  Q.   Did you have a particular focus with respect to the

20  search?

21  A.   Yes.

22  Q.   What was your focus?

23  A.   My focus was the identifying and securing the digital

24  evidence at the residence.

25  Q.   And was there anyone else at the search working with

827

Mr. Fearon - Direct - Mr. Spector

1  you for that?

2  A.   Yes, there was.

3  Q.   Who was that?

4  A.   One of this investigators assigned to my unit,

5  Investigator Michael Prunty.

6  Q.   Can you describe what happened when you first arrived

7  at the defendant's home for the search?

8  A.   Once the -- once we went to the house someone knocked

9  on the door and there was an initial time where the house

10  had to be secured where it had to -- where there was an

11  initial sweep done on the house.  That's essentially just

12  to make sure that the house is safely secure, that there

13  isn't anyone hiding in a closet some place or hiding

14  under a bed.

15        THE COURT:  Is there any reason why we can't

16  get to what he found?

17        MR. SPECTOR:  I'll get to it as quickly as

18  possible, Judge.  I'll move along.

19  Q.   Other than law enforcement authorities was there

20  anyone else present during the search?

21  A.   A person that we were able to find out was Mr.

22  Yannai, and there were also to other women at the house.

23  Q.   Was the defendant's wife present?

24  A.   No.

25  Q.   So after the house was secured what did you do?

828

Mr. Fearon - Direct - Mr. Spector

1  A.   After the house was secured myself and Investigator
2  Prunty went through the process of identifying digital
3  evidence that was located in the house, and once those
4  items were identified we had to catalog them, take
5  pictures of them, and to secure them as evidence.
6      We would -- we had to take photos of the general area
7  in the house, and if there was a computer or some sort of
8  digital evidence located we would -- we would photograph
9  where it was, photograph the general area around the
10 computer, and note any connections of that computer to
11 things such as a router or a cable modem.  We would take
12 pictures of those and note those.  And once we've noted
13 the computers that were there we would actually -- we
14 would disconnect them, secure them, and prepare them for
15 transport.
16 Q.   And can you describe what you found in the house?
17 A.   In the house we found there were eight computers and
18 one laptop computer.
19 Q.   And where were the computers located?
20 A.   There were four computers that were up and running.
21 In the basement of the house there is -- there was an
22 office area, and just to the right of the office area
23 outside the office area there were some computers that
24 were located there.  There were four computers that were
25 basically in a line.  Two computers that were inside the

829

                    Mr. Fearon - Direct - Mr. Spector

1    office area and two computers outside.  Those computers

2    were running.  In a closet area nearby the boiler area

3    there were four other computers that weren't connected or

4    up and running.

5              MR. SPECTOR:  If I can just show the witness

6    what's been marked as 6C.

7    Q.   Do you recognize that photo?

8    A.   Yes, I do.

9    Q.   What is it?

10   A.   This is a picture of the office area looking into the

11   office area.  There's a glass door that separates the

12   office from the basement.  As you can see there are two

13   stations where computers were located inside the office

14   area, and coming outside of the office there are two more

15   stations located there.

16   Q.   And showing 6D.  What is that?

17   A.   Okay.  This is another picture of the office looking

18   out towards the sliding glass doors.  If you looked out

19   those sliding glass doors --

20             MR. SPECTOR:  I'm sorry, Judge, can I just

21   offer 6C and 6D into evidence.

22             THE COURT:  Absolutely.

23             MR. SCHNEIDER:  No objection.

24   (Government's Exhibit No. 6-C and 6-D received in

25   evidence.)

830

Mr. Fearon - Direct - Mr. Spector

1          MR. SPECTOR:  Publish, please.

2          THE COURT:  I don't think so.  Let's go.  Next

3    question.  If you're interested ladies and gentlemen when

4    you're deliberating you can see whatever has been offered

5    into evidence, but I think we've seen enough pictures of

6    the house.

7    Q.   After you located and secured the computers what Did

8    you do with them?

9    A.   Once they were identified they were prepared to

10   transport to the State Police in Somers.

11   Q.   Now you said you found nine computers; is that right?

12   A.   Yes.

13   Q.   And they were eight hard drives and a laptop?

14   A.   Eight desk top computers and one laptop computer.

15   Q.   Did your team conduct an analyze of the laptop?

16   A.   No, we did not.

17   Q.   Why was that?

18   A.   During the investigation we found out that the eight

19   computers -- the eight desk top computers were the

20   computers that belonged to Mr. Yannai, the laptop did not

21   belong to him so we didn't review that computer.

22   Q.   Who did the laptop belong to?

23   A.   It belonged to one of the women that were in the

24   house at the time.

25   Q.   Now the eight computers you did review -- excuse me -

831

Mr. Fearon - Direct - Mr. Spector

1  - were copies of those eight hard drives provided to

2  defense counsel in this case?

3  A.   Yes, they were.

4  Q.   Can you just briefly describe the analysis that you

5  conducted on the eight computers?  That was conducted on

6  the eight computers.

7  A.   Uh-huh.  Basically the -- when the computers are --

8           THE COURT:  What did you find?  You're going to

9  have to go --

10          MR. SPECTOR:  All right, Judge, I'll move

11  ahead.  I'm sorry, I'll skip ahead.

12  Q.   Which computer did you analyze?

13  A.   I analyzed item number one.

14  Q.   What types of documents and information did you find

15  on the computer?

16  A.   On the computer there were documents --

17          THE COURT:  Ask him about specific documents

18  that he found.

19          MR. SPECTOR:  Okay.

20  Q.   Did you find one e-mail account or more than one

21  e-mail account on the computer?

22  A.   Found more than one e-mail account on the computer.

23  Q.   And what type of e-mail service did the computer use?

24  A.   There was -- it was AOL, America Online.

25  Q.   And how many active e-mail accounts did you find on

832

Mr. Fearon - Direct - Mr. Spector

1   the computer?

2   A.   Six.

3   Q.   What were the names of those six accounts?

4   A.   There was jyasstrjoannak, danielben222,

5   publishersplus, Elena Fusillo, and Joseph Yannai.

6   Q.   Now in addition to active accounts did you find any

7   inactivity accounts -- e-mail accounts on the computer?

8   A.   Yes, there were inactive accounts.

9   Q.   Do you remember the names of any of those?

10  A.   The other inactive accounts I located there was a

11  danielben101 and instylecompanies.

12        MR. SPECTOR:   I'm going show the witness what's

13  been marked as Government's Exhibit 15.

14  Q.   The first page of that exhibit, what is that

15  document?

16  A.   This is a printout of a file that was located in the

17  my documents location under Joseph Yannai's account.

18  Q.   And showing the second page of Government's Exhibit

19  15, what is that document?

20  A.   That's the document that was also in the my documents

21  location of Joseph Yannai's account for a questionnaire.

22        MR. SPECTOR:   Government offers 15.

23        MR. SCHNEIDER:   No objection.

24        THE COURT:   It's admitted.

25  (Government's Exhibit No. 15 received in evidence.)

833

Mr. Fearon - Direct - Mr. Spector

1          MR. SPECTOR:  May I publish?

2    Q.   If you can just read aloud the dear in the first

3    paragraph, please.

4    A.   Okay.  "Dear XXX."  Should I continue?

5    Q.   Please, just the first paragraph.

6    A.   First paragraph.  "We are in the process of writing a

7    book about au pair world.  The book will provide young

8    ladies who wish to become an au pair and those families

9    who are considering an au pair for their homes an

10   introduction to each other thereby helping each to better

11   relate and make the experience more enjoyable and

12   constructive."

13   Q.   And focusing on the bottom, what's the signature line

14   there?

15   A.   It says, "Warmest regards, Daniel Ben, Associated

16   Editor."

17   Q.   If I can show you the second page of Government's

18   Exhibit 15.  What is that document?

19   A.   This is the -- this is the au pair questionnaire.

20   Q.   And how many -- there are a number of questions

21   listed here.  Do you remember approximately how many

22   questions there are?

23   A.   There were approximately 140 questions.  I think

24   altogether I think it was 144.

25          MR. SPECTOR:  May I approach, your Honor?

834

Mr. Fearon - Direct - Mr. Spector

1          THE COURT:  Uh-huh.

2          MR. SPECTOR:  I'm showing the witness what's

3   been marked as Government's Exhibit 4.

4   Q.   What is that document?

5   A.   This is a spreadsheet that was located in the my

6   documents located under the Joseph Yannai account.

7          MR. SPECTOR:  Government offers Exhibit 4.

8          MR. SCHNEIDER:  We have a previous objection.

9          THE COURT:  Overruled.  It's admitted.

10  (Government's Exhibit No. 4 received in evidence.)

11  Q.   If you could just lift that up to show to the jury,

12  please.  You can turn it sideways.  Thanks.  Publish a

13  copy of it for the jury, first page.

14         THE CLERK:  Repeat that counsel.

15         MR. SPECTOR:  If I could just publish a copy of

16  Exhibit 4 to the jury, the first page of Exhibit 4.

17  Q.   Investigator Fearon, how many categories are there on

18  this spreadsheet?

19  A.   On the spread Sheet itself it actually extends out

20  for quite a while.  There are approximately 100 -- at

21  least 140 separate categories.

22  Q.   And does each category on the spreadsheet correspond

23  with a specific question from Government Exhibit 15?

24  A.   Yes.

25  Q.   If we can just quickly go through a couple examples.

835

Mr. Fearon - Direct - Mr. Spector

1   Question -- can you just read aloud questions 14, please.

2   A.   Uh-huh.

3   Q.   On the scream.

4   A.   Uh-huh.  "Are your parents alive?  Mother, yes, no.

5   Father, yes, no."

6   Q.   And then showing the spreadsheet.  The highlighted

7   column there, what does that say?

8   A.   It says, "Parents," and the number 014, and the

9   entries are either B, M.

10  Q.   And if I can show you question 64.  If you can read

11  that aloud, please.

12  A.   "Did you consult with family members/friends, as to

13  which of the families who approached you you should

14  choose?  If yes, with whom?"

15  Q.   And showing you another page of the spreadsheet.

16  Just read aloud the highlighted portion and describe that

17  area.

18  A.   It says, "Consult," and the number 64, and then the

19  entries, they are -- there are various other -- various

20  entries based on responses.

21  Q.   And just showing you the last group here.  If you can

22  read the three highlighted questions there, please.

23  A.   Uh-huh.  There's number 114, "Were you able to

24  contact your friends in the country you came from?"  115

25  is, "Did you have access to the internet?  If yes, how

836

Mr. Fearon - Direct - Mr. Spector

1   often and under what circumstances?"  116 is, "Did you

2   make friends among the other au pairs in your area?"

3   Q.   And if I can just show you another page of the

4   spreadsheet.  Just read those highlighted portions and

5   describe the columns.

6   A.   Uh-huh.  The first one is, friends contact, and it

7   says, "114," and there's a yes or no.  Internet is 115

8   and an A, it says -- there are answers for yes or no.

9   And internet circumstances is 115B, and there are entries

10  underneath.

11  Q.   And then just one final question on the

12  questionnaires.  119, can you read that aloud, please.

13  A.   Uh-huh.  "Did you have a local boyfriend?  If yes,

14  how did the host family react to him?"

15  Q.   Showing you again the spreadsheet.

16  A.   Uh-huh.  And the heading it says, "boyfriend, 119,"

17  and there are yes or no answers.

18  Q.   Now when you reviewed the defendant's computer did

19  you find a number of e-mails on the hard drive?

20  A.   Yes.

21          MR. SPECTOR:  If I can show the witness what's

22  been marked as 12B.

23  Q.   Was that one of the e-mails you found on the

24  defendant's computer?

25  A.   Yes.

837

Mr. Fearon - Direct - Mr. Spector

1          MR. SPECTOR:  Offer 12B.

2          MR. SCHNEIDER:  No objection.

3          THE COURT:  It's admitted.

4  (Government's Exhibit No. 12-B received in evidence.)

5          MR. SPECTOR:  Publish, please.

6  Q.   If you can just read aloud just this portion, please.

7  A.   "Dear Detty, while it was good news from Joseph I did

8  not understand and he did not explain to me what was the

9  permit that you got, so I will ignore it and try to help

10  you as if there is no permit, whatever it is.

11      You have to go to the internet to the America embassy

12  website and fill up a form.  Do it from a computer that

13  is attached to a printer because you would have to print

14  their approval.  They will ask you different questions.

15      The answers that I can help you with is Joseph's

16  address which is 309 Salem Road, Pound Ridge, NY 10576.

17  That where you are were going to stay.  If they ask in

18  the form or when you come to JFK what you are coming for

19  is that you come as a tourist to visit the country.

20  Joseph and Elena are friends of the family.  It is better

21  that they will be friends for your parents because of the

22  age and they invited their friend's daughter, you, to

23  come and visit the U.S.  They will take you touring

24  around and you will stay with them and all your expenses

25  will be on them."

838

Mr. Fearon - Direct - Mr. Spector

1   Q.   Just focusing on the bottom there.  Who signed that?

2   A.   Joanna.

3           MR. SPECTOR:  I'm showing the witness what's

4   been marked as Government Exhibit 8, a two-page document.

5   Q.   Do you recognize both pages of that document?

6   A.   Yes.

7   Q.   Where did you find that document?

8   A.   Those documents were located in the "my documents"

9   folder of the Joseph Yannai account.

10          MR. SPECTOR:  Government offers Exhibit 8.

11          MR. SCHNEIDER:  No objection.

12          THE COURT:  Admitted.

13  (Government's Exhibit No. 8 received in evidence.)

14          MR. SPECTOR:  If I can publish starting with

15  the first page.  Can you just read aloud the first couple

16  lines, please.

17          THE WITNESS:  Uh-huh.  "Dear XXX, thank you for

18  your letter.  Maybe I should describe to you a little of

19  my experience with Joseph, the boss, the work and the

20  terms and you will be able to deduct from it.  The secret

21  of" --

22  Q.   That's fine.

23  A.   Okay.

24  Q.   That's fine.  If you can just read just the first

25  couple lines starting there.

839

Mr. Fearon - Direct - Mr. Spector

A.   "As to the pay you will have two options to choose
from and you will have to choose before you come.  One is
the live-out option in which case you will be paid $2,000
a month, his business pays monthly, but all the expenses
but the food you eat when you at their home and all the
expenses when you travel with Joseph are on you."
Q.   That's fine.  If I can show you the next page of
Government Exhibit 8.
          MR. SPECTOR:  If I can publish to the jury,
please.
Q.   If you can read the first two paragraphs, please.
A.   "Dear XXX, we are not looking for an au pair as an au
pair is for children.  We are looking for an assistant to
my previous boss.  For more than two years I had the same
job I am offering you now who is far away from being a
child, he is 64 years old.  The boss is a businessman who
operates from home.  He has several businesses, but
concentrates mainly in book publishing in the hospitality
industry, travel, hotels, and restaurants.  He is
completely independent, not disabled."
          THE COURT:  Stop, we've heard this before.
          MR. SPECTOR:  Thank you, Judge.
          THE COURT:  You know, ladies and gentlemen,
there was a time we didn't have all this fancy equipment.
We'd be here for five minutes, they would say did you

840

Mr. Fearon - Direct - Mr. Spector

1  find these documents and that would be the end of it.

2  Now we have to go through using this fancy equipment.

3           MR. SPECTOR:  Thank you, Judge, I'll move

4  along.

5  Q.   Who's the signature line there?

6  A.   Joanna Kulik.

7           MR. SPECTOR:  If I can show the witness what's

8  marked as 7A.

9  Q.   Did you find this document -- what is this document?

10 A.   This is an e-mail that was secured from one of the

11 accounts on the -- one of the active accounts on the

12 computer.

13          MR. SPECTOR:  Government offers 7-A.

14          MR. SCHNEIDER:  I have an objection.

15          THE COURT:  I don't know what 7-A is.  Can I

16 see it?  Just let him give it to me.  What is the -- do

17 you want to come up and tell me what the objection is?

18          MR. SCHNEIDER:  Sure.

19

20

21

22

23

24

25

841

Mr. Fearon - Direct - Mr. Spector

1          (Conference held at sidebar.)

2          MR. SCHNEIDER:  This isn't the only one of

3  these that the government is offering.  I don't think

4  that's the Vanessa who testified, I think it's a

5  different Vanessa.

6          THE COURT: So what?

7          MR. SCHNEIDER:  I just think it's irrelevant --

8          THE COURT:  But it's irrelevant.  I don't

9  understand.

10          MR. SCHNEIDER:  Because --

11          THE COURT:  The indictment says between

12  approximately 2003 and 2009 that Yannai engaged in a

13  scheme using lies, intimidation, manipulation to induce

14  young women mostly between the ages of 18 and 25 to

15  travel to the United States from aboard so that he could

16  sexually abuse them, and then it goes through.  I don't

17  understand.  This is like, you know, somebody is charged

18  with five bank robberies and they find evidence that

19  there was ten.  You could exclude the other five because

20  it shows propensity?

21          MR. SCHNEIDER:  Well, if they didn't charge it,

22  yeah.

23          THE COURT:  It's part of the scheme for heavens

24  sakes, this is all proof.

25          MR. SCHNEIDER:  They -- the government --

842

Mr. Fearon - Direct - Mr. Spector

1      THE COURT:  Your objection is overruled.

2   (Conference ended at sidebar.)

3      MR. SPECTOR:  Government offers 7-A.

4      THE COURT:  It's admitted.

5   (Government's Exhibit No. 7-A received in evidence.)

6      MR. SPECTOR:  May I publish?

7   Q.   Investigator Fearon, is this e-mail -- the text of

8   this e-mail identical to the form letter you just read a

9   moment ago?

10  A.   Yes, it is, with the exception of the age of the

11  person, it's changed from 64, I believe, to 63.

12  Q.   Okay.  With that exception?

13  A.   I believe so.

14  Q.   Did you do a search on the defendant's computer to

15  find other e-mails identical to this one?

16  A.   Yes, I did.

17  Q.   Can you explain how it is you conducted that search?

18  A.   I took a small -- I took a small piece of that -- of

19  this message, took the first sentence, and I used -- I

20  conducted a search to look through the AOL e-mail

21  accounts looking for that actual piece of a sentence, and

22  I was able to find -- I was able to find multiple copies

23  of this message.

24  Q.   And how many copies of this message did you find on

25  the defendant's computer?

843

Mr. Fearon - Direct - Mr. Spector

1      MR. SCHNEIDER:  Objection.

2      THE COURT:  Overruled.

3  Q.   How many copies of this message did you find on the

4  defendant's computer?

5  A.   It was at least 1500.

6  Q.   Just one more document I'd like to show you, sir.

7      MR. SPECTOR:  Showing the witness what's been

8  marked as Government Exhibit 13.

9  Q.   Do you recognize this document?

10  A.   Yes, I do.

11  Q.   Did you find -- is it an e-mail?

12  A.   It is an e-mail.

13  Q.   Did you find it on the defendant's computer?

14  A.   Yes, I did.

15      MR. SPECTOR:  Government offers 13.

16      MR. SCHNEIDER:  Objection.

17      THE COURT:  I don't know what 13 is.

18      MR. SCHNEIDER:  It should be on the screen.

19      THE COURT:  Is this the same -- it's the same

20  that we considered?

21      MR. SCHNEIDER:  No, it's not.

22      THE CLERK:  Side bar, counsel.

23

24

25

844

Mr. Fearon - Direct - Mr. Spector

1          (Conference held at sidebar.)

2          MR. SCHNEIDER:  This is an e-mail from the au

3  pair world website to -- this is an e-mail from the au

4  pair world website --

5          THE COURT:  Right.

6          MR. SCHNEIDER:  -- to who they thought was

7  Joanna Kulik saying you violated the terms of our service

8  by sending this e-mail.

9          MR. SPECTOR:  Judge, there are two reasons

10  we're offering this.

11          First of all, this e-mail is one of the few, I

12  think as far as we're concerned, the only document which

13  makes clear in the same document he's posing as both

14  Sylvia and Joanna.  It starts actually addressed to

15  Sylvia, and there is a correspondence with the au pair

16  website, and at the end they send him examples of the

17  message he sent as Joanna.  That's the first reason we're

18  offering it.

19          The second reason is because it corroborates

20  Anne Simonsen who testified that when she went home she

21  told the au pair website that -- or told an au pair

22  website that he was misusing the au pair website, and

23  they kicked him off.  I don't believe this is the same au

24  pair website, but it's nonetheless important

25  corroboration.

845

Mr. Fearon - Direct - Mr. Spector

1          THE COURT:  This doesn't -- this is?  2009.

2    Did she --

3          MR. SPECTOR:  It's not the same.  It's not the

4    same time period.  The reason it's important

5    corroboration is because we think the defense is likely

6    to argue that the victims came back to their home

7    countries and they did nothing.

8          THE COURT:  I know, but how does this prove

9    that they did anything?

10         MR. SPECTOR:  Well, it corroborates her

11   testimony that she said she contacted the au pair website

12   and they kicked him off.

13         THE COURT:  What year did she do this?

14         MR. SPECTOR:  Several years ago.  It's not this

15   same website, but it corroborates her -- because it shows

16   that that's how the au pair website reacts when you

17   contact them and you tell them he's misusing the terms of

18   service.  So there's two independent reasons why it

19   should be admitted.

20         MR. SCHNEIDER:  But I don't understand how a

21   completely separate message from an au pair website

22   saying you sent spam to our participants corroborates

23   something someone called about to a different site three

24   years before.

25         MR. SPECTOR:  It's not spam, it specifically

846

Mr. Fearon - Direct - Mr. Spector

1    says that he's misusing it because he doesn't have

2    children.  If you look at the end -- if I may, Your

3    Honor.

4              MR. SCHNEIDER:  As well as sending spam

5    e-mails.

6              MR. SPECTOR:  If you look at the first message

7    to Sylvia.  "Several au pairs have informed us that you

8    are not looking for an au pair for your children, for

9    this reason you can no longer use our site for your

10   search."

11             MR. SCHNEIDER:  Well, that's clearly just

12   hearsay.

13             MR. SPECTOR:  It's not being offered for the

14   truth, it's being offered for corroboration of the

15   summonses.

16             MR. SCHNEIDER:  It's not for truthful

17   corroboration.

18             MR. SPECTOR:  Also it's part of a conversation

19   with the defendant.

