UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA    :

    -against-                                    :        10 CR 594 (ERK)

JOSEPH YANNAI,                              :

             Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## REPLY MEMORANDUM
## <u>IN SUPPORT OF A REASONABLE SENTENCE</u>

NEIL B. CHECKMAN
Attorney for Defendant
 JOSEPH YANNAI
111 Broadway, Suite 1305
New York, New York  10006
(212) 264-9940

Georgia J. Hinde
  Of Counsel

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                    :

    -against-                                      :        10 CR 594 (ERK)

JOSEPH YANNAI,                                      :

             Defendant.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>REPLY MEMORANDUM IN SUPPORT OF A REASONABLE SENTENCE</u>

       This memorandum is respectfully submitted on behalf of the defendant Joseph Yannai, in reply to the government's recently submitted sentencing memorandum ("Gov. Sent. Mem.") and to assist the Court in fashioning a sentence that is sufficient but not greater than necessary.

       Although Mr. Yannai has no criminal history whatsoever, the government has again urged an extraordinarily excessive sentencing range of 292-362 months, a range amounting to well more than a life sentence for this sixty-nine year old man who suffers from a number of chronic and serious medical conditions.  The government asks this Court to impose such a disproportionately severe sentence, not on the basis of the offense conduct that the jury found proven at trial – the sum of which we have already shown would call for a guideline sentencing range of 37-46 months – but by asking this Court to disregard the jury's conclusion and to find instead that Mr. Yannai's offense conduct involved, not only sexual contact but, on two occasions, two sexual acts against two of the five testifying witnesses.  Further, although the government chose not to call a number of other women to testify, either at trial or a <u>Fatico</u> hearing, it has asked this Court to rely on their untested claims as well, not as relevant conduct for purposes of computing the guideline sentencing range (as this Court has already held will not occur), but as conduct that is otherwise

2

"relevant to the defendant's history and characteristics pursuant to 18 U.S.C. § 3553(a)" (Gov. Sent. Mem. at 3 n.1).

We discuss at the outset additional details about the testimony of each of the women who was called as a witness at trial. Considering their testimony as a whole, the Court should agree that the jury properly refused to credit their claims that the defendant committed any sexual act beyond the sexual contact reflected in the jury's verdict, a finding that this Court should also make by a preponderance of the evidence. We also discuss aspects of what little information is known about the claims of other women, named and unnamed, who did not testify at trial – claims that are too unreliable and speculative to support any upward modification of the defendant's sentence under § 3553(a). We then address why the Court should reject, not only the application of the cross-reference provision that would result in a draconian and unjustified increase in the sentencing range for the uncharged conduct here, but also two other upward sentencing enhancements that the government has pressed, even after the probation office agreed that neither is warranted based on the trial evidence. Finally, as the government continues to dispute objective medical records that confirm Mr. Yannai's infirmities, we set the record straight with respect to his conditions and his failing health.

Overall, we will ask that this Court impose a sentence anchored to the 37-46 month guideline range that best reflects the jury's verdict and the evidence as a whole. The Court should only exceed this range if it finds that some upward modification is warranted, not because the defendant's offense conduct was immoral or perverse, but because specific and reliably proven circumstances elevated the seriousness of the offense to a degree that is not outweighed by the defendant's age, illnesses, need for medical treatment, and the more than adequate ability of strict conditions of supervision to assure any necessary protection of the public far better, and more cost

effectively, than years of additional incarceration, and that will also better afford some prospect

for effective rehabilitation.  As Chief Judge Jacobs has recently observed, an offense of conviction

should not become "a peg on which to hang a comprehensive moral accounting" at sentencing

when a defendant's conduct, while plainly unacceptable and wrong, was not of a severity that

warrants punishment that a technically elevated advisory guideline calculation can allow to

become grossly disproportionate to the crime.  United States v. Broxmeyer, 699 F.3d 265, 298 (2d

Cir. 2012) (Jacobs, C.J., dissenting).

## A.   Testimony and Reported Statements

### 1.   Witnesses Who Testified At Trial

Even though only one of the five witnesses at trial made "smiling and happy" video

recordings during the period when she worked for Mr. Yannai – recordings this Court has

acknowledged showed good reasons to doubt her later testimony (7/11/13 Tr. 100) – other aspects

of each witness' testimony showed reasons why their later accounts, at trial and in recent letters to

the Court, appear exaggerated and less than reliable.  We discuss those aspects here.

#### (a)  A.S. (Jane Doe #1)

A.S. had been invited to work for a Turkish parent who expressly wanted her not only to

take care of his daughter, but to serve as his lover (Tr. 51).  She rejected this invitation, but

accepted Mr. Yannai's offer to come to the United States to work for him, despite email

correspondence that suggested that this job would also involve sexual intimacy (Tr.  59-60).  A.S.

arrived at the defendant's home on the evening of January 4, 2006, and left on the morning of

January 6, 2006, when Mr. Yannai drove her to the airport (Tr. 86) – a freedom to leave both the

house and the job that every witness similarly confirmed, thus refuting the government's claim

4

that the witnesses testified that the location of the house made it "difficult for [them] to escape (Gov. Sent. Mem. 6). Also, since A.S. spent scarcely more than a day in the defendant's company, her recent victim impact statement seems at best somewhat embellished, particularly insofar as her brief tenure as Mr. Yannai's assistant did not prevent her from accepting another au pair position in France three weeks after she left (Tr. 87). As the government agrees, no sexual act was alleged or proved in the case of this witness.

