

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DAS/AES  
F. #2010R00212

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 18, 2013

**BY HAND AND ECF**
Honorable Edward R. Korman
Senior United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Joseph Yannai
>      <u>10 CR 594 (ERK)(S-1)</u>

Dear Judge Korman:

      The government respectfully submits this letter in response to the Court's order, dated September 16, 2013, requesting that the government address the defendant's arguments regarding the credibility of B.H. and N.Y.  In his Reply Sentencing Submission, Yannai mischaracterizes both the trial testimony and the nature of these witnesses' prior statements.  Contrary to Yannai's claims, both witnesses previously provided detailed descriptions of the sexual assaults to which they testified at trial, long before the trial ever occurred.  Both witnesses further explained that they were uncomfortable repeatedly providing the most intimate details concerning these sexual assaults, and therefore understandably did not do so during every meeting prior to their testimony.  The record before the Court therefore amply supports the jury's specific finding that both witnesses were credible, and the Court should reject Yannai's unfounded attacks upon their veracity.

I.  <u>N.Y.</u>

      Yannai begins his attack upon N.Y.'s credibility by minimizing and distorting the record of her testimony.  Specifically, Yannai claims that, during his sexual assault of N.Y. while visiting a lake, he "put his hand into her underwear and vagina, removing his hand when N.Y. told him she did not like it and wanted it to stop."  Yannai Reply Sentencing Submission, at 22.  This skewed version of the facts implies

that the initial touching may have been consensual, and that Yannai stopped immediately upon N.Y.'s protestations. The trial record directly belies this claim. As N.Y. testified, "he put his hand under my pantyhouse and pushed his hand into my vagina. . .and so I told him that I didn't like that, I didn't want him to do that, <u>but he continued doing it for a certain amount of time</u>." Trial Transcript ("Tr.") 464:8:14 (emphasis added). Indeed, N.Y. reiterated this fact on cross-examination:

> Q: Did he insert a finger in your vagina?
>
> A: Yes.
>
> Q: Was he holding you at that time?
>
> A: Yes.
>
> Q: Did you tell him to stop?
>
> A: Yes.
>
> Q: Did he eventually stop?
>
> A: After a time; yes.

Tr., 539:1-8.

Yannai next argues that N.Y. should be discredited because she did not describe this aspect of the sexual assault in a prior statement to law enforcement authorities in 2010. Yannai again ignores the record in the case. As N.Y. testified, when she first discussed the lake incident during a 2010 telephone interview with law enforcement authorities, "it was an event that I didn't like to think back to but I did mention it but I didn't go into details." Tr. 540:11-13. N.Y.'s understandable reluctance to discuss these embarrassing details was well-documented. In December 2010, N.Y. was interviewed by Austrian law enforcement authorities regarding the instant case. During that interview, N.Y. said that Yannai had performed sexual acts on her at the lake, but that she "was not able to discuss the details at that time of the interview." <u>See</u> Report of Investigation, 3500-NY-7, at 5 (attached hereto as Exhibit 1). The author of the report, who was not otherwise involved in the instant investigation or prosecution, specifically noted that, at the time of the interview, "[N.Y.] appeared to be traumatized regarding that event."

2

Yannai also purports to rely upon an interview of N.Y. conducted by members of the federal defenders office under dubious circumstances. As N.Y. testified at trial, two employees of the federal defenders accosted her at her hotel, and mislead her into believing that they were representatives of the government. Tr. 540. N.Y. told these individuals that "it was difficult for her to talk about the details of sexual abuse". Tr. 866:1-2. Having already repeatedly relayed details of the sexual assault to the government shortly before, and believing these individuals to be representatives of the government, N.Y. understandably saw no reason to repeat these uncomfortable details again, particularly where the interview occurred in the lobby of the Marriott Hotel, rather than the privacy of an office. Tr. 866.

Indeed, the record before the Court corroborates N.Y.'s trauma and discomfort at discussing these details. Emails N.Y. sent contemporaneously with the assault show that N.Y. was reluctant to discuss these details even with those closest to her. In an email to a friend sent on March 21, 2006, N.Y. told the friend that "[a]ny physical contact with Joseph, I don't really want to talk about." See 3500-NY-17, March 21, 2006 email (relevant portion attached hereto as Exhibit 2). Indeed, during the trial, N.Y. broke down into sobs a few minutes into her direct testimony, prompting the Court to calm her down, telling her "take your time. Relax." Tr. 436:12-14. The well-established evidence of the continuing traumatic effect of the sexual assault upon N.Y. corroborates her testimony and explains her understandable reluctance to relive these details during every meeting with the government. [1]

II. **B.H.**

Yannai similarly mischaracterizes B.H.'s testimony, claiming that he merely "guided her towards his penis after he emerged from his bath, and stopped when she could not bring

---

[1] Yannai also claims, without attribution, that N.Y. "repeatedly confirmed that the defendant did not use force or threats in his dealings with her." Yannai Reply, at 22. As the government has previously noted, in addition to the incident at the lake, Yannai also physically assaulted N.Y. in a separate incident, holding her down while grabbing her breast and compelling another victim to touch N.Y.'s breast. N.Y. "tried to get away from him, but he was so heavy and strong I couldn't do it." Tr. 472:21-473:10.

3

herself to perform oral sex." Yannai Reply, at 22. Unsurprisingly, Yannai cites to no evidence supporting his characterization of a gentle "guide" of B.H's head, as the evidence showed this action was far more forceful and malevolent. As B.H. testified, Yannai pushed her by the shoulders to the floor, grabbed her hair and pushed her head towards his exposed penis. Tr. 606:10-607:22. These events occurred in the closed quarters of Yannai's bathroom, where he had insisted that B.H. assist him with his bath. <u>Id.</u>, at 605-06.

