UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X     **Docket#**
UNITED STATES OF AMERICA,      :     10-cr-00594-ERK
                               :
     - versus -                :     U.S. Courthouse
                               :     Brooklyn, New York
JOSEPH YANNAI,                 :
              Defendant        :     September 23, 2013
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES SENIOR DISTRICT JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**


**For the Government**:           **Loretta E. Lynch, Esq.**
                                  United States Attorney

                         BY:      **Daniel Spector, Esq.**
                                  **Hilary Jager, Esq.**
                                  **Audrey Stone, Esq.**
                                  Assistant U.S. Attorney
                                  271 Cadman Plaza East
                                  Brooklyn, New York  11201


**For the Defendant**:            **Neil Checkman, Esq.**
                                  **Georgia Hinde, Esq.**



**Transcription Service**:        **Transcriptions Plus II, Inc.**
                                  740 Sharon Road
                                  Copiague, New York 11726
                                  Transcriptions2@verizon.net




Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  United States v. Joseph Yannai.

2    Your appearances, counsel.

3          MR. SPECTOR:  Good afternoon, your Honor.

4    Daniel Spector, Audrey Stone and Hilary Jager for the

5    government.

6          MR. CHECKMAN:  Good afternoon, your Honor.

7    Neil Checkman and Georgia Hinde for Mr. Yannai.

8          THE CLERK:  On for sentencing, Judge.

9          THE COURT:  There are a couple of preliminary

10   issues that I have to deal with before sentencing that

11   deals with the issues related to the continuation of the

12   trial on June 1st after the defendant was hospitalized

13   for taking an overdose of drugs.  I believe the drug

14   involved, according to the expert that both parties

15   agreed upon was Temazepam which is a much stronger drug;

16   I think Dr. Milton said six times as strong as Valium.

17          So, I have -- I first want to deal with the

18   issue of the burden of proof.  I've discussed this before

19   in various places in the transcript and I assume you

20   would be able to find it without my having to -- you know

21   I've written it down where I've discussed it at various

22   places.  The burden of proof in my view is on the

23   defendant.  That is once it's clear that he knew that he

24   was supposed to be in court on the morning of June 1st

25   and he failed to appear; the burden was on him to explain

3

Proceedings

1   why and to come up with an explanation that would excuse

2   his absence.

3          I want to begin first with the decision of the

4   Supreme Court that I've previously alluded to in <u>Medina</u>

5   <u>v. California</u>.  That was a case as you recall that

6   involved the issue of the competence of a defendant to

7   stand trial.  <u>Medina v. California</u> appears at 505 US 477

8   and the issue in that case in California places the

9   burden on the defendant to show that he was not competent

10  and the Supreme Court held that the due process clause

11  did not compel a burden shift to the government.  That

12  consistent with the due process clause, the defendant

13  could be placed in the position of showing that he was

14  not competent to stand trial.

15         I think that case is particularly analogous

16  here because a defendant who is not competent to stand

17  trial is not competent -- is unable -- is one who is

18  unable to understand the nature of the proceedings and to

19  participate in the defense of the case.  In other words,

20  he could be physically present but he's essentially an

21  absent defendant.

22         And indeed, the Supreme Court said in Medina

23  that where that's the case where the defendant is unable

24  to comprehend the nature of the proceedings or to

25  participate in his defense, then you can't go forward

4

Proceedings

1  with the trial.  And that's, of course, equally true

2  where the defendant voluntarily absents himself from the

3  trial.

4         So I think that the Medina case is particularly

5  compelling in the context of this case and it is really

6  closely analogous because in both instances we're dealing

7  with essentially a claim by a defendant that he was not

8  permitted to understand what was going on in the

9  courtroom and to participate in his defense.

10        The case that you rely on in your brief, I

11  don't think you've discussed in the papers that you

12  buried me with, Medina v. California but it's possible

13  that I missed it.  You did?  A little bit -- the case

14  that you cite -- let me see if I -- in your brief, United

15  States v. Salem, which is at 690 F.3d 115 for the

16  proposition that the government bears the burden of

17  proof, I don't believe is sufficiently strong enough to

18  overcome Medina for several reasons.

19        First, the issue was never -- if you take a

20  look at the briefs, the issue of who had the burden of

21  proof was never even argued.

22        Second, nothing turned on who had the burden of

23  proof.  That is, in a strict technical sense, the burden

24  of proof becomes relevant where the evidence is in

25  equipoise.  That is, as we all know, when we charge a

5

Proceedings

1  jury in a civil case, if it's fifty-fifty, the party that

2  bears the burden of proof loses.

3          In the Salem case, the Court of Appeals didn't

4  discuss the issue of the evidence being in equipoise.

5  The holding didn't turn on a finding that the Court --

6  that the evidence was in equipoise and therefore, the

7  government loses.  In fact, the government won the case

8  on plain error grounds.

9          So, that's one reason why I think that at best,

10 the language in -- that you cite in that case is dictum

11 since it did not affect the outcome of the case as the

12 Court decided the case and as I said, it still leaves us

13 with the Medina case which I think is compelling.  And I

14 think the language in that case was more talking about

15 burden of proof and the way the Court said the government

16 didn't meet its burden of proof was in a more generalized

17 way than the technical sense that the term is used in.

18         So I don't think that the language in that case

19 is compelling -- I think it's dictum; a case that it

20 cited for the proposition that the government bore the

21 burden of proof, United States v. Lynch says the

22 government bears the burden of proving by a preponderance

23 of the evidence that the defendant waive his

24 constitutional rights, didn't involve a case of the

25 defendant being absent from the courtroom or didn't

6

Proceedings

1   involve the presence of a defendant in the courtroom.

2   Instead, I believe that it involved a Miranda issue.

3            (Pause)

4            THE COURT:  And it wasn't a Miranda issue, it

5   was -- yes, it involved a Miranda issue.  If you read

6   Medina, Medina distinguished those cases from the

7   situation before the Court in Medina.  And I am not even

8   sure that it's entirely true as a general proposition or

9   as a -- that the government bears the burden of

10  demonstrating by a preponderance of the evidence the

11  defendant waived his constitutional rights in every case.

12  It's that statement is somewhat inconsistent with the

13  doctrine of procedural forfeiture.

14           For example, a defendant has a right -- the

15  constitutional right to have -- to be indicted by the

16  grand jury and one that's not selected on the basis of

17  purposeful discrimination.  And I believe the Supreme

18  Court has said that the failure to raise that right

19  before trial wins even though there's no knowing and

20  voluntary waiver.

21           So, the whole doctrinal procedure of forfeiture

22  involves a waiver of constitutional rights without it be

23  knowingly and voluntarily made.

24           And finally, there is a basis which I think I

25  have already cited to you which basically says that once

7

Proceedings

1   it is shown that the defendant knew he was supposed to be

2   present in the courtroom at a particular date and time,

3   that he -- that is, the defendant bears the burden of

4   justifying his absence from a known proceeding against

5   him.  And that's United States v. Ryder, 897 F.2d 639 at

6   page 643, United States v. Sanchez, 790 F.2d 245, 249,

7   where the Court said the defendant bears the burden of

8   justifying his absence from a known proceeding against

9   him.

10          So there's so much precedent as opposed to

11   policy.  There are also good policy arguments for that

12   result and I've gone through them with you as well.

13   First, of course, with the general rule of evidence and

14   it's reflected in the Supreme Court's decision that I

15   already cited to you that where a defendant -- where a

16   party has knowledge that is peculiar to him, that it's

17   only right and just that that party bear the burden of

18   proof.

19          And I think that - I know your argument that

20   you make was that well it's inconsistent with what

21   normally happens in criminal cases.  It actually really

22   isn't.  Of course in a criminal case, the government

23   bears the burden of proving the defendant guilty beyond a

24   reasonable doubt regardless of who has actual knowledge

25   of, for example, a defendant's state of mind.  But that

8

                              Proceedings

1    deals with the issue of guilt or innocent; whether we're

2    going to put somebody away to jail and, you know, for how

3    long.  We're not dealing with that issue in this case.