20             THE COURT:  I don't understand what you're

21   talking about.  First of all let's get back to the first

22   reason that you told me.

23             MR. SPECTOR:  The first reason is this shows

24   that the defendant is using both the Sylvia identity and

25   the Joanna identity.

847

Mr. Fearon - Direct - Mr. Spector

1          THE COURT:  Is there any issue in the case

2    about that.

3          MR. SCHNEIDER:  Respectfully --

4          THE COURT:  Did I miss anything?

5          MR. SPECTOR:  We have an obligation to prove

6    that, whether or not the defense now claims it's in

7    dispute.

8          MR. SCHNEIDER:  I don't think it's in dispute,

9    I think that this witness is going to testify that he

10   found e-mails from Sylvia and Joanna on that computer.

11         MR. SPECTOR:  Judge, there's a fraud charge

12   here in the indictment, and we --

13         MR. SCHNEIDER:  Wait, am I wrong about that?

14   He is going to testify that he found e-mails from Joanna

15   and Sylvia on that computer?

16         MR. SPECTOR:  Judge, we're --

17         THE COURT:  Will you answer his question?

18         MR. SPECTOR:  Yes.

19         THE COURT:  Okay.  So I don't -- it's not

20   necessary for that purpose.  What else?

21         MR. SPECTOR:  The other purpose is are the ones

22   that I've articulated, it's also the defendant's

23   statements.  This is a correspondence --

24         THE COURT:  There's no -- I'm not, I'm not

25   admitting.  So let's move on.

848

Mr. Fearon - Direct - Mr. Spector

1      MR. SPECTOR:  Thank you, Judge.

2      (Conference concludes at sidebar.)

849

Mr. Fearon - Cross - Mr. Schneider

1  Q.   Sir, in your search of the e-mails of the defendant's

2  computer did you also find e-mails written or signed in

3  the name Sylvia?

4  A.   Yes, I did.

5        MR. SPECTOR:  Nothing further.

6  CROSS-EXAMINATION

7  BY MR. SCHNEIDER:

8  Q.   You did a search for that -- I forget the number now

9  -- but that form e-mail, correct?

10       THE COURT:  Hold on, give me the indictment

11  back.

12  Q.   Sir, you performed a search for one of the

13  government's exhibits which was a form e-mail on the

14  computer.  Do you recall that?

15  A.   Yes, I do.

16  Q.   And you said you found at least 1500 e-mails

17  containing those same words?

18  A.   Yes.

19  Q.   Each of those e-mails had been sent I assume?

20  A.   I wouldn't be able to establish that from the search.

21  Q.   But did each of those e-mails have an e-mail address

22  in the "to" line?

23  A.   Yes.

24  Q.   So each of those e-mails was addressed to a

25  particular e-mail address?

850

Mr. Fearon - Cross - Mr. Schneider

1   A.   As far as I was able to determine, yes.

2   Q.   Your search of the computers, you were able to

3   determine -- you could search the documents on the

4   computer and determine for instance if an e-mail had been

5   composed on that computer, correct?  Composed and saved?

6        Well, let me step back.  Somebody goes to a computer,

7   they type an e-mail, they address it to somebody and they

8   send it.  You follow me?

9   A.   So far, yes.

10  Q.   Would that -- would a copy of that message be saved

11  on the computer?

12  A.   It depends on the software that was used, it depends

13  on the program, depends on -- it depends on how that

14  program was actually set up and configured.

15  Q.   In this -- the computer that we're talking about

16  where you found these e-mails, do you believe that's how

17  they came to be on the hard drive of that computer?

18  A.   I don't know if I can -- I don't know if I can say

19  that for every e-mail.  I mean the search was just that.

20  I searched based on a term and then I was able to find --

21  I was able to find remnants of e-mails.

22  Q.   All right.  But you don't know -- you can't say for

23  certain whether they had been sent or not?

24  A.   No.

25  Q.   And you said -- I believe you just testified that

851

Mr. Fearon - Redirect - Mr. Spector

1  it's not necessarily that an e-mail program will save a

2  copy of the e-mail on the computer, correct?

3  A.    It depends on the e-mail program.  If I -- most of

4  the -- the information that was located will have a date

5  and a time stamp whether the e-mail was sent, so then

6  you'd be able to deduce what time the e-mail was sent, if

7  it was.

8  Q.    Do you have any knowledge of AOL's e-mail accounts?

9  Let me ask you this.  Do you know if AOL has an internet

10 e-mail program?

11 A.    Yes.

12 Q.    Do they?

13 A.    Yes.

14 Q.    And does that mean that if somebody has an AOL

15 internet account and they're away from home and don't

16 have their computer that they can go to an internet café

17 and log on to their account?

18 A.    Yes.

19 Q.    And they can send an e-mail from that account?

20 A.    Yes.

21         MR. SCHNEIDER:  No further questions.

22 REDIRECT EXAMINATION

23 BY MR. SPECTOR:

24 Q.    If someone had remotely logged onto the defendant's

25 AOL account somewhere else and sent an e-mail from

852

                    Mr. Fearon - Redirect - Mr. Spector

1   somewhere else would that e-mail appear on the

2   defendant's computer, the hard drive?

3   A.   If it was sent I don't believe so.

4              MR. SPECTOR:  Nothing further.

5              MR. SCHNEIDER:  No further questions.

6              THE COURT:  All right.  Now you want to come up

7   for a minute?

8              MR. SPECTOR:  Oh, I'm sorry, Judge, can we

9   excuse the witness?

10             THE COURT:  Yes.

11             (Witness excused.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

853

Proceedings

1          (Conference held at sidebar.)

2          THE COURT:  Okay.  This instruction, you want

3  me to give this now?  I'm not --

4          MR. SCHNEIDER:  Yes.

5          THE COURT:  When I say this instruction I'm

6  referring to the May 25th, 2011 letter that was sent to

7  me.

8          MR. SCHNEIDER:  Yes.

9          THE COURT:  Sent ECF.  This is not true.  The

10  government exhibits were introduced that some of them

11  weren't, "the witnesses may have performed in their

12  home."  That's simply not true.  They are alleging the

13  scheme, I told you that.

14          MR. SCHNEIDER:  They are alleging a scheme, but

15  that's --

16          THE COURT:  A scheme, and this is proof.  This

17  is evidence that the jury could conclude as part of that

18  scheme.

19          MR. SCHNEIDER:  Our position --

20          THE COURT:  You know, I may have misspoken when

21  I talked about bank robberies, but if there's a scheme or

22  a conspiracy to commit bank robberies, evidence -- for

23  example, just -- it's not directly pertinent -- but if

24  you had ten other banks in which he examined for the

25  purpose of, you know, determining where the windows are,

854

Proceedings

1   the cars -- where the getaway cars could be parked, it

2   would be admissible.

3            I'm ready to give this charge with this -- you

4   may consider the evidence to the extent that you think it

5   is relevant to the specific charge contained in the

6   indictment.  You may not consider it as proof that the

7   defendant has a (indiscernible) personality or bad

8   character.

9            MR. SPECTOR:  That's fine for the government.

10           THE COURT:  If that's what you want I'll give

11   it.

12           MR. SCHNEIDER:  No we, we don't want any

13   limiting instruction then.  To make my point clear, the

14   government has added surplus language to the indictment.

15   You won't be charging this jury about a scheme.  There's

16   five counts now of Mann Act violations --

17           THE COURT:  I understand that.  You want them,

18   how many -- you know, I don't think they have to charge

19   every single count to just -- to get in evidence that he

20   had a scheme.

21           MR. SCHNEIDER:  But a scheme is -- I understand

22   your ruling.  It's our position a scheme is not an

23   element of this crime, there's no reason they have to

24   prove a scheme.  They have to prove that he did this to

25   one or all of these five women, that's the proof.  If

855

Proceedings

1  they put a scheme in the indictment is what they did, but

2  they don't have to prove it.

3          THE COURT:  No, there's something -- look,

4  there's called part of a common scheme and plan.

5          MR. SCHNEIDER:  Yes.

6          THE COURT:  Okay.  And that's an exception,

7  although it doesn't necessarily have to fit exactly, but

8  that's an exception.  This is part of -- he had a -- one

9  of the reasons I didn't -- I thought that some of the

10 questions about how many other women were living in the

11 house was -- it was not helpful to you because I thought

12 it, A, it sort of supported it, and B, it just showed,

13 you know, bizarre nature of what was going on in that

14 house.  But that's beside the point, this is part of the

15 scheme.  I mean the fact that he didn't -- I'm willing to

16 say give the part of the charge that says --

17         MR. SCHNEIDER:  No, we would like the first

18 part of the charge.

19         THE COURT:  The defendant is not charged with

20 attempt, inducing or attempting to induce any of the

21 women to come to his home.

22         MS. CESARE:  Yes.

23         THE COURT:  I'll give that charge.

24         MR. SCHNEIDER:  Yes, we want that charge.

25         THE COURT:  I'm not going to give a false

Transcription Plus II, Inc.

856

Proceedings

1  statement as to why they were introduced.

2      MR. SCHNEIDER:  Judge, they're going to rest

3  now, we have one short witness.  Should we just go

4  straight into it and then --

5      THE COURT:  What is it and how short is it?

6      MR. SCHNEIDER:  Three minutes of direct at the

7  most.

8      MR. SPECTOR:  Judge, we -- Judge, yeah, I mean

9  we have an objection to this witness.

10      THE COURT:  What is --

11      MR. SPECTOR:  As I understand it --

12      THE COURT:  What type of witness is this?

13      MR. SCHNEIDER:  When I questioned Ms. Yagoub

14  she testified that Mr. Silverman and one of our

15  paralegals interviewed in a hotel room.

16      The two things we want to bring out which we

17  think impeach her is she said they didn't identify

18  themselves.  She'll testify that she said she was from

19  the federal defenders, that she gave her a business card

20  at the very first instance she met her, and she also said

21  that she believed she discussed with them Mr. Yannai

22  putting his hands down her pants at the lake.  She'll

23  testify that when she questioned her about the lake she

24  said that he grabbed her breast and tried to kiss her and

25  she pushed him away.

857

Proceedings

1          MR. SPECTOR:  As to the second point it's not

2   proper impeachment.  The witness testified when asked

3   what she told the investigator at the Marriott Hotel she

4   said, I don't remember.  As to the issue of whether the

5   federal defenders identified themselves, entirely

6   collateral.  So it should not be allowed.

7          MR. SCHNEIDER:  Well, I wouldn't call her

8   except that --

9          THE COURT:  You can call her.

10         MR. SCHNEIDER:  Okay.

11         (Conference ended at sidebar.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

858

Ms. York - Direct - Mr. Silverman

1          MR. SPECTOR:  The government rests.

2          THE COURT:  Ladies and gentlemen, the

3   government introduced evidence that Mr. Yannai sent and

4   received questionnaires from women who were au pairs or

5   looking to become au pairs, the defendant is not charged

6   with inducing or attempting to induce any of those women

7   to come to his home.  The charges here are limited to the

8   discrete instances as to which you heard evidence.  Let's

9   go.

10          THE COURT:  Your rule 29 motion is deemed made

11  and denied.

12          MR. SCHNEIDER:  I'll renew it after this.

13          THE COURT:  Okay.

14  **C A I T I L I N   Y O R K**

15      **having been first duly sworn, was examined and**

16  **testified as follows:**

17          THE CLERK:  State your name for the record.

18          THE WITNESS:  Caitilin York.

19  DIRECT EXAMINATION

20  BY MR. SILVERMAN:

21  Q.   Hi.  And where do you work?

22  A.   I work at the Federal Defenders of New York.

23  Q.   And where did you go to school?

24  A.   Yale University.

25  Q.   And when did you graduate?

859

Ms. York - Direct - Mr. Silverman

1   A.    Last year, in 2010.

2   Q.    And what is your current position?

3   A.    I'm a paralegal.

4   Q.    And have you worked on the investigation of Joseph

5   Yannai in this case?

6   A.    Yes.

7   Q.    And did you go to the Marriott Hotel a few blocks

8   from here last week?

9   A.    I did.

10  Q.    And was I with you?

11  A.    Yes.

12  Q.    And what happened?

13  A.    I entered the Marriott lobby with you.

14          THE COURT:  We don't need the whole trip up the

15  elevator, the knock on the door.  Let's get to --

16          THE WITNESS:  All right.

17  Q.    We used my cell phone to call reception.  I asked to

18  speak with Nathalie Yagoub.  I was transferred to her

19  room.  Ms. Yagoub answered.  I said -- I introduced

20  myself, said I was calling -- I was in the lobby with Ben

21  Silverman, we were calling from the Federal Defenders.

22  And we asked her if she'd talk to us if we could come up

23  to her room or if she'd be more comfortable if we came to

24  the lobby.  She told us she was getting dressed.  She had

25  just woken up and she would come down.

860

Ms. York - Cross - Ms. Jager

1    Ms. Yagoub came down the elevator.  We introduced
2  ourselves again, asked her if she wanted to talk in the
3  lounge.  We walked to the lounge with her, had a seat.  I
4  gave her my business card.  You didn't have your business
5  card, so you wrote your name and phone number on the back
6  of my card and we began to ask her questions about her
7  experience.
8  Q.  Was she asked specifically about going to the lake
9  with Mr. Yannai?
10 A.  She was not asked specifically about that.  She
11 brought it up in reference to something else and she told
12 us about that day.
13 Q.  What did she say?
14 A.  She told us that at the lake, Mr. Yannai kissed her
15 and touched her breasts.  That she did not want him to do
16 that.  She asked him to stop.  He was persistent.  When
17 we asked her what that meant, she said that, although he
18 stopped touching her, he tried to convince her verbally
19 to let him continue.
20 Q.  Did she say that Mr. Yannai put his hand in her
21 pants?
22 A.  No.
23 Q.  No further questions.
24 CROSS-EXAMINATION
25 BY MS. JAGER:

Transcription Plus II, Inc.

861

Ms. York - Cross - Ms. Jager

1   Q.   Good afternoon, Ms. York.

2   A.   Good afternoon.

3   Q.   Now you testified you interviewed Ms. Nathalie

4   Yagoub; correct?

5   A.   Yes.

6   Q.   And that took place May 18, 2011?

7   A.   I believe so; yes.

8   Q.   And you're a paralegal with the Federal Defenders;

9   right?

10  A.   I am.

11  Q.   You're not a criminal investigator; are you?

12  A.   No, ma'am.

13  Q.   And you were with an attorney from the Federal

14  Defenders office named Ben Silverman; correct?

15  A.   Yes.

16  Q.   The same attorney who just questioned you?

17  A.   Yes.

18  Q.   And it took place at the Marriott Hotel in Brooklyn;

19  right?

20  A.   That's right.

21  Q.   Now when you went to interview Ms. Yagoub, you didn't

22  have an appointment with her; did you?

23  A.   We did not.

24  Q.   And, in fact, you only knew she was staying there

25  because that's where the government typically lodges its

862

                    Ms. York - Cross - Ms. Jager

1   witnesses for trial.

2   A.   That's right.  We assumed.

3   Q.   And when you arrived at the Marriott, isn't it true

4   that you called her hotel room from the lobby?

5   A.   Yes, using my cell phone.

6   Q.   Excuse me.  And you told her you were downstairs in

7   the lobby at that moment; right?

8   A.   I did; yes.

9   Q.   And you asked her if you could go up to her hotel

10  room; right?

11          THE COURT:  Why are we repeating all of this?

12          MS. JAGER:  I'll move ahead, your Honor.

13  Q.   Isn't it true that Ms. Yagoub had never met you

14  before?

15  A.   That is true.

16  Q.   And she had never met Mr. Silverman before?

17  A.   I don't believe they'd met before; no.

18  Q.   And when she declined to permit you to come to her

19  room, she did agree to come to the lobby.

20  A.   Yes.

21  Q.   Isn't it true that when she came down to meet you,

22  she said she was surprised to see you?

23  A.   I don't recall that.

24  Q.   Isn't it true that she said she didn't have a meeting

25  planned with the government that day?

863
Ms. York - Cross - Ms. Jager

A.   I don't know.  She hadn't expected my phone call

certainly.

Q.   In fact, she told you that she had met with the

government the day before; right?

A.   She did tell us that; yes.

Q.   Now isn't it true that you introduced yourselves when

Ms. Yagoub came downstairs by giving her your business

card?

A.   That is true.

Q.   And you showed her your Federal Defenders I.D.?

A.   I had my I.D. in my hand, as did Ben Silverman.

Q.   And do you have that badge with you now?

A.   Yeah, it's in my bag back there.

         MS. JAGER:  Would it be possible, your Honor,

for the witness to show it to the jury?

         THE COURT:  I don't know -- why?

         MS. JAGER:  Just to show what it looks like.

         THE COURT:  I don't see the relevance of this.

         MS. JAGER:  Okay, I'll move ahead.

Q.   You told her you with the Federal Defenders; right?

A.   Yes.

Q.   You didn't tell her that you represented the

defendant Joseph Yannai; did you?

A.   Not when we first introduced ourselves, no.

Q.   Isn't it true that you and Ben Silverman proceeded to

864

                    Ms. York - Cross - Ms. Jager

1   interview Ms. Yagoub for a significant period of time?

2   A.   Yes.

3   Q.   In fact, you wrote a six-page single spaced memo

4   summarizing that interview; right?

5   A.   I did.

6   Q.   And you took about fifteen pages of handwritten

7   notes; is that right?

8   A.   I don't know how long my handwritten notes but yeah.

9   Q.   Let me show you --

10            THE COURT:  We don't -- how many pages is it?

11   Is it --

12            MS. JAGER:  It's fifteen pages.

13            THE WITNESS:  That sounds right.  It was long.

14   Q.   And you talked to her for how long, about thirty

15   minutes, forty-five minutes, sixty minutes?

16   A.   Probably about an hour.

17   Q.   Ms. Yagoub at some point talked about what happened

18   at the lake; correct?

19   A.   She did.

20   Q.   And isn't it true that she said that the defendant

21   had, in fact, kissed her at the lake?

22   A.   Yes.

23   Q.   And --

24            THE COURT:  Why do you have to go over what has

25   already been elicited that she said?  I don't understand.

865

Ms. York - Cross - Ms. Jager

1    MS. JAGER:  Because I am --

2    THE COURT:  Can you just get to this point of

3 your cross-examination?

4    MS. JAGER:  Yes, your Honor.

5 Q.  And Ms. Yagoub told you that she told the defendant

6 to stop and at first he continued; right?

7 A.  She told us that she wanted him to stop and that he

8 stopped touching her.

9 Q.  Well, isn't it true she told you -- "I told him -- at

10 the lake he wanted to kiss me.  He put his hands to my

11 breasts.  I told him I don't want to do that and he

12 resisted but then he stopped."

13 A.  Yeah, and then I believe we clarified and asked her

14 what she meant by resisted, whether that was physical or

15 verbal and she told us he verbally protested and tried to

16 convinced her.

17 Q.  But isn't it true that when she answered that

18 question, she didn't answer specific to that account --

19 to that particular time, she said "When I would ask him

20 to stop, he would try to convince me."

21 A.  That's true.  She was saying generally when she tried

22 to -- when he would try to convince her, it was verbally

23 rather than physically; yes.

24 Q.  Didn't Ms. Yagoub tell you that it is easier to talk

25 about everything besides the physical and the sexual?

Ms. York - Cross - Ms. Jager

1   A.   Yes.

2   Q.   And is it -- in fact, she told you specifically that

3   it was difficult for her to talk about the details of

4   sexual abuse.

5   A.   Yes.

6   Q.   And isn't it true that you were questioning her in

7   the lobby of the Marriott Hotel.

8   A.   We were; yes.

9   Q.   And you weren't in a private place; right?

10  A.   No.

11  Q.   But you were asking her personal information.

12  A.   Yes.

13  Q.   And to describe sexual experiences she had with the

14  defendant?

15  A.   Yes, we were asking her.

16  Q.   Topics that would be embarrassing or intimate?

17  A.   Certainly, they can be; yeah.

18  Q.   And now your office is about five minute walk away

19  from the Marriott Hotel; isn't it?

20  A.   Yes.

21  Q.   And to get there, you would have to walk past the

22  United States -- the building that the United States

23  Attorney's Office is in; correct?

24  A.   Yeah.

25  Q.   And you didn't invite her to come to your office

867

Ms. York - Cross - Ms. Jager

1  which is less than five minutes away; did you?

2  A.   No.

3  Q.   You didn't mention that your office was close by?

4  A.   I think I did actually mention where our office was

5  located but I can't remember what it was in relation to.

6  Q.   Now at one point in the interview, she said something

7  to you about sending documents or photos you were

8  discussing to Mr. Spector; correct?

9  A.   She told us she had photos of her working at a

10  restaurant in New York and asked if that was the kind of

11  thing she needs to send to the prosecutor.

12  Q.   And you didn't tell her at that time that you didn't

13  work with Mr. Spector; did you?

14  A.   No.

15  Q.   And you didn't tell her that you don't work for the

16  United States Attorney's Office?

17  A.   I didn't think I needed to be explicit about that

18  when I told her that I worked at the Federal Defenders.

19  Q.   At the end of the interview, she seemed to be in a

20  pretty good mood; right?

21  A.   Yes.

22  Q.   When Ben Silverman, he gave her some suggestions

23  about places to listen to jazz music; right?

24  A.   Yes, she asked us about some things to do to fill her

25  time in the City.

868

Ms. York - Cross - Ms. Jager

1  Q.   About museums?

2  A.   Museums and music; yeah.

3  Q.   And so things were friendly between Ms. Yagoub and

4  you and Mr. Silverman when you left?

5  A.   Yes.

6  Q.   But then you and Mr. Silverman came back a few

7  minutes later and approached Ms. Yagoub again; correct?

8  A.   We did.

9  Q.   And you told her again that you were with the Federal

10 Defenders office; right?

11 A.   That's correct.

12 Q.   And isn't it true that then you approach her a final

13 time and at that point, she asked you if you represented

14 the defendant?

15 A.   Yes, she said "Do you work for Mr. Yannai?"

16 Q.   And isn't it correct that you showed her your I.D.s

17 again at this time?

18 A.   Yes, because we were concerned that she was asking

19 again.

20 Q.   And when she told you this, her demeanor changed;

21 right?