**(b) L.R. (Jane Doe #2)**

L.R. decided to come to the United States and work for Mr. Yannai after she received his email communication that her photograph showed that she was a beautiful woman with beautiful legs and hands, and expressed how he looked forward to her arrival: "only three days and we are together, with all my love, Joseph" (Tr. 148). L.R. was not an immature or inexperienced young woman, but a 25-year old university graduate with a degree in business management (Tr. 128). She arrived on a Saturday, July 8, 2006, with a round-trip ticket, cash and a credit card (Tr. 151, 224) – financial resources that belie the government's claim that Mr. Yannai routinely "deceived" women who came to work for him into arriving without the wherewithal to leave and return home again (Gov. Sent. Mem. 6). The day after her arrival (a Sunday), she went to a polo match and had dinner at home with Mr. Yannai, his wife, and their friends (Tr. 158, 160). L.R. then worked with Mr. Yannai at his home office for two days (Monday-Tuesday) before telling him on early Wednesday morning that she wanted to leave (Tr. 171). In one of the emails she sent to her boyfriend during this brief stay, she told him that Mr. Yannai offered to drive her to the airport if she decided to leave (Tr. 241). Instead, L.R. walked out of the house after telling Mr. Yannai that she was leaving, hitched a ride to a supermarket, came back with a young man who drove her to collect her luggage that she had left in the house, departed again to the train station, traveled to

5

New York, changed her return airline tickets for an earlier departure, and returned to her homeland a few days later (Tr. 172, 174-78).  L.R. did not claim to be the victim of any sexual act.  Her victim impact statement indicated that she is presently seeing a psychiatrist, but she reportedly did not begin doing so until some seven years after her very brief stay with Mr. Yannai.  It is therefore likely that her presently stated aversion to physical contact and need for psychiatric assistance arose either before or since the time she stayed at the defendant's home and not as a result of those few days.

### (c) V.S. (Jane Doe #3)

V.S. stayed for a period of less than four months with Mr. Yannai, from July 29 through October 18, 2008 (Tr. 331, 338).  At the same time, Mr. Yannai had a second personal assistant, G.L. (Gisele) (Tr. 364).  Both V.S. and photographs suggested that G.L. was happily in Mr. Yannai's employ and enjoyed the intimacies V.S. claimed to have observed G.L. sharing with him (Tr. 392, 394).   V.S. and G.L. were hardly the defendant's prisoners, moreover: they often left the house to go jogging or to walk in the woods and park, passing a number of nearby homes in the neighborhood on their way (Tr. 323, 352, 407-08).  V.S. also had her passport, her German driver's licence, a return airline ticket and cash throughout the period that she worked for Mr. Yannai (Tr. 288-89, 296, 361), allowing her to leave this employment whenever she chose.

Early on in her stay, she agreed to an intimate relationship with Mr. Yannai, similar to the relationship he shared with G.L. (Tr. 366).  She never saw Mr. Yannai force G.L. to engage in any sexual act, nor was V.S. ever forced: whatever she did was admittedly voluntary (Tr. 375, 379, 419-20).  During the first two months of her stay, V.S. made video recordings showing the home she lived in while working for Mr. Yannai, and also showing her surroundings when she traveled with Mr. Yannai to Detroit (Tr. 379-80, 383).  As narrator of these films, she appeared to be

having a very good time.  She admittedly knew, from emails and photographs she received before

she arrived in the United States – including a photograph of Mr. Yannai and a former assistant,

Joanna, kissing and holding hands – that Mr. Yannai preferred an intimate relationship with his

assistants (Tr. 286, 334).  V.S. testified that she engaged in oral sex with Mr. Yannai (Tr. 314-15),

and the jury asked to hear the recording of V.S.'s testimony about this alleged sexual act during

deliberations (Tr. 1301).  After the testimony was played, the jury could not credit V.S.'s claim

that she was an unwilling participant in any sexual act (Tr. 1352).  Like the other witnesses, V.S.

testified that Mr. Yannai did not prevent her from returning home when she told him she wanted

to do so, and he drove her to the airport when she was ready to leave (Tr. 418).

### (d)  N.Y. (Jane Doe #4)

N.Y. worked at the Yannai home for approximately one month in 2006 (Tr. 432).  At the

start of this period, the defendant's wife, Elena, also worked at home, as well as another assistant,

Joanna (Tr. 455).  When his wife was not in the home office, Mr. Yannai began to touch N.Y.'s

breast while she worked at a computer (Tr. 459-61).  N.Y. initially pushed his hand away, but

stopped resisting when he told her he would send her back to Austria (Tr.460).[1]  N.Y. agreed that

the defendant never used or threatened to use force against her (Tr. 514-15, 520, 523, 558).

One day, the defendant drove N.Y. to a lake to discuss her aversion to physical contact (Tr.

462).  He then kissed N.Y., pulled her closer to him, and pushed his hand beneath her pantyhose

and into her vagina (Tr. 464).  After she told him she did not like it and did not want him to do

that, he removed his hand and they drove home (Tr. 464).  He then offered N.Y. a choice of

---

[1]      Sending an assistant back home again was the most that the testimony showed at
the cited page, or anywhere else.  No testimony supported the government's claim that, "by
ensuring that his victims entered the United States illegally, Yannai could later threaten them with
deportation if they refused to yield to his demands" (Gov. Sent. Mem. at 5, also citing Tr. 460).

continuing to work for him with or without physical intimacy, and asked her to consider this choice while he traveled overseas to Turkey between April 1-5, 2006 (Tr. 533-34). When he returned, N.Y. decided instead to leave, and both Mr. Yannai and Joanna drove her to the train station (Tr. 480). When N.Y. arrived at New York's Grand Central Station, she met a young man, spent a week in his apartment, and found a job in a restaurant, which she soon lost because she was late too often (Tr. 433-34, 503-05). Later, she met another young man and fell in love (Tr. 433, 508). She ultimately returned to Austria before her visa expired (Tr. 508).

When later contacted by a female federal investigator in 2010 (Special Agent Donna Roethel), N.Y. never mentioned any incident with Mr. Yannai when he supposedly put his hand into her pantyhose and vagina at a lake, claiming at trial that the information was only omitted because it was "too embarrassing" (Tr. 539, 543). Nor did she tell representatives of the Federal Defender's Office who interviewed N.Y. in 2011, a week prior to the trial, about this supposed incident, even though she misunderstood at the time that they represented the government and they specifically asked her what happened at the lake (Tr. 543-44). N.Y. was equally selective about what she told the government about her own consensual conduct with the young men she sequentially met and lived with in New York after leaving Pound Ridge: she admittedly concealed what she described as "casual physical contact" with one of the young men, and that she fell in love with a second young man, deeming both "personal matters" (Tr. 433, 552). And while N.Y. is not (yet) a plaintiff in the pending civil suit against Mr. Yannai and his wife, she admitted that at least part of her reason for returning to the United States to testify at trial was the "possibility" that she would receive money for the time she spent working for Mr. Yannai (Tr. 562-63).