As with N.Y., Yannai also mischaracterizes the nature of B.H.'s prior, pre-trial statements regarding the bathroom sexual assault. As B.H. testified during the trial, when the police first contacted B.H. at Yannai's home in March 2009, she remained understandably traumatized, and, with no money and no legal status, feared that she might be required to return to the defendant's home. Tr. 649:21-650:12. She was therefore afraid to divulge the full details of what had occurred. <u>Id.</u> The next day, while still traumatized and uncomfortable, B.H. wrote a statement for investigators, in which she described the sexual assault but again did not divulge all details. Tr. 650:17-25. B.H. was similarly uncomfortable divulging these details to a male investigator during an interview two days later. Tr. 651:15-17.

As with N.Y., this discomfort in discussing such intimate details is both understandable and unsurprising. That is particularly so with respect to B.H.'s initial statements to authorities, which occurred mere days after the assault. As the government has previously noted, psychological research indicates that the anxiety and fear that follows a rape peaks within three weeks. <u>See</u>, The Impacts of Sexual Assaults on Women, Cameron Boyd, published by the Australian Centre for the Study of Sexual Assault, April, 2011, attached as Exhibit 6 to the Government's Initial Sentencing Submission.

Yannai misleadingly implies that B.H. maintained this incomplete story up until the trial, and then dramatically added details of the sexual assault in an attempt to unfairly malign Yannai. As with virtually all of Yannai's claims, the truth is precisely the opposite. In fact, approximately one month after these initial statements -- and over two years prior to the trial -- B.H. provided a sworn statement to law enforcement authorities in which B.H. provided the very same details of the bathroom assault to which she testified at the trial. <u>See</u> 3500-BH-8, Supporting Deposition of B.H., April 22, 2009 (attached

4

hereto as Exhibit 3).  In this sworn statement, B.H. attested that Yannai tried to force her "to perform oral sex on him by pushing my head to his penis but I refused, telling him I didn't want to do it.  Even after I refused he still tried to force me to do it and was angry with me, making me afraid."  Id.  B.H. further described her fear of Yannai generally, noting that she was afraid that if she "didn't do these sexual things Joseph would hurt me or kill me …"  Id.  Indeed, at trial, the Court permitted evidence of B.H.'s prior sworn statements to be placed before the jury, because the Court was concerned that Yannai had left the jury with the misleading impression that B.H. had never fully described the assault in 2009.  Tr. 769:10-22; 778:8-12.

Following her sworn deposition in April 2009, B.H. recounted these details again on multiple occasions.  For example, during an interview with federal law enforcement authorities in June 2009, and again during her testimony before the New York State Grand Jury B.H. described the graphic details of the bathroom assault, entirely consistent with her trial testimony.  See Report of Investigation, 3500-BH-11, at 5 (attached hereto as Exhibit 4);  Grand Jury Testimony of B.H., 3500-BH-10, at 84-85 (attached hereto as Exhibit 5),.

The evidence before the Court therefore establishes a consistent, long-standing record of B.H. providing complete and accurate details of the bathroom assault.  Yannai's absurd contention that B.H.'s description of the assault was "doubtless a result of the pretrial preparation of her testimony and the prompting of the prosecution at trial" is therefore nothing more than another of Yannai's many attempts to mislead the Court.[2]

### III. Conclusion

In a final effort to avoid punishment for the sexual assault of his victims, Yannai repeats the absurd canard that N.Y. and B.H. falsely testified in the hopes of receiving some financial compensation.  As an initial matter, it should be noted that even Yannai's trial attorneys thought little of this argument, relegating it to one sentence of the summation.  Tr. 1096.  In this regard, the suggestion that the victims would

---

[2] Yannai also argues, again without citation to the record, that B.H.'s fears stemmed not from the defendant, but rather "from reports she had read on the internet before leaving her homeland."  Yannai Reply, at 23.  Whatever apprehensions B.H. may have harbored before meeting Yannai were far exceeded by the abuse to which Yannai subjected her.

5

choose to endure the trauma of reliving the assaults in a public courtroom, while subjecting themselves to cross-examination, all in the hope of receiving some relatively meager compensation, is absurd. Indeed, as the government has noted previously, N.Y. and B.H. are each entitled to only approximately $1,000 in restitution. Moreover, while B.H subsequently joined a civil lawsuit against Yannai, that lawsuit was not filed until long after the trial, and therefore cannot conceivably have influenced B.H.'s testimony.

Moreover, there is simply no motivation for N.Y. and B.H. to have falsified this (or any other) aspect of their testimony. As the sentencing litigation has made clear, the legal significance of these assaults, as opposed to those of the other victims, was unclear to anyone, including the parties, at the time of the trial, when the focus was understandably on issues of establishing guilt. Furthermore, as the government successfully argued to the jury in rebuttal, if the victims had intended to falsify a story to impugn Yannai, one would expect them to describe even more extreme assaults. The fact that N.Y. and B.H. describe the assaults so carefully provides further evidence of their veracity.

LORETTA E. LYNCH
United States Attorney

By: /s/Daniel Spector
Daniel A. Spector
Hilary Jager
Assistant U.S. Attorney
(718) 254-6345

Audrey Stone
Spec. Assistant U.S. Attorney

cc: Neil Checkman, Esq.
Georgie Hinde, Esq.