4    We're dealing with an issue of a defendant's state of

5    mind in taking what I believe is evidence that clearly

6    establishes as overdoses of medications contrary to the

7    prescription on whatever bottles he had and you have

8    testimony -- you, indicating that.

9           (Pause)

10          MS. HINDE:  Thank you, Judge.

11          THE COURT:  That the most critical question

12   here, at least according to Dr. Milman's testimony was

13   what did he take and when did he take it.  In fact, I

14   believe you asked him at the hearing -- at page 39 of the

15   hearing on July 12th -- July 11th -- you said -- you

16   asked Dr. Milman's:

17          "Question:  You read the declaration" referring

18   to the defendants -- I assume referring to the

19   defendant's affidavit -- "Based upon that, would there

20   have been any additional questions that you would have

21   had, Mr. Yannai, that you would have liked to ask

22   Mr. Yannai in terms of making a determination?"

23          And skipping down, Dr. -- to line 22, Dr.

24   Milman said:

25          "Answer:  I do have some questions I would have

                    Transcriptions Plus II, Inc.

9

Proceedings

1    asked. "

2              "Question:  And what kind of questions would

3    you have liked to have asked, Dr. Milman of Mr. Yannai?

4              "Answer:  Well, one question is in terms of

5    exactly what he took, if he can describe the drug, you

6    know, that he took and I can be more specific.  I'm

7    purposely not being specific because I don't know if

8    you're going to go that way with him."

9              So we're dealing with what the doctor described

10   as an important question that he essentially did not have

11   the answer to.  And later on on page 72 -- I'm sorry, on

12   page 56 the question on cross from Ms. Stone is:

13             "Question:  Isn't the only way to really

14   resolve what he took is to ask Mr. Yannai exactly what he

15   took and describe it?

16             "Answer:  Well, that would help, assuming you

17   believe what he tells you."  Of course that's a separate

18   issue in this case.

19             And then at page 72, Dr. Milman -- the question

20   was asked:

21             "Question:  Now you also have concluded to what

22   I believe you say is a degree of scientific certainty

23   that even if he took ten pills, that that was an

24   accidental overdose.

25             "Answer:  No, I didn't say that.  And I think I

10

Proceedings

1  mentioned this earlier, my confidence is good on the low

2  end that if he took four pills, it was accidental but the

3  larger the number, the less confidence I have that it was

4  accidental."

5          And his own testimony, Dr. Milman's testimony

6  was based on his belief it was four to ten pills.  And

7  this is an expert who you both agreed upon and whose

8  testimony was lacking in some respects but I think it was

9  useful in other respects in terms of what common sense

10  would even suggest.

11          So what we have here is essentially a record

12  that's incomplete.  It's incomplete because the defendant

13  knows the answers to critical questions and he has not

14  provided it. I know you're looking at me quizzically.

15  You're telling me he gave you an affidavit.

16          MS. HINDE:  I did.

17          THE COURT:  Well I can't judge the credibility

18  of an affidavit but Dr. Milman didn't believe it.  In the

19  affidavit, I believe Mr. Yannai said he took Valium.

20  Dr. Milman didn't believe that he took Valium, nor do I

21  for that matter.

22          Indeed, Dr. Milman said he took Temazepam and

23  as we -- in the course of the hearing, when we went back

24  over the medical notes of his first attempt at -- first

25  overdose which is conceded was a suicide attempt, the

11

Proceedings

1   medical note which Ms. Stone read into the record at page

2   82, it begins at line 16.  I'm not going to read the

3   whole thing.  It says:

4           "Ms. Stone: He became -- the defendant when he

5   returned from the bathroom" -- this is when he was

6   arrested -- " he appears sluggish and was taken -- he

7   appears sedated and sluggish and was taken to the

8   Emergency Department.  He became increasingly

9   unresponsive and required intubation.  Patient apparently

10  took an unknown amount of Valium and possible Temazepam."

11          And the defendant himself, the first time

12  around, I believe when he testified at the bail hearing

13  said he didn't take Valium.  He said he took sleeping

14  pills I think in testimony that is quoted in -- I believe

15  in one of the government's papers that is in the

16  transcript.  He clearly understood the difference and

17  made it clear that he wasn't -- that he had not taken

18  Valium; that he had taken sleeping pills, which is

19  consistent with the Temazepam.

20          So that what we have here are -- this goes back

21  to my basic policy reason of why it is that the defendant

22  should bear the burden of proof.  Indeed, it's bizarre

23  that we are -- the parties have retained experts to deal

24  with something that it may not be possible to establish

25  by expert toxicology testimony at all.  And I don't -- in

Proceedings

1    fact, I think it's beyond the expertise of a toxicologist

2    generally to say whether it was an overdose, whether it

3    was a suicide attempt or whether it was an accident, just

4    simply on the basis of the amount of drug in the system.

5              I think we do know from the affidavit and you

6    could correct me that he was popping pills the whole

7    night before he showed up -- before this happened and he

8    claimed he felt great in the morning.  He felt well

9    enough to drive allegedly, unlike the preceding day when

10   he claims he took a car service.

11             So that's number -- another consideration of

12   policy, of course, I think I've alluded it again is that

13   -- I've alluded to it before that really related is the

14   fact that we're not dealing here with the guilt or

15   innocence of a defendant.  We're basically dealing with

16   an important legal issue but it's an issue of him not

17   being present at a point in the trial, which as I  have

18   already said on a number of occasions was one in which he

19   had nothing to contribute.  I know you're very good at

20   hypothesis -- give me -- speculative -- I am going to be

21   kind -- arguments as to why he could have made some great

22   contribution to -- during the course of the reading of

23   the charge.  He, of course, being present when the charge

24   -- when we went over the charge, having had presumably if

25   he were interested, an opportunity to read the draft.

13

Proceedings

1  There were notes involving legal issues and the jury did

2  not even come into the courtroom.  They were answered

3  without his presence and these were entirely legal

4  arguments that he had nothing to contribute to.

5          The jury came into the courtroom once during

6  -- before the verdict.  That was pursuant to what I would

7  regard as an extraordinary request that I think may have

8  only been the first or possibly the second time since I

9  have been using ESR since 1995 and have had to take

10  advantage of the option that I give them and my

11  instructions, which is you have the charges sent into --

12  you could have the transcript sent into or you could hear

13  the testimony as it was actually given because we record

14  it all and they actually asked to hear it which, just as

15  an aside is significant to another issue and that is the

16  extent of the care with which the jury gave in its

17  deliberations.  And then finally, there was the verdict.

18          I'm not saying that the defendant shouldn't be

19  present at any of these proceedings but the question

20  really is here assuming I made a mistake, whether it was

21  harmless or not and I don't think his presence -- he, of

22  course, heard the verdict on the phone but I don't think

23  -- and that normally wouldn't be enough.  I think the

24  case -- the Salem case involved the issue of video

25  conferencing on the sentencing wouldn't be enough but it

14

Proceedings

1  more than nothing in terms of the harmlessness of the

2  error.

3         I think in one of your papers, Ms. Hinde

4  suggests that maybe if the jury would have seen him

5  somehow would have caused them to change their verdict.

6  You know, just the fact that looking at a defendant --

7  that may be one of the reasons among others that we want

8  the defendant to be present but I don't believe that it

9  would have caused them to change the verdict.  In fact, I

10  never heard of such a case, at least -- I mean I've heard

11  of one case in which when the jury was polled one juror

12  said it wasn't the verdict.  But I don't believe it's

13  because they looked at the defendant but that's one case

14  and I have been in this court twenty-eight years as a

15  judge and ten years in the United States Attorney's

16  Office.  So that's thirty-eight years and I can't think

17  of one case where that happened and it certainly wouldn't

18  have been this case where I think the evidence was

19  essentially overwhelming.

20         So those are the reasons of -- and the other

21  half of that, of course, is balanced against that is the

22  fact that if I were to grant a new trial, I would have to

23  bring these poor women back to go through the burden and

24  trauma of having to testify again over what I believe is

25  essentially harmless error and one that if I were to

Proceedings

1    resolve the case or if I ever -- it would mean

2    essentially placing -- essentially totally relieving your

3    client of any obligation to assist in the determination

4    of the issue of whether his absence in the courtroom was

5    voluntary.  So, unless the issue of course is assuming I

6    made an error, is whether it was harmless or not.  I

7    believe it was.