22 A.   Yes, a bit.

23 Q.   She wasn't in a good mood anymore?

24 A.   She was not as forthcoming as she had been during our

25 interview.

869

Ms. York - Cross - Ms. Jager

1  Q.  In fact, she was very surprised by who you were.

2        MS. CESARE:  Objection.

3        THE COURT:  Overruled.

4  A.  I don't that she was surprised by who we were but she

5  seemed -- she did change; yes.  I mean, we gave her the

6  same I.D. and the names we had given her before.

7  Q.  Now when talking to witnesses, you know you have an

8  ethical responsibility to identify yourself as a

9  representative of the defendant; correct?

10  A.  I believe that I have an ethical responsibility to

11  state clearly where I work and who I am.

12  Q.  But not that you represent the defendant.

13  A.  I think that's an extension of where I work.

14  Q.  You didn't until the end explicitly tell the witness

15  that you represented the defendant.

16  A.  Yes, she asked us at the end.

17  Q.  And when you do this, witnesses -- this is in order

18  for witnesses to make a decision which they have a right

19  to whether or not to speak with you; correct?

20  A.  I'm sorry, can you repeat that?

21  Q.  They have a -- the purpose of the ethical

22  responsibility to identify yourself as a representative

23  of the Federal Defenders or the defendant is so that the

24  witnesses can decide whether or not they want to speak

25  with you because they have no obligation to do so.  It's

870

                    Proceedings

1    freely their choice to speak with you or not.

2    A.   Yes, that's what I was told before doing this

3    investigation.

4    Q.   Now, Ms. York, you didn't bring a German interpreter

5    with you for this interview; did you?

6    A.   No.

7              MS. JAGER:  Just one moment, please.  No

8    further questions.

9              MR. SCHNEIDER:  No further questions.

10             THE COURT:  You can step down.

11             (Witness excused.)

12             THE COURT:  Do you rest?

13             MR. SCHNEIDER:  Yeah, the defense rests.

14             MR. SPECTOR:  No rebuttal case, your Honor.

15             THE COURT:  Ladies and gentlemen, so we're

16   going to take a recess until Tuesday.  I think

17   realistically -- you see I give instructions to you but

18   normally before I can give the instructions to you, I

19   have to go over the instructions with the attorneys.  And

20   my instructions may not be ready to go over with them

21   tomorrow. So, instead of having you sit around on Tuesday

22   morning, I suggest that you come in -- come in at 11:00

23   -- 11 o'clock. Have a nice weekend.

24             Ladies and gentlemen, let me remind you again

25   please don't discuss the case with anyone else.  I told

871

Proceedings

1  you that sitting on a jury is an interesting experience.

2  It's a unique experience.  It's something you want to

3  talk to people about but you're not permitted to do so

4  until after the case is over because otherwise, you can

5  be influenced by what they say and we only want you to be

6  influenced by what you hear in this courtroom.  And by

7  what other jurors have to tell you when you begin your

8  deliberations.  So please again, remember, don't discuss

9  the case with anyone else or among yourselves.  Thank

10  you.

11             (Jury exits the courtroom.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

872

                        Proceedings

1              THE COURT:  Okay.

2              MR. SCHNEIDER:  Your Honor, we're moving for a

3    judgment of acquittal.  Should we come up or should we

4    sit?

5              THE COURT:  Come up.

6              MR. SCHNEIDER:  We're renewing our Rule 29

7    motion for a judgment of acquittal as to each count.  The

8    first count which is the Mann Act charge requires that

9    Mr. Yannai have the intent --

10             THE COURT:  I don't see any point.  My basic

11   view is that the government has no right to an appeal if

12   I grant the motion.

13             MR. SCHNEIDER:  That's mine, too.

14             THE COURT:  And whereas if you -- you know,

15   you're free to make this if the jury convicts, and then

16   I'll consider it on the merits when the government would

17   have a right to an appeal if I made a mistake and granted

18   it.

19             MR. SCHNEIDER:  They were --

20             THE COURT:  So that's my -- it's been my -- in

21   fact, the federal rules to a degree encourage it by

22   allowing a judge to reserve decision on the --

23             MR. SCHNEIDER:  I won't make the argument then.

24             THE COURT:  -- Rule 29 motion precisely for

25   this reason.

873

Proceedings

1          MR. SCHNEIDER:  I guess I understand the
2    Court's ruling.  I will say this.  We believe that Count
3    5, the importation of an alien for prostitution or
4    immoral purposes clearly does not lie.  The government's
5    argument --

6          THE COURT:  You know, we have to -- it all
7    depends on what -- how you define immoral purposes and
8    when we do the jury instructions, you can make that
9    argument but I need to have the --

10         MR. SCHNEIDER:  That's fine.

11         THE COURT:  I mean on its face, it's -- one
12   could argue that it's unconstitutionally vague.  However,
13   in the context of a criminal case, you know, the issue is
14   whether it's unconstitutional as applied and in part,
15   that depends on how the courts have defined -- I mean
16   other than a First Amendment case, I don't want to get --

17         MR. SCHNEIDER:  Yes, it's not First Amendment;
18   yes.

19         THE COURT:  But it all depends on how the term
20   is defined.  And we can deal with that when you both give
21   me your request to charge.

22         MR. SCHNEIDER:  Okay.

23         MS. CESARE:  Thank you.

24         MR. SCHNEIDER:  Should we -- we should just
25   come back Tuesday at 10:00 or --

874

Proceedings

1    THE COURT:  Well I am going to try and e-mail

2    you the charge by tomorrow -- by the end of the day

3    tomorrow, so that you'll at least have it before Tuesday

4    morning.

5            MR. SPECTOR:  And we'll submit a charge to you

6    this evening, your Honor.

7            THE COURT:  Okay.  But, you know, short of that

8    you could take a look at what Sand has to say.

9            MR. SCHNEIDER:  Yes, we have.

10           THE COURT:  Okay.

11           MR. SPECTOR:  Thank you, Judge.

12           MS. JAGER:  Thank you, Judge.

13           MS. STONE:  Thank you, Judge.

14           THE COURT:  Have a nice weekend.

15           Oh, by the way before you all go, I intend to

16    -- you know, my practice is to send testimony into the

17    jury.  The transcript is prepared in such a way, then you

18    can just rip out the portions and where there were

19    objections.  That is, where there's an objection that's

20    on a separate page that could be ripped out.  And you

21    should also go over it to see if you think there are any

22    mistakes.  The one advantage of doing it this way instead

23    of having a court reporter is that it's all recorded and

24    mistakes can be -- you know, the transcript can be

25    checked against the audio.  And if you want to

875

Proceedings

1   cannibalize my copy of the transcript --

2           MR. SCHNEIDER:  We've been given copies.

3           MR. SPECTOR:  Yes, we have them as well, your

4   Honor.  Thank you.

5           THE COURT:  Yes, but be sure -- it avoids delay

6   if you do it in advance.

7           MR. SCHNEIDER:  You're saying we should take

8   the objections out ahead of time.

9           THE COURT:  Yes, and make sure that there

10  aren't things that you think are -- do not accurately

11  reflect what was said, so that I can just send the

12  transcripts in without delay if the jury asks for it.

13          MR. SPECTOR:  We'll do that over the weekend,

14  your Honor.  Thank you.

15          MS. CESARE:  Thank you, Judge.

16              (Matter adjourned)

17                  -o0o-

18

19

20

21

22

23

24

25

876

1                          **I  N  D  E  X**

2

3    **<u>Bernadett Herczeg</u>**:

4    Cross-Examination by Ms. Cesare. . . . . . . . . . .   712

5    Redirect Examination by Ms. Stone. . . . . . . . . .   763

6    Recross Examination by Ms. Cesare. . . . . . . . . .   786

7

8    **<u>Cornelius Merritt</u>**:

9

10   Direct Examination by Ms. Stone. . . . . . . . . . .   790

11   Cross-Examination by Mr. Schneider. . . . . . . . .   816

12

13   **<u>Denzil Fearon</u>**:

14   Direct Examination by Mr. Spector. . . . . . . . . .   822

15   Cross-Examination by Mr. Schneider. . . . . . . . .   849

16   Redirect Examination by Mr. Spector. . . . . . . . .   851

17

18   **<u>Caitlin York</u>**:

19   Direct Examination by Mr. Silverman. . . . . . . . .   858

20   Cross-Examination by Ms. Jager. . . . . . . . . . .   860

21

22

23

24

25

877

1                            **I N D E X**

2                           (Continuued)

3

4                    **E X H I B I T S**

5   <u>**Government's Exhibit Marked in Evidence:**</u>

6   Government's Exhibit 1. . . . . . . . . . . . . . . . 804

7   Government's Exhibit 2. . . . . . . . . . . . . . . . 807

8   Government's Exhibit 3-A through 3-J. . . . . . . . 812

9   Government's Exhibit 6-C. . . . . . . . . . . . . . . 829

10  Government's Exhibit 6-D. . . . . . . . . . . . . . . 829

11  Government's Exhibit 15. . . . . . . . . . . . . . . 832

12  Government's Exhibit 4. . . . . . . . . . . . . . . . 834

13  Government's Exhibit 12-B. . . . . . . . . . . . . . 837

14  Government's Exhibit 8. . . . . . . . . . . . . . . . 838

15  Government's Exhibit 7-A. . . . . . . . . . . . . . . 842

16

17  <u>**Defendant's Exhibit Marked In Evidence**</u>:

18  Defendant's Exhibit P-3. . . . . . . . . . . . . . . 732

19  Defendant's Exhibit P-4. . . . . . . . . . . . . . . 751

20

21

22

23

24

25

878

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **26th** day of **May**, 2011.

*Linda Ferrara*

Linda Ferrara
Transcription Plus II, Inc.

Multi-Page

**$2,000 - allowing**

## -$-

**$2,000** [1] 839:3
**$20,000** [4] 765:9 782:1 797:12 821:19

## -*-

**\*MR** [2] 798:5 803:24

## ---

**-o0o** [1] 875:17

## -.-

**.712** [1] 876:4
**.732** [1] 877:17
**.751** [1] 877:18
**.763** [1] 876:5
**.786** [1] 876:6
**.790** [1] 876:9
**.807** [1] 877:6
**.812** [1] 877:7
**.816** [1] 876:10
**.822** [1] 876:13
**.829** [2] 877:8,9
**.832** [1] 877:10
**.834** [1] 877:11
**.837** [1] 877:12
**.838** [1] 877:13
**.842** [1] 877:14
**.849** [1] 876:14
**.851** [1] 876:15
**.858** [1] 876:18
**.860** [1] 876:19

## -/-

**/boyfriend** [1] 805:16

## -0-

**014** [1] 835:8

## -1-

**1** [4] 803:23 804:2 819:18 877:5
**10-cr-594** [1] 711:2
**100** [1] 804:11 834:20
**104** [1] 820:10
**10576** [1] 837:16
**10601** [1] 711:24
**109** [1] 820:14
**10:00** [1] 873:25
**11** [5] 733:12 752:21 770:8 771:5 870:23
**111** [1] 711:23
**11201** [1] 711:19
**11241** [1] 711:31
**114** [2] 835:23 836:7
**115** [2] 835:24 836:7
**115B** [1] 836:9
**116** [1] 836:1

**11783** [1] 711:34
**119** [2] 836:12,16
**11:00** [1] 870:22
**11th** [1] 787:5
**12-B** [1] 837:4 877:12
**12B** [1] 836:22 837:1
**13** [11] 733:20 735:3,17 736:8 737:7 742:16 743:9 746:7 768:19 770:9 771:5 843:8,15,17
**13th** [5] 774:13 776:6 793:14 818:23 819:9
**14** [1] 835:1
**140** [2] 833:23 834:21
**144** [1] 833:24
**15** [7] 832:13,19,22,25 833:18 834:23 877:10
**1500** [2] 843:5 849:16
**16** [6] 711:29 743:16 768:19 770:9 771:5 791:17
**16th** [5] 774:5,13 776:7 778:17,21
**17** [1] 753:1
**18** [3] 712:15 841:14 861:6
**1:00** [1] 780:16

## -2-

**2** [4] 806:14 807:8,12 877:6
**20** [2] 780:15 790:20
**2002** [1] 823:20
**2003** [1] 841:12
**2006** [1] 823:22
**2007** [2] 815:10,24
**2009** [45] 712:15 733:12 735:3,17 737:8 742:16 743:17 746:7 752:21 753:2 754:19 756:12,20 757:7 761:11 763:4 765:2 767:24 769:12,18 770:9,9 770:9 773:6 774:5 776:6 776:7 779:25 781:8 782:12 783:21 784:15 786:17,25 787:5 789:1,6 789:13 793:14 794:15 824:21 825:16 841:12 845:1
**2010** [4] 760:18 761:5,9 859:1
**2011** [4] 711:7 853:6 861:6 878:14
**2013** [1] 761:12
**20th** [1] 714:4
**21st** [2] 815:10,24
**22** [5] 760:18 761:4,9 767:24 773:6
**22nd** [2] 778:17 786:17 786:25 789:1,6,13
**23rd** [4] 794:15 819:6,9 820:18
**25** [2] 790:20 841:14
**25th** [1] 853:6
**26** [1] 711:7

**26th** [1] 878:14
**27** [1] 711:18
**29** [4] 761:12 858:10 872:6.24

## -3-

**3** [3] 796:2,4 809:9
**3-A** [1] 812:18,22 877:7
**3-B** [1] 812:22
**3-C** [1] 812:22
**3-D** [1] 812:22
**3-E** [1] 812:22
**3-F** [1] 812:22
**3-G** [1] 812:23
**3-H** [1] 812:23
**3-I** [1] 812:23
**3-J** [2] 812:23 877:7
**30** [4] 761:11 775:3,25 779:16
**309** [12] 792:24 816:22 817:4,14,16,24 818:3,12 818:15,20 825:19 837:16
**329** [1] 775:1
**35** [1] 793:6
**3859** [1] 711:33
**3A** [1] 810:23 812:9
**3B** [3] 810:23,24 813:10
**3C** [1] 813:14
**3D** [3] 810:24 815:4 816:11
**3E** [2] 815:13 816:11
**3F** [2] 816:4,11
**3G** [2] 815:19 816:11
**3H** [1] 814:5
**3I** [1] 814:9
**3J** [2] 814:21,24
**3rd** [1] 711:30

## -4-

**4** [8] 757:7 763:4 834:3,7 834:10,16,16 877:11

## -5-

**5** [3] 756:12 790:21 873:3
**50** [1] 791:24 805:14
**51** [1] 805:18

## -6-

**6-C** [2] 829:24 877:8
**6-D** [2] 829:24 877:9
**63** [1] 842:11
**64** [5] 805:22 835:10,18 839:16 842:11
**68** [1] 819:23
**6C** [1] 829:6.21
**6D** [1] 829:16.21

## -7-

**7-A** [5] 840:13.15 842:3,5 877:14

**72** [2] 820:3.3
**781** [1] 775:1
**7A** [1] 840:8

## -8-

**8** [5] 838:4.10.13 839:8 877:13
**804** [1] 877:5

## -A-

**ability** [2] 784:3 823:16
**able** [19] 736:16 749:16 749:19,22 790:1,6 792:25 816:6 827:21 835:23 838:20 842:22,22 849:20 850:1,2,21,22 851:7
**aboard** [1] 841:15
**above** [1] 785:22
**above-entitled** [1] 878:5
**Absolutely** [2] 818:22 829:22
**abuse** [2] 841:16 866:4
**academy** [1] 824:12
**accepted** [2] 747:10 748:16
**access** [1] 835:25
**accompany** [1] 795:19
**according** [1] 804:8
**account** [12] 831:20,21 831:22 832:17,21 834:6 838:9 851:16,18,20 852:1 865:18
**accounts** [11] 831:25 832:3,6,7,7,8,10 840:11 840:11 842:21 851:9
**accurate** [2] 738:10 878:3
**accurately** [2] 772:6 875:10
**accused** [1] 769:2
**achieved** [1] 746:19
**acknowledge** [1] 778:19
**acquisition** [2] 824:8,9
**acquittal** [2] 872:3,7
**acres** [1] 817:7
**act** [3] 746:13 854:16 872:8
**action** [1] 878:11
**active** [3] 831:25 832:6 840:11
**activity** [1] 825:8
**actual** [1] 842:21
**add** [1] 779:21
**added** [1] 854:14
**addition** [3] 802:3 807:1 832:6
**address** [12] 780:9 792:23 803:8 804:18,18 815:16 825:17,19 837:16 849:21,25 850:8
**addressed** [3] 814:24 844:14 849:24

**adjacent** [1] 802:5
**adjourned** [1] 875:16
**admissible** [5] 767:9,13 769:13 774:11 854:2
**admission** [2] 773:2,6
**admitted** [16] 751:8 804:1 807:11 812:16,21 813:10 814:1,8 815:6 817:11 832:24 834:9 837:3 838:12 842:4 845:19
**admitting** [1] 847:25
**advance** [3] 720:24 721:2 875:6
**advanced** [1] 824:9
**advancing** [1] 721:4
**advantage** [1] 874:22
**advised** [3] 761:2 793:16 796:21
**affection** [1] 747:22
**affectionate** [1] 747:20
**affidavit** [30] 758:5,19 763:4,13,17 765:3,5,7,11 765:16 767:25 768:1 772:10 773:2,6,19 774:19 779:24 780:1,4 782:11,20 783:4,7,10,21 786:16,18 786:25 789:2
**afraid** [11] 719:19,22 720:7,9 721:25 722:4,8 733:1,5,6 785:22
**afternoon** [6] 753:5 790:14 822:21,22 861:1,2
**again** [14] 735:9 748:9 793:19 813:16 815:22 818:11 836:15 860:24 868:7,9,17,19 870:24 871:8
**against** [1] 874:25
**age** [1] 837:22 842:10
**agencies** [1] 823:9
**agency** [1] 820:1.3.7
**ages** [1] 841:14
**agitated** [1] 795:21
**ago** [4] 764:25 765:2 842:9 845:14
**agree** [2] 720:7 862:19
**agreeable** [1] 815:6
**agreed** [11] 713:19 723:11 739:4,9,23 741:11 757:18 758:12,20 759:9 763:18
**ahead** [8] 751:7.22 770:3 831:11,11 862:12 863:19 875:8
**airport** [5] 712:14,18 713:5 764:20 812:6
**Albany** [1] 823:3
**alien** [1] 873:3
**alive** [1] 835:4
**allegations** [1] 797:3
**alleging** [1] 853:12,14
**allow** [1] 774:20
**allowed** [4] 734:8 805:7 805:7 857:6
**allowing** [1] 872:22

Index Page 1

**Multi-Page™**

**allows** [1] 774:21
**almost** [1] 780:15
**alone** [1] 719:11
**along** [1] 827:18 840:4
**aloud** [3] 832:3 835:1,11 835:16 836:12 837:6 838:15
**alphabetically** [2] 807:17,18
**alteration** [1] 803:10
**altered** [1] 803:9
**altogether** [2] 790:1 833:24
**always** [3] 718:16 723:3 790:5
**Amendment** [2] 873:16 873:17
**America** [3] 711:2 831:24 837:11
**among** [2] 836:2 871:9
**analysis** [1] 831:4
**analyze** [2] 830:15 831:12
**analyzed** [1] 831:13
**Andras** [2] 787:13 789:9
**Anna** [2] 811:2 815:1
**Anne** [5] 814:6,12,25,25 844:20
**answer** [9] 730:9 734:8,9 735:6 759:23 760:12,14 847:17 865:18
**answered** [10] 713:12 727:7 751:19 753:5,8,17 753:18 762:10 859:19 865:17
**answers** [6] 770:5 773:5 806:2 836:8,17 837:15
**antiques** [1] 792:9
**anyway** [1] 769:18
**AOL** [5] 831:24 842:20 851:10,15 852:1
**AOL's** [1] 851:9
**apart** [1] 775:25
**appeal** [2] 872:11,17
**appear** [1] 852:2
**appeared** [2] 795:22 815:15 820:20
**application** [17] 754:20 756:12 758:16,20,24,25 759:15,18,24 760:9 763:5 763:7 765:1,9 784:18,19 784:23
**applied** [3] 757:4,9 873:14
**apply** [4] 761:19,20 771:17 794:10
**appointment** [1] 861:22
**approach** [4] 767:4 802:17,18,19 833:25 868:12
**approached** [3] 805:24 835:13 868:7
**approval** [1] 837:14
**April** [14] 767:24 770:17 773:6 778:17,21 781:21

**area** [29] 716:4 790:25 791:5,5,6 795:18 796:14 796:18 802:6,8 809:23 817:1,6 820:24 823:2,3 828:6,9,22,22,23 829:1,2 829:2,10,11,14 835:17 836:2
**arguably** [1] 769:15
**argue** [5] 767:16,17 771:11 845:6 873:12
**arguing** [1] 776:11,18 790:5 811:7
**argument** [1] 775:19,20 778:12,15,16 809:18 872:23 873:5,9
**arrangements** [1] 797:11
**arrested** [4] 759:1,5,20 760:1
**arrival** [1] 794:20
**arrived** [5] 794:2 796:2,3 827:6 862:3
**articulated** [1] 847:22
**ashamed** [2] 735:9 736:13
**aside** [2] 715:12 792:19
**asks** [1] 875:12
**assigned** [3] 790:23 824:22 827:4
**assist** [1] 825:2
**assistance** [2] 788:10,18
**assistant** [4] 711:17 771:2 800:16 839:13
**assistants** [7] 797:7 799:9,10,14 800:10 801:2 821:10
**Associated** [1] 833:15
**assume** [4] 770:23 815:18 818:13 849:19
**assumed** [1] 862:2
**assuming** [1] 818:6
**assumption** [1] 818:11
**attached** [4] 813:2,23 814:19 837:13
**attempt** [1] 855:20
**attempting** [3] 795:19 855:20 858:6
**attention** [3] 736:1 747:22 824:21
**attest** [1] 819:10
**attire** [1] 796:7
**attorney** [8] 711:14,17 755:24 771:2 861:13,16 878:8,9
**Attorney's** [3] 711:22 866:23 867:16
**attorneys** [1] 870:19
**au** [45] 802:10,13,15 804:17,22 805:3,4,11,17 806:2,9,10,20 807:14,23 808:2,3,3,5,10,14 814:17 814:20 819:18 833:7,8,9 833:19 836:2 839:12,12 844:2,3,15,21,21,22,23