**(e) B.H. (Jane Doe #5)**

The last of the testifying witnesses is one of the plaintiffs seeking monetary damages from

both the defendant and his wife in a pending civil suit – a status that could well require her to testify again, and thus suggests that her recent letter has somewhat exaggerated how difficult she found it to testify at the defendant's criminal trial.  B.H. worked for Mr. Yannai for three weeks, from February 18 until March 11, 2009 (Tr. 688-89).  Like other witnesses, she arrived with a round-trip ticket that allowed her to return to her homeland in a month's time, a passport, and about $200 in cash (Tr. 593, 598, 720-21).  She was allowed to use the telephone every week to call her parents, with whom she spoke Hungarian (Tr. 600).  She also took regular evening walks in the neighborhood, along with G.L., who was still working at the house at that time (Tr. 695-96).  She stopped wearing a bra when the defendant asked her to because she wanted to keep her job (Tr. 601).  By the second week, while she worked at the computer researching churches for the defendant, he would stand behind her and touch her breast (Tr. 605).  She was also required, along with G.L., to assist him with his bath and to wake him from his naps (Tr. 599, 603, 606).

One day, after the defendant finished his bath, B.H. claimed that he pushed her to her knees and put his hand at the back of her head to guide it towards his penis (Tr. 606-07).  When she could not bring herself to perform oral sex and said so, he acceded (Tr. 608, 704).  She did, however,  remain in the bathroom on another occasion when she could have left, watching while G.L. allegedly performed oral sex on Mr. Yannai (Tr. 731).  B.H. agreed that Mr. Yannai did not force G.L. to do this (Tr. 730).  Also, when a friend later helped her prepare a typewritten account for investigators of her experiences working for Mr. Yannai, it contained no statement that he ever pushed her to her knees in the bathroom, but merely indicated that "he wanted me to have oral sex, I refused every time and he didn't force me" (Tr. 734-37).  She said the same a few days later when speaking with the police (Tr. 737-38).

B.H. also testified, strongly prompted by the government, that she felt afraid that Mr.

9

Yannai would "make me disappear, make me vanish–take me somewhere and just not coming back", or that she "would be kicked out" with "nowhere to go" (Tr. 606, 700) – although she admittedly had a return airline ticket.  In any case, she agreed that the defendant never made any such threat (Tr. 705, 722), and admitted that she had heard stories before she ever left Hungary about girls who go to foreign countries and never come back (Tr. 571-72, 663-64), so her fear most likely came from those stories and not from the defendant.

B.H. also reluctantly acknowledged that Mr. Yannai told her he would take her to the airport if her employment did not work out (Tr. 701).  Instead of accepting this offer, B.H. went to the authorities and met with a state prosecutor (S.A.U.S.A. Stone)  and an investigator on March 16, 2009, the day before her scheduled return flight (Tr. 689-90, 752-53).  She thereafter applied for a visa to remain in the United States, and  had obtained work as a hotel front desk agent in the United States at the time of the trial, using her associates degree in the hospitality industry that she had earned before coming to the United States (Tr. 565, 590).

## 2. <u>Reported Statements of Women Not Called To Testify</u>

Besides the witnesses who testified at trial, the government again relies on interviews with, and uncorroborated reports about, other women who were supposedly victims of Mr. Yannai's utterly undemonstrated "twenty-year history of sexually assaulting women" (Gov. Sent. Mem.  at 3, 7-11).  Further, the government again baselessly asserts that boxes of questionnaires seized from Mr. Yannai's home showed his intention to victimize "numerous" others (Gov. Sent. Mem. at 11).   While the government conceded that none of these allegations support any aspect of the guideline computation absent a <u>Fatico</u> hearing, it maintains that the Court may nevertheless consider these unproven claims as "relevant to the defendant's history and characteristics pursuant to 18 U.S.C. § 3553(a)" (Gov. Sent. Mem. 3 n.1).

10

Even for that limited purpose, however, the Court should not rely on disputed claims for which no sufficient or reliable corroboration exists.  In our timely objections to Mr. Yannai's presentence report (Letter dated 4/10/13 at 3-4), we previously opposed the inclusion of any of these unproven allegations in Mr. Yannai's presentence report.  For the following few reasons, we also object to considering these unreliable allegations as any part of the Court's § 3553 analysis. See King v. Hoke, 825 F.2d 720, 724 (2d Cir. 1987) ("It is well established that '[m]isinformation or misunderstanding that is materially untrue regarding a prior criminal record, or material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process'," quoting United States v. Malcolm, 432 F.2d 809, 816 (2d Cir. 1970)).  Instead, the Court should order the unproven and unreliable allegations stricken from Mr. Yannai's presentence report.  Briefly, we discuss here reasons why the Court should rely on none of these allegations.

(a) The government again refers to an alleged "New Jersey Victim" who filed charges against Mr. Yannai in 1992, reportedly for his unwanted sexual advances, but never pursued her claim.  Charges were also brought against this supposed "victim" for stealing jewelry from Mr. Yannai's wife.  Mr. Yannai appeared for trial, but the purported "victim" failed to appear, and her charges were accordingly dismissed.

(b) A second unnamed "victim" was a sixteen year old who lived in Michigan, with whom Mr. Yannai supposedly "had a sexual encounter" in 2008 (Gov. Sent. Mem. at 10-11).  The only evidence of this supposed "sexual encounter" was, however, a statement of V.S., whose credibility even the government does not attempt to endorse.  Further, contrary to the government's assertion that we have corrected before (4/10/13 Letter at 2-3), Mr. Yannai has never "conceded" that any such encounter occurred.  The government again has unfairly mis-characterized trial counsel's

11

successful objection to the introduction of any such inflammatory propensity evidence at Mr. Yannai's trial, in part because such evidence would be viewed as "abhorrent" by a large portion of society, even though a sixteen year old is legally capable of consenting to sexual relationships in Michigan.