8         I should add by the way that I did say -- in

9    regard to what I said before when we were doing this, I

10   believe I did say that if this case had been in a

11   different stage of the proceeding, if it were -- if we

12   were taking evidence, I might not have made the decision

13   to go forward but we were not in the evidence stage.  We

14   were at a stage where I thought the defendant's presence

15   would have added nothing.  The jury had already come in

16   that day.  That is the morning which he had passed out at

17   a gasoline station.  I sent them home.  There was no

18   guarantee that he would be available a second -- the next

19   day.  In fact, he wasn't.

20        As I understand it, it wasn't until the

21   afternoon of June 3rd that he regained a degree of

22   consciousness that was -- that enabled one of the doctors

23   to speak with him and he wasn't discharged from the

24   hospital for seven days thereafter.

25        And I also had a record before me -- I mean I

16

Proceedings

1  didn't just lead to this decision.  I actually held a

2  hearing and spoke to doctors on the telephone and at the

3  very least established that he took an overdose of pills

4  for the second time in the course of this criminal

5  proceeding.

6          Now the harmless error part I've already

7  addressed and I believe that it was harmless beyond a

8  reasonable doubt and the Second Circuit has held in the

9  United States v. DeMott, 513 F.2d 55 58, which is

10  actually cited in the Salem case, that "An error

11  regarding the right to be present is harmless where the

12  defendant's presence would not have affected the

13  outcome."  And in addition to all of the other factors

14  that I have alluded to in terms of not effecting the

15  outcome, I believe the evidence in the case was

16  overwhelming.

17          I know he has said -- Mr. Schneider said -- I

18  believe it was Mr. Schneider, his lawyer, said that or he

19  said, the defendant said, I don't remember which -- Mr.

20  Schneider quoting him or the defendant saying it, that he

21  was very optimistic about the outcome of the case.  You

22  know, defendants may be generally optimistic but

23  realistically, there was no cause for optimism and I

24  would be surprised if Mr. Schneider totally agreed with

25  him.  The record doesn't indicate what Mr. Schneider said

17

Proceedings

1   in response.

2          So we have an overwhelming case; a case that

3   could not in my judgment be won without the defendant

4   taking the stand.  The defendant does not take the stand.

5   There are very sympathetic witnesses who I believe were

6   truthful, sympathetic.  Much of the testimony in terms of

7   how they were induced to come to the United States and to

8   this comparatively rural part of a New York suburb, is

9   all corroborated.

10          So the evidence is overwhelming.  It's

11   inconceivable to me beyond any standard -- by any

12   standard that this result would have been difference had

13   he been present.  So, that leaves us with the question of

14   I believe he had the burden of proof.  I think I said at

15   an earlier proceeding when Dr. Milman testified that I

16   think in the best case scenario, you could argue that

17   from the defendant's stand point is that the evidence is

18   at equipoise.  And I believe if that's true, he loses

19   because I don't believe that the balance is because he

20   bears the burden of proof.  And the party who bears the

21   burden of proof where the evidence is equipoise loses.

22          You're giving me these looks, I don't --

23          MS. HINDE:  No, I --

24          THE COURT:  -- I don't know what they mean and

25   I don't know what you --

18

                              Proceedings

1          MS. HINDE:  I have (indiscernible) this
2    question.
3          THE COURT:  I don't know whether you don't
4    understand what I am saying or whether you disagree with
5    me.
6          MS. HINDE:  Can I ask a question, Judge?
7          THE COURT:  Sure.
8          MS. HINDE:  Just a few -- I mean, I've had a
9    few and I've been bottling them up here.  The first one
10   is, is it the Court's finding that the evidence is in
11   equipoise?  I mean, I just -- you've said that a few
12   times and I am assuming you're saying that because
13   otherwise burden of proof doesn't make any difference
14   according to dicta.
15         THE COURT:  Well it makes a difference in terms
16   of an appellate record.  I could leave it at that or I
17   could make a finding.
18         MS. HINDE:  Well, I would just -- yes, I would
19   like --
20         THE COURT:  I mean I think that he took it
21   deliberately.
22         MS. HINDE:  No, I am sorry, your Honor.  My
23   question is --
24         THE COURT:  He took it deliberately -- you
25   know, I don't find it in equipoise.  I find that it's

19

                    Proceedings

1    more likely than not that he took it deliberately.

2              MS. HINDE:  All right.  Okay.  So no equipoise.

3              THE COURT:  Okay.

4              MS. HINDE:  Your Honor, I don't mean to just be

5    giving looks --

6              THE COURT:  No, that's all right.

7              MS. HINDE:  -- but I was really trying to

8    just --

9              THE COURT:  No, no, I have so much --

10             MS. HINDE:  -- I was trying to hold back.

11             THE COURT:  I have so much respect for you that

12   when I state --

13             MS. HINDE:  Likewise and I don't want to --

14             THE COURT:  -- a principle of law, you make a

15   face at me, I think my God, have I misstated something?

16   If it were Mr. Spector, maybe you know -- he's right

17   occasionally but --

18             MS. HINDE:  Too many times, Judge.

19             Your Honor, procedural forfeiture wise, policy

20   grounds.

21             THE COURT:  No, I was just --

22             MS. HINDE:  What the -- no, I understand.

23             THE COURT:  -- I was just alluding to the --

24             MS. HINDE:  I'm just saying that I think that

25   the --

Proceedings

1    THE COURT:  -- there were a number of reasons

2  why I felt that the one liner in Salem is not dispositive

3  for the issue of who bore the burden of proof.  It was

4  not argued in the case by the parties.  The Court didn't

5  say it -- normally when you talk about burden of proof,

6  it's to resolve an issue where the evidence is in

7  equipoise.  Otherwise, you don't need any discussion of

8  the burden of proof.

9    MS. HINDE:  Exactly.

10    THE COURT:  Right.  And the Court didn't

11  discuss -- didn't say the evidence is in equipoise and

12  because the government bears the burden of proof, the

13  government loses.

14    And finally, I mean this -- you're talking

15  about what precedential weight I should accord to this.

16  The case it cites for the proposition that the government

17  bears the burden of proof in demonstrating by a

18  preponderance of the evidence that the defendant waived

19  its constitutional rights is in fact a Miranda case, not

20  a case --

21    MS. HINDE:  Well, right. Yes, your Honor and

22  that's an important --

23    THE COURT:  -- not a case involving absence

24  from the courtroom and if you read Stone v. California,

25  Justice Kennedy distinguishes those cases and says they

21

Proceedings

1  don't require a result contrary to the holding in Stone.

2          MS. HINDE:  But, your Honor, a Miranda issue

3  and the waiver of constitutional rights has the same

4  underlying significance in the guilt or innocence phase

5  as does a defendant's absence which is equally

6  fundamental.

7          THE COURT:  I know.

8          MS. HINDE:  I mean it's the point --

9          THE COURT:  I don't want to argue it.

10          MS. HINDE:  Okay.

11          THE COURT:  I'm just telling you my reasons.

12  You could argue it to the Court of Appeals.

13          MS. HINDE:  That's why I was putting a cork in

14  it, Judge.

15          THE COURT:  I think that the dispositive case

16  is the Medina case which wasn't cited.

17          MS. HINDE:  Yes, I don't want to --

18          THE COURT:  And the Medina case is really right

19  on point for the reasons I said.  It basically deals with

20  who has the burden of proof in the context of a defendant

21  not being able to be present in the court in a meaningful

22  way.

23          MS. HINDE:  Understood, your Honor, and I

24  respectfully disagree.

25          THE COURT:  Well, okay.  I don't lightly

22

Proceedings

1   disregard Second Circuit cases that I think require me to

2   hold in a particular way but I think that this does not

3   require me to hold in a particular way if only because it

4   was dictum and unnecessary to the outcome of the case.

5   But also true for all the other reasons that I gave.

6           MS. HINDE:  Understood, your Honor.  Your

7   Honor, may I just ask for one small other additional part

8   of this new trial motion and that was the Tortora issues

9   that I don't think we've ever really addressed and I

10  understand that once you get to harmless error, that I

11  suppose that would fall through that trap door, as well.