845:11,16,21 846:7,8 858:4,5
**audio** [1] 874:25
**Audrey** [11] 711:20 742:19,22,25 744:3 753:15 754:1,9 755:11,13 755:24 756:8
**Aupairconnect.com** [2] 808:2,4
**authorities** [1] 827:19
**authorize** [1] 825:5
**authorized** [1] 825:6
**avail** [1] 777:13
**available** [2] 772:2 824:20
**avoid** [1] 778:10
**avoids** [1] 875:5
**award** [2] 761:4 763:1
**away** [8] 719:8 805:17 818:7 839:15 851:16 856:25 866:18 867:1

-B-

**B** [3] 835:9 855:12 877:3
**backup** [2] 712:15 720:15
**bad** [1] 854:7
**badge** [1] 863:12
**bag** [1] 863:13
**bank** [5] 800:9,15 841:18 853:21,22
**banks** [1] 853:24
**bar** [1] 843:22
**based** [4] 760:21 783:25 835:20 850:21
**basement** [2] 828:21 829:12
**basic** [2] 824:7 872:10
**basis** [5] 722:22 723:20 755:20 769:1,8
**bath** [6] 722:23,25 723:3 723:19,25 732:1
**bathrobe** [1] 796:5
**bathroom** [27] 723:6,8 723:13,23 724:17 725:19 727:11 728:1 730:6 731:1 731:4,9,14,24,25 732:8 735:14,18,24 736:7,11,22 737:18,23 738:7 751:10 789:23
**bcard** [1] 795:4
**bearing** [2] 774:23 777:10
**became** [2] 757:14 795:21
**become** [5] 762:2 793:12 793:15 833:8 858:5
**bcd** [10] 739:7,9,14 740:9 740:20,23 743:13 745:8 745:18 827:14
**bedroom** [5] 719:11 739:6 745:14 748:13 751:13,17
**beg** [1] 773:11
**began** [3] 722:19 757:13 860:6

**begin** [1] 871:7
**beginning** [3] 724:20 740:1,4
**behind** [2] 721:17,20
**belong** [2] 830:21,22
**belonged** [2] 830:20,23
**belongings** [2] 721:7,12
**Ben** [7] 711:27 833:15 859:20 861:14 863:11,25 867:22
**benefits** [1] 788:10
**Bernadett** [14] 763:24 764:13,18 765:18 781:6 781:25 783:9,17 784:5,25 785:25 794:3 819:2 876:3
**beside** [2] 723:9 855:14
**better** [2] 833:10 837:20
**between** [5] 775:6 778:17 792:3 817:7 819:9,11 841:11,14 868:3
**beyond** [4] 764:11 774:24 786:10 789:25
**big** [1] 818:11
**bigger** [1] 817:8
**bit** [3] 742:7 778:7 868:22
**bite** [1] 783:5
**biting** [3] 742:15 743:8 768:4
**bitten** [1] 743:6
**bizarre** [1] 855:13
**blankets** [1] 739:11
**blocks** [1] 859:7
**Blouse** [1] 796:7
**Blvd** [1] 711:23
**board** [3] 757:19 758:12 758:21
**bodies** [1] 740:18
**body** [1] 724:4
**boiler** [1] 829:2
**bonus** [2] 797:12 821:19
**bonuses** [1] 800:13
**book** [5] 804:16,21 833:7 833:7 839:18
**border** [1] 813:11
**Bosley** [2] 793:17 796:17
**boss** [3] 838:19 839:14 839:16
**bottom** [3] 833:13 838:1
**box** [13] 802:14 804:5 806:8,9,15,19,24 807:1,3 807:4,6,6,13
**boxes** [14] 802:6,10,11 803:2,4,7,13,14,17 806:1 806:5 807:4,4 814:11
**boyfriend** [3] 805:12 836:13,16
**bra** [10] 718:20,23 719:2 719:3,13,20,23 720:1 748:7,9
**brassieres** [1] 719:5
**Brazil** [2] 794:23 815:24
**breast** [1] 856:24
**breasts** [2] 721:17 722:17 742:7,7 743:6

745:1 746:20 748:4 782:22 783:4,6 860:15 865:11
**briefly** [2] 794:3 831:4
**bring** [11] 712:2,3 723:5 749:11 762:14 767:7 768:24 769:1 780:19 856:16 870:4
**bringing** [1] 768:19
**Brooklyn** [4] 711:5,19 711:31 861:18
**brought** [4] 734:12 746:14 769:18 860:11
**bubble** [1] 723:3
**building** [2] 756:9 866:22
**Bureau** [1] 790:17
**buses** [1] 792:20
**business** [9] 792:6 796:7 799:12 821:14 839:4 856:19 860:4,4 863:7
**businesses** [2] 792:8 839:17
**businessman** [1] 839:16

-C-

**C** [5] 711:12 790:9 858:14 877:25,25
**cable** [1] 828:11
**Cadman** [1] 711:18
**caf** [1] 851:17
**Caitilin** [1] 858:18
**Caitlin** [1] 876:17
**calls** [2] 785:23 822:14
**camera** [1] 823:14
**canceled** [1] 800:12
**cannibalize** [1] 875:1
**capacity** [1] 771:1
**car** [2] 713:15 818:1
**card** [5] 856:19 860:4,5,6 863:8
**cars** [2] 854:1,1
**case** [35] 762:23 763:1 767:2 768:1 769:3,6,19 774:15 784:17 786:9 788:6,7 790:5 793:18,21 793:22 794:5 803:21 810:7,9 818:23 824:16,18 824:20,22 831:2 839:3 847:1 859:5 870:14,25 871:4,9 873:13,16
**cases** [2] 824:13,16
**catalog** [1] 828:4
**categories** [2] 834:17,21
**category** [1] 834:22
**Catholic** [1] 715:19
**causing** [1] 783:5
**cautious** [2] 777:4 778:8
**cell** [4] 749:12,19 859:17 862:5
**Center** [1] 824:7
**certain** [3] 764:18 765:18 850:24
**certainly** [1] 719:5 773:1

810:20 863:2 866:17

**certainty** [1] 818:2

**certify** [2] 878:1,7

**Cesarc** [62] 711:26 712:8 712:10 732:3,5 746:1 751:2,5,9,20 755:3,9,13,19 763:19,21,25 764:7,9,16 765:24 767:4,6,14,16 768:6,16 769:24 770:2,4 770:11,14,25 771:3,18,22 772:14,23,25 773:11,15 773:18,25 774:4,11 775:5 775:18 776:1,9,22,24 777:2,6,12,18 786:7 789:18 855:22 869:2 873:23 875:15 876:4,6

**cetera** [1] 805:9

**chair** [1] 718:7

**chance** [1] 771:24

**change** [3] 724:22,24 869:5

**changed** [9] 768:18,23 769:7 774:5 779:2 803:9 809:5 842:11 868:20

**character** [2] 791:25 854:8

**charge** [16] 749:12,19 769:18 841:21 847:11 854:3,5,18 855:16,18,23 855:24 872:8 873:21 874:2,5

**charged** [4] 809:16 841:17 855:19 858:5

**charges** [1] 858:7

**charging** [1] 854:15

**check** [1] 797:15

**checked** [1] 874:25

**checks** [1] 800:12

**chief** [1] 791:19

**child** [1] 839:16

**children** [5] 820:16,17 839:13 846:2,8

**chin** [1] 795:4

**choice** [1] 870:1

**choose** [4] 805:25 835:14 839:1,2

**chose** [1] 719:23

**Christian** [1] 715:24

**Christianist** [1] 715:25

**church** [5] 715:9,13,14 716:16 748:23

**churchangel.com** [1] 714:12

**churches** [12] 714:7,13 714:14,16,19,22 715:2,7 715:19,21 717:4,5

**cigarettes** [1] 723:5

**circumstances** [3] 769:15 836:1,9

**City** [4] 791:25 792:2 815:11 867:25

**claim** [5] 773:24 774:10 778:13,13 779:5

**claimed** [1] 759:12

**claims** [1] 847:6

**clarified** [1] 865:13

**class** [1] 788:1

**clause** [3] 767:10 772:1 772:4

**clean** [1] 744:10 799:12 821:16

**clear** [3] 746:9 844:13 854:13

**clearer** [1] 815:25

**clearly** [5] 725:17 758:20 846:11 869:11 873:4

**CLERK** [10] 712:1,3,5,7 780:11 781:1,3 834:14 843:22 858:17

**climbed** [1] 746:19

**Clive** [1] 787:16

**close** [4] 768:21 775:21 775:23 867:3

**closer** [2] 718:14,15

**closest** [2] 793:1,3

**closet** [2] 827:13 829:2

**clue** [1] 762:17

**coffee** [1] 723:5

**cold** [1] 820:13

**collaborate** [1] 717:7

**Collar** [1] 824:7

**collateral** [1] 857:6

**collect** [1] 806:8

**collected** [3] 803:15 806:25 809:6

**collecting** [1] 796:9

**collection** [1] 799:22

**column** [1] 835:7

**columns** [1] 836:5

**comfortable** [3] 805:11 820:11 859:23

**coming** [5] 759:13 821:1 825:23 829:14 837:18

**commerce** [1] 792:5

**commercial** [2] 793:1,3

**commit** [1] 853:22

**committed** [4] 759:1,4 759:19,25

**common** [1] 855:3

**communicate** [1] 749:23

**Communications** [1] 804:14

**company** [1] 813:20

**company's** [1] 807:19

**complained** [1] 758:2

**complete** [1] 772:10 812:3

**completely** [3] 780:1 839:20 845:21

**component** [1] 824:17

**composed** [1] 850:5,5

**computer** [48] 714:3 716:8 748:24 799:11 821:13 822:25 823:8,14 823:17,19,23,25 824:4 828:7,10,10,18 830:14,21 831:12,15,16,21,22,23 832:1,7 836:18,24 837:12

840:12 842:14,25 843:4 843:13 847:10,15 849:2 849:14 850:4,5,7,12,16 850:18 851:3,17 852:3

**computer-based** [1] 824:15

**computers** [28] 716:11 800:2,3 802:3 825:7,9 828:13,17,19,20,23,24,25 829:1,1,3,13 830:7,11,14 830:19,19,20,25 831:5,6 831:7 850:2

**concentrates** [1] 839:18

**concerned** [2] 844:12 868:18

**concerning** [4] 768:4 800:3,9,15

**conclude** [1] 853:17

**concludes** [1] 811:9 848:2

**conclusion** [1] 771:4

**conduct** [1] 830:15

**conducted** [9] 795:8,16 804:20 816:24 826:9 831:5,5 842:17,20

**Conference** [17] 767:5 810:1 811:9 841:1 842:2 844:1 848:2 853:1 857:11

**configured** [1] 850:15

**conflicted** [1] 795:23

**confrontation** [1] 772:1 772:3

**confronted** [2] 776:1,5

**confronting** [2] 768:7 768:17

**Connect** [1] 808:10

**connect-worldwide** [1] 808:3

**connected** [2] 716:11 829:3

**connection** [2] 803:21 814:18

**connections** [1] 828:10

**consensual** [2] 785:2,25

**consequences** [1] 721:25

**consider** [5] 724:18 777:9 854:4,6 872:16

**considered** [1] 843:20

**considering** [1] 833:9

**consistent** [11] 767:7,21 768:3 769:8 774:13,14,22 776:25 777:14 779:10,12 780:1

**consisting** [1] 792:1,8

**consortium** [1] 824:10

**conspiracy** [1] 853:22

**constructive** [1] 833:12

**consult** [1] 805:23 835:12,18

**contact** [13] 714:13,15 714:21 730:5,15 740:11 819:8,11,12 825:22 835:24 836:6 845:17

**contacted** [1] 845:11

**contacting** [2] 714:18 717:4

**contained** [6] 802:13,14 806:9 812:3 814:11 854:5

**containing** [2] 812:4 849:17

**contemporaneous** [1] 770:18

**contemporaneously** [3] 770:16 771:25 772:7

**contention** [1] 779:22

**contents** [1] 803:14

**context** [1] 873:13

**continue** [6] 734:8 741:23 799:21 800:19 833:4 860:19

**continued** [4] 712:9 748:23 749:1 865:6

**Continued** [1] 877:1

**conversation** [5] 743:2 749:3 794:6,9 846:18

**converter** [1] 749:11

**convicted** [1] 762:23

**convicts** [1] 872:15

**convince** [4] 777:15 860:18 865:20,22

**convinced** [1] 865:16

**copies** [5] 831:1 842:22 842:24 843:3 875:2

**copy** [6] 773:18 834:13 834:15 850:11 851:3 875:1

**Cornelius** [1] 876:8

**Corners** [1] 792:7

**Corp** [1] 804:14

**correct** [100] 712:21 713:7 714:9,23 715:11 716:4 720:18,25 721:19 721:21 722:19 723:18 724:11,17 726:1,2 731:12 732:2,20,24,25 733:21 734:2,14,16,23 735:4,19 736:6,22,25 737:20,21 738:9,15 740:14 741:11 741:20 742:2,9,23 743:2 743:20 745:20 747:15 748:14,19 749:8,23 750:1 751:14,16 752:22,23 753:2,15 754:22 756:1,5 756:13 757:11,19 758:6,9 758:16,22 759:2,14,20 760:19 761:12,17,21 765:20 772:19 773:25 779:6 787:1,4,14 816:24 817:2,5 818:21,24,25 821:11 849:9 850:5 851:3 861:4,14 864:18 866:23 867:8 868:7,11,16 869:9 869:19

**correspond** [1] 834:22

**correspondence** [2] 844:15 847:23

**corroborates** [4] 844:19 845:10,15,22

**corroboration** [4] 844:25 845:5 846:14,17

**couches** [1] 820:22

**counsel** [6] 712:1 831:2 834:14 843:22 878:8,9

**counseling** [1] 787:23

**counselors** [1] 766:3

**count** [1] 806:6 854:19 872:7,8 873:2

**countries** [2] 812:7 845:7

**country** [6] 750:11 762:9 812:6 815:10 835:24 837:19

**counts** [1] 854:16

**county** [3] 711:21 790:24

**couple** [4] 781:16 834:25 838:15,25

**course** [5] 715:5 716:21 770:14,18 783:23

**court** [202] 711:29 712:2 712:13 713:12 724:13 727:6,8,13 729:4 730:3,9 732:6 734:9 745:25 750:12 751:6,22 753:6,11 753:18,20 755:17,20,23 760:10 762:10 764:1,4,8 764:10,12,17 765:25 767:12,15,19,23 768:2,9 768:14,25 769:6,9,10,25 770:3,10,13,15 771:1,9 771:19,21,23 772:11,15 772:24 773:3,7,9,12,21 773:21,22 774:1,7,9,10 774:17 775:6,11,13 776:8 776:11,23 777:1,3,7,17 777:19 778:7,20,24 779:4 780:19 783:18,22 784:3 786:4,12 789:21,24 790:5 794:24 796:23 798:7 801:5 802:18,21,24 804:1 807:11 809:17,20,24 810:2,9,13,16,22 811:7 812:21 822:5,7,11,18 827:15 829:22 830:2 831:8,17 832:24 834:1,17 837:3 838:12 839:21,23 840:15 841:6,8,11,13 842:1,4 843:2,17,19 844:5 845:1,8,13 846:20 847:1 847:4,17,19,24 849:10 852:7,11 853:2,5,9,16,20 854:10,17 855:2,6,19,23 855:25 856:5,10,12 857:9 858:2,10,13 859:14 862:11 863:16,18 864:10 864:24 865:2 869:3 870:10,12,15 872:1,5,10 872:14,20,24 873:6,11,19 874:1,7,10,14,23 875:5,9

**Court's** [1] 873:2

**Courthouse** [1] 711:4

**courtroom** [9] 712:6 764:2 768:11,15 777:21 778:14 781:2 871:6,11

**courts** [1] 873:15

**cover** [2] 791:5 823:2

**covered** [1] 791:6

**covering** [1] 803:10

**covers** [1] 803:12 823:3 823:3

**Multi-Page™**

**credibility** [2] 774:24
777:11

**credit** [1] 784:1

**crime** [9] 759:1,4,9,19,25
764:20,24 824:7 854:23

**crimes** [4] 823:1.8,18,19
823:24,25

**criminal** [4] 711:9
790:17 861:11 873:13

**critical** [1] 770:19

**cross** [1] 767:8

**cross-examination**
[13] 712:9 770:6 771:6
772:3 781:12 816:17
849:6 860:24 865:3 876:4
876:10,14,19

**cross-examine** [1]
771:25

**Csilla** [3] 749:17 787:13
789:9

**current** [1] 859:2

**customs** [2] 803:19
813:11

### -D-

**D** [3] 822:15 876:1,25

**daily** [2] 738:21,25

**damages** [2] 763:6.10

**dan** [1] 758:5

**Daniel** [3] 711:15 833:15

**danielben101** [1]
832:11

**danielben222** [1] 832:4

**data** [2] 824:8,9

**date** [20] 720:25 721:2,4
733:22 746:2,8,13 754:22
756:15 761:8 783:15
786:18,19,21,23 789:3,7
825:12,13 851:5

**dated** [4] 734:16 735:2
735:16 736:8

**dates** [4] 770:7 771:7,12
813:8

**daughter** [1] 837:22

**Davis** [3] 787:16 795:13
795:18,22,24

**days** [9] 733:23 742:18
743:19,23 775:3,25
779:16 781:16 819:5

**deal** [6] 757:24 758:17
810:13 823:7 824:15
873:20

**dear** [5] 833:2,4 837:7
838:17 839:12

**deceased** [1] 815:17

**decide** [2] 783:25 869:24

**decided** [2] 719:13 749:6

**decision** [7] 719:14
747:11 748:1,16,18
869:18 872:22

**declarant** [2] 772:2,16

**declined** [1] 862:18

**deduce** [1] 851:7

**deduct** [1] 838:20

**defendant** [31] 711:7,25
782:13,22 785:3 786:1
793:13 794:24 795:6,15
796:3,10 797:1 799:3
804:19 809:15 824:23
846:19,24 854:7 855:19
858:5 863:23 864:20
865:5 866:14 868:14
869:9,12,15,23

**defendant's** [33] 717:23
731:22 732:7 750:22
751:4 781:13,20 783:11
792:12,13,23 793:2,4
794:11 803:8 804:20
806:25 817:12 827:7,23
836:18,24 842:14,25
843:4,13 847:22 849:1
851:25 852:3 877:16,17
877:18

**defenders** [12] 711:28
856:19 857:5 858:22
859:21 861:8,14 863:10
863:20 867:18 868:10
869:23

**defense** [4] 831:2 845:5
847:6 870:13

**define** [1] 873:7

**defined** [2] 873:15,20

**definition** [1] 779:7

**degree** [1] 872:21

**delay** [2] 875:5,12

**deli** [1] 793:8

**deliberating** [1] 830:4

**deliberations** [1] 871:8

**demanded** [1] 821:21

**demands** [2] 799:18,19

**demeanor** [1] 868:20

**denied** [1] 858:11

**Denmark** [1] 814:6

**denominations** [1]
715:17

**Denzil** [2] 822:14 876:12

**department** [7] 776:3
791:7 794:2,5 803:19
819:2 826:14

**departments** [1] 791:4

**Departure** [1] 815:24

**dependent** [1] 757:14

**depicted** [1] 817:21

**deposition** [1] 773:2

**deputy** [1] 764:2

**describe** [14] 769:5
775:20 790:15 791:3,22
795:2 812:1 827:6 828:16
831:4 835:16 836:5
838:18 866:13

**described** [3] 732:11
776:10 817:1

**description** [1] 808:4

**designation** [1] 807:21

**desk** [4] 716:8.14 830:14
830:19

**detail** [1] 743:15

**detailed** [1] 802:14

**details** [7] 733:16 736:24
768:7,20 769:5 770:12

**866:3**

**determine** [5] 783:21
784:2 850:1,3,4

**determining** [1] 853:25

**Detty** [1] 837:7

**DHS** [1] 813:11

**difference** [1] 775:4

**different** [12] 769:15
777:23 778:18 804:25
805:5 812:4,7 826:16,16
837:14 841:5 845:23

**difficult** [1] 841:2

**digital** [13] 823:10,10,12
823:13,13,14,15 824:20
825:7,9 826:23 828:2,8

**digitally** [1] 823:16

**dinner** [1] 744:7

**direct** [18] 720:3 732:11
732:22 736:1 741:1 742:6
743:12 759:7 790:12
805:14,21 818:17 822:19
856:6 858:19 876:9,13,18

**directly** [3] 818:16
853:23 878:10

**disabled** [1] 839:20

**disagreements** [1]
820:15

**disconnect** [1] 828:14

**discrete** [1] 858:8

**discuss** [3] 737:22
870:25 871:8

**discussed** [3] 781:17
812:14 856:21

**discussing** [1] 867:8

**dispute** [1] 847:7,8

**distance** [1] 793:7

**distinction** [1] 774:18

**district** [5] 711:11,22
771:2 792:6 822:25

**division** [2] 711:28
790:17

**Docket#** [1] 711:1

**doctrine** [1] 769:10
774:21 777:24

**document** [19] 736:2
773:13 815:14,22 820:9
832:15,19,20 833:18
834:4 838:4,5,7 840:9,9
843:6,9 844:12,13

**documentation** [2]
800:2,6

**documents** [12] 721:10
831:14,16,17 832:17,20
834:6 838:8,8 840:1 850:3
867:7

**doesn't** [8] 711:16 772:3
772:17 778:21 783:24
845:1 846:1 855:7

**domestic** [2] 765:19,22

**domestically** [1] 788:4

**done** [4] 713:7 776:12
808:23 827:11

**door** [4] 817:19 827:9
829:11 859:15

**doors** [1] 829:18,19

**down** [14] 732:12 734:21
735:3 738:17 739:9
750:16 768:13 783:1
822:5 856:22 859:25
860:1 862:21 870:10

**downstairs** [4] 802:5,8
862:6 863:7

**draw** [1] 771:4

**dressed** [6] 719:10,11,16
796:3,6 859:24

**drive** [1] 836:19 850:18
852:3

**drives** [2] 830:13 831:1

**driveway** [1] 818:2

**duly** [3] 790:10 822:16
858:15

**during** [14] 723:25 756:6
770:23 775:2 776:13
779:8 787:9 800:18 802:2
803:15 826:17 827:20
830:18 868:24

**duties** [2] 799:10 823:5

### -E-

**E** [12] 711:12,12,13 790:9
790:9 822:15,15 876:1,25
877:3,25,25

**e-mail** [36] 785:10,10
831:20,21,22,23,25 832:7
840:10 842:7,8,20 843:11
843:12 844:2,3,8,11 849:9
849:13,21,25 850:4,8,20
851:2,3,4,6,79,11,20
852:1,2 874:1