(c) Of the next four asserted "victims", three appeared in Mr. Yannai's presentence report as numbered "Jane Does" (PSR ¶¶ 14, 42-50), and a fourth has been newly minted only in the government's sentencing submissions.  We reassert our objection to including any of them in  Mr. Yannai's permanent record.  First of these four is G.L. (Jane Doe #6), who stayed with Mr. Yannai for close to two years, and is now the lead plaintiff in a civil suit against Mr. Yannai and his wife, as well as a college student pursuing a degree.  Despite the fact that she lives in the United States and is available as a witness, the government chose not to call her to testify at trial, which itself speaks volumes about the government's own assessment of her credibility.  G.L. recounted to investigators that she met the defendant in France, where she spent two nights with him at a hotel, allegedly subjected to his unwanted sexual advances.  Notwithstanding this experience, G.L. came to the United States to work for Mr. Yannai and lived with him and his wife from July 2007 until March 2009.  When V.S. arrived in July 2008, G.L. appeared happy to be working for Mr. Yannai, as shown in photographs (Tr. 369).  V.S. also believed G.L. was loyal to Mr. Yannai and testified that she did not discuss things with G.L. because she was afraid G.L. would repeat them to Mr. Yannai (Tr. 317) – an impression another woman (I.K.)  shared, as indicated in her interview report.  Overall, G.L. appeared to have engaged in consensual sexual contact and acts throughout the twenty-month period she worked for Mr. Yannai.  Her present contrary claims and her recently submitted "victim impact statement" should be disregarded as predicates composed to help her win damages in the civil suit she has instituted against the defendant and his wife.

(d) A.K. (Jane Doe #7) first met Mr. Yannai at an airport in Washington, D.C. in 2007. After talking awhile, she went with him to his hotel and spoke with him at the hotel bar where she drank champagne. Then they went to his room, where Mr. Yannai undressed.  Though she said that this embarrassed her, A.K. talked with Mr. Yannai for most of the night and fell asleep in her underwear and a shirt.  The next morning they had breakfast together.  Though she understood that Mr. Yannai expected A.K. to give him hugs and eventually to give herself to him completely,  she chose to accept the position he offered, and spent several months working for Mr. Yannai in 2007 and 2008.  In February 2008, she left to accept another position and married.  She did not submit any victim impact statement to the Court.

(e)  I.K. (Jane Doe #8) is the third plaintiff in the pending civil suit against Mr. Yannai and his wife.  Though she has also submitted a victim impact statement – aspects of which were likely suggested by the government, such as her use of the term "trafficker", and which are also plainly designed with her civil suit in mind  – her earlier interview with federal investigators showed no victimization.  I.K. was 33 years old when she accepted the position in Mr. Yannai's home, even after her suspicions were aroused by the fact that emails from both Joanna and Mr. Yannai used the same punctuation.  Nevertheless, she came to the United States and stayed with Mr. Yannai for ten days in March 2009.  When Mr. Yannai touched I.K.'s breast at the end of a hug, she told him not to do that and he apologized.  I.K. also refused to assist Mr. Yannai with his bath and had nothing to do with his naps.  As with every other assistant, no one prevented I.K.'s departure when she decided to leave.

(f)  S.F. (Jane Doe #9) stayed at the Yannai residence for a short time in 2007,  while G.L. and A.K. were also there. She left when she wanted to and was never forced to do anything.  For some reason, the notes of her interview have not been reproduced in a readable form, such as the

13

ICE Reports of Investigation that have been prepared for other uncalled witnesses.  Plainly, the government did not think her statements either reliable or relevant enough to call for a legible report, much less to call S.F. as a witness.[2]  The Court should accordingly not consider her complaints at sentencing.

(g) Finally, the government has asserted that "records of the Department of Homeland Security reveal numerous other women who listed Yannai's residence on their immigration entry documents" as supposed evidence of the "scope of Yannai's criminal conduct" (Gov. Sent. Mem. at 11).  The government has not, however, bothered to specify how many women make up the universe of "numerous" women, how many, if any, of these "numerous women" ever actually stayed at Mr. Yannai's residence, or how many were family friends or relatives of Mr. Yannai, his wife, or any of the women who worked as Mr. Yannai's assistant.  In G.L.'s case, for example, Mr. Yannai paid for her mother's airfare to come to the United States and spend a week with her daughter at Mr. Yannai's home.  These records are therefore evidence of nothing probative to sentencing and should not be considered.  Likewise, with respect to the boxes of questionnaires admitted at trial, the government never produced any evidence that anyone who submitted a questionnaire – including mature women, men, and whole families looking for work as au pairs – later came to work for Mr. Yannai or was even contacted by him, nor was it the government's original theory, when arguing for their admission at trial, that these questionnaires were being "used to create a list of future victims" (5/11/11 Tr. 30-31).  As former counsel advised when

---

[2]      Nor did the probation office "adopt[] the government's corrections and additional information" related to S.F. in the PSR Addendum, as the government wrongly reports (Gov. Sent. Mem. at 9 n.4).  The PSR Addendum contains no mention of anyone with the initials "S.F." or the moniker "Jane Doe #9", and the government has cited no portion of the addendum to show otherwise.

objecting to the admission of these documents at the time, these questionnaires were simply research for a book about au pairs and were not relevant to any charges against the defendant (5/11/11 Tr. 30).  The Court therefore should not consider these questionnaires because they are just as irrelevant to any sentencing issue.

**B.  <u>The Government's Proposed Guideline Computation Is Unsupported and Excessive</u>**

We have undertaken some detail in the foregoing review of the record, both to correct yet again the government's exaggerations and misstatements about its evidence, and to support the discussion that follows.  We now ask the Court to agree that the appropriate sentencing guideline range in this case should not depend on an inapplicable and inapt cross-reference to a more serious offense that the government has neither charged nor proved, nor on a guideline range that has been improperly elevated on the basis of two sentencing enhancements for which the government has most recently pressed – both adjustments that the probation office did not independently deem warranted by the evidence.

When Mr. Yannai's initial presentence report issued, it had computed an advisory guideline range of 188-235 months.  We objected to the basis for this severe sentencing range in a letter dated April 10, 2013, primarily because the total offense level of 36 was premised, not on the offense conduct the jury actually found – the state misdemeanor offense of sexual abuse in the third degree, which occurs whenever a defendant "subjects another person to sexual contact without the latter's consent", New York Penal Law § 130.55 – but on more serious state sexual felonies that the jury, though given an explicit choice, could <u>not</u> find, most likely because it did not credit those few easily exaggerated aspects of some of the complaining witnesses' testimony that could technically have established more serious sexual "acts" instead of less serious sexual "contact".