12          THE COURT:  There's one other thing I didn't

13  address.  Hold -- write down Tortora before I -- there's

14  one other point that I wanted to address.  There's this

15  issue that you've been desperately trying to connect to

16  the absence to the courtroom which I think sort of

17  reflects an understanding on your part of the otherwise

18  harmless nature of the error but you don't have to -- I

19  say you -- I consider you're denying it right now and

20  that's your effort to link it to the fact that it turned

21  out that two or three of the jurors had indicated that

22  they had heard that the defendant attempted to commit

23  suicide.  And I have indicated that that's a separate

24  issue from the issue of his not being permitted to be

25  present in the court.

Proceedings

1          First, if my recollection is correct, the

2    information about the fact that he may have attempted to

3    commit suicide came out on June 1st which was the morning

4    when he didn't show up.  No?

5          MS. HINDE:  Your Honor, I think the jurors

6    delivered notes at the end of the second day.

7          THE COURT:  No, no, that's when they said they

8    heard it.

9          MS. HINDE:  That's what I meant.

10          THE COURT:  No, no, the way it works here,

11    certain things come out in the courtroom on day one.

12    They get reported in the newspaper on day two.

13          MS. HINDE:  Oh.

14          THE COURT:  And that's when the jury starts to

15    hear about it.

16          MS. HINDE:  All right.  I misunderstood.

17          THE COURT:  It may have even come out before I

18    actually said I was going forward.  So what I tried to

19    say on any number of occasions is that it's -- that's why

20    a separate and discrete issue from whether or not I

21    should have gone forward in his absence.  That is, even

22    if I had stopped the trial, the jurors would have still

23    heard and known about the fact that there was an

24    attempted suicide or that --

25          Second, I questioned the jurors and they each

24

Proceedings

1  indicated --

2          MR. CHECKMAN:  Sorry, your Honor.

3          THE COURT:  Would you send my colleagues an

4  e-mail saying your cell phone went off in the courtroom,

5  all of whom assured us that it would never happen.  We

6  let lawyers bring cell phones into the courtroom.

7          MR. CHECKMAN:  I think this call was from the

8  government, your Honor.

9          THE COURT:  I questioned the jurors.  They each

10 indicated that this would not in any way affect their

11 verdict in substance.  I was not asked by the defendant's

12 lawyer to ask any more questions.

13         Now the complaint is that I didn't instruct the

14 jury that he actually didn't intend to commit suicide.

15 Of course, there was no such request for me to give such

16 an instruction and quite frankly, I just don't credit the

17 explanation that you quote on page 32 of your -- I guess

18 I can't read my handwriting now -- one of your briefs of

19 Mr. Schneider saying that well he couldn't have asked for

20 such a thing until he knew that the defendant commit

21 suicide, which is simply not true.  And of course if you

22 believe him, he also thought the defendant was just in a

23 jolly mood when he left the courthouse the night before

24 or optimistic about being acquitted.

25         So, that's my basic view.  That's a separate

25

Proceedings

1   and discrete issue.  I believe it's harmless for many of

2   the same reasons I've just gave and I don't want to

3   repeat them.

4           So now you were going back to talk --

5           MS. HINDE:  I wasn't going to repeat anything.

6           THE COURT:  No, you were -- I just didn't want

7   to leave that issue.

8           MS. HINDE:  No, I didn't mean to interrupt.

9           THE COURT:  So you were on Tortora.

10          MS. HINDE:  I was only interrupting because I

11  was making --

12          THE COURT:  It's okay.

13          MS. HINDE:  -- (indiscernible) motions.

14          THE COURT:  Go ahead.

15          MS. HINDE:  The Tortora is the opportunity to

16  cure an absence, as Nichols said.  I mean that was a case

17  your Honor knows it very well where you gave him lots of

18  opportunities when he's sitting down in the pens and

19  giving him his explanation of what would happen if he

20  didn't come back to the courthouse right then and there

21  and stand trial.

22          And Mr. Yannai did not get that opportunity,

23  although the government did not reach out --

24          THE COURT:  He didn't get the opportunity

25  because he was unconscious.

26

Proceedings

1        MS. HINDE:  Well, but the government --

2        THE COURT:  I mean, you know --

3        MS. HINDE:  -- didn't object to a two day

4    continuance, your Honor.

5        THE COURT:  Well even if I had given a two day

6    continuance, it wouldn't have made any difference because

7    he was not, as I understand the record, he was not

8    competent -- one of his doctors, I forget which one, it

9    may have been the treating physician or the consulting

10   psychiatrist, I believe said he wasn't able to really

11   engage him in conversation until the end of the third day

12   on June 3rd, which would have been the third day and he

13   wasn't released from the hospital or found to be capable

14   of being released from the hospital for another seven

15   days.

16        In the Nichols case, which really involved --

17   the defendant in that case who you're talking about is

18   Howard Pappy Mason, he was here in court and it was one

19   of the earliest cases that I had and my case manager

20   comes in and says to me, "The defendant doesn't want to

21   come out."  I remember thinking to myself, what do I do

22   when a defendant doesn't want to come out?

23        And so we went into the holding pen -- I look

24   over there because in the courtroom that I had in the old

25   building it was to my left, with a court reporter and I

Proceedings

1    said to him, "You know, this is the story.  If you think

2    you could hold up this court, you're mistaken.  I'm going

3    forward whether you are coming out or not."  And I

4    explained to him why I thought it was in his best

5    interest to come out.

6              And I actually thought I persuaded him and I

7    still think the mistake I made was this; instead of

8    stepping back and letting him go first, I went first and

9    then he didn't follow me.  But to complete the story, he

10   made various appearances.  He would decide -- we arranged

11   to have a camera hooked up and he was -- he didn't refuse

12   to come to court.  So, we arranged to have a camera and a

13   closed circuit television where if he wanted to watch, he

14   could watch and if he didn't want to watch, he didn't

15   watch and occasional he came up and if he wasn't pleased

16   by the testimony, he just stood up and walked out.

17             So it's a different kind of case.  I had an

18   opportunity to say to him, hey listen, you think you're

19   going to hold up -- you're going to stop this case from

20   going forward, you're seriously mistaken.

21             But I didn't have that opportunity here and I

22   did weigh what I thought was a imposition on a -- you

23   know, I believe the jury should be treated, not only with

24   respect but with consideration for the disruption that a

25   trial imposes on their lives.  I did not hold trial on

28

Proceedings

1   the day that it occurred and I did take into account what

2   part of the proceeding I was in.  This wasn't -- I would

3   not have done what I had done if this were in the middle

4   of trial and where we were still taking testimony.

5              And quite frankly in retrospect, I am sorry I

6   did what I did, not because I think I made any mistake

7   but because I don't like to create complicated legal

8   issues that could be avoided but eventually, it -- and

9   when it became clear that it was going to be another

10  week, I don't know that I would have held it, even though

11  I had held it for another day or two, whether I would

12  have held it for another seven days, disrupt

13  deliberations, increase a significant period of delay

14  between when the jury heard witnesses and the testimony

15  and, you know, have what essentially amounts to a ten day

16  delay.  And I don't even remember whether the seventh day

17  would have fallen out on a weekend or not and whether it

18  would have even been more than a ten day delay.

19              But hey listen, that's what the Court of

20  Appeals gets paid to do.  So I get paid to sentence and

21  that's what I think we have to do.  So let me get these

22  papers out of the way.

23              (Pause)

24              THE COURT:  All right.  So I deny your motion

25  for a new trial, either in the interest -- certainly in

Proceedings

1    the interest of justice and to the extent that it

2    involves a legal error that would be subject to reversal

3    on appeal which would be another ground for me to grant a

4    new trial, I deny it as well because I don't -- I believe

5    if I made an error, the error was harmless.  I believe

6    that the defendant deliberately has the burden of proof

7    in this case that he has -- that in the light most

8    favorable to him, the evidence is in equipoise, that it's

9    not possible to know one way or another and that

10   therefore he loses because he has the burden of proof and

11   even if the government had the burden of proof, I would

12   still find that his absence was voluntary and deliberate.