**e-mailed** [1] 749:9

**e-mails** [11] 836:19,23
842:15 846:5 847:10,14
849:1,2,16,19,21,24
850:17,22

**easier** [1] 865:24

**East** [1] 711:18

**easy** [1] 746:24

**cat** [1] 839:5

**ECF** [1] 853:9

**Editor** [1] 833:16

**EDWARD** [1] 711:10

**effect** [3] 758:6,9 775:13

**eight** [9] 828:17 830:13
830:14,18,19,25 831:1,5
831:6

**either** [3] 743:9 795:15
835:9

**ejaculated** [4] 722:17
744:25 746:10,20

**ejaculation** [1] 768:5

**electronic** [2] 711:36
878:3

**element** [1] 854:23

**Elena** [7] 743:25 744:2,4
744:16,21 832:5 837:20

**elevator** [2] 859:15 860:1

**elicit** [3] 776:15 778:11
810:19

**elicited** [3] 770:6 777:15
864:25

**eligible** [1] 762:1

**embarrassing** [1]
866:16

**embassy** [1] 837:11

**employee** [8] 808:17
812:2,10 814:2,7 816:14
878:8,9

**employees** [2] 802:7
809:4

**employment** [3] 797:5
800:16 805:8

**encourage** [1] 872:21

**end** [10] 717:13 718:8
747:7 840:1 844:16 846:2
867:19 869:14,16 874:2

**ended** [2] 842:2 857:11

**enforcement** [4] 732:19
732:23 803:20 826:10,10
827:19

**engaged** [4] 740:10
745:18 825:8 841:12

**English** [1] 735:9

**enjoyable** [1] 833:11

**enter** [1] 821:2

**entered** [4] 785:6 812:18
814:23 859:13

**entering** [1] 815:10

**enters** [2] 712:6 781:2

**entirely** [1] 857:5

**entitled** [3] 769:21
771:15 804:21

**entries** [4] 835:9,19,20
836:9

**entry** [2] 812:6 815:23

**envelope** [1] 808:22

**equal** [1] 793:7

**equipment** [1] 823:15
839:24 840:2

**ERK** [1] 711:2

**erroneous** [1] 770:22

**Esq** [7] 711:13,15,16,20
711:25,26,27

**essentially** [3] 769:13
771:23 772:1,19 775:17
824:16 827:11

**establish** [1] 777:18
849:20

**establishment** [2] 793:1
793:3

**establishments** [1]
793:10

**estate** [1] 787:16

**et** [1] 805:9

**ethical** [3] 869:8,10,21

**evening** [1] 874:6

**events** [2] 767:18 776:9

**eventually** [4] 724:22
724:24 740:7 795:23

**evidence** [17] 717:22
732:3,7 750:3 751:2,4
773:3 774:12 777:3
783:25 785:6 796:9
799:22,24 802:17,23
803:11,11,12,23 804:2
806:8 807:2,9,12 809:10

810:12,16 811:2 812:16 812:19,23 813:10 814:1,8 814:23 815:6 817:12,13 819:18,21 823:10,10,11 823:12,13,13 824:20 825:7,9 826:24 828:3,5,8 829:21,25 830:5 832:25 834:10 837:4 838:13 841:18 842:5 853:17,22 854:4,19 858:3,8 877:4 877:16

**exact** [3] 716:19 775:15 775:15

**exactly** [2] 753:7 855:7

**Examination** [12] 763:22 781:4 790:12 822:19 851:23 858:19 876:5,6,9,13,15,18

**examined** [5] 767:9 790:10 822:16 853:24 858:15

**example** [3] 804:4 820:12 853:23

**examples** [3] 820:17 834:25 844:16

**Excel** [3] 715:10 717:8 717:18

**except** [1] 857:8

**exception** [2] 767:10 842:10,12 855:6,8

**exceptions** [1] 808:9

**exchange** [3] 757:18 758:12,21

**exclude** [1] 841:19

**excuse** [4] 802:9 830:25 852:10 862:6

**excused** [4] 789:20 822:6 852:12 870:11

**executed** [5] 794:13,15 794:16 795:7,25

**executing** [1] 825:10

**execution** [1] 825:2

**exhibit** [56] 717:23 731:22 732:7 750:3,22 751:4 803:23 804:2 806:13 807:8,12 809:9 812:9,22 813:9 814:5,9 814:21,24 815:4 816:4 817:12 819:18 829:24 832:13,14,18,25 833:18 834:3,7,10,16,16,23 837:4 838:4,10,13 839:8 842:5 843:8 877:4,5,6,7,8,9,10 877:11,12,13,14,16,17,18

**exhibits** [4] 812:14 816:11 849:13 853:10

**existed** [1] 774:14

**exits** [3] 768:11,15 871:11

**expectation** [1] 762:21

**expectations** [1] 805:4

**expected** [1] 863:1

**expenses** [1] 757:19 758:13,21 837:24 839:4,6

**experience** [4] 790:19 833:11 838:19 860:7 871:1,2

**experiences** [3] 734:13

---

805:3 866:13

**expired** [1] 753:14

**explain** [6] 796:19 804:7 815:13 823:5 837:8 842:17

**explained** [3] 761:25 764:19 765:7

**explaining** [1] 798:7

**explicit** [1] 867:17

**explicitly** [1] 869:14

**extends** [1] 834:19

**extension** [1] 869:13

**extent** [1] 769:17 777:10 854:4

---

**-F-**

**F** [1] 822:15 823:4 877:25

**F2d** [1] 775:1

**fabricated** [3] 778:16,25 779:23

**fabrication** [16] 767:17 769:3 773:24 774:6,8,10 774:16 776:18 777:16,21 777:21,22 778:13,25 779:5,11

**face** [1] 873:11

**fact** [20] 735:2,17 736:6 742:25 743:4 759:4 763:5 763:17 769:6 772:2 775:13 783:23 855:15 861:24 863:3 864:3,21 866:2 869:1 872:21

**fair** [8] 719:19,22 737:16 746:12 756:19 762:21 770:5 771:8

**fall** [1] 774:16

**false** [3] 734:18 760:15 855:25

**falsely** [2] 759:12,18

**familiar** [4] 816:20,22 826:2,4

**families** [4] 805:6,7,24 833:8 835:13

**family** [9] 744:14 762:14 805:3,23 815:16 820:11 835:12 836:14 837:20

**fancy** [2] 839:24 840:2

**far** [12] 716:18,20 729:2 792:11,20 805:2,8 818:7 839:15 844:12 850:1,10

**father** [3] 815:17,18 835:5

**favors** [1] 821:21

**faxing** [1] 716:22

**FBI** [1] 824:12

**Fearon** [5] 822:14,21 834:17 842:7 876:12

**federal** [16] 711:28 762:1 769:19 823:9 856:19 857:5 858:22 859:21 861:8,13 863:10,20 867:18 868:9 869:23 872:21

**feeling** [3] 769:16 775:1

---

776:16

**felony** [1] 791:14

**felt** [5] 719:18 733:5,6 735:9 805:11

**FERRARA** [1] 878:1

**few** [10] 732:22 733:23 742:18 743:19 808:9 817:10 821:3 844:11 859:7 868:6

**fiance/boyfriend** [1] 805:19

**field** [1] 805:5

**fifteen** [2] 864:6,12

**fights** [1] 820:15

**file** [19] 754:19 758:5 800:4 802:7 808:17,18 809:3,5,23 812:2,3,5,10 814:2,7,11 816:12,14 832:16

**filed** [1] 758:1

**files** [5] 800:4 802:1,6,11 803:7

**fill** [2] 837:12 867:24

**filled** [16] 756:12 758:15 759:15 760:8,10 765:1,3 765:5 767:1 779:24 784:18

**filling** [2] 722:25 723:1

**final** [2] 836:11 868:12

**finally** [5] 813:9 815:3 815:19,19 816:2

**financ** [2] 805:11,16

**financial** [1] 800:5

**financially** [1] 878:10

**fine** [6] 811:6 838:22,24 839:7 854:9 873:10

**finish** [2] 734:9 790:1

**finished** [1] 744:5

**first** [44] 718:22 730:14 732:22 733:3,4 739:6 767:19 768:1 772:9 772:24 775:17,19 790:10 793:24 794:1 818:23 822:16 827:6 832:14 833:2,5,6 834:13,16 836:6 838:15,15,24 839:11 842:19 844:11,17 846:6 846:21,21,23 855:17 856:20 858:15 863:24 865:6 872:8 873:16,17

**fist** [1] 767:25

**fit** [1] 855:7

**five** [14] 775:9,11 783:10 787:3,7,8,9 839:25 841:18 841:19 854:16,25 866:18 867:1

**flew** [2] 712:14 713:2

**flight** [2] 753:1 813:17

**floor** [4] 711:30 820:24 821:5,6

**flown** [2] 786:8,14

**fly** [1] 720:19

**focus** [3] 826:19,22,23

**focusing** [2] 833:13 838:1

**folder** [2] 802:7 838:9

---

**follow** [2] 720:8 850:9

**following** [2] 759:23 794:9

**follows** [3] 790:11 822:17 858:16

**fondling** [2] 722:11,19

**food** [2] 765:10 839:5

**force** [9] 727:2,9 730:1 737:3 751:23 752:2 774:23 782:14,17

**forced** [14] 724:16 725:23 731:16 735:7 736:21 737:17 738:7,13 751:10 751:13,16 752:9 768:4 782:24

**forcibly** [2] 752:12,16

**forcing** [1] 735:3

**foregoing** [1] 878:2

**forget** [2] 772:8 849:8

**form** [6] 757:10 837:12 837:18 842:8 849:9,13

**forthcoming** [1] 868:24

**forty-five** [1] 864:15

**found** [16] 799:13 800:3 802:2 816:12 827:16 828:16,17 830:11,18 831:18,22 836:23 847:10 847:14 849:16 850:17

**four** [11] 744:7 760:25 761:14 791:5 792:13,14 797:9 817:7 828:20,24 829:3

**frame** [1] 733:11

**France** [1] 794:22

**Frankly** [1] 770:4

**fraud** [1] 847:11

**free** [4] 723:13 761:16 765:10 872:15

**freely** [1] 870:1

**friend** [7] 735:8 736:10 736:16 749:7,17 799:6,15

**friend's** [1] 837:22

**friendly** [3] 748:19 749:3 765:25

**friends** [7] 783:14 787:13 835:24 836:2,6 837:20,21

**frightened** [1] 734:2

**front** [4] 735:10 809:18 817:23 818:6

**full-time** [4] 791:13,19 791:20 792:3

**furniture** [1] 747:17

**furthest** [1] 718:8

**Fusillo** [1] 832:5

---

**-G-**

**galleries** [1] 792:9

**gas** [1] 793:6

**gathering** [1] 823:10

**general** [7] 776:19 810:3 812:2 824:1 826:5 828:6 828:9

**generally** [5] 774:8 791:14 824:13 825:4

---

865:21

**generated** [1] 815:23

**gentleman** [2] 794:20 795:3

**gentlemen** [8] 768:10 783:18 822:12 830:3 839:23 858:2 870:15,24

**geographic** [1] 823:2

**German** [3] 813:1,6 870:4

**gesture** [1] 730:14

**getaway** [1] 854:1

**girls** [1] 797:8,13

**Gisele** [11] 716:1,16 717:3 718:23 723:17,19 727:10 728:1,2 730:5,8 730:14,25 731:5 738:23 738:24 739:1 740:10 743:13 745:3,18 746:3,13 748:18 750:6 794:23 795:19 815:9,16 816:10 816:12

**given** [8] 715:2 762:8 767:23,24 774:8 784:3 869:6 875:2

**giving** [2] 725:3 863:7

**glass** [1] 829:11,18,19

**glossy** [1] 718:1

**goes** [4] 773:17 783:19 841:16 850:7

**good** [13] 712:11,12 713:9 735:9 790:14 799:6 822:21,22 837:7 861:1,2 867:20 868:23

**government** [40] 711:13 764:19 768:19,24 769:8 769:19,21 771:15 774:12 775:7 776:15,24 777:6,13 777:16 778:11 806:13 822:14 832:22 834:7,23 838:4,10 839:8 840:13 841:3,25 842:3 843:8,15 853:10 854:9,14 858:1,3 855:25 862:25 863:4 872:11,16

**government's** [40] 767:6 803:23 804:2 807:8 807:12 809:9 812:9,22 813:9 814:5,9,21,24 815:4 815:13 816:4 819:18 829:24 832:13,18,25 833:17 834:3,10 837:4 838:13 842:5 849:13 873:4 877:4,5,6,7,8,9,10 877:11,12,13,14

**grab** [1] 724:18

**grabbed** [3] 724:5 741:12 856:24

**graduate** [1] 858:25

**grant** [1] 872:12

**granted** [3] 760:18,21 872:17

**GreatAupair.com** [2] 808:10,14

**green** [1] 809:3

**grope** [1] 748:4

**ground** [2] 727:6 755:17

**Multi-Page**™

**group** [1] 835:21
**guess** [1] 873:1
**guys** [1] 716:4

**-H-**

**H** [1] 877:3
**H-a-h-l** [1] 795:14
**Hahl** [1] 795:14
**hair** [2] 723:25 724:2
**half** [3] 793:4 798:4 822:10
**hamlet** [1] 792:7
**hand** [6] 713:15,16,16 713:21,21 724:5,18 730:17 741:12,17 782:25 790:8 795:4 860:20 863:11 878:13
**handed** [1] 808:22
**hands** [2] 856:22 865:10
**handwritten** [2] 864:6,8
**hanging** [1] 802:7 809:3
**happening** [1] 731:19 745:21
**hard** [6] 783:5 830:13 831:1 836:19 850:18 852:3
**hardware** [1] 792:9
**he'd** [1] 725:2
**head** [1] 724:14 782:15 785:22
**heading** [1] 836:16
**hear** [2] 809:17 871:6
**heard** [3] 818:23 839:21 858:8
**hearsay** [12] 767:9 768:25 771:16,21,24 772:2,4,16,18,21 798:6 846:12
**heavens** [1] 841:23
**Heidi** [1] 711:26
**held** [6] 713:15 767:5 810:1 841:1 844:1 853:1
**help** [11] 736:2 744:10 754:2,5 755:4 757:4 784:2 784:6,17 837:9,15
**helped** [9] 736:19 754:19 755:8 763:7 786:9 787:10 787:20,21 788:21
**helpful** [1] 855:11
**helping** [4] 735:8 746:17 784:11 833:10
**helps** [1] 786:21,22
**Herczeg** [7] 786:8 794:3 794:7,9 798:3 819:3 876:3
**hereby** [1] 878:1
**hereunto** [1] 878:14
**Herzceg** [2] 712:11,14
**Hi** [1] 858:21
**hiding** [2] 827:13,13
**highest** [1] 820:8
**highlighted** [6] 765:15 782:7 835:6,16,22 836:4
**Hilary** [1] 711:16

**hire** [1] 755:2
**hiring** [1] 800:5
**Hold** [1] 849:10
**Holding** [2] 803:24 807:10
**home** [26] 713:24 717:19 718:5 721:7 734:14 738:20 744:2,4 790:1 792:12,13,23 793:2,4 825:20,21,23 827:7 839:5 839:17 844:20 845:6 851:16 853:12 855:21 858:7
**Homeland** [1] 803:19
**homes** [3] 792:1,3 833:9
**honest** [2] 731:8,12
**Honor** [42] 727:4,12 733:10 734:7 750:9 751:18 753:4,16 754:3,8 755:16 768:16 772:9,14 772:23 773:14,18 776:22 777:12 779:21 786:10 789:19,22 802:16,22 803:22 809:8 811:2,4 816:16 822:1,4 833:25 846:3 862:12 863:14 865:4 870:14 872:2 874:6 875:4,14
**HONORABLE** [1] 711:10
**hope** [1] 763:1
**hospitality** [1] 839:18
**host** [4] 805:5,6,7 836:14
**hot** [1] 718:2
**hotel** [8] 856:15 857:3 859:7 861:18 862:4,9 866:7,19
**hotels** [1] 839:19
**hour** [4] 745:8,14 822:10 864:16
**house** [63] 712:23 713:15 717:20 718:5,19 719:6 721:16 722:5,8 723:15,16 731:12 732:19 733:4 736:14 737:18 743:22 744:25 750:14 760:22 765:10 781:14,20 783:11 794:16,18,20 795:20 799:9,20 801:3 817:4,22 817:24 818:4,7,14,16 819:5 820:12,23,24,25 821:1,5,6,8 827:8,9,11,12 827:22,25 828:1,3,7,16 828:17,21 830:6,24 855:11,14
**houses** [5] 817:6 818:7,9 818:17,20
**housing** [4] 754:2 765:10 787:10,20
**hug** [1] 782:24
**hugging** [1] 740:13
**Hugo** [1] 815:18
**human** [3] 748:3 757:11 793:18
**hundred** [2] 715:4 750:13
**hundreds** [6] 717:4,5 756:6 806:6,19,20
**Hungarian** [1] 749:7

**Hungary** [4] 720:20 752:22 785:1 786:8
**hungry** [1] 790:3
**hurt** [2] 722:8,10

**-I-**

**I.D** [2] 863:11 869:6
**I.D.** [1] 863:10
**I.D.s** [1] 868:16
**idea** [5] 717:15 755:1,8 791:15 806:1
**identical** [2] 842:8,15
**identification** [2] 731:21 750:21
**identified** [6] 770:8 794:21 795:6 828:4 830:9 857:5
**identify** [3] 856:17 869:8 869:22
**identifying** [2] 826:23 828:2
**identity** [2] 846:24,25
**ignore** [1] 837:9
**II** [2] 711:32 878:18
**imagines** [1] 825:7
**immigration** [12] 754:11 755:14 756:1,5 758:2 759:10 761:23 764:20,24 784:6,12
**Immigrations** [1] 803:19
**immoral** [2] 873:4,7
**impeach** [1] 856:17
**impeached** [1] 774:15
**impeachment** [1] 857:2
**implicate** [2] 772:3 775:13
**implicated** [1] 772:21
**implication** [2] 775:15 776:13
**important** [3] 768:20 844:24 845:4
**importation** [1] 873:3
**impression** [10] 769:12 769:17,20 770:22,25 771:3,12,13 775:2 778:10
**inactive** [2] 832:8,10
**inactivity** [1] 832:7
**Inc** [2] 711:32 878:18
**incident** [4] 722:16 732:11 768:22 775:21
**income** [1] 800:4
**inconsistent** [2] 774:9 779:14
**independent** [2] 839:20 845:18
**indicated** [2] 725:17 747:19 761:3
**indicates** [2] 779:11,12
**indictment** [11] 841:11 847:12 849:10 854:6,14 855:1
**indirectly** [1] 878:10
**indiscernible** [1] 854:7

**individual** [3] 715:14 807:20,20
**individually** [1] 806:6
**individuals** [1] 825:8
**induce** [3] 841:13 855:20 858:6
**inducing** [2] 855:20 858:6
**industry** [1] 839:19
**influenced** [2] 871:5,6
**information** [17] 714:16 714:21 715:6,9 762:16 782:21 798:2 802:15 805:3 813:18 815:15 816:1 823:16 824:11 831:14 851:5 866:11
**informations** [1] 714:14
**informed** [2] 762:12 846:7
**initial** [5] 769:16 781:7,9 827:9,11
**initiate** [1] 730:5,12
**inside** [5] 752:7 806:15 808:24 828:25 829:13
**Inspector** [1] 822:21
**instance** [2] 850:4 856:20
**instances** [1] 858:8
**instead** [7] 731:18 737:1 747:14,17 759:13 870:21 874:22
**institutions** [2] 715:23 715:24
**instruction** [3] 853:2,5 854:13
**instructions** [6] 720:8 870:17,18,19,20 873:8
**instylecompanics** [1] 832:11
**intend** [2] 773:13 874:15
**intent** [1] 872:9
**interact** [1] 795:15
**intercourse** [2] 751:23 752:2
**interested** [4] 763:5,9 830:3 878:10
**interesting** [1] 871:1
**internet** [10] 716:11 717:1 799:17 835:25 836:7,9 837:11 851:10,16 851:17
**interpretation** [1] 770:5
**interpreter** [1] 870:4
**interview** [11] 713:1 796:11,12,15 861:21 864:1,4 867:6,19 868:25 870:5
**interviewed** [8] 795:10 795:11,12,14 796:10 820:18 856:15 861:3
**interviews** [1] 795:8,16
**intimate** [1] 740:18 866:16
**intimidation** [1] 841:13
**introduce** [1] 769:8

**introduced** [8] 755:10 853:10 856:3 858:3 859:19 860:1 863:6,24
**introduction** [1] 833:10
**investigate** [1] 721:4
**investigation** [8] 790:18 793:12,25 800:19 801:1 830:18 859:4 870:3
**investigations** [1] 824:2 826:5
**investigative** [2] 791:13 826:7
**investigator** [63] 733:20 734:19 737:6,8,17 738:3 738:6 742:14,19 743:1,1 743:5 745:10 746:6,16 767:2 776:3 781:17,20 790:14,16,19,22,23 793:16,20 795:6,13,14,18 795:22,24 796:17 799:3 800:8,18 802:1 803:2 804:3 806:12,18 807:13 808:12,16,21 812:1,24 813:4 814:19 815:7,20 816:2,11,19 822:24 823:6 824:1 827:5 828:1 834:17 842:7 857:3 861:11
**investigators** [1] 793:20 823:7 824:19 827:4
**invite** [1] 866:25
**invited** [1] 837:22
**inviting** [1] 739:1
**involve** [2] 722:25 802:10 816:12
**involved** [5] 740:16 769:19 770:7 793:12,15
**involving** [1] 824:22
**irrelevant** [2] 841:7,8
**Isabelle** [1] 794:22
**issuance** [2] 796:22 797:4
**issue** [2] 737:22 773:4 780:8 847:1 857:4 873:13
**issues** [1] 784:12
**it.THE** [1] 855:2
**item** [2] 807:2 831:13
**items** [1] 828:4
**itineraries** [1] 812:5
**itinerary** [3] 813:8,17 816:8
**itself** [2] 807:1 834:19