Specifically, we objected to the application of the cross-reference provision in §

2G1.1(c)(2), directing the application of U.S.S.G. § 2A3.1 and a base offense level of 30 (instead

of the otherwise applicable offense level of 14 under § 2G1.1(a)(2)) when an offense involved

criminal sexual abuse or attempted criminal sexual abuse as proscribed by 18 U.S.C. §§ 2241 or

2242 (prohibiting conduct that "causes another person to engage in a sexual act", or "attempting to

do so" by means of force or threats of death, serious bodily injury, kidnapping, or otherwise

placing a person in fear) – two serious felony offenses carrying sentencing ranges up to a lifetime

in prison that were never charged against this defendant, despite what this Court aptly observed

more than once was the government's "kitchen sink" approach to the charges in this case,

"lard[ing] up" the indictment by "throw[ing] in . . . every offense that you could possibly find in

the United States Code" (Tr. 927, 937, 1261).  Without this cross-reference, the overall adjusted

offense level for all charges (including an additional point for each testifying witness under the

grouping guideline) dropped from 36 to 21, and the resulting guideline range from 188-235

months to 37-46 months, a term that we argued in our objections "better reflects the jury's actual

verdict that depended, not on any underlying felony offense or any use of force, but only on the

least serious of the state misdemeanors on which the federal charges depended" (4/10/13

Objections at 7).

     After that, the probation office issued an addendum to the presentence report on April 24,

2013.  It rejected the defendant's objection to application of the cross-reference because, even if

the jury did not find the requisite conduct beyond a reasonable doubt, the defendant could still be

subject to this enhancement if the Court found that a preponderance of the evidence proved that

the defendant "sexually abused or attempted to sexually abuse all the victims in the instant

offense", given descriptions of offense conduct provided by the government and in the initial

presentence report (PSR Addendum at 3). Also, reconsidering its earlier conclusion that no

obstruction of justice enhancement should apply, the probation office cited additional information

provided by the government about Jane Doe #6 ("Gisele" or "G.L."), who was not called to testify

at trial. Based wholly on this uncalled witness' claims – that the defendant "directed Jane Doe #6

not to talk to law enforcement about certain criminal conduct, including the immigration fraud and

the defendant's having had sexual intercourse with a sixteen-year-old,"[3] as well as the defendant's

offer "to purchase an airline ticket for Jane Doe #6 back to Brazil", supposedly "so that she could

not testify against the defendant", and the defendant's "direct[ion that] Jane Doe #6 not . . . talk

about anything that had gone on in the defendant's home" – the probation office concluded that

the defendant had unlawfully influenced G.L. and that an enhancement for obstruction of justice

was warranted on that account alone (PSR Addendum at 1). As for the other litany of reasons

pressed by the government as its single objection to the initial presentence report (and again in the

government's recent sentencing submission, at 31-34),[4] the probation office reasonably

"maintain[ed] that the conduct described by the government does not amount to obstruction of

---

[3]      It is undisputed that G.L. was not present when Mr. Yannai traveled with V.S. to
Michigan and this alleged sexual act occurred. Therefore, G.L. had no personal knowledge to
report on the issue, and her claim could have been nothing more than second-hand hearsay based
on an uncorroborated account by V.S., whose lack of credibility has already been recognized.

[4]      The government has generally incorporated its entire response to the Rule 33
Motion as containing a "more detailed history of Yannai's pattern of obstruction" (Gov. Sent.
Mem. At 31 n.6). In our reply memorandum (at 19-22), we previously explained why the
government's characterization is unwarranted and unsupported by the record. Simply, there was
and is no good faith basis for the government to assert either that the arguments made by counsel
or opinions afforded by doctors and experts in support of Mr. Yannai's motion for a new trial are
somehow products of Mr. Yannai's "manipulation and deception", much less any sort of effort to
"subvert the criminal process" (Gov. Sent. Mem. at 1). Nor has the government identified any
sound reason for its assertion that Mr. Yannai's declaration in support of that motion was
"perjurious", for the reasons detailed in our letter dated April 23, 2013, objecting to the many
blatant inaccuracies in the government's March 3, 2013, on which it has again relied (Gov. Sent.
Mem. at 34).

justice" (PSR Addendum at 1), just as it said in the original presentence report (PSR ¶ 52).

One additional upward adjustment also appeared in the presentence report addendum: a four-level increase added to the already enhanced cross-referenced guideline base offense level of 30 pursuant to U.S.S.G. § 2A3.1 (b)(1) , for the defendant's alleged use of "physical force and threats of serious bodily injury . . . to ensure [Jane Doe #6's] continued employment" (PSR Addendum at 5).  This adjustment was added in the PSR Addendum <u>only</u> to the separate guideline computation for Jane Doe #6 (Gisele or G.L.), an available witness the government, again, did not call to testify.  With the addition of an obstruction of justice enhancement and this upward adjustment, the adjusted offense level for uncalled witness G.L. captured the guidelines lead with an offense level of 36, to which an additional five levels were added under the grouping guideline for other witnesses who actually testified at trial but earned lesser adjusted offense levels of 32, for a total offense level of 41, and a guideline range of 324-405 months (PSR Addendum at 5-7).

This drastic elevation of the applicable guideline range, from 36-47 months for the offenses of which the jury actually convicted this defendant, to a sentence some ten times greater, was based entirely on the claims of an individual the government did not even call to testify at trial, although she had spent the most time working for the defendant, had previously testified before a state grand jury, and was the centerpiece of that initial prosecution – for which, again, the defendant was offered a sentence of probation in exchange for his guilty plea.  We therefore renewed our request for a <u>Fatico</u> hearing in our letter dated May 1, 2013, to hear at least from uncalled witness G.L., whose untested claims were the sole basis for both the addition of an obstruction of justice enhancement and a use of force enhancement, as well as two other uncalled witnesses, I.K. and A.K., whom the government claimed were additional "victims" based solely on interviews with each of these women.  In a responding letter dated May 2, 2013, the

18

government advised that it did not "intend to present any witnesses or additional evidence beyond the reports of investigation that have been provided to the Probation Department" and took the position that no Fatico hearing was needed.

Ultimately, after the evidentiary hearing on July 11, 2013, the Court denied our request for a Fatico hearing, without which the probation office agreed that the guideline range would descend from the "stratosphere" into which the government's additional claims had inflated it, to the 188-235 range in the initial presentence report (7/11/13 Tr. 87-88) – a range based on a guideline computation that did not include either a "use of force" enhancement from the cross-referenced guideline or any "obstruction of justice" enhancement.  Those issues that would have been among the subjects of a Fatico hearing were thus effectively "resolved in [the defendant's] favor" (id. at 87).