13           So, let me get my papers out of the way that

14   deal with this issue.

15           Okay, so now we get to the sentencing part of

16   the proceeding.  So where do we stand now that we have a

17   -- is there one issue that I have to resolve?

18           MR. SPECTOR:  I believe it is the guidelines

19   dispute, your Honor --

20           THE COURT:  I know.

21           MR. SPECTOR:  -- with the cross-reference --

22           THE COURT:  I know but that was the one issue I

23   was referring to. I was just wondering whether there was

24   more that you didn't --

25           MR. SPECTOR:  I'm not aware of any other

30

Proceedings

1  outstanding --

2          THE COURT:  So the issue is the cross-

3  reference.

4          MS. HINDE:  Your Honor, just as a subsidiary

5  issue to the cross-reference issue, because we received a

6  revision to the revised presentence report issued last

7  Wednesday.  On Friday afternoon at about 4:30, indicating

8  that if the cross-reference applies, the government is

9  now proposing an additional four level increase based on

10 the same grounds that are cross-referenced would apply

11 under -- and we object to that also.

12         THE COURT:  Well I think the argument

13 underlying that objection is well-taken.  That there's a

14 degree of double-counting.  I'm told though by my advisor

15 from probation that technically it's not double-counting,

16 even though it is and that -- but I intend to give a

17 sentence outside the guideline range.  I intend to take

18 into account that there is, in fact, this double-counting

19 that you're talking about.  There's something not right

20 with going up from a fourteen to whatever it is based on

21 the fact that there was force and then adding another

22 four points because there was force.  I think that that

23 would be unfair and an unjustified form of double-

24 counting.

25             But I do find that there was force.  I do find,

31

Proceedings

1  I agree with the government's arguments in the memo that

2  it submitted, particularly with respect to I believe it's

3  N.Y.  I don't think the initial general description that

4  she gave about what happened is inconsistent at all with

5  her testimony in court.  Her testimony in court is

6  entirely consistent and I believe that with respect to

7  her for sure, that the government's view of this is

8  correct and that the adjustment on the cross-reference is

9  right.

10       I think it's -- I'm almost certain but it's

11  probable that it's equally true with respect to the --

12  what were the initials --

13       MR. SPECTOR:  B.H.

14       THE COURT:  -- B.H.  So I do make that finding.

15       I looked at it carefully.  In fact, I asked the

16  government to specifically address your arguments because

17  of the effect that it has on the guideline range.  If I

18  am right on the -- and I believe Ms. Hinde is right and I

19  agree with her on the double counting, we're left -- we

20  would have -- if I didn't -- if there was no double-

21  counting -- where is my probation -- that the guideline

22  range would be 151 to 188.

23       MR. SPECTOR:  That's a level 34, criminal

24  history 151 to 188.

25       MS. HINDE:  Um-hum.

32

Proceedings

1      THE COURT:  And if you would like, I mean I

2 will have him put down in detail how he gets there but I

3 don't think there's any real dispute about it.

4      MR. SPECTOR:  It's not necessary from the

5 government's perspective though.

6      THE COURT:  Okay.

7      MS. HINDE:  Are we to understand that that was

8 the --

9      THE COURT:  I'm agreeing -- you win on that

10 point.

11      MS. HINDE:  The revised -- yes, well the

12 revised presentence report contains and if that's the --

13 that's fine.

14      THE COURT:  Right.

15      MS. HINDE:  Well it's not fine but --

16      THE COURT:  I know it's not fine but --

17      MR. CHECKMAN:  Your Honor, there's one other

18 issue that I'm looking at the second revised presentence

19 report on page 31, there's a section in paragraph 168

20 relating to forfeiture.

21      THE COURT:  I thought that that was going to be

22 for another proceeding, forfeiture.

23      MR. SPECTOR:  That --

24      THE COURT:  Am I --

25      MR. SPECTOR:  That's correct.  That's not part

Proceedings

1  of the criminal procedure.

2      THE COURT:  They were going to bring a separate

3  proceeding on the forfeiture.

4      MR. SPECTOR:  We would have to bring a

5  separate --

6      THE COURT:  I mean that's what I understood

7  from my reading a long time ago, I don't -- I assume that

8  it's -- my recollection is correct.

9      MR. CHECKMAN:  Does that get removed from the

10  presentence report or from the second revised presentence

11  report, paragraph 168?

12      THE COURT:  Let me read it to see how

13  prejudicial it is to you.

14      MR. CHECKMAN:  I don't think it's particularly

15  prejudicial, your Honor.  It just states that property

16  that does not belong to my client is forfeited.

17      THE COURT:  It doesn't say -- it says that's a

18  potential penalty.  This is under the section -- it's

19  after the sentence, after the supervised release, after

20  the restitution and it says forfeiture and then fines.  I

21  mean, look, you want to take it out, we could take it

22  out?  I don't -- I am not going to have him prepare a new

23  probation report over this.

24      MS. HINDE:  There's been so many.

25      THE COURT:  Yes.  Okay?  So I am ready to hear

34

Proceedings

1  you.

2          Mr. Yannai, have you had an opportunity to read

3  the presentence report?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Okay.

6          MR. CHECKMAN:  Your Honor, if the Court

7  pleases, the Court is far more familiar with the facts

8  and circumstances from the very beginning of this case

9  than even counsel is, though I've had an opportunity to

10  read everything.

11          And from what I could see, your Honor, this

12  case started with an arrest and prosecution in

13  Westchester County by Ms. Stone and her office, whereby

14  at one point in time the Westchester County District

15  Attorney's office was seeking a sentence of probation.

16          We now are left with a presentence report, your

17  Honor, indicating a guideline level of 151 to 188 months.

18  What I suggest to the Court is this.  That guideline

19  sentence makes little sense in this particular case, your

20  Honor.  It way overstates the gravity of the crimes for

21  which Mr. Yannai was convicted and in many respects, your

22  Honor, it amounts to a life sentence for the conduct for

23  which he was convicted which was sexual abuse in the

24  third degree, a misdemeanor under New York State Law.

25          To me that makes no sense.  It makes no sense

Proceedings

1    on a variety of levels.  Mr. Yannai has spent just shy of

2    three years incarcerated in this case at the Metropolitan

3    Detention Center, a maximum security prison.  Over that

4    period of time, his health has deteriorated as are many

5    people who are housed in the Metropolitan Detention

6    Center but what we have here is an individual who is over

7    sixty-nine years of age, in poor health.

8              In my initial sentencing memorandum, your

9    Honor, I pointed out the -- and I am not even going to

10   bother to read them into the record now because they're

11   all over the record.  He has chronic diseases.  The

12   government has made a large deal out of the fact that

13   they don't believe he has cooperated in the tender care

14   and medical treatment from the MDC.

15             But notwithstanding that, your Honor, it is

16   clear that Mr. Yannai has several physical deficits which

17   will only get worse.  The question now becomes what is

18   the appropriate sentence that recognizes both punishment

19   and protects the public?  Well, the punishment level for

20   a sixty-nine year old who has now spent the last three

21   years in jail away from his wife, that's a severe

22   punishment.

23             But what we have here is a situation where Mr.

24   Yannai is being -- could be held in jail for the rest of

25   his life.  As his condition worsens, he will require, he

Proceedings

1   will require more and more treatment. He will require

2   correction officers to be able to take him to and from

3   medical facilities.

4           We will be spending thousands and tens of

5   thousands actually hundreds of thousands of dollars to

6   incarcerate him for the rest of his life, as the

7   government would have it and as the probation department

8   comes -- as the guidelines would have it.  That makes no

9   sense.

10          This Court can protect the public and ensure

11  that Mr. Yannai is in no position to commit any crimes,

12  even similar to these crimes through a sentence that

13  involves home confinement, strict supervision by the

14  probation department.  A sensible restrictions on his use

15  of the computer of his use of e-mail based upon

16  regulation through the probation service.  All of this

17  can basically prevent this crime from ever happening

18  again.