**-J-**

**J.F.K** [1] 712:14
**Jager** [12] 711:16 860:25 862:12 863:14,17,19 864:12 865:1,4 870:7 874:12 876:19
**January** [3] 760:18 761:4 761:9
**Jasmine** [1] 813:1
**jazz** [1] 867:23
**Jennifer** [1] 795:14
**JFK** [4] 812:6 813:7,17 837:18

**Joanna** [14] 785:11,12,13
785:15,16 799:16 838:2
840:6 844:7,14,17 846:25
847:10,14

**job** [15] 714:7 719:20,23
720:7,11,14,17 725:10
744:4 759:13 785:22
790:15 820:2 823:5
839:15

**join** [2] 739:1 744:16

**Joseph** [80] 711:6 713:14
716:14 717:18 718:8
721:6,16 722:13 723:23
724:16 727:9 728:1,2
729:1 730:1,6,15 731:1,5
731:25 732:12,18 733:7
735:3,6,17 736:7 737:18
737:25 738:6,12,21 739:2
739:14,17,22 740:9 741:1
742:7 743:13,20,25
744:24 745:18,23 746:3,4
746:19 747:3 748:1,18
750:7 751:10,23 752:1,6
752:20 757:14 759:16
760:22 762:22 763:6,10
785:23 793:13 794:21,24
824:23 825:21 832:5,17
832:21 834:6 837:7,20
838:9,19 839:6 859:4
863:23

**Joseph's** [17] 720:8
722:23 733:4 738:20
750:14 765:10 837:15

**Jr** [1] 711:23

**judge** [26] 711:11 768:12
769:24 770:2 771:18,22
780:7,8 827:18 829:20
831:10 839:22 840:3
844:9 847:11,16 848:1
852:9 856:2,8,8 872:22
874:11,12,13 875:15

**judgment** [3] 784:3
872:3,7

**July** [2] 815:10,24

**June** [7] 754:19 756:12
756:20 757:7 763:4 765:2
779:25

**jurisdiction** [1] 826:7

**jurors** [1] 871:7

**jury** [37] 711:9 712:2,6
732:5 751:8 768:11
770:19 771:4,11 777:9
778:4,9,21 780:19 781:2
785:7 804:4,7 809:18
812:19 813:14 814:2
815:5 817:13 834:11,13
834:16 839:9 853:17
854:15 863:15 871:1,11
872:15 873:8 874:17
875:12

**justice** [2] 771:20 824:11

**jyasstrjoannak** [1]
832:4

**-K-**

**K** [2] 823:4 858:14

**keep** [1] 790:2

**keeping** [1] 743:2

**kick** [1] 725:11

**kicked** [2] 844:23 845:12

**kind** [6] 713:1 715:18
716:19 748:21 793:22
867:10

**kindness** [1] 747:23

**kiss** [4] 782:24 783:4
856:24 865:10

**kissed** [3] 742:7 860:14
864:21

**kissing** [3] 740:13,18
742:8

**kitchen** [1] 744:10

**knees** [7] 731:7 732:13
735:4,7 736:22 737:17
738:18

**knew** [3] 757:21 759:9
861:24

**knock** [1] 859:15

**knocked** [1] 827:8

**knowing** [1] 798:1

**knowledge** [3] 791:21
819:10 851:9

**KORMAN**

**Krintz** [2] 794:22 795:13

**Kulik** [2] 840:6 844:7

**-L-**

**L** [4] 790:9 822:15 823:4
858:14

**L-u-n-k-e-s** [1] 794:23

**labeled** [4] 802:7 807:3
807:3 808:17

**ladies** [9] 768:10 783:18
822:11 830:3 833:8
839:23 858:2 870:15,24

**Lafertype@verizon.net**
[1] 711:35

**lake** [7] 856:22,23 860:8
860:14 864:18,21 865:10

**language** [3] 813:5 816:9
854:14

**laptop** [6] 828:18 830:13
830:14,15,20,22

**large** [5] 802:11 814:11
820:21,22,24

**last** [7] 809:22,22 835:21
859:1,8

**lasted** [1] 745:13

**law** [6] 732:19,23 762:1
826:10,10 827:19

**lawyer** [15] 754:19,23,25
755:2,4,8,14 761:23 763:7
763:12 764:19 784:6,11
784:19,23

**leading** [1] 793:10

**learn** [2] 717:18 801:1

**learned** [2] 764:23 819:2

**learning** [1] 724:21

**least** [5] 792:14 834:21
843:5 849:16 874:3

**leave** [5] 720:9 722:4,8
771:11 775:2

**leaving** [2] 805:11,19

**led** [1] 797:4

**left** [26] 713:21 733:4,15
733:23 742:23 743:19,22
747:1 752:20 759:16
768:20 769:12,17,20
770:12,22 771:14 775:16
776:13 781:13 783:10
787:3,4,12,18 868:4

**legal** [3] 761:20 762:2
784:11

**legally** [1] 761:17

**lengthy** [2] 802:13
804:10

**less** [1] 867:1

**letter** [20] 734:13,16,18
734:21 735:2,7,8,16,16
736:8,19,21,24 737:3,14
743:9 809:3 838:18 842:8
853:6

**level** [5] 791:14 796:12
820:25,25 821:2

**Lewisboro** [1] 791:8

**lic** [6] 733:18 739:9
740:20,23 759:9 873:4

**lies** [1] 841:13

**life** [5] 762:6,9,14 788:1
805:3

**lift** [1] 834:11

**likely** [1] 845:5

**limited** [2] 773:5 858:7

**limiting** [1] 854:13

**LINDA** [1] 878:1

**line** [2] 753:17 828:25
833:13 840:5 849:22

**lines** [3] 785:17 838:16
838:25

**liquor** [1] 793:6

**list** [1] 714:13

**listed** [4] 715:15 804:18
807:2 833:21

**listen** [1] 867:23

**live** [6] 760:24 761:16
762:9,13,14 765:21

**live-out** [1] 839:3

**lived** [3] 749:7 765:18
787:16

**living** [15] 732:9 762:6
765:23 766:2 788:3,25
789:5 795:18 796:13
820:19,20,23 821:3
822:23 855:10

**lobby** [7] 859:13,20,24
862:4,7,19 866:7

**local** [6] 790:25 791:3,9
791:11 823:9 836:13

**located** [17] 793:8 800:2
802:4 828:3,8,19,24
829:13,15 830:7 832:10
832:16 834:5,6,8 838:8
851:5 867:5

**location** [3] 825:3 832:17
832:21

**lodges** [1] 861:25

**log** [1] 851:18

**logged** [1] 851:25

**longer** [4] 790:2 809:20
822:10 846:9

**look** [19] 736:2 750:17
757:2 765:14 780:3 782:7
784:22 785:5 806:12
807:14,25 808:5,8 816:3
842:20 846:2,6 855:3
874:8

**looked** [3] 732:8 750:14
829:18

**looking** [8] 735:21
829:10,17 839:12,13
842:21 846:8 858:5

**looks** [2] 807:18 863:17

**Loretta** [1] 711:13

**lose** [6] 719:20,23 720:7
720:14 785:22,22

**losing** [1] 720:10

**lots** [1] 783:5

**loud** [2] 736:1 757:2

**lounge** [2] 860:3,3

**lunch** [4] 780:10,11
789:25 790:7

**Lunkes** [13] 794:23
795:12,19,21 798:1 799:4
799:5 815:9,16,18,23
816:10,12

**lying** [2] 745:21 764:20
764:23

**Lynch** [1] 711:13

**-M-**

**m** [4] 790:9 835:9 847:24
853:3

**ma'am** [1] 861:12

**mailbox** [1] 818:2

**main** [1] 820:24

**makes** [1] 844:13

**manager** [1] 790:5

**manipulated** [1] 741:19

**manipulation** [1]
841:13

**Mann** [1] 854:16 872:8

**manner** [2] 769:4 797:14

**manually** [1] 741:2

**manuscript** [1] 804:21

**March** [40] 733:12,20
735:2,17 736:8 737:7
742:16 743:9,16 746:7
752:21 753:1 768:8,19,19
770:8,9,9,16 771:5,5,5,12
774:5,13,13 776:6,6
778:17 781:8 787:5
793:14 794:15 818:23
819:6,9,9 820:18 825:14
825:16

**Mark** [1] 794:1

**marked** [24] 731:22 732:7
751:4 803:23 806:13
807:8,22 809:9 812:9
813:9,13 814:20 815:4,12
816:3 829:6 832:13 834:3
836:22 838:4 840:8 843:8
877:4,16

**Market** [1] 793:8

**marking** [1] 807:5

**Marriott** [7] 857:3 859:7
859:13 861:18 862:3

866:7,19

**massage** [1] 785:23

**masseuse** [1] 785:24

**massive** [1] 717:16

**matter** [4] 743:22 818:19
875:16 878:5

**may** [26] 711:7 732:5
751:5 754:9 762:1 763:19
767:4 772:23 774:22
778:2 789:25 790:2
807:25 819:11 833:1,25
842:6 846:2 853:6,11,20
854:4,6 861:6 870:20
878:14

**meal** [1] 744:7

**meals** [1] 749:1

**mean** [31] 718:15 719:20
747:21 751:25 753:6
767:12 768:2 769:11,14
769:16 770:12 771:16
772:17 773:22 774:2
775:24 776:19,23 777:25
778:4 779:16 783:24
810:17 850:20 851:15
855:15 856:8 869:5
873:11,15

**means** [2] 720:10,10,13
762:5 788:11

**meant** [2] 860:17 865:14

**medium** [1] 802:4

**meet** [5] 749:9,25 764:18
766:3 862:21

**meeting** [10] 742:18
743:19 753:14 754:9,13
755:12,22,24 756:4
781:12,16 862:24

**meetings** [1] 756:8

**member** [2] 790:20
823:25

**members** [1] 755:25
826:10

**members/friends** [2]
805:23 835:12

**memo** [1] 864:3

**memory** [4] 736:5 760:8
808:2 818:14

**mention** [4] 735:6 736:21
867:3,4

**mentioned** [1] 715:12
735:3 796:9 797:12

**merely** [1] 777:10

**merits** [1] 872:16

**Merritt** [40] 733:20
734:19 737:17 738:3,6
742:14,19 743:1,5 746:7
746:16 767:2 776:3
781:17,21 790:14,19,23
795:6 799:3 800:8,18
802:1 803:2 804:3 806:12
806:18 807:13 808:13,16
808:21 812:1,24 813:4
814:19 815:7,21 816:2,11
876:8

**Merritt's** [2] 737:6,8

**message** [8] 842:19,23
842:24 843:3 844:17
845:21 846:6 850:11

**mct** [17] 712:20 733:20 734:1,6,10,10 742:22,25 743:4,16 749:16 756:6 856:20 862:13,16,17 863:3

**Michael** [3] 711:25 795:13 827:5

**microphone** [1] 730:10

**middle** [2] 739:15 781:8

**might** [5] 762:22 779:21 784:12 818:11 824:17

**miles** [4] 791:24 792:13 792:14 793:5

**Miller** [1] 794:1,4

**mind** [2] 724:24 725:9

**mine** [3] 718:13 752:13 872:13

**minute** [6] 763:19 768:9 772:22 773:7 852:8 866:18

**minutes** [8] 818:19 839:25 856:6 864:15,15 864:15 867:1 868:7

**misimpression** [1] 779:23

**misleading** [2] 776:17 778:10

**miss** [1] 847:4

**misspoke** [1] 778:2

**misspoken** [1] 853:20

**mistake** [1] 872:17

**mistaken** [1] 777:25

**mistakes** [2] 874:22,24

**misusing** [1] 844:22 845:17 846:1

**MLK** [1] 711:23

**mobile** [1] 793:5

**modem** [1] 828:11

**moment** [4] 725:4 731:3 777:4 786:3 808:8 842:9 862:7 870:7

**money** [10] 762:19,22 763:1,6,10 788:12,13,16 788:17,18

**month** [4] 769:14 775:9 779:18 839:4

**monthly** [1] 839:4

**months** [1] 759:15

**mood** [2] 867:20 868:23

**morning** [7] 712:11,12 719:10,13 732:1 870:22 874:4

**most** [5] 756:8 808:10 818:19 851:4 856:7

**mostly** [1] 841:14

**Mother** [1] 835:4

**motion** [1] 858:10 872:7 872:12,24

**move** [13] 730:22 732:3 751:2 764:16 803:22 807:7 809:8 827:18 831:10 840:3 847:25 862:12 863:19

**moved** [3] 783:15 789:3 789:7

**moving** [3] 753:9 782:25 872:2

**Ms** [159] 712:8,10,11,14 727:4,7,12 729:3 730:2 732:3,4,5 733:10 734:7 746:1 750:9 751:2,3,5,9 751:18,20 753:4,9,13,16 753:19 754:3,8 755:16,18 763:19,21,23,25 764:7,9 764:16 765:24 767:4,6,11 767:14,16,21,24 768:3,6 768:16 769:24 770:2,4,11 770:14,25 771:1,3,18,22 772:9,14,23,25 773:2,5,5 773:15,18,25 774:4,11 775:5,18 776:1,4,9,22,24 777:2,6,12,18 779:21 780:7 781:5 782:4 786:3 786:5,7,8,10 787:20 789:18,19 790:13 794:6,9 795:5,12,13,21 798:1,3 799:4,5 802:16,20 803:22 807:7 809:8,15,19,22 810:15,18,23 811:1,4 812:13,16,18 814:15 815:23 816:15 822:4 855:22 856:13 859:19 860:1,25 861:1,3,21 862:12,13 863:7,14,17,19 864:1,12,17 865:1,4,5,24 868:3,7 869:2 870:4,7 873:23 874:12,13 875:15 876:4,5,6,9,19

**multiple** [1] 842:22

**museums** [2] 868:1,2

**music** [2] 867:23 868:2

**must** [3] 717:16 763:13 815:3

**-N-**

**N** [7] 711:12 790:9 822:15 822:15 858:14 876:1,25

**N.Y.** [1] 711:34

**name** [9] 810:9,10 813:12 813:16 815:2 816:1 849:3 858:17 860:5

**named** [6] 723:17 743:25 794:22,23 799:16 861:14

**names** [5] 812:4 815:17 832:3,9 869:6

**nap** [2] 738:22 739:2

**Nathalie** [2] 859:18 861:3

**national** [2] 824:6,10

**nature** [2] 824:13 855:13

**nearby** [1] 829:2

**nearest** [1] 718:13

**neat** [1] 799:12

**necessarily** [5] 771:17 772:18 783:24 851:2 855:7

**necessary** [1] 847:20

**need** [3] 809:11 859:14 873:9

**needed** [2] 788:22 867:17

**needs** [2] 785:23 867:11

**Neil** [1] 733:20

**never** [44] 712:20,23 721:23,23 722:10,13 723:15 724:16 725:21,23 725:25,25 735:3 737:16 738:7,12,12 739:25 751:10,13,16 752:9,12,16 754:17 757:15 758:3,11 758:20,25 759:19 761:24 769:12,20 770:11,22,25 771:4,7,13,14 778:18 862:13,16

**new** [20] 711:5,19 713:2 720:15 753:9 790:16,20 790:24 791:22,25 792:2,5 792:24 815:10 816:20 820:2 822:25 824:3 858:22 867:10

**news** [1] 837:7

**newspaper** [1] 723:5

**next** [12] 745:21 789:21 789:21,22 803:3 819:5 820:9 822:7,9,12 830:2 839:7

**nice** [2] 870:23 874:14

**night** [3] 733:3,4 781:13

**nine** [1] 830:11

**Nobody** [2] 731:12,16

**none** [6] 772:20 789:19 792:17,17,22 822:4

**nonetheless** [1] 844:24

**nor** [1] 878:9

**normally** [4] 779:4 789:25 793:20 870:18

**north** [3] 791:8,25 793:5

**notation** [1] 815:17

**note** [4] 807:19 813:19 828:10,12

**noted** [2] 802:23 828:12

**notes** [4] 734:25 743:2 864:7,8

**nothing** [4] 762:25 845:7 849:5 852:5

**notice** [4] 761:4,8,25 762:12

**November** [2] 761:11 761:12

**now** [74] 713:14,24 716:1 716:1 718:18 721:15 722:21 725:14 732:11,18 736:5 737:7 741:8 742:14 743:25 748:18 752:20 760:8 761:16,19 762:18 765:18 767:13 768:17 769:25 772:8 776:15 778:20 780:9 782:11 783:17 784:25 785:12 793:12 795:7,25 796:9 800:18 803:22 804:3,24 806:8 807:7,13 809:8 812:8 813:2,13,22,25 816:19 818:23 820:18 826:9 830:11,25 832:6 836:18 839:15 840:2 847:6 849:8 862:7 853:2 854:16 856:3 861:3,21 863:6,12 866:18 867:6 869:7 870:4

**now.** [1] 773:21

**number** [13] 805:14 806:7 810:22 813:21 815:16 831:13 833:20 835:8,18,23 836:19 849:8 860:5

**numerous** [2] 812:3,4

**NY** [3] 711:24,31 837:16

**-O-**

**O** [3] 790:9 822:15 858:14

**o'clock** [1] 870:23

**oath** [4] 712:13 772:11,13 772:15

**object** [10] 727:4 733:10 750:9 751:6 755:16 773:1 773:1 810:6,21,25

**objection** [40] 727:12 729:3 730:2 732:4 751:3 754:3,8 755:21 763:25 764:4,5,7,16 765:24 767:4 772:18 773:1 780:6 798:5 801:4 802:23 803:25 807:10 809:13 810:3 812:13,17 829:23 832:23 834:8 837:2 838:11 840:14,17 842:1 843:1,16 856:9 869:2 874:19

**objections** [3] 771:21 874:19 875:8

**obligation** [2] 847:5 869:25

**observe** [4] 718:22 730:1 730:16 740:20

**observed** [3] 716:18 731:19 740:10

**observing** [1] 745:21

**obvious** [2] 779:2,3

**occasion** [4] 741:10 742:6 752:6 777:23

**occasionally** [1] 725:18

**occasions** [3] 730:25 732:19 783:24

**occurred** [2] 731:10 776:20 779:11

**off** [6] 739:17 740:4,24 808:2 844:23 845:12

**offense** [1] 759:25

**offer** [5] 765:9 773:13 823:8 829:21 837:1

**offered** [6] 763:7 777:3 777:8 830:4 846:13,14

**offering** [4] 839:15 841:3 844:10,18

**offers** [6] 832:22 834:7 838:10 840:13 842:3 843:15

**offhand** [1] 818:16

**office** [39] 711:22 718:4 718:5 737:6,8 742:15,20 743:5 753:15 754:1,10,13 756:9,9 776:4 787:21 788:22 802:6 822:25 823:2,7 828:22,22,23 829:1,10,11,12,13,14,17 861:14 866:18,23,25 867:3,4,16 868:10

**officer** [1] 819:8

**officers** [17] 732:20,23 769:6 791:12,16 819:1 826:16

**officials** [1] 754:10

**often** [1] 836:1

**old** [2] 753:11 839:16

**once** [13] 724:5 750:18 757:13 813:16 815:22 817:19,20 818:11 827:8,8 828:3,12 830:9

**one** [58] 712:17 713:7 741:1,10 742:6 743:12 756:12 765:9 771:24 774:8 786:3 789:14,15,16 792:6 799:16 802:9 804:4 807:1,2,2,4 808:11 810:5 810:11 814:11 815:20 820:4,7 822:1 824:1 827:4 828:18 830:14,23 831:13 831:20,20,22 836:6,11,23 839:2 840:10,11 841:2 842:15 843:6 844:11 849:12 854:25 855:8 856:3,14 867:6 870:7 873:11 874:22

**one-month** [1] 720:22

**ones** [2] 814:10 847:21

**Online** [1] 831:24

**onto** [2] 732:12 851:25

**open** [2] 808:21 820:24

**operates** [1] 839:17

**operation** [1] 800:3

**opportunity** [1] 762:8

**oppose** [1] 773:5

**opposite** [1] 777:19

**option** [1] 839:3

**options** [1] 839:1

**oral** [23] 725:18,25 727:10 727:10 728:2 729:1 730:1 730:23,25 732:13 735:13 735:18,24 736:7,10 737:2 737:23 738:7 740:16 746:3 768:4 782:13,14

**order** [6] 776:24 777:6,12 778:9 779:24 869:17

**ordered** [1] 795:21

**organization** [2] 755:9 755:10,13,25 826:13

**organized** [1] 807:16

**orgasm** [2] 746:14,19

**original** [1] 815:25

**otherwise** [1] 871:4

**ourselves** [2] 860:2 863:24

**outside** [1] 805:8 818:1 828:23 829:1,14

**overrule** [1] 780:5

**overruled** [11] 730:3 750:13 764:12,17 765:25 786:12 802:25 834:9 842:1 843:2 869:3

**own** [9] 716:6,8,14 717:10 717:10 723:13,15 740:23 777:14

**ownership** [1] 800:3

**-P-**

**P** [2] 711:12,12

**P-3** [4] 731:22 732:3,7 877:17

**P-38** [1] 750:4

**P-4** [4] 750:22 751:2,4 877:18

**P-7** [1] 717:23

**P-9** [1] 817:12

**P-i-c-r-r-c** [1] 775:1

**p.m** [2] 796:2,4

**packed** [1] 719:5

**pad** [2] 807:19,19

**page** [11] 820:9 832:14 832:18 833:17 834:13,16 835:15 836:3 838:15 839:7 874:20

**pages** [7] 717:13 804:25 813:23 838:5 864:6,10,12

**paid** [10] 757:15,21 758:3 782:1 797:13,15 799:6,7 821:18 839:3

**pain** [1] 783:5

**painful** [1] 742:10

**pair** [38] 802:10 804:17 804:22 805:3,4,11,17 806:2,19,20 807:14,23 808:2,3,3,6,10,14 814:17 814:20 819:19 833:7,8,9 833:19 839:12,13 844:3,4 844:15,21,21,22,24 845:11,16,21 846:4