With respect to the defendant's objection to the cross-reference, the Court indicated that its application depends, not only on whether conduct involved any use of force, but also whether the conduct amounted to a sexual "act", as prohibited in §§ 2241 and 2242, or to sexual "contact" or "touching", as prohibited under the federal analog (18 U.S.C. § 2244) to the only state misdemeanor offense that the jury found proved at trial (id. at 96-98).   Since conduct amounting to a violation of § 2244 would not trigger application of the cross-reference, and since the jury found nothing else, the Court informed the government that, before the cross-reference could be applied, the government needed to specify the trial evidence that would support the Court's own finding that a sexual act had occurred and that force was used (id. at 98-100, 107).   The Court also expressed some understandable concern that, if it made any finding by a preponderance of the evidence that supported any application of the cross-reference, the resulting dramatic increase to Mr. Yannai's sentencing range – amounting to an additional 151-189 months, or 12 to16 extra

years, which itself could amount to a life sentence for a defendant as infirm as Mr. Yannai, who is already 69 years old – would be driven "substantially by a finding of fact that I make as the judge rather than what the jury found" (*id.* at 98-99).

In its most recent sentencing submission, the government has not afforded any reason for the Court's concerns to be assuaged.   As discussed above, the government now acknowledges that two of its five witnesses ("A.S." and "L.R.") said nothing on which the Court could rely to find that Mr. Yannai's conduct amounted to a sexual act as opposed to sexual contact (Gov. Sent. Mem. at 36 n.8) .  Also, in light of the Court's stated misgivings about the credibility of a third witness ("V.S.") who made video recordings during her stay with Mr. Yannai in which she seemed "quite happy and smiling" (7/11/13 Tr. 100), the government does not seek to apply the cross-reference to this witness either.[5]

Instead, of the five witnesses as trial, the government now asks that the Court find that Mr. Yannai committed a sexual act justifying application of the draconian cross-reference only with respect to the remaining two witnesses, "N.Y." and "B.H.", and also urges the application of an additional 4-level upward adjustment for each witness for an offense involving conduct described in § 2241, plus a 2-level upward adjustment for obstruction of justice that the probation office has repeatedly agreed does not apply absent the Fatico hearing that will not be held in this case.  With the addition of these proposed adjustments, the government has come up with an adjusted offense level of 40 and a sentencing range of 292-365 months, only slightly below the "stratospheric" guideline range that the probation office has agreed and the Court has already held is inapplicable

---

[5]     This was, again, the same witness whose recorded testimony (about alleged oral sex) the jury asked to hear again before returning a verdict that did not find that this alleged sexual act had occurred (Tr. 314-15, 1301).

absent a <u>Fatico</u> hearing.

On what does the government rely to justify these additional 21 to 27 <u>years</u> of incarceration represented by this grossly enhanced guideline range?  A total of two arguable "acts" – one of alleged digital penetration of N.Y.'s vagina,  and one of alleged and no more than attempted oral sex with B.H., plus claims about generalized fears that led these women to acquiesce to the defendant's sexual advances.  As detailed above, however, the jury had good reasons <u>not</u> to credit these claims about sexual acts, and the Court should respect that careful assessment by declining to impose the extreme sentence-escalating cross-reference that a contrary finding by a preponderance of the evidence would otherwise require.  The Court should also reject the cross-reference because the disputed information on which it relies does <u>not</u> possess "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a).

Again, in the case of N.Y., she testified that, on a single occasion when they sat in a car by a lake, the defendant kissed N.Y. and then put his hand into her underwear and vagina, removing his hand when N.Y. told him she did not like it and wanted it to stop.  N.Y. never mentioned this purported event that could technically satisfy the definition of a sexual act contained in 18 U.S.C. § 2246(2)(C), either when she originally spoke to a female federal investigator in 2010, nor when she spoke to staff from the Federal Defender's Office in 2011, just a week prior to the trial, even though they specifically asked her what happened at the lake, and even though she mistook these staff members for government representatives.  Further, N.Y. repeatedly confirmed that the defendant did not use force or threats in his dealings with her. Finally, as she admitted at trial, her testimony was to some extent motivated by the prospect of financial gain.  All of these factors warrant this Court's agreement with the jury that N.Y.'s uncorroborated description of a single, unforced sexual act has not been proved by a preponderance of the evidence, and it should not be

a basis for applying the cross-reference to § 2A3.1.

Nor did B.H.'s testimony reliably establish an attempted sexual act, as the government contends. B.H. claimed that the defendant once pushed her to her knees, guided her head towards his penis after he emerged from his bath, and stopped when she could not bring herself to perform an act of oral sex. When she later prepared a written statement for investigators, however, she described no such "attempt", but merely indicated that the defendant "wanted me to have oral sex, I refused every time and he didn't force me".

 Further, doubtless as a result of the pretrial preparation of her testimony and the prosecution's prompting at trial, she claimed that she feared that Mr. Yannai would "make [her] disappear, make [her] vanish" or "kick [her] out" and she would have no place to go (despite her possession of a valid airline ticket back to her homeland). Yet these general fears were not based on anything the defendant said or did, but stemmed from  reports she had read on the internet before leaving her homeland that some girls go to foreign countries and never come back. Also, B.H. is another witness whose testimony warrants skepticism because she has a financial motivation, given her status as one of the plaintiffs in a pending civil suit against Mr. Yannai and his wife. The Court should therefore agree that the record contains insufficient reliable evidence to find it probable that Mr. Yannai either attempted oral sex with B.H., or that he used force or threats against her – a technique that the government itself has acknowledged was not his usual means of persuasion (Gov. Sent. Mem. 47).

Without the cross-reference that depends on these two witnesses, the guidelines call for a sentencing range of 37-46 months under § 2G1.1, which sets a base offense level of 14 instead of 30 for Counts One and Five. Then, the base offense level for Counts Two and Three is 16 instead of 32, to which 5 levels are added under grouping principles, for a total offense level of 21 instead

22

of 40 (under the government's latest unsupported calculation) or 36 (in the presentence report).