19          So then the question is, do we warehouse Mr.

20  Yannai for the rest of his life in a federal prison at

21  incredible cost to the public for committing the crimes

22  of sexual abuse in the third degree, a misdemeanor under

23  New York State Law or do we decide at this particular

24  point in time that enough is enough, that we do not need

25  to put yet another person in jail for too long a period

Proceedings

1    of time.  And if sounds like I'm paraphrasing,

2    your Honor, I'm paraphrasing Eric Holder, Mr. Spector's

3    boss.  Far too many people are spending far too much time

4    in our prisons at great expense with no public purpose

5    whatsoever.  And I suggest to your Honor that putting Mr.

6    Yannai in jail for an additional period of time makes

7    little sense at all under the circumstances, your Honor.

8           I've asked in my sentence memorandum for this

9    Court to do what I believe is the proper thing; sentence

10   him to time served.  Sentencing him to supervision under

11   the restrictions of this Court and the supervision of the

12   probation service in such a way that crimes such as the

13   ones he was convicted of can never ben committed again.

14          MR. SPECTOR:  Judge, the defendant has left a

15   wake of victims who suffered immensely at the time and

16   who are still suffering today.  You see that again and

17   again in the victim impact statements.  This is not a

18   case where it's a one-time event, a one-time mistake.

19   This went on for years.  It's really no exaggeration to

20   say in many ways this crime was the defendant's life's

21   work.  And it would still be going on if the police

22   hadn't fortuitously intervened in 2009.  It would still

23   be happening today.

24          You know there have been hundreds of pages

25   submitted to the Court since the trial, both by counsel

38

Proceedings

1   and by the defendant acting pro se.  In all of those

2   pages there's not one hint of sympathy for the victims

3   from the defendant.  No acknowledgment whatsoever of any

4   wrongdoing.  What we see from the defendant is a total

5   lack of remorse.

6           And, you know, I suppose that's not surprising

7   because of the record before the Court shows that the

8   defendant exhibits what I think can only be described as

9   a sociopathic level of selfish arrogance.  We've seen

10  that in the way he treated his victims.  We've seen that

11  in the way he approached the Court process.  We saw that

12  most dramatically in the second overdose.  He

13  purposefully ingests an overdose of benzodiazepine and

14  then gets in the car and drives for two hours on the

15  highway during rush hour.  It's really maybe the most

16  fortunate thing about this case that he passed out when

17  he did.

18          THE COURT:  Well we don't even know that that's

19  what happened.  He could have conceivably taken the

20  pills, stopped at the gas -- stopped at the service

21  station and taken the pills then and there.

22          MR. SPECTOR:  Well, Judge, we know he took an

23  overdose --

24          THE COURT:  We know.

25          MR. SPECTOR:  -- and he was in the car.

Proceedings

1          THE COURT:  I know.  I'm just saying that this

2     is the one -- it's one possibility if he took it earlier,

3     then he was not only endangering his own life but he

4     could have killed a lot of people in the process.

5          MR. SPECTOR:  Absolutely.  And I think when you

6     look at the kind of mind set, and this has gone on for so

7     long where you have someone who has really a righteous

8     belief in his prerogative to do whatever he wants

9     regardless of the consequences to others; you have to

10    have a concern that this type of conduct, however it

11    manifests itself again will continue.

12          And, you know, just one episode that I think is

13    helpful in understanding the mind set of the defendant --

14    we talked about this during the bail litigation, after he

15    was charged in state court, after he had been publicly

16    charged with a crime, he went and approached that woman

17    who worked at the dry cleaner to try to get him to come

18    work at his home.

19          THE COURT:  All right.

20          MR. SPECTOR:  I'm sorry?

21          MS. JAGER:  It was her -- you said him.

22          MR. SPECTOR:  Oh, him.  Yes.  And so that again

23    shows you the mind set that we're dealing with.  He's

24    undeterrable, regardless of the circumstances.

25          THE COURT:  Well what about age and health?

40

Proceedings

1    I'm not giving him time served.  So we're talking about

2    -- I mean I regard that suggestion as ridiculous.  But

3    when we're dealing with a question of age and health that

4    may be disabling as well in terms of the commission of

5    other crimes, depending on how long I sentence him to.

6              MR. SPECTOR:  Well I think there are a couple

7    of points with respect to that.  Number one, as we've

8    seen, much of the criminal activity actually did not

9    involve use of force.  He was able to create an

10   atmosphere through psychological coercion, through

11   financial coercion, which he would still be able to do.

12   And even with Internet monitoring, unfortunately it's not

13   a perfect system, particularly with all sorts of iPhones

14   and handheld devices and who knows what will be available

15   in a few years.  The problem is the mind set that he will

16   get around whatever restrictions are in place, physical

17   or legal, to do whatever he wants to do.  This is never

18   going to go away.

19              And at the end of the day, Judge, really the

20   sentencing from our perspective is about the victims

21   because they all still live with the fear today and every

22   day in jail that the defendant spends is a day of

23   reprieve for the victims, that they don't have to fear

24   him.

25              THE COURT:  Well, I am not -- I don't know why

41

Proceedings

1  these victims would continue to fear him.  You said

2  yourself in most of these cases, force was not used. He

3  had a little trouble getting these women to come to his

4  -- to fall for his, you know, scheme.  I don't know why

5  they would continue to live in fear.  I could understand

6  the argument that they might take some comfort from the

7  fact that the person who perpetrated these acts has been

8  punished.  And that punishment is certainly  factor to be

9  taken into account at sentencing but I don't quite

10 understand why they would still be in fear of him.

11         MR. SPECTOR:  Judge, if you recall the

12 testimony, the defendant exerted a total control over

13 their lives.

14         THE COURT:  But that was because -- look,

15 you're putting me in almost the position of trying to

16 defend him; he was able to exercise total control over

17 their lives because of the circumstances because he

18 essentially under false pretenses, he lures them into

19 this -- his house in Pound Ridge, a relatively rural

20 area.  They have no money.  They're in a strange country.

21 He makes them offer essentially that they can't refuse.

22 They could live in his house and pick up all their

23 expenses and at the end of the year, he'll give them

24 $20,000 or they could live outside the house and they

25 could pick up their own expenses.

42

Proceedings

1       So this whole arrangement -- and then they find

2  themselves because they take the offer of living in his

3  house and they found themselves in what I would say for

4  lack of a better word is almost psychologically enslaved

5  by the circumstances.  So I mean this is not likely to

6  repeat itself with respect to those women.

7           MS. STONE:  Your Honor, if I may?  I think

8  what's important to remember is the ongoing nature of the

9  trauma that these victims continue to suffer because of

10  that psychological abuse.   This defendant knew

11  everything about these women and these victims that he

12  targeted.  He knows where they live.  He knew where they

13  worked.  He knew their family members.  And that is part

14  of the psychological control that he exerted over them.

15  And they've described, I think quite eloquently --

16           THE COURT:  Oh, I don't -- again, I think what

17  he did was awful and I don't think it has to be

18  exaggerated but in the end, however long it may have

19  taken them, a week, two weeks, three weeks, they decided

20  to leave.  So -- and even drove -- you know, the trial is

21  already three years ago or two and a half years ago, he

22  drove some of them to the station.  So we're not dealing

23  with they were in extremely difficult circumstances.  I

24  think they were again, as I say psychologically enslaved.

25  It took a while for them to get up the energy and the

43

Proceedings

1   strength to say I am not going to do this anymore.

2          But I think the notion that they're still

3   afraid of him is a little bit more than what I could

4   accept.

5          MR. SPECTOR:  I understand, Judge.  I think the

6   point is from the perspective of the victims --

7          THE COURT:  I think from the perspective of the

8   victims and I think it's an important perspective, is

9   that they should feel that a just punishment was imposed.

10  And that in that sense, one of the critical elements that

11  should be taken into account is that it should go into a

12  reasonable sentences punishment.

13         MR. SPECTOR:  And from our perspective, that

14  reasonable sentience is the guideline range of

15  (indiscernible).