**pairs** [7] 802:13,15 806:10 836:2 846:7 858:4 858:5

**pants** [2] 856:22 860:21

**paper** [1] 778:5

**papers** [1] 810:3

**paperwork** [1] 825:8

**paragraph** [3] 833:3,5,6

**paragraphs** [1] 839:11

**paralegal** [2] 859:3 861:8

**paralegals** [1] 856:15

**pardon** [1] 773:11

**parent's** [1] 815:17

**parents** [4] 820:16 835:4 835:8 837:21

**parked** [1] 854:1

**part** [18] 722:15 725:10 785:20 795:20 799:11 808:16 818:8,9 819:17 841:23 846:18 853:17 855:3,8,14,16,18 873:14

**part-time** [5] 791:7,12 791:20,21 792:3

**participants** [1] 845:22

**participate** [1] 825:10

**particular** [12] 745:17 746:8,12 760:11 769:18 802:10 805:10 807:16 815:14 826:19 849:25 865:19

**parties** [1] 878:8

**parts** [3] 724:7 740:18

785:10

**passenger** [1] 816:10

**passes** [1] 748:2

**passing** [1] 721:20

**passport** [5] 721:7 810:5 812:25 813:1 815:8

**past** [2] 790:21 866:21

**Patrick** [2] 793:17 796:17

**patrol** [1] 824:2

**Pause** [8] 763:20 773:8 780:20 790:4 803:1 808:20 809:12 822:2

**pay** [1] 839:1

**payment** [5] 765:7 797:11 800:9,12,16

**pays** [1] 839:4

**pedigree** [2] 805:2 815:15

**Pendaflex** [1] 809:3

**penetration** [1] 752:1

**penis** [5] 725:13 730:20 741:2,14,17,19 752:7 782:15,25

**penis-vagina** [1] 752:1

**people** [13] 750:4,6 754:14 755:14 756:4,6 787:21 792:2 794:20 800:6,7 810:6 871:3

**perfectly** [1] 770:20

**perform** [6] 725:18 730:1 730:23 732:15 782:13,14

**performed** [8] 725:25 728:2 729:1 730:25 746:3 746:13 849:12 853:11

**performing** [1] 727:10

**period** [12] 770:23 775:3 776:13 778:9 779:13,15 787:9,13 805:12,20 845:4 864:1

**permanent** [2] 761:20 762:2

**permission** [1] 760:24

**permit** [5] 773:3 800:1 837:9,10 862:18

**permitted** [3] 761:20 799:24 871:3

**persist** [1] 772:25

**persistent** [1] 860:16

**person** [8] 712:20 723:16 747:17 755:12,13,25 827:21 842:11

**personal** [10] 788:13 797:7 799:8,10,14 800:10 800:16 801:2 821:10 866:11

**personality** [1] 854:7

**personnel** [2] 714:18 791:13

**pertinent** [1] 853:23

**petition** [1] 758:1

**ph** [1] 793:17

**pharmaceutical** [1] 807:19 813:19

**phone** [7] 749:12,20 815:16 859:17 860:5

**photo** [2] 817:21 829:7

**photocopy** [1] 812:25

**photocopying** [1] 803:20

**photograph** [3] 815:9 828:8,9

**photos** [4] 810:6 828:6 867:7,9

**physical** [2] 865:14,25

**physically** [1] 865:23

**pick** [4] 712:17,19 713:5 713:8

**picture** [11] 718:1,3,7,12 750:4,6,12,24 818:6 829:10,17

**pictures** [3] 828:5,12 830:5

**piece** [5] 747:16 778:5 823:15 842:18,21

**Pierre** [1] 774:25

**place** [9] 720:16 796:11 796:12 825:12,13 827:13 861:6,18 866:9

**placed** [3] 799:19 803:3 803:12

**places** [2] 792:2 867:23

**Plains** [1] 711:24

**Plaintiff** [1] 819:11

**plan** [7] 712:15 713:10 713:11 720:15 749:9,25 855:4

**plane** [1] 784:25

**planned** [1] 862:25

**plans** [1] 720:16

**Plaza** [1] 711:18

**Plus** [2] 711:32 878:18

**podium** [1] 803:3

**point** [22] 764:18 765:18 768:6,16,17,20 770:15 771:10,10 774:4 778:22 778:24 783:13 799:16 854:13 855:14 857:1 864:17 865:2 867:6 868:13 872:10

**pointing** [1] 772:19

**police** [50] 733:2,5,7,13 734:6,10,12 767:25 768:8 768:21 769:6 776:3 780:9 781:7,10,13 782:18 783:3 783:6 790:17,20,25 791:3 791:6,7,9,10,11,11,14 793:17,19,23 794:2 803:12 807:2,5 819:1,8 819:11,12 822:25 823:17 823:19 825:1 826:6,7,14 826:15 830:10

**Polish** [1] 799:16

**pond** [1] 750:17

**portion** [4] 765:15 802:5 835:16 837:6

**portions** [2] 836:4 874:18

**portrait** [1] 813:5

**posing** [1] 844:13

**position** [4] 779:9 853:19

**862:5 863:1**

**possibility** [2] 762:7 785:21

**possible** [4] 720:24 793:18 827:18 863:14

**Pound** [24] 713:22 749:7 765:23 791:8,15,22,24 792:5,16,24 793:17,19 794:1 796:22 816:20 818:8,9 819:1,12 825:3 826:1,2,14 837:16

**practice** [1] 874:16

**precisely** [1] 872:24

**prepare** [2] 722:22 828:14

**prepared** [3] 820:2 830:9 874:17

**preparing** [1] 723:19

**present** [3] 796:15 827:20 827:23

**pressure** [1] 719:18 725:4

**pretty** [1] 867:20

**previous** [4] 803:24 807:10 834:8 839:14

**previously** [6] 802:22 806:13 807:8 812:9 814:8 814:23 815:4 816:3

**primarily** [2] 812:5 824:15

**print** [1] 837:13

**printer** [1] 837:13

**printout** [1] 832:16

**private** [5] 719:11 721:7 721:12 724:7 866:9

**probative** [1] 774:23

**problem** [1] 820:13

**procedure** [1] 795:12

**proceeded** [1] 863:25

**proceedings** [3] 711:36 878:2,4

**process** [3] 724:21 828:2 833:6

**procure** [1] 779:24

**produced** [1] 711:37

**professional** [1] 785:23

**profile** [6] 807:25 808:3 814:10,12,13,20

**profiles** [6] 802:15 806:9 806:11,19,20 807:14,20 807:24 808:8

**program** [5] 850:14,15 851:2,4,11

**promise** [1] 782:1

**proof** [4] 841:24 853:16 854:6,25

**propensity** [1] 841:20

**proper** [2] 770:20 857:2

**property** [2] 750:17 817:20

**prosecute** [1] 776:4

**prosecution** [1] 803:21

**prosecutor** [8] 742:19 742:22 743:4,16 753:15 786:16 787:9 867:11

**854:22 859:2**

**possibility** (see above)

**prosecutor's** [2] 776:4 788:22

**prosecutors** [1] 762:18

**prostitution** [1] 873:3

**protection** [1] 813:11

**Protestant** [1] 715:21

**protested** [2] 722:7 865:15

**prove** [6] 810:12 845:8 847:5 854:24,24 855:2

**provide** [2] 784:6 833:7

**provided** [4] 772:10 782:21 788:20 831:1

**provides** [1] 762:1

**Prunty** [4] 827:5 828:2

**public** [3] 788:10 792:15 792:21

**publish** [13] 717:23 732:5 751:5 812:12 814:15 830:1 833:1 834:12,15 837:5 838:14 839:9 842:6

**published** [6] 785:7 804:4 812:19 813:14 814:1 815:5

**publisher** [4] 804:13,14 804:15,17

**publishersplus** [1] 832:5

**publishing** [3] 799:12 821:14 839:18

**pulled** [1] 724:19

**purpose** [8] 772:4 796:19 797:2 804:8 847:20,21 853:25 869:21

**purposes** [5] 750:21 771:23 772:21 807:3 873:4,7

**pursuant** [4] 796:21 799:24 802:12 803:8

**push** [1] 732:12

**pushed** [2] 738:17 856:25

**pushing** [1] 782:15

**put** [20] 716:13 717:8 730:17 737:3 741:14,17 743:8 752:6 765:16 773:19 782:12 808:12 810:5,11,14 815:19,21 855:1 860:20 865:10

**putting** [1] 856:22

**-Q-**

**Quantico** [1] 824:12

**questioned** [3] 856:13 856:23 861:16

**questioning** [5] 753:17 773:4,4 809:23 866:6

**questionnaire** [9] 804:8 804:11,12,13 805:1 819:19,23 832:21 833:19

**questionnaires** [9] 802:10,13,14 804:5 806:2 806:10,11 836:12 858:4

**questions** [30] 763:21 765:6 770:5 773:5 778:6 781:7,9 786:5 789:18

796:24 804:11,24 805:1 805:10 816:16 819:22 822:3 833:20,22,23 835:1 835:22 837:14 851:22 852:6 855:10 860:6,23 870:8,9

**quickly** [2] 827:17 834:25

**quit** [1] 774:17

**quite** [1] 791:25 834:20

——————

**-R-**

**R** [8] 711:10,12 790:9,9,9 822:15 858:14 877:25

**raise** [1] 790:8

**raised** [1] 821:4

**ranging** [1] 805:2

**rate** [1] 820:7

**rather** [1] 865:23

**rating** [1] 820:8

**reach** [1] 818:20

**react** [1] 836:14

**reaction** [1] 805:16

**reacts** [1] 845:16

**read** [19] 736:1 757:2 785:17 805:15,22 813:3 815:20 833:2 835:1,10,16 835:22 836:4,12 837:6 838:15,24 839:11 842:8

**reading** [1] 774:25

**ready** [3] 738:25 854:3 870:20

**real** [1] 820:10

**realistically** [1] 870:17

**really** [5] 719:15 734:3 761:1 790:3 809:22

**reason** [19] 725:2,3,8 727:1,5,9 735:5 758:17 777:22 784:16 827:15 844:17,19 845:4 846:9,22 846:23 854:23 872:25

**reasons** [1] 844:9 845:18 855:9

**rebut** [2] 769:13,21

**rebuttal** [1] 870:14

**receive** [1] 763:1

**received** [17] 761:4 804:2 807:12 812:23 824:5,6,7 824:8,9,11 829:24 832:25 834:10 837:4 838:13 842:5 858:4

**recent** [14] 767:17 769:3 773:24 774:5,7,10,16 776:18 777:15,20,22 778:13,25 779:5

**reception** [1] 859:17

**recess** [4] 768:10 773:10 773:13 870:16

**recessed** [1] 773:21

**recognize** [14] 718:2 731:22 750:4,22 803:3,6 806:16 812:10 814:2 817:21,23 829:7 838:5 843:9

**recollect** [1] 783:3

**recollection** [12] 735:22 736:3 746:9 756:23 760:4 760:6,13 761:8 765:14,15 782:5,9

**record** [3] 795:5 800:15 858:17

**recorded** [4] 711:36 715:10 772:6 874:23

**recorder** [1] 823:15

**recording** [2] 714:21 878:4

**records** [4] 800:5,5,9 812:3

**recovery** [1] 824:8,9

**Recross** [1] 876:6

**RECROSS-EXAMINATION** [1] 786:6

**redaction** [1] 773:16

**redirect** [6] 763:22 781:4 786:11 851:23 876:5,15

**reduced** [1] 878:4

**refer** [3] 792:21 796:13 820:23

**reference** [1] 860:11

**references** [1] 813:7

**referred** [5] 755:19 792:6 793:18,24 821:12

**referring** [1] 853:6

**reflect** [2] 795:5 875:11

**refresh** [6] 735:21 736:3 756:23 760:6 765:15 782:9

**refreshed** [1] 736:5

**refreshes** [4] 760:4 761:7 765:14 782:5

**refuse** [1] 722:9

**refused** [6] 722:11 737:2 738:3 782:14,15,17

**regard** [1] 820:12

**regarding** [1] 811:2 825:9

**regards** [1] 833:15

**regular** [2] 722:22 723:19

**regularly** [1] 721:16 727:10

**rehabilitate** [2] 769:25 775:7

**rehabilitation** [3] 769:11 774:21,22

**relate** [1] 833:11

**related** [2] 800:5 823:8

**relates** [1] 813:15

**relating** [1] 794:10

**relation** [1] 867:5

**relations** [1] 745:19

**relationship** [2] 785:2 786:1

**Relationships** [1] 805:5

**relative** [1] 878:7,9

**relax** [1] 744:13

**release** [1] 803:17

**released** [1] 803:18

**relevance** [5] 750:10 751:7 798:5 809:14

863:18

**relevant** [3] 779:10 810:8 854:5

**religious** [1] 715:23

**remain** [1] 754:20

**remained** [1] 731:1,9

**remember** [45] 713:23 718:24 735:20 743:10,18 744:18 745:5 746:5 750:14 753:7 754:12,13 754:18,22 755:22 756:2,4 756:21 757:4 760:2 761:6 764:23 765:8,11,12 767:3 781:8,22 782:3 783:15 786:18,19,21,23 789:3,7 825:12,12,17,17 832:9 833:21 857:4 867:5 871:8

**remind** [1] 870:24

**remnants** [1] 850:22

**remotely** [1] 851:25

**remove** [1] 808:24

**removed** [1] 806:22

**renew** [1] 858:12

**renewing** [1] 872:6

**rent** [1] 788:18

**repeat** [3] 755:23 834:14 869:20

**repeated** [1] 783:23

**repeating** [1] 862:11

**repetition** [1] 774:24

**rephrase** [3] 719:21 751:21,22

**report** [1] 779:18

**reporter** [1] 874:23

**represent** [1] 869:12

**representative** [2] 869:9,22

**representatives** [1] 803:18

**represented** [3] 863:22 868:13 869:15

**request** [1] 873:21

**requested** [2] 824:19 825:1

**require** [1] 805:3

**requirement** [1] 719:24

**requires** [1] 872:8

**research** [10] 713:25 714:3,7,10 715:3 716:16 716:19,21 717:8 748:24

**researching** [4] 715:16 715:17,23 717:4

**reserve** [2] 810:20 872:22

**residence** [37] 732:9 733:23 734:23 737:12 742:23 743:20 750:25 752:21 759:16 776:10 787:4,4,12 793:5,7 794:11 796:2,4,13 797:6,9 798:2 798:3 800:2,4,6,7,9 802:4 802:5,8 804:21 806:25 817:17,19 818:1 826:24

**residency** [1] 761:20

**resident** [1] 762:2

**residents** [3] 792:3,4

794:18

**resisted** [2] 865:12,14

**resolve** [1] 784:8

**respect** [2] 806:24 826:19

**Respectfully** [1] 847:3

**response** [2] 724:12 730:7

**responses** [2] 806:4 835:20

**responsibilities** [1] 826:17

**responsibility** [3] 869:8 869:10,22

**rest** [6] 762:5,9,13 791:20 856:2 870:12

**restaurant** [1] 867:10

**restaurants** [2] 792:8 839:19

**rests** [2] 858:1 870:13

**result** [2] 762:19 801:1

**return** [4] 720:24 721:2,4 752:21 753:1 817:20

**reversed** [1] 778:1

**review** [4] 803:20 809:11 830:21,25

**reviewed** [2] 784:23 836:18

**ride** [1] 713:22

**ridge** [24] 713:22 749:7 765:23 791:8,15,22,24 792:5,16,24 793:17,19 794:2 796:23 816:20 818:8,9 819:1,12 825:3 826:1,2,14 837:16

**right** [210] 712:20,24 714:1,7,8,25 715:5,7,10 715:19 716:2,9,12 717:1 717:16 718:1,20 719:3,6 719:11,17,23 720:11,13 720:17,20,22 721:8,13,18 722:1,2,11,14,17,23 723:1 723:6,11,14,17,20,23 724:9,19 725:4,6,12,13 725:15,19,21,23 727:2 731:2,10 732:16 733:16 733:24 735:14 736:11,14 736:19,24 737:1,4,9,19 737:18,23 738:1,4,7,13 738:15,22 739:7,15 740:5 740:11,24 741:2,4,6,8,8 741:17,24 742:8,12,20 743:13,17,23,25 744:5,8 745:1,4,6,19,23 746:2,4 746:14,19,20,22,24 747:5 747:8,10,14,24 748:2,4 748:16,24 749:1,7,12,16 749:20 751:11 752:9,10 752:12,14 753:13 754:6 754:23 755:15 756:8,10 756:17,22 757:22,24 759:5,13,16 760:3,16,22 761:5,11,14 762:3,8,15 762:19 763:2,10,15 765:2 767:14 771:7 773:21 776:18 779:4 783:14 786:17,20,21 787:5,10,16 787:18,20,24 789:2,11,12 790:8 795:3 809:24 810:2 817:4 818:10,14 819:6

**Rosa** [4] 814:6,12,25 815:1

**roughly** [6] 770:15,17 775:2,25 776:13 779:16

**round** [1] 720:19

**Route** [1] 793:6

**router** [1] 828:11

**routine** [1] 738:25

**rule** [7] 771:16,24 772:5 772:21 858:10 872:6,24

**rules** [1] 872:21

**ruling** [4] 778:3 802:24 854:22 873:2

**running** [4] 722:25 828:20 829:2,4

**rural** [2] 791:25 817:1

——————

**-S-**

**s** [8] 711:12 785:20 790:9 811:3 847:6,24,25 877:3

**safely** [1] 827:12

**safer** [1] 765:21

**safety** [2] 776:2,4

**sakes** [1] 841:24

**salary** [1] 757:21

**Salem** [14] 791:8 792:24 793:7,8,9 816:22 817:5 817:14,16,24 818:15,21 825:19 837:16

**sample** [1] 807:25

**Sand** [1] 874:8

**sat** [1] 734:21

**satisfied** [1] 820:1

**save** [1] 851:2

**saved** [2] 850:5,11

**says** [14] 776:21 790:6 804:17 813:20 820:1 833:15 835:8,18 836:7,8 836:16 841:11 846:1 855:24

**scenario** [1] 774:16

821:8 828:22 830:11 831:10 844:5 850:23 852:7 859:16 861:9,19,20 862:2,7,10 863:4,20 864:4 864:7,13 865:6 866:9 867:20,23 868:10,21 869:18 872:11,17

**rip** [1] 874:18

**ripped** [1] 874:20

**rise** [2] 712:5 781:1

**road** [11] 792:24 816:22 817:5,14,16,24 818:15,18 818:21 825:19 837:16

**robberies** [3] 841:18 853:21,22

**role** [2] 791:3,9

**romantic** [2] 785:2 786:1

**roof** [1] 785:22

**room** [19] 744:14 745:6 747:1 756:2 757:18 758:12,21 795:18 796:13 820:19,20,23 821:3 856:15 859:19,23 862:4 862:10,19

**scheduled** [1] 786:9

**scheme** [15] 841:13,23
853:13,14,16,18,21
854:15,20,21,22,24 855:1
855:3,15

**Schneider** [93] 711:25
764:11 771:20 773:16
778:2,15,23 779:1,6,9,17
780:8,12,15,18 789:22
798:5 801:4 802:22
803:24 807:10 809:11,13
810:4,10,21,24 811:5
812:15,17 816:18 822:1,3
829:23 832:23 834:8
837:2 838:11 840:14,18
841:2,7,10,21,25 843:1
843:16,18,21 844:2,6
845:20 846:4,11,16 847:3
847:8,13 849:7 851:22
852:6 853:4,8,14,19
854:12,21 855:5,17,24
856:2,6,13 857:7,10
858:12 870:9,13 872:2,6
872:13,19,23 873:1,10,17
873:22,24 874:9 875:2,7
876:10,14

**school** [1] 858:23

**scope** [5] 763:25 764:9
764:10,11 786:10

**Scotts** [1] 792:7

**scream** [1] 835:3

**screen** [4] 717:24 756:25
819:22 843:18

**seal** [1] 803:11

**search** [45] 794:10,13,15
794:16 795:7,12 796:1,22
797:3,4 799:25 800:1,8
800:18 802:2,12 803:8,15
804:20 808:17 816:24
817:20 824:10 825:2,4,6
825:10,23 826:9,17,20,25
827:7,20 842:14,17,20
846:10 849:1,8,12,20
850:2,3,20

**searched** [1] 850:21

**searching** [1] 825:18

**seat** [1] 860:3

**seated** [4] 712:1,7 781:3
822:18

**second** [2] 713:25 714:2
714:5,6 721:15 722:21
738:20 822:1 832:18
833:17 844:19 857:1

**secondary** [1] 792:1

**secret** [1] 838:20

**section** [1] 782:7

**secure** [4] 825:6 827:12
828:5,14

**secured** [6] 802:7 827:10
827:25 828:1 830:7
840:10

**securing** [2] 823:9
826:23

**security** [1] 803:19
813:20

**see** [35] 717:24 730:5,8,14
730:17,20,22 751:7

**short** [6] 773:9,13 787:13
856:3,5 874:7

**shortly** [1] 742:22

**show** [40] 713:5 717:22
731:21 735:25 750:3,21
751:8 756:22 760:3 761:7
765:13 771:15 774:9,9
782:4 786:20 804:25
812:8 813:2,13,22,25
815:3,12 817:11 819:17
820:9 829:5 832:12
833:17 834:11 835:10
836:3,21 839:7 840:7
843:6 863:15,17 864:9