Further, no upward adjustment should be added for use of force or threats because (1) as the

probation office agreed, trial testimony did not reliably establish any such "conduct described in

18 U.S.C. § 2241" (examples of which are contained in Application Note 4 to § 2G1.1: "if any

dangerous weapon was used or brandished, or in a case in which the ability of the victim was

substantially impaired by drugs or alcohol" – but no remotely similar conduct occurred in this

case) , and (2) this specific offense characteristic only applies to offenses computed under the

cross-referenced guideline, § 2A3.1, which should not apply in this case.[6]  Nor is any adjustment

for obstruction of justice warranted based on the testimony at trial, as opposed to the un-

confronted and disputed claims of G.L. that are not a part of this calculus by virtue of the

government's decision not to call her as a witness at trial or at a Fatico hearing.

In reaching this bottom line, we appreciate that the Court has already expressed its

preliminary impression that, while we are "factually and legally accurate" in computing a

sentencing range of 36-47 months based on the jury's verdict, this may not be the range that the

Court ultimately finds to be sufficient to address the facts of this case (7/11/13 Tr. 99, 106).   We

have hopefully shown here that uncharged and unreliably proven relevant conduct will not support

any increase in this guideline range, not only because the jury did not find the aggravating factors

on which the government now relies,[7] but also because the government cannot point to sufficiently

---

[6]      An example of the severe sort of sexual abuse to which this sexual abuse guideline
and the use of force upward adjustment have been applied and upheld in this Circuit was the
"vicious sexual assault on Abner Louima".  United States v. Volpe, 224 F.3d 72, 74 (2d Cir.
2000).  Plainly, it would be unreasonably disproportionate to punish the offense conduct described
by witnesses at Mr. Yannai's trial using the same harsh measure that was fairly applied to a sexual
offense that was far more brutal and severe.

[7]      The government cites decisions that have held that "[a] district court may treat
acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of
the evidence that the defendant committed the conduct" (Gov. Sent. Mem. at 40, citing United
States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012), and United States v. Florez, 447 F.3d 145,

trustworthy evidence that fairly supports such an extravagant increase in the resulting sentencing range, even under the lower standard of proof that applies at sentencing.

We therefore urge this Court to adopt the 36-47 month range as the appropriate guideline anchoring point from which its sentencing judgment will flow.  We ask this not only because it is the range that corresponds to the jury's carefully considered verdict, but because it more fairly represents the record as a whole, including the testimony discussed above that likely led the jury to reject the uncorroborated claims of two of the witnesses at trial about alleged sexual acts.  This range is certainly more proportionate to the proven conduct that, had it been prosecuted in state court, would have resulted in a sentence of probation.  At the least, if the Court believes that some factor we have not addressed warrants an upward variance or departure from this range (and we would respectfully request an opportunity to address any such factor), the Court should still use this range as the appropriate anchor from which its ultimate judgment should flow, considering as well the defendant's age, medical conditions, and the other § 3553 factors we discussed in Mr. Yannai's previously submitted sentencing memorandum, some of which we  briefly address again below.

## C.  <u>The Defendant's Age and Health Warrant A Lesser Sentence</u>

---

156 (2d Cir. 2006)).  We do not dispute this long-established premise, but note that both of the district courts in the cited cases did <u>not</u> impose a sentence within the resultingly elevated guideline range.  Instead, in <u>Florez</u>, 447 F.3d at 156, after finding a quantity of drugs that increased the defendant's offense level by two points, Judge Sifton imposed a lesser sentence at the bottom of the un-enhanced range.  And in <u>Pica</u>, 692 F.3d at 88, Chief Judge Amon found acquitted conduct by a preponderance of the evidence that increased the defendant's offense level from 28 to 43, but "decline[d] to impose a sentence at the level called for by the guidelines . . . based on a finding made by a preponderance of the evidence," and concluded that the defendant "was convicted of less serious offenses, and it is for those offenses that he is and should be sentenced." While we do not believe there is sufficient evidence to support findings in addition to those made by the jury in this case, we would urge this Court to follow Chief Judge Amon's example if there were.

The government's sentencing memorandum pretends that a sentence within a range of 292 to 365 months is "amply justified" for a defendant who is sixty-nine years of age and suffers from myriad chronic and serious ailments that have been detailed in the presentence report, the PSR Addendum, the defendant's original sentencing memorandum, and in voluminous medical records from the MDC and from earlier treating physicians.  Yet a sentence anywhere near this range would amount to a life sentence for conduct that the jury decided did not amount to a sexual act.

Some recent observations on federal sentencing practices deserve repeating here.  "Anger, grief and the desire for retribution are understandable, and we can all agree that people who commit serious crimes should be held accountable. But retribution can shade into vengeance." New York Times, August 19, 2013, op-ed article authored by Jamie Fellner, Senior Advisor at Human Rights Watch.  Further, as a nation, we are incarcerating more of our citizens for far too long at a cost which is no longer sustainable.  An aging prisoner population will result in a need to invest in "special training for correction officers; in round-the-clock medical care; in retrofitting buildings, wheelchair accessible cells and bathrooms; in units with lower bunks and no stairs; and in increased hospice care for the terminally ill."  *Id.*  Attorney General Holder thinks so too:  "It's clear . . . that too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason."  Remarks at the American Bar Association, August 12, 2013.

These realistic limits on federal sentencing are plainly not reflected in the government's excessively punitive sentencing submission.  Indeed, the government goes out of its way to insinuate that even Mr. Yannai's medical records should not be believed.  We therefore offer the following to correct the record one more time.

First, the government claims that Mr. Yannai's "medical condition is largely self-inflicted" (Gov. Sent. Mem. at 47).  This assertion is totally baseless.  Certainly, Mr. Yannai could not have

"self-inflicted" his          [Redacted]

Next, while conceding as it must that the defendant is physically limited, the government preposterously claims that Mr. Yannai "is still quite capable of continuing his criminal conduct" that relied "on deceit, manipulation, coercion and fear – all tools which he is eminently capable of employing even from a wheelchair. Nothing short of total incapacitation will adequately protect the public from Yannai" (Gov. Sent. Mem. at  47-48).   This hyperbolic statement ignores the fact that the nature of some of his offenses of conviction required, not only the use of a computer to invite young women to his home, but some greater degree of physical mobility than he presently possesses to thereafter commit offenses involving unwanted sexual contact.

Mr. Yannai's diminished physical condition will certainly prevent the latter, and this Court can effectively prevent the former by limiting the defendant's use of a computer and forbidding him from contacting people on line or through emails without the knowledge and consent of his supervising probation officer.  As even the government must recognize, Mr. Yannai was hardly roaming the streets in search of unsuspecting victims.  Without the wherewithal to entice anyone to his home, he presents no realistic future risk to anyone.