16         THE COURT:  Okay.  Do you have anything to add?

17         MR. CHECKMAN:  Just a little -- very, very

18  briefly, your Honor.  Since the Court has indicated that

19  a time served sentence is not something that the Court

20  will impose even though I wasn't being facetious when I

21  made the application, your Honor, and --

22         THE COURT:  I don't think you were being

23  facetious.  You were being a lawyer.  You were making the

24  best arguments.  Look, it's not -- there are articles

25  that suggest that -- you know, with some of these

44

Proceedings

1    Draconian sentences that are imposed, particularly in

2    drug cases, you know, federal prison is going to become

3    geriatric homes and the government being burdened with

4    dealing with sick old people.  So you know --

5           MR. CHECKMAN:  No.

6           THE COURT:  -- I understand the point but

7    that's not -- you know, it doesn't drive -- it has some,

8    I suspect -- some merit to be taken into account but I

9    don't think it's -- I'm not overwhelmed, at least in the

10   context of this case.

11          You know he wasn't -- it wasn't as if he was

12   young, and vigorous and healthy when he committed these

13   crimes.

14          MR. CHECKMAN:  But he's much -- he's less

15   young, less healthy --

16          THE COURT:  It's three years --

17          MR. CHECKMAN:  -- less vigorous.

18          THE COURT:  He's three years older.  He is

19   suffering essentially from what I could tell, most of the

20   same illnesses; chronic -- I don't want to go through it

21   but he's being medicated.  He's taking statins for his

22   coronary condition and pills or diabetes.

23          Look, all of these -- I don't doubt that all of

24   these are eventually degenerative conditions and they'll

25   ultimately result in his death.

45

Proceedings

1          MR. CHECKMAN:  What I am asking the Court to do

2    at this point is to in rendering the sentence, first of

3    all, I am going to ask the Court to recommend that Mr.

4    Yannai be incarcerated in Otisville.  The reason I am

5    asking for that is because it's about the closest prison

6    for him to be visited by his wife who has visited him

7    from my knowledge, your Honor, every single Wednesday

8    since he has been incarcerated and not missed a day.

9    It's important to him.  It's important to her.  And I

10   think it is not an unreasonable request.

11          And finally, your Honor, I would just ask the

12   Court to listen to the strictures of the sentencing

13   statute.  The phrase that says that the sentence to be

14   imposed should be sufficient to meet the requirements and

15   the aims of the sentencing statute but not greater than

16   necessary.

17          THE COURT:  Well, that's a great generality

18   that's never given me any comfort or guidance.

19          MR. SPECTOR:  Judge, excuse me.

20          MR. CHECKMAN:  I gave you a specific, Judge.

21          MR. SPECTOR:  I just think you need to ensure

22   that the defendant has a right to speak to the Court.

23          THE COURT:  I haven't forgotten. Do you wish to

24   speak, Mr. Yannai?  You could come up if you want or you

25   could stay where you're seated.

46

Proceedings

1          THE DEFENDANT:  I don't wish to speak.

2          THE COURT:  Okay.  I'm just going to take a

3     five minute recess.

4          MR. CHECKMAN:  Your Honor, one thing I would

5     like to tell the Court is that I have advised Mr. Yannai,

6     though we are mindful of the fact that he has the right

7     to speak before this Court and based upon the fact that

8     he has an upcoming appeal in this particular case, and I

9     have advised him that he should not speak at this point,

10    your Honor.

11         THE COURT:  I really don't quite understand

12    that.  I don't see how it prejudices his appeal.  His

13    appeal, I don't believe is going to be of the sufficiency

14    of the evidence.  It's going to be on the grounds that,

15    you know, were very well argued as always, in the papers

16    that Ms. Hinde has filed.  And I don't see how any of

17    those grounds that have nothing to do with guilt or

18    innocence, the sufficiency of the evidence --

19         MR. CHECKMAN:  I understand what the Court's

20    point is.

21         THE COURT:  -- have --

22         MR. CHECKMAN:  But I have had discussions with

23    my client, your Honor, over various aspects of an appeal

24    that will be filed and it was my judgment, your Honor,

25    that he can't -- that at this point in time, he could not

47

Proceedings

1    add to the proceedings.

2          THE COURT:  I suppose depending on what he

3    would say you might be right.  Okay.

4          (Off the record)

5          THE COURT: I'm going to sentence the defendant

6    to the custody of the attorney general for 132 months.

7    I'm going to impose concurrent -- to run concurrently on

8    each count.  On Count Four and Six, I sentence the

9    defendant to the custody of the attorney general for a

10   period of five years, concurrent on each count and

11   concurrent on all the other counts.  On Count Five, I

12   sentence the defendant to the custody of the attorney

13   general for a period of ten years, concurrent to all the

14   other counts.  On Count Six, I sentence the defendant to

15   six months sentence concurrent to all the other

16   sentences.  And I impose a period of three years

17   supervised release with a special condition that the

18   defendant be subject to computer monitoring as directed

19   by the probation department.  That defendant not have any

20   contact with the victims.  This means that he shall not

21   have or attempt to meet in person, communicate by letter,

22   telephone, e-mail, the Internet, or through a third-party

23   without the knowledge and permission of the probation

24   department.  The defendant shall submit his personal

25   residence, place of business, vehicle or any other

Proceedings

1   premises under his control to a search on the basis that

2   the probation department has a reasonable belief that

3   contraband or evidence or a violation of conditions of

4   release may be found.  The search must also be conducted

5   in a reasonable manner and at a reasonable time and the

6   failure to submit such a search may be grounds for

7   revocation and the defendant shall inform any other

8   resident that the premises may be subject to search

9   pursuant to the condition.

10          The defendant shall not possess a firearm,

11   ammunition or destructive device and the defendant shall

12   comply with sex offender registration requirements that

13   are mandated by law.  And I impose a $610 special

14   assessment.

15          I have imposed a sentence under Section

16   3553(a).  I believe that the defendant -- for the

17   offenses that the defendant committed were just, as I've

18   indicated, were just terrible not only in terms of the

19   impact that -- not only in terms of the sexual contact

20   and abuse of the victims but also because of the

21   circumstances under which they occurred.

22          They were falsely lured into a situation under

23   which they were essentially, under psychological

24   compulsion.  They were psychological prisoners and alone

25   in a strange country with little money and no friends and

Proceedings

1    being subject to the conduct of the defendant that we've

2    already discussed and gone through.  I've taken into

3    account, of course, the sentencing guidelines which are

4    higher than the sentence that I've imposed.  The only

5    mitigating factor here and I believe that the sentence

6    that I've imposed is under the circumstances sufficient

7    to carry out what I think is the most important part of

8    the sentence in this case; that is punishment.

9         To the extent that I have not -- that I have

10   given the sentence less than what the guidelines would

11   other require, the only mitigating circumstance here is

12   his health and his age.  And in my view, they justify

13   some adjustment of the sentence.

14        (Pause)

15        THE COURT:  Paula said that I misspoke in some

16   of the count numbers.  So, just to make sure that it's

17   correct: on Count One through Three, fifteen years to the

18   custody of the attorney general to run -- not fifteen

19   years, I'm sorry -- 132 months, to run concurrently with

20   each other.

21        On Counts Four and Six, five years in the

22   custody of the attorney general to run concurrent with

23   each other and all the other counts.  On Count Five, ten

24   years in the custody of the attorney general, concurrent

25   with all other counts.  And Count Seven, six month

50

Proceedings

1    custody of the attorney general to run concurrent with

2    all the other counts and the period of supervised release

3    is three years.

4           THE CLERK:  Thank you, Judge.

5           MR. CHECKMAN:  Your Honor?

6           THE CLERK:  One moment.  Disposition of any

7    remaining counts or underlying indictments?

8           THE COURT:  There are none.

9           MR. SPECTOR:  I think there was an underlying

10   indictment which will be dismissed.

11          THE COURT:  It's dismissed.

12          MR. CHECKMAN:  Can I ask the Court to recommend

13   that -- to the Bureau of Prisons that Mr. Yannai be

14   incarcerated in Otisville?

15          THE COURT:  You can and I will but you should

16   be aware that in terms of his physical condition, he

17   might not get the most optimum -- that Otisville may not

18   be the most optimum place for him to be.  That he would

19   be better off in a facility that provides medical care.