**showed** [5] 712:17 713:7
855:12 863:10 868:16

**showing** [1] 774:24
812:6 815:9 829:16
832:18 834:2 835:6,15,21
836:15 838:3 843:7

**shown** [2] 750:12 817:12

**shows** [3] 841:20 845:15
846:23

**sic** [1] 715:25

**side** [2] 820:16 843:22

**side-bar** [1] 767:5

**sidebar** [8] 810:1 811:9
841:1 842:2 844:1 848:2
853:1 857:11

**sidewalks** [1] 793:10,11

**sideways** [1] 834:12

**sign** [2] 763:12 817:25

**signature** [2] 833:13
840:5

**signed** [4] 734:16 763:9
838:1 849:2

**significance** [1] 774:18

**significant** [2] 806:7
864:1

**signing** [1] 767:3

**Silverman** [12] 711:27
856:14 858:20 859:21
861:14 862:16 863:11,25
867:22 868:4,6 876:18

**similar** [2] 750:13 814:10

**Simonsen** [4] 811:2
814:6,12 844:20

**simply** [4] 768:25 769:25
770:20 853:12

**single** [1] 854:19 864:3

**sit** [6] 723:8,22,22 739:7
870:21 872:4

**site** [2] 845:23 846:9

**sitting** [4] 731:1,3 795:3
871:1

**situated** [1] 818:4

**situations** [1] 788:4
818:10

**six** [5] 775:5 787:7,9
832:2,3

**six-page** [1] 864:3

**sixty** [1] 864:15

**size** [1] 809:3

**sizes** [1] 817:7

**skill** [2] 717:19,21

**skills** [1] 788:1

**skip** [1] 831:11

**skirt** [1] 796:8

**slapped** [1] 743:13

**sliding** [1] 829:18,19

**slightly** [2] 821:3,4

**small** [8] 785:20 791:24
792:8 793:6,6,8 842:18
842:18

**smaller** [1] 817:10

**soap** [1] 724:6

**social** [1] 813:20

**Socializing** [1] 805:9

**software** [1] 850:13

**solved** [1] 813:20

**someone** [4] 724:18
827:8 845:23 851:25

**Somers** [8] 790:24 791:1
791:7 794:2 825:1 826:6
826:7 830:10

**sometimes** [5] 723:22
723:25 739:11 740:23
744:13

**somewhat** [1] 822:9

**somewhere** [2] 852:1,2

**soon** [1] 743:22

**sorry** [27] 735:15 752:8
752:15 758:7 764:1,5
779:11 805:21 807:3
808:11 811:1 814:15,19
814:25 816:19 817:15
820:3 829:20 831:11
852:9 869:20

**sort** [5] 769:11 792:10
824:19 828:7 855:12

**sound** [3] 756:15 761:5
878:3

**sound-recording** [1]
711:36

**sounds** [1] 864:13

**south** [3] 793:6,9 823:3

**southern** [2] 822:24
823:6

**space** [1] 718:8

**spaced** [1] 864:3

**spam** [3] 845:22,25 846:4

**speak** [9] 724:13 730:10
795:20 796:20 813:5
816:9 859:18 869:19,24
870:1

**SPEAKER** [1] 811:3

**speaking** [4] 795:17
799:21 824:13 825:4

**specific** [9] 714:10
715:17 746:2 770:7
810:18 831:17 834:23
854:5 865:18

**specifically** [7] 746:2
770:8 798:1 845:25 860:8
860:10 866:2

**Spector** [67] 711:15
768:12 775:9 822:9,14,20
827:17 829:5,20 830:1
831:10,19 832:12,22
833:1,25 834:2,7,15
836:21 837:1,5 838:3,10

**skilled status**

**838:14 839:9,22 840:3,7
840:13 842:3,6 843:7,15
844:9 845:3,10,14,25
846:6,13,18,23 847:5,11
847:16,18,21 848:1 849:5
851:24 852:5,9 854:9
856:8,11 857:1 858:1
867:8,13 870:14 874:5,11
875:3,13 876:13,15**

**spend** [1] 762:5

**spent** [1] 745:14

**split** [1] 820:25

**splitting** [1] 792:3

**spoke** [5] 733:7 742:15
746:6 794:3 819:1

**spots** [1] 718:2

**spread** [2] 792:1 834:19

**spreadsheet** [12] 715:10
717:8,10,11,14 834:5,18
834:22 835:6,15 836:4,15

**spring** [1] 793:9

**Square** [1] 804:14

**stamp** [2] 815:10 851:6

**stand** [4] 712:4 721:17
731:5,5

**standard** [2] 792:21
817:7

**standing** [1] 731:4

**start** [4] 714:3 730:8
748:9 795:11

**started** [3] 713:25 722:21
722:22 738:21 756:7

**starting** [2] 838:14,25

**starts** [1] 844:14

**state** [21] 790:17,20 791:6
791:10,14 793:23 803:11
807:2,5 822:25 823:9,17
823:19 824:3 825:1 826:6
826:6,15 830:10 858:17
869:11

**State's** [1] 790:16

**statement** [45] 738:10
757:10,13,16 758:8,11,24
759:21 760:15 763:9,14
763:17 767:2,3,7,21
768:24,25 769:1 772:8
769:9,13,14,15,22,23
775:6,7,12 776:21,25
777:7,14,15 779:10,13
781:21,22,25 783:20
789:1,6,12,13 856:1

**statements** [13] 734:18
767:8 769:9 770:8 775:24
776:1,2,5,6 779:14 781:7
781:9 847:23

**states** [25] 711:2,11,14
754:6,10,15,20 756:1,13
758:2 760:25 761:16,17
762:2,6 774:25 784:9,14
785:1 809:4 815:23
841:15 866:22,22 867:16

**station** [11] 716:6 718:9
718:11,16 721:18 734:6
734:10,12 793:5,6 794:2

**stations** [2] 829:13,15

**statistics** [1] 824:11

**status** [1] 761:21

**stay** [10] 731:16 754:5,15 756:13 784:8,16 789:9 822:12 837:17,24

**stayed** [5] 731:18 745:8 784:15 787:12 789:11

**staying** [3] 783:13,14 784:5,14 861:24

**Stenzel** [3] 813:1,12,16

**step** [6] 768:13 793:25 794:1 822:5 850:7 870:10

**stickers** [1] 807:17

**stickies** [1] 807:21

**sticky** [2] 807:19 813:19

**still** [4] 712:13 752:21 782:17 786:9

**Stone** [69] 711:20 727:4 727:7,12 729:3 730:2 732:4 733:10 734:7 742:19,22 743:1,5,16 750:9 751:3,18 753:4,15 753:16 754:3,8 755:11,13 755:16,18,24 763:23 767:11,21,24 768:3 771:1 772:9 773:14 776:5 779:21 780:7 781:5 782:4 786:3,5,10 787:20 789:19 790:13 795:5 802:16,20 803:22 807:7 809:8,15,19 809:22 810:15,18,23 811:1,4 812:13,16,18 814:15 816:15 822:4 874:13 876:5,9

**Stone's** [3] 754:1,9 756:9

**stop** [12] 718:19 719:2,3 721:24 742:4 748:7 764:14 839:21 860:16 865:6,7,20

**stopped** [7] 742:1 748:3 748:19,21 860:18 865:8 865:12

**stops** [1] 748:1

**storage** [1] 802:4

**store** [2] 792:9 823:16

**story** [7] 732:24 768:18 768:23 769:7 774:4,7 779:3

**straight** [1] 856:4

**street** [8] 711:29,33 720:12 793:9 817:4 818:15,17 821:1

**strike** [2] 764:16 798:8

**stuff** [1] 771:7

**submit** [1] 874:5

**subsequent** [4] 767:8 768:18,24 770:12

**subsequently** [3] 768:23 769:7 794:21

**substance** [1] 775:15

**substantial** [1] 805:20

**such** [4] 823:14 828:11 874:17 878:9

**suggest** [5] 764:5 769:2 770:18 771:6 870:22

**suggested** [1] 770:11

**suggesting** [1] 771:16

**suggestion** [2] 767:22 769:13

**suggestions** [1] 867:22

**summarizing** [1] 864:4

**summonses** [1] 846:15

**supervise** [2] 823:7 824:15

**supervisor** [4] 793:16 796:17 823:21,22

**supervisory** [2] 822:24 823:6

**supper** [1] 744:10

**support** [2] 758:19 763:4

**supported** [1] 855:12

**supporting** [1] 773:2

**surplus** [1] 854:14

**surprised** [3] 862:22 869:1,4

**surrounding** [1] 792:19

**survey** [1] 804:9

**sustained** [5] 727:8,13 729:4 753:6 801:5

**swear** [1] 763:14

**swearing** [1] 781:22

**sweep** [1] 827:11

**swore** [3] 758:8 786:17 786:25

**sworn** [12] 767:1 768:1 781:21 782:11,20 783:4,7 783:9 790:10 791:11 822:16 858:15

**Sylvia** [8] 815:2 844:14 844:15 846:7,24 847:10 847:15 849:3

### -T-

**t** [8] 760:18 790:9,9 853:11 858:14 877:3,25,25

**tab** [1] 809:4

**table** [1] 795:3

**takes** [1] 712:4

**tape** [3] 803:11,12 806:21

**tax** [1] 800:4

**Taxi** [1] 792:19

**team** [1] 830:15

**technical** [2] 771:19 772:20

**technically** [1] 772:18

**technology** [2] 823:7 824:17

**technology-based** [1] 824:16

**telephone** [2] 716:24 723:6

**television** [1] 744:16

**telling** [3] 782:18 783:6 819:16

**temperature** [1] 820:12

**tempted** [1] 751:6

**ten** [5] 819:5 820:8,8 841:19 853:24

**term** [2] 850:21 873:19

**terms** [5] 799:9 823:9 838:20 844:7 845:17

**testified** [11] 776:20,21

790:11 822:17 841:4 844:20 851:1 856:14 857:2 858:16 861:3

**testify** [5] 786:14 847:9 847:14 856:18,23

**testifying** [4] 763:24 764:3,13 783:22

**testimony** [12] 768:3 769:9 775:15 778:17 779:23 780:2,9 784:1,2,3 845:11 874:16

**text** [2] 749:22 842:7

**texted** [1] 749:25

**thank** [19] 712:8 731:18 751:9 780:7 808:12 814:16 816:15 838:17 839:22 840:3 848:1 871:9 873:23 874:11,12,13 875:4,14,15

**Thanks** [1] 834:12

**themselves** [3] 777:13 856:18 857:5

**thereby** [1] 833:10

**third** [3] 714:5 802:14 806:9

**thirty** [1] 864:14

**thought** [5] 799:2 814:16 844:6 855:9,11

**thousands** [2] 714:13 715:6

**three** [16] 714:24 717:13 739:14 764:25 789:10,12 797:9 802:11 806:9 807:4 807:4,5,5 835:22 845:23 836:6

**through** [9] 777:2 784:19 804:24 828:2 834:25 840:2 841:16 842:20 877:7

**throughout** [1] 812:7

**Tiana** [1] 711:33

**ticket** [6] 720:19,22 721:12 752:22 753:1,14

**timeline** [1] 794:4

**timely** [1] 769:4

**times** [9] 732:22 739:17 739:20 745:18 750:13 782:12,21 813:7 817:13

**timing** [2] 778:16 779:1

**today** [1] 794:25

**today's** [1] 824:17

**together** [4] 744:8,11 745:6,15

**tomorrow** [3] 870:21 874:2,3

**too** [2] 820:13 872:13

**took** [13] 734:25 739:17 741:17 796:11,12 825:12 825:13 842:18,18,19 861:6,18 864:6

**top** [7] 713:16,21 746:20 821:5,6 830:14,19

**topic** [2] 753:10,10

**topics** [2] 753:12 866:16

**totally** [2] 757:14 778:1

**touch** [10] 721:17 722:13

724:16 725:4,12 741:2,10 741:23 749:6 782:25

**touched** [5] 721:17 752:12,16 782:22 860:15

**touching** [5] 730:20 741:23 742:1 860:18 865:8

**touring** [1] 837:23

**tourist** [2] 759:12 837:19

**towards** [4] 730:15,22 747:20 829:18

**town** [9] 791:5,6,24 792:7 796:22 825:25 826:1,8,14

**towns** [2] 791:7 792:20

**trafficking** [2] 757:11 793:18

**train** [1] 799:1

**training** [6] 824:5,6,7,8 824:10,12

**trains** [1] 792:21

**transcript** [8] 711:9,37 804:16 874:17,24 875:1 878:2,3

**transcription** [4] 711:32 711:32,37 878:18

**transcripts** [1] 875:12

**transferred** [1] 859:18

**transport** [2] 828:15 830:10

**transportation** [5] 788:17,22 792:15,16,22

**travel** [7] 721:10 812:5 813:8 816:8 839:6,19 841:15

**treat** [3] 747:14,16,22

**treating** [1] 748:3

**trial** [5] 711:9 762:19 763:24 780:2 862:1

**tried** [7] 732:12 782:14 782:17 856:24 860:18 865:15,21

**trip** [2] 720:19 859:14

**Troop** [2] 823:4,4

**trooper** [3] 790:21 824:2 824:3

**troops** [2] 823:4,4

**true** [20] 763:17 783:24 784:4 853:9,12 862:3,13 862:15,21,24 863:6,9,25 864:20 865:9,17,21 866:6 868:12 878:2

**truly** [1] 772:21

**truth** [5] 733:14,15 758:15 777:10 846:14

**truthful** [2] 783:22 846:16

**truthfulness** [1] 763:14

**try** [7] 721:2 767:7 789:24 837:9 865:20,22 874:1

**trying** [1] 751:20

**tub** [2] 723:1 730:17

**Tuesday** [4] 870:16,21 873:25 874:3

**turn** [3] 814:4 824:21 834:12

**turned** [1] 793:22

**TV** [1] 744:14

**twice** [3] 713:12 750:20 817:19

**two** [31] 717:7 723:22 739:12 740:10 745:6 754:10 755:25 764:25 771:23 775:22 776:9 785:7 789:12,16 793:4 796:6 802:9,12 803:2 807:4 817:7 828:25 829:1 829:12,14 839:1,11,14 844:9 845:18 856:16

**two-page** [1] 838:4

**type** [11] 715:16 736:19 784:19 792:15 793:20 804:16 824:16,18 831:23 850:8 856:12

**types** [4] 802:1 804:25 824:13 831:14

**typewriting** [1] 878:4

**typically** [2] 803:10 861:25

**typing** [1] 781:22

### -U-

**U** [1] 790:9

**U.S** [3] 711:4,17 837:23

**Uhm** [2] 724:5 760:5

**unbuttoned** [4] 739:18 739:20,22 745:23

**uncomfortable** [6] 737:19 741:4,6,8,22 742:12

**unconstitutional** [1] 873:14

**unconstitutionally** [1] 873:12

**under** [12] 712:13 719:18 739:11 767:17 772:11,12 772:15 795:4 827:14 832:17 834:6 836:1

**underlined** [2] 785:8,17

**underlying** [1] 772:4

**underneath** [1] 836:10

**understand** [28] 730:12 736:13 752:15 767:19 770:10,13 771:9 774:17 776:8 777:24 778:3,11,12 778:23 802:24 810:11 818:4 825:20 837:8 841:9 841:17 845:20 846:20 854:17,21 856:11 864:25 873:1

**understood** [2] 757:24 810:4

**unfair** [1] 776:16

**UNIDENTIFIED** [1] 811:3

**uniformed** [1] 790:21

**unique** [1] 871:2

**unit** [6] 823:1,18,19,24,25 827:4

**United** [24] 711:2,11,14 754:6,10,15,20 756:1,13 758:2 760:25 761:16,17

762:2.6 774:25 784:9,14
785:1 815:23 841:15
866:22,22 867:16
**University** [1] 858:24
**unless** [2] 753:6 777:25
**up** [45] 712:3,17,18,18,19
713:5,5,7,8,22 722:25
723:1 738:21,24 739:2
744:10 745:4 747:1
748:12 749:12,19 753:10
784:19 790:1 803:11
808:22 809:24 810:9,10
821:3,16 828:20 829:4
834:11 837:12 840:17
850:15 852:7 859:14,22
859:25 860:11 862:9
872:3,5
**upper** [2] 796:12 820:25
**upset** [2] 742:1 746:22
**upstairs** [1] 795:18
**used** [5] 774:22 775:6
842:19 850:13 859:17
**using** [5] 714:15 840:2
841:13 846:24 862:5
**usually** [4] 731:25
745:11,13,14

----

**-V-**

**vagina** [2] 752:12,16
**vague** [1] 873:12
**valid** [3] 752:21 761:3,11
**Vanessa** [6] 813:1,12,16
813:20 841:4,5
**various** [3] 804:25
835:19,19
**verbal** [3] 724:12 730:7
865:15
**verbally** [1] 860:18
865:15,22
**versus** [3] 711:4 774:25
791:9
**victim** [1] 757:10
**victims** [1] 845:6
**video** [1] 823:15
**view** [2] 779:18 872:11
**violated** [1] 844:7
**violations** [1] 854:16
**violent** [3] 765:19,22
788:4
**visa** [36] 754:5,14,20
756:13 757:5,9 758:1,19
758:25,25 759:15,23
760:9,18,21,24 761:1,2,3
761:4,9,11,14,19,25 762:8
762:12 763:5 765:1,3,5
779:24 784:18 813:11
815:9,10
**visibility** [1] 818:1
**visit** [3] 797:2 837:19,23
**voice** [1] 764:5

----

**-W-**

**Wait** [3] 768:9,9 847:13
**waiver** [1] 813:12
**wake** [4] 738:21,24 745:4

748:12
**walk** [4] 750:16 751:13
866:18,21
**walked** [5] 723:13 731:14
737:6,8 860:3
**walking** [1] 818:20
**wants** [4] 768:24 775:7
776:15 778:11
**Warmest** [1] 833:15
**warrant** [20] 780:1
794:10,14,15,17 795:7,12
796:1,22 797:3,4 799:25
800:1,19 802:12 803:8
825:2,4,6,10
**wash** [3] 723:25 724:2,4
**wastes** [1] 802:21
**watch** [2] 744:13,16
**water** [1] 723:1
**wear** [4] 719:13,20,23
720:1
**wearing** [5] 718:19 719:2
719:3 748:7,9
**website** [20] 714:12,14
714:15 715:12,13,13,15
814:18 837:12 844:3,4,16
844:21,22,22,24 845:11
845:15,16,21
**websites** [11] 807:23
808:6,15
**week** [12] 715:5 718:18
718:22 721:15 722:21
738:20 743:23 776:9
779:18 789:14,15 859:8
**week's** [1] 718:18
**weekdays** [1] 744:4
**weekend** [4] 792:2
870:23 874:14 875:13
**weekends** [1] 744:2
**weeks** [13] 714:24 717:13
764:25 775:5,9,11 783:10
787:3,7 789:1,5,10,12
**weren** [1] 853:11
**Westchester** [2] 711:21
790:24
**whereas** [1] 872:14
**WHEREOF** [1] 878:13
**white** [3] 711:24 807:18
824:6
**whole** [10] 713:22 732:24
733:14,15 756:7 758:15
771:10,10 820:7 859:14
**wife** [2] 743:25 827:23
**willing** [5] 724:25 777:4
778:7,8 855:15
**willingly** [1] 729:2
**win** [1] 762:22
**windows** [1] 853:25
**winter** [1] 820:13
**wish** [1] 833:8
**within** [6] 792:7 794:20
800:2,4 802:4 812:5
**without** [3] 817:25
842:12 875:12
**witness** [60] 712:3,4
730:11 734:8 735:24

750:11 756:24 767:8
768:12,15,17 769:2,4
772:6,10 777:2,14 778:16
779:23 780:5,14 782:5,6
783:22 784:1 786:13,22
789:20,21,22 799:1
802:17 809:21 814:17
822:6,7,9,13 829:5 832:12
834:2 836:21 838:3,17
840:7 843:7 847:9 852:10
852:12 856:3,9,12 857:2
858:18 859:16 863:15
864:13 869:14 870:11
876:13
**witness's** [2] 783:20
810:5
**witnessed** [1] 717:3
**witnesses** [7] 810:7
853:11 862:1 869:7,17,18
869:24
**woke** [1] 739:2
**woken** [1] 859:25
**woman** [7] 723:17 785:19
794:21,22 796:7 799:15
799:16
**women** [19] 764:15 788:3
795:16 796:6 797:6
799:17,20 801:2 810:12
812:4 821:7 827:22
830:23 841:14 854:25
855:10,21 858:4,6
**women's** [1] 787:10
**word** [1] 730:12
**words** [1] 849:17
**wore** [1] 718:23
**worked** [10] 716:4 799:15
800:7 801:2 823:17,23
824:1 826:6 859:4 867:18
**works** [1] 756:9
**world** [7] 804:17,22 812:7
824:18 833:7 844:3,4
**worst** [1] 744:24
**write** [2] 735:16,17
**writing** [4] 765:8,11
782:12 833:6
**written** [5] 734:13 758:8
772:7,8 849:2
**wrong** [3] 779:20 790:6
847:13
**wrote** [10] 735:22 736:6
736:18,18 737:1 743:9
760:11 767:25 860:5
864:3

----

**-X-**

**X** [6] 711:1,8 776:20 876:1
876:25 877:3
**XXX** [1] 833:4 838:17
839:12

----

**-Y-**

**Y** [3] 776:21 804:14
858:14
**Y2** [1] 804:14
**Yagoub** [14] 856:13
859:18,19 860:1 861:4,21

862:13 863:7 864:1,17
865:5,24 868:3,7
**Yale** [1] 858:24
**Yannai** [51] 711:6 712:19
732:9 733:23 734:14,22
736:14 737:12 738:6
742:23 750:7,24 757:14
762:22 764:14 776:10
785:16 787:4,4,12 793:13
794:21,24 795:11,17,21
796:16,20 797:2,5 799:21
819:9 820:18 824:23
825:21,22 827:22 830:20
832:5 834:6 838:9 841:12
856:21 858:3 859:5 860:9
860:14,20 863:23 868:15
872:9
**Yannai's** [19] 713:14,24
717:18 718:4,5,8,19 721:6
721:16 732:19 737:18
743:20,25 744:25 752:20
759:16 760:22 832:17,21
**year** [14] 761:14 765:2,8
765:9 781:23 782:2
790:20 798:4 821:19
824:1 825:15 826:5
845:13 859:1
**years** [9] 760:25 790:21
790:21 797:10,12 839:14
839:16 845:14,24
**yellow** [1] 807:21
**yesterday** [8] 720:3,6
732:11 742:6 753:5,8,19
759:7
**York** [22] 711:5,19 713:2
720:15 790:16,20,24
791:23,25 792:2,5,24
815:11 816:20 822:25
824:3 858:18,22 861:1
867:10 870:4 876:17
**young** [3] 821:7 833:7
841:14
**yourself** [4] 719:14,16
739:20 755:2 869:8,22
**yourselves** [2] 863:6
871:9

----

**-Z-**

**Z** [1] 822:15