In another baseless attempt to portray Mr. Yannai's conditions as something of his own invention, the government asserted that "the defendant has purposely exacerbated his medical conditions by repeatedly refusing treatment and lying to MDC medical staff regarding his condition" (Gov. Sent. Mem. at  48).   This is patently false.  When Mr. Yannai refused to authorize the release of medical records from the White Plains Hospital to the MDC shortly after his conviction, he merely wanted to avoid another disclosure of his medical records to the press, as had already occurred at the time of his arrest.  Also, MDC records (annexed as part of Exhibit 14 to the government's sentencing submission) confirmed that he told MDC personnel that he wanted

26

to speak to his attorney before authorizing the release of his hospital records, that his attorney would make the records available to the MDC, and that he believed or hoped that he would soon be released from custody and could then obtain treatment from his own physicians.

Given the BOP's unfortunate track record in treating prisoner medical conditions, Mr. Yannai was justified in this approach.  Similarly, after learning that the BOP's idea of cost-effective dentistry and the preferred form of dental treatment at the MDC is always extraction, he understandably declined dental treatment on two occasions as well, as other MDC records show. This did not show an intent to "exacerbate" any condition, but simply a desire to keep whatever teeth he still has.

Further, the condition that has confined Mr. Yannai to a wheel chair since his arrival at the MDC in June 2011 is      [Redacted]          The fact that he made this assessment months before his Rule 33 motion was filed does not diminish this fact: as letters to the Court showed, he asked for the appointment of new counsel in December 2011 because his former counsel had not filed a new trial motion more quickly.

Since the appointment of present counsel and the filing of his new trial motion in March 2012, Mr. Yannai has continued to hope that he might still obtain medical treatment [redacted] by physicians in whom he would have more confidence than those who might afford treatment to him as a prisoner.  Because we are here preparing a sentencing submission, Mr. Yannai's hope may have been misplaced, but that does not undermine his understandable preference for the possibility that he could still be treated by his own doctors.

As for the government's additional assertion that Mr. Yannai refused to be vaccinated (Gov. Sent. Mem. at 51), that is not evidence of any effort to exacerbate his poor health, but of his hope to preserve what health he has, given his awareness of medical articles that suggest that

vaccinations at his age can be more harmful than efficacious.

Nor does Mr. Yannai refuse or neglect to take his medications regularly.  We previously addressed this contention in our letter dated July 25, 2013, with respect to the government's suggestion that, when Mr. Yannai [ Redacted]

Finally, the government dismisses the possibility that Mr. Yannai may be may be suffering from     [ Redacted]   as "perhaps the weakest of all his claims," pointing to Mr. Yannai's pro se submissions as evidence that his mind is working just fine (Gov. Sent. Mem. at 52).    Submissions from Mr. Yannai that we have received have not been mailed from the MDC in Brooklyn, however, but from Mr. Yannai's wife, who has assisted her husband by helping him compose what he wishes to say and by editing his submissions for coherence.  That the couple worked together to inform this Court about his complaints and concerns does not take away from the fact that he has a direct      [ Redacted]

In sum, the Court should not be persuaded by the government's baseless claims that Mr. Yannai's myriad health problems are some sort of manipulative ploy for sympathy (Gov. Sent. Mem. at 52-53).  At bottom, the medical facts are irrefutable:  Mr. Yannai, is a sixty-nine year old man suffering from chronic, severe illnesses which will require medical treatment for the rest of his life, and his conditions can be expected to deteriorate and become more and more costly to effectively treat as he ages.  The Court should accordingly impose a sentence that permits his treatment outside of confinement at the earliest possible date, since that will be more efficient and cost-effective than attempting to treat his conditions in custody, and such treatment can readily be achieved without any danger to the public or foregoing any other legitimate sentencing purpose.

**D.  <u>Sentencing Recommendation</u>**

The Sentencing Guidelines require that the Court sentence Mr. Yannai to "a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, adequate deterrence and to protect the public from further crimes of the defendant.  U.S.S.G. § 3553(a).  This Court can fashion such a sentence without resorting to the draconian punishment the government urges, and even without imposing a sentence within the enhanced guideline range in the original presentence report.  This result will be achieved if the Court imposes a sentence within the 36-47 month guideline range called for by his offenses of conviction, and follows that sentence with a term of supervised release that imposes limitations on Mr. Yannai's use of a computer sufficient to insure that he will commit no similar crimes in the future.  His term of supervised release can also require Mr. Yannai's home confinement with reasonable exceptions permitted for medical treatment at a significantly lower cost for more effective treatment than he would receive while he remains incarcerated.

In our original sentencing memorandum dated April 15, 2013, we urged the Court to impose a sentence of time served, since Mr. Yannai has already spent close to three years in custody in a maximum security prison, where he has maintained a record of entirely clear conduct, although his health has continued to deteriorate.  We also reminded the Court that the alternative of strict conditions of supervision was considered entirely sufficient by the original state prosecutors as punishment that would penalize the offense conduct, afford general and specific deterrence, and protect the public.

If the Court does not agree with this recommendation, we alternatively ask the Court to impose a sentence anchored to the properly computed guidelines range of 37-46 months, and to only exceed that range to whatever limited extent that this range may be found insufficient to address a specific sentencing purpose.   Because he will be required to register as and comply with

the strict reporting requirements of a sex offender, and because of his diminished physical state, Joseph Yannai is simply no longer in a position to commit any of the offenses for which he has been convicted.  He will also spend additional years under the close supervision of the United States Probation Office, which will both assure that his offense conduct remains in his past, and that he is afforded a meaningful opportunity for effective rehabilitation .  Finally, he will be able to deal with his health issues more effectively and at far less expense to the taxpayer than if he is warehoused in a custodial setting "for no truly good law enforcement reason".   We accordingly urge the Court to recognize the flaws in the government's sentencing arguments and to sentence Joseph Yannai to a term no greater than necessary in light of the applicable guideline range, his age, illnesses, need for medical treatment, and the government's inability to show that his offense conduct was more severe than the jury already determined.

Dated:  New York, New York
      August 29, 2013

                           Respectfully submitted,

                           _____/s/_____
                           Neil B. Checkman

                           _____/s/_____
                           Georgia J. Hinde

                           Attorneys for the Defendant Joseph Yannai