20   I seen one of them -- I'm not suggesting that's the one

21   but for example, I visited the federal facility in Fort

22   Worth, Texas which is a combination.  It's sort of a

23   prison hospital and a prison.  Not everybody is sick but

24   they have the ability to take care of people who have

25   physical conditions.

Proceedings

1        So I'll recommend Otisville if that's what he

2   wants but it's a place that's not necessarily --

3        MR. CHECKMAN:  Well that is what he wants, your

4   Honor, and the idea is so that he can get -- to increase

5   the opportunity for visitation of his wife which is very

6   important to him.

7        THE COURT:  I'll recommend it.

8        MR. CHECKMAN:  Your Honor, I have one other

9   issue, I believe before the Court.  In my letter of

10  September 16th, I asked the Court to direct the

11  government to return the -- to do whatever the government

12  has to do to release the funds that I believe are being

13  held by the clerk of the court as security for his bail;

14  $67,000.

15       The government has resisted this, saying that

16  they can hold onto the money.  It's the defendant's money

17  for payment of a variety of other things including

18  restitution, and the $610 special assessment.  But having

19  reviewed the government's submission and the presentence

20  report, the grand total if we add the $610,000 (sic) --

21       THE COURT:  $610.

22       MR. CHECKMAN:  -- to the $6,762.25 --

23       THE COURT:  $610.

24       MR. CHECKMAN:  -- there's like $7,372, seems to

25  me that you cannot -- even if the money was his, you

52

Proceedings

1  shouldn't be able to hold $67,000.  Putting that aside,

2  your Honor, the money wasn't his.  In fact, I don't think

3  that they would have secured his release if he was

4  putting up his own money.  I think that the Court had its

5  concerns about whether Mr. Yannai would show up in court.

6  I think that there was a tremendous amount of bail

7  litigation in this case and that they wanted some further

8  assurance that the defendant would show up in the

9  courtroom when he was supposed to and therefore, his wife

10 would come up with her money and he would be less likely

11 to disappoint her by taking her $67,000.  I mean, that's

12 the normal course of affairs.

13          As the cases are -- the case I've cited to the

14 Court, United States v. Powell, 639 F.2d. 224 at page 225

15 said "The purpose of bail is to secure the presence of

16 the defendant.  Its object is not to enrich the

17 government or punish the defendant.  Like any other

18 contract, a bail bond should be construed to give effect

19 to the reasonable intentions of the parties with the

20 understanding that the construction should be in favor of

21 the surety who may not be held liable for greater

22 undertaking than agreed to."

23          And I believe that Elena Fussilo deposited her

24 $67,000 to secure her husband's release.  That was the

25 intentions of the parties at the time and she should not

53

Proceedings

1   at this point in time forfeit her money and her interest

2   in her money.

3           As for the government's contention that this

4   marital property, your Honor, this is not as I've pointed

5   out in my letter, a community property state.  Therefore,

6   any decision as to whose money is whom would be at the

7   dissolution of marriage at the time where the parties

8   would settle and a court of jurisdiction would then

9   determine this is yours and this is yours.

10          So right now, there's no reason to believe that

11  the money belongs to anyone else other than Elena Fusillo

12  because for well over four years the defendant hasn't

13  worked and hasn't earned a dime as the government pointed

14  out time and time again.

15          So this was her money that she put up to secure

16  her husband.  It doesn't belong to him.  She earned it

17  from her job and it should be returned to her.

18          MR. SPECTOR:  Judge, first of all, I don't know

19  how he can possibly say it's solely her money.  They've

20  been married for 23 years.  As I understand the marital

21  law, the only way it would be her money separate from the

22  marital property is if she had earned it before the

23  marriage, which I don't think is the contention.

24          THE COURT:  I'm not -- you know, first of all

25  you may be confusing divorce law from other kinds of law

54

Proceedings

1   and also community property which is different in a

2   state, for example, like California but I think what

3   you're getting at is how the assets of the two of them

4   might be divided in the event of a divorce which is what

5   I am not dealing with here and short of that, it's her

6   money.

7             MR. SPECTOR:  Well if I can speak to that, we

8   have no evidence of that.  We have an assertion by the

9   defense which presumably is coming from either the

10  defendant or his wife, that it came from an account in

11  her name.  We've seen nothing.  The cash was just posted

12  at the time of the bail.

13            THE COURT:  By whom?

14            MR. SPECTOR:  By her.  But it could easily have

15  been from an account in his name.  We don't know where

16  the money came from.  So at a minimum, if the ruling is

17  that you know, if the account was in her name, it's her

18  money.  We would like to see a paper trail showing that

19  that's what happened.

20            THE COURT:  Well, she put up the money and she

21  wants it back.

22            MR. SPECTOR:  But, Judge, respectfully it could

23  have been a joint account.

24            THE COURT:  Could I ask you --

25            MR. CHECKMAN:  It wasn't a joint account.  So

55

Proceedings

1  if you don't believe it's a joint account based upon my

2  say so and based upon her say so, then prove it's not a

3  joint account.  You've got subpoena power.

4          THE COURT:  Who -- he is saying it is a joint

5  account.

6          MR. CHECKMAN:  It's not a joint account.  The

7  money came from her personal account.  She's the only

8  signatory on the account.

9          THE COURT:  He says, show him the book -- show

10  him the bank book.  If you have any objection, we don't

11  have to -- there's no such thing anymore but you know

12  what I mean and we don't have to argue about.  Other than

13  that, you can write a memo on who has the burden of proof

14  over that $7,000.

15          MR. SPECTOR:  Judge, there's a separate matter

16  and that is the imposition of restitution which I believe

17  should be imposed regardless of whether this money goes

18  to him.

19          THE COURT:  It's a small -- a relatively small

20  amount.  I don't remember.  It's not -- the amount is in

21  the paragraph in the presentence report and I don't think

22  it --

23          MR. SPECTOR:  It's paragraph 167.

24          THE COURT:  -- I don't think it's --

25          MR. CHECKMAN:  $6,762.25 of restitution,

56

Proceedings

1  your Honor.

2          THE COURT:  But the question is his ability to

3  pay restitution in terms of my making -- you know,

4  getting into an argument over whose money is what.  How

5  much did you say it is?

6          MR. SPECTOR:  It's $6,762.25.

7          THE COURT:  Look, he says he has no money.  I

8  assume --

9          MR. CHECKMAN:  He has no money, your Honor.

10  Sometimes he -- they have -- the Bureau of Prisons

11  imposes upon defendants some financial responsibility and

12  therefore, if he was working, they would deduct a certain

13  amount of that money to be put away towards it.  They do

14  it with a special assessment all the time as well,

15  your Honor.

16          THE COURT:  Well, if I operate under the

17  assumption he has no money now, then I may have to impose

18  this but I have to do it under a reasonable payment

19  schedule.  What I normally do is in these cases where

20  restitution has to be imposed and the defendant has no

21  assets is I say in the amount of, you know, fifteen

22  percent of their net income after they're released, since

23  he has no income while he's in jail.

24          THE COURT:  All right.  And from what I

25  understand, there's lawsuits pending against him which

57

Proceedings

1   are waiting to be collected, if he has any to be

2   collected.

3           So I will impose restitution in the amount of

4   $762.25 (sic).

5           MR. SPECTOR:  Judge, excuse me.  I think you've

6   misspoken.  Is it $6,762.25?

7           THE COURT:  That's what I thought I said.

8           THE CLERK:  No.

9           THE COURT:  I didn't?

10          THE CLERK:  No, you forgot the $6,000 portion.

11          THE COURT:  I can't be trusted with numbers.

12  $6,762.25 to be paid at ten percent of his net income

13  after he's released.

14          MR. SPECTOR:  Judge, there are specific amounts

15  we've worked out for each victim.  I can prepare a form

16  order for the Court.

17          THE COURT:  Okay.  I assume you're filing a

18  notice of appeal.  You have a right to appeal.

19          Do you understand that?

20          THE DEFENDANT:  (Indiscernible)

21          THE CLERK:  Thank you, counsel.

22          MR. CHECKMAN:  Thank you.

23          MR. SPECTOR:  Thank you.

24                  (Matter concluded)

25                      -o0o-

58

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **27th** day of **October**, 2013.

*Linda Ferrara*